1  WALTER A. HERRING, ESQ.
   Texas State Bar No. 09535300
2  NORLYNN B. PRICE, ESQ.
   Texas State Bar No. 02499050
3  Each admitted *pro hac vice*
   Fulbright & Jaworski L.L.P.
4  2200 Ross Avenue, Suite 2800
   Dallas, Texas 75201
5  Telephone:  (214) 855-8000
   Facsimile:  (214) 855-8200
6  Email:  wherring@fulbright.com
             nprice@fulbright.com
7
   STANLEY W. PARRY, ESQ.
8  Nevada Bar No. 1417
   Ballard Spahr Andrews & Ingersoll, LLP
9  300 South Fourth Street, Suite 1201
   Las Vegas, Nevada  89101
10 Telephone: (702) 471-7000
   Facsimile: (702) 471-7070
11 Email:  ParryS@ballardspahr.com

12 Attorneys for all Plaintiff LLCs [with the exception of
   Hesperia Lenders, LLC]
13
   JANET L. CHUBB, ESQ.
14 Nevada State Bar No. 176
   JONES VARGAS
15 P.O. Box 281
   Reno, NV 89504-0281
16 Telephone:  (775) 786-5000
   Facsimile:  (775) 786-1177
17 Email:  jlc@jonesvargas.com
             tbw@jonesvargas.com
18
   Attorneys for Mojave Canyon, Inc., Charles B. Anderson
19 Trust, Rita P. Anderson Trust, Baltes Company, Robert J.
   Kehl and Ruth Ann Kehl, Daniel J. Kehl, Kehl
20 Development Corporation, Kevin A. Kehl, Kevin Kehl as
   Guardian of Susan L. Kehl, Kevin Kehl as Guardian of
21 Andrew Kehl, Robert  A. Kehl and Tina M. Kehl, Krystina
   L. Kehl, Christina M. Kehl, Warren Hoffman Family
22 Investments, LP, Judy A. Bonnet, Kevin McKee, Patrick J.
   Anglin, and Cynthia Winter
23
   ALAN R. SMITH, ESQ.
24 KEVIN DARBY, ESQ.
   Nevada Bar No. 1449
25 Law Offices of Alan R. Smith
   505 Ridge Street
26 Reno, Nevada  89501
   Telephone: (775) 786-4579
27 Facsimile: (775) 786-3066
   Email: mail@asmithlaw.com
28 Attorneys for Hesperia Lenders, LLC

| | |
|---|---|
| 1 | **UNITED STATES DISTRICT COURT** |
| 2 | **DISTRICT OF NEVADA** |
| 3 | |
| | —00O00— |
| 4 | |

| | | |
|---|---|---|
| 5 | 3685 SAN FERNANDO LENDERS, LLC, a Nevada limited liability company, 5055 | **Case No.  2:07-CV-892-RCJ-GWF-BASE** |
| 6 | COLLWOOD LENDERS, LLC, a Nevada limited liability company, 6425 GESS | **AND** |
| 7 | LENDERS, LLC, a Nevada limited liability company, 60th STREET VENTURES | |
| 8 | LENDERS, LLC, a Nevada limited liability company, AMESBURY HATTERS PT | **Case No. 3:07-CV-241-RCJ-GWF** |
| 9 | LENDERS, LLC, a Nevada limited liability company, ANCHOR B LENDERS, LLC, a | **SECOND AMENDED COMPLAINT** |
| 10 | Nevada limited liability company, BAR-USA LENDERS, LLC, a Nevada limited liability | **FOR DECLARATORY RELIEF AND DAMAGES** |
| 11 | company, BAY POMPANO LENDERS, LLC, a Nevada limited liability company, | |
| 12 | BINFORD LENDERS, LLC, a Nevada limited liability company, BROOKMERE LENDERS, | **JURY DEMAND** |
| 13 | LLC, a Nevada limited liability company, BUNDY CANYON 2.5 LENDERS, LLC, a | |
| 14 | Nevada limited liability company, BUNDY CANYON 5.0 LENDERS, LLC, a Nevada | |
| 15 | limited liability company, BUNDY CANYON 5.725 LENDERS, LLC, a Nevada limited | |
| 16 | liability company, BUNDY CANYON 7.5 LENDERS, LLC, a Nevada limited liability | |
| 17 | company, CABERNET LENDERS, LLC, a Nevada limited liability company, CASTAIC | |
| 18 | II LENDERS, LLC, a Nevada limited liability company, CASTAIC III LENDERS, LLC, a | |
| 19 | Nevada limited liability company, CHARLEVOIX LENDERS, LLC, a Nevada | |
| 20 | limited liability company, CLEAR CREEK PLANTATION LENDERS, LLC, a Nevada | |
| 21 | limited liability company, COM VEST LENDERS, LLC, a Nevada limited liability | |
| 22 | company, COPPER SAGE II LENDERS, LLC, a Nevada limited liability company, | |
| 23 | CORNMAN TOLTEC LENDERS, LLC, a Nevada limited liability company, DEL | |
| 24 | VALLE LIVINGSTON LENDERS, LLC, a Nevada limited liability company, EAGLE | |
| 25 | MEADOWS LENDERS, LLC, a Nevada limited liability company, FIESTA | |
| 26 | MURIETTA LENDERS, LLC, a Nevada limited liability company, FIESTA USA | |
| 27 | STONERIDGE LENDERS, LLC, a Nevada limited liability company, FOX HILLS 216 | |
| 28 | LENDERS, LLC, a Nevada limited liability | |

company, GRAMERCY COURT LENDERS, LLC, a Nevada limited liability company, HARBOR GEORGETOWN LENDERS, LLC, a Nevada limited liability company, HESPERIA LENDERS, LLC, a Nevada limited liability company, HFA CLEARLAKE I LENDERS, LLC, a Nevada limited liability company, HFA CLEARLAKE II LENDERS, LLC, a Nevada limited liability company, HUNTSVILLE LENDERS, LLC, a Nevada limited liability company, LA HACIENDA LENDERS, LLC, a Nevada limited liability company, LAKE HELEN PARTNERS LENDERS, LLC, a Nevada limited liability company, LERIN HILLS LENDERS, LLC, a Nevada limited liability company, MARGARITA ANNEX LENDERS, LLC, a Nevada limited liability company, MARLTON SQUARE I LENDERS, LLC, a Nevada limited liability company, MARLTON SQUARE II LENDERS, LLC, a Nevada limited liability company, MOUNTAIN HOUSE-PEGS LENDERS, LLC, a Nevada limited liability company, OAK SHORES II LENDERS, LLC, a Nevada limited liability company, OCEAN ATLANTIC 2.75 LENDERS, LLC, a Nevada limited liability company, OCEAN ATLANTIC 9.425 LENDERS, LLC, a Nevada limited liability company, PALM HARBOR I LENDERS, LLC, a Nevada limited liability company, SHAMROCK TOWER LENDERS, LLC, a Nevada limited liability company, SO CAL LAND LENDERS, LLC, a Nevada limited liability company, STANDARD PROPERTY HOLDINGS, LLC, a Nevada limited liability company, TAPIA RANCH LENDERS, LLC, a Nevada limited liability company, TEN NINETY 4.15 LENDERS, LLC, a Nevada limited liability company, THE GARDENS 2.425 LENDERS, LLC, a Nevada limited liability company, THE GARDENS TSHR LENDERS, LLC, a Nevada limited liability company, CHARLES B. ANDERSON TRUST, created in Michigan, RITA P. ANDERSON TRUST, created in Michigan, BALTES COMPANY, incorporated in Michigan, KEHL DEVELOPMENT CORPORATION, incorporated in Iowa, MOJAVE CANYON INC., incorporated in Nevada, WARREN HOFFMAN FAMILY INVESTMENTS, LP, a limited partnership formed in Iowa, PATRICK J. ANGLIN, an individual resident of Illinois; JUDY A. BONNET, an individual resident of Illinois,

1    CHRISTINA M. KEHL, an individual resident
     of Illinois, DANIEL J. KEHL, an individual
2    resident of Iowa, KEVIN A. KEHL, an
     individual resident of Iowa, KEVIN KEHL AS
3    GUARDIAN OF ANDREW KEHL, an
     individual resident of Iowa, KEVIN KEHL AS
4    GUARDIAN OF SUSAN L. KEHL, an
     individual resident of Iowa, KRYSTINA L.
5    KEHL, an individual resident of Illinois,
     ROBERT A. KEHL & TINA M. KEHL,
6    individual residents of Illinois, ROBERT J.
     KEHL & RUTH ANN KEHL, individual
7    residents of Nevada, KEVIN MCKEE, an
     individual resident of Iowa, CYNTHIA
8    WINTER, an individual resident of Iowa

9              Plaintiffs,

10   v.

11   COMPASS USA SPE, LLC, a Delaware
     limited liability company, COMPASS
12   PARTNERS, LLC, a Delaware limited
     liability company, DAVID BLATT, an
13   individual, and BORIS PISKUN, an
     individual, SILAR ADVISORS, LP, a
14   Delaware limited partnership, SILAR
     SPECIAL OPPORTUNITIES FUND, LP, a
15   Delaware limited partnership,

16             Defendants.

17

18       The above named Plaintiffs (collectively, the "Plaintiffs"), through their respective

19   counsel, Fulbright & Jaworski L.L.P., Ballard Spahr Andrews & Ingersoll, LLP, Jones Vargas,

20   and the Law Offices of Alan R. Smith, hereby aver and seek relief as set forth below:

21                                    **GENERAL AVERMENTS**

22   A.    **Jurisdiction and Venue.**

23       1.     The United States District Court has subject matter jurisdiction over this action

24   pursuant to 28 U.S.C. §§ 1331 and 1332(a).

25       2.     Pursuant to 28 U.S.C. § 2201, *et seq.* (the Federal Declaratory Judgment Act), this

26   Court has jurisdiction to declare the rights and legal obligations of the interested parties.

27       3.     Venue for this case in this district is proper pursuant to 28 U.S.C. § 1391.

28

**B.** **The Parties.**

4.    Plaintiffs are, respectively, Nevada limited liability companies ("LLCs"), individuals, trust funds created in Michigan, companies incorporated in Michigan and Nevada, a corporation incorporated in Iowa, and a limited partnership formed in Iowa.  All Plaintiffs are direct lenders/investors in certain investments made through USA Commercial Mortgage Company ("USACM").  These investments were in the nature of direct loans to third-party borrowers secured by real property and, sometimes, improvements.  These loans were brokered by USA Commercial Mortgage Company ("USACM").  The members of the Plaintiff LLCs are all direct lenders/investors who originally invested with USACM, but assigned their interest in the loans to the LLCs in order to consolidate and unite to protect themselves and their investments from the actions of Defendants as alleged herein.  The members of the Plaintiff LLCs, or their predecessors in interest, are named as payees on certain Promissory Notes and Deeds of Trust evidencing and perfecting the secured loans brokered by USACM.  Each Plaintiff LLC is a direct lender/investor in a separate and distinct loan.  (As used herein, the term "Plaintiff" or "Plaintiffs" shall refer to the named Plaintiffs in this case, including the LLCs, and the direct lender individuals or entity Plaintiffs, as contextually appropriate.)

5.    Defendant Compass USA SPE, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

6.    Defendant Compass Partners, LLC is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.  (Compass USA SPE, LLC and Compass Partners, LLC are collectively referred to herein as "Compass").

7.    Defendant David Blatt ("Blatt") is a resident of the State of New York and is a member and manager of Compass.

8.    Defendant Boris Piskun ("Piskun") is a resident of the State of New York and is a member and manager of Compass.

9.      Defendant Silar Advisors, LP is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York.

10.     Defendant Silar Special Opportunities Fund, LP is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of New York (hereafter, Silar Advisors, LP, and Silar Special Opportunities Fund, LP shall collectively be referred to as "Silar").

**C.      General Background.**

11.     USA Commercial Mortgage Company, defined above as USACM, which sometimes did business under the name "USA Capital," was formed as a Nevada corporation in 1989 and was in the business of underwriting, originating, brokering, funding and servicing short term (typically one year or less) commercial loans primarily secured by residential and commercial developments, on behalf of private investors/direct lenders.

12.     On January 11, 1990, USACM obtained a license to act as a mortgage broker/agent in the State of Nevada under NEVADA REVISED STATUTES Chapter 645B (2005) and NEVADA ADMINISTRATIVE CODE Chapter 645B (2007).

13.     USACM routinely advertised and promoted, through sales and marketing literature, high-yield secured investments and represented that no investors had ever lost money in their investments with USACM.

14.     On April 13, 2006, USACM filed a Chapter 11 Petition for bankruptcy in the Bankruptcy Court for the District of Nevada, Las Vegas, together with four other entities related to USACM (hereinafter collectively referred to as the "USA Bankruptcy Cases").

15.     At the time USACM filed its bankruptcy petition, approximately 3,600 investors were "lenders" in one or more loans originated and serviced by USACM. These 3,600 investors are commonly referred to as "direct lenders."

16.     The loans brokered by USACM on behalf of the direct lenders are each evidenced by a "Promissory Note Secured By a Deed of Trust" or a "Promissory Note Secured By a Mortgage" (respectively, the "Promissory Note"), which were executed by third-party borrowers

1    in favor of the direct lenders (or their predecessors in interest) in each loan. All loan documents,

2    including the Promissory Notes, expressly provide that they are governed by Nevada law.

3        17.    At the time USACM brokered direct loans, each lender/investor and USACM

4    entered into various Loan Servicing Agreements ("Loan Servicing Agreements" or "LSAs")

5    pursuant to which USACM would service the loans it brokered on behalf of direct lenders. Per

6    USACM's requirements, each direct lender was supposed to execute a single Loan Servicing

7    Agreement that covered, or purported to cover, every investment made by that direct lender with

8    USACM over time. All Loan Servicing Agreements expressly provide that they are governed by

9    Nevada law. However, on information and belief, and based upon an audit conducted by the

10   State of Nevada, Department of Business and Industry, Division of Mortgage Lending

11   ("NMLD"), a substantial number of direct lenders never executed Loan Servicing Agreements.

12   Additionally, there are various forms of the Loan Servicing Agreements, which include

13   differences in several key provisions (such as servicing fees ranging from 0% to 4%). The

14   consequence of USACM's documentation was that most or all of the loans were serviced by a

15   single servicer operating under multiple, inconsistent Loan Servicing Agreements.

16       18.    At the time USACM filed its bankruptcy petition, the loan portfolio it was

17   servicing pursuant to the Loan Servicing Agreements consisted of approximately 115 loans

18   having a combined outstanding principal balance of approximately $960 million. Most of the

19   original direct lenders invested in more than one of the serviced loans, with there being an

20   average of approximately three to four loans for each direct lender.

21       19.    During the course of the USA Bankruptcy Cases, USACM admitted that it had

22   breached the Loan Servicing Agreements, breached its fiduciary duties and violated Nevada state

23   law prior to filing its bankruptcy petition.

24       20.    As a result of USACM's fraudulent misrepresentations and conduct, 100% of the

25   portfolio of loans USACM brokered are in default. This fact is in stark contrast to the national

26   default rate for commercial loans, which is approximately 1.5%.

27       21.    On or about September 22, 2006, USACM filed its *Motion for Order Scheduling*

28   *an Auction for the Sale of Certain Assets, Appointing SPCP Group, LLC, as Lead Bidder, and*

*Approving Bid Procedures and Protections* in the Bankruptcy Case, in which USACM sought to establish the parameters for the sale of certain assets in the USA Bankruptcy Cases, primarily consisting of valuable assets of a related debtor, the First Trust Deed Fund.  The Bankruptcy Court entered an Order: *(A) Scheduling an Auction for the Sale of Certain Assets; (B) Appointing SPCP Group, LLC, as Lead Bidder; and (C) Approving Bid Procedures and Protections, Approving Bidding Procedures* ("Order Scheduling Auction") on November 8, 2006.  The stalking horse bidder agreed to honor the obligations of USACM under the Loan Servicing Agreements as part of the sale, but did not attribute any of its initial bid price to the Agreements.

22.    After the Order Scheduling Auction was entered, but prior to the auction's being conducted, Mesirow Financial Interim Management ("MFIM"), the Bankruptcy Court's appointed manager for USACM, prepared calculations of the potential default interest under the loans.

23.    Upon information and belief, USACM did not collect default interest (which, according to the majority of the Loan Servicing Agreements, is waivable at the option of the direct lenders) upon discounted settlement of a loan – *i.e.*, where less than 100% of principal and interest was paid by the borrower.  USACM's pattern and practice of not collecting default interest upon discounted loan settlements conform with industry standards.

24.    Upon information and belief, Compass became aware of the opportunity to purchase the USACM assets through its business dealings with direct lenders whereby Compass bought certain direct lenders' loan interests at discounted rates.

25.    The Bankruptcy Court conducted an auction of various assets of the USA Bankruptcy Cases on December 7, 2006.

26.    Compass was the successful bidder at the auction and, on February 16, 2007 (the "Closing Date"), acquired substantially all of the assets of USACM and its related debtor, the First Trust Deed Fund ("FTDF"), in exchange for approximately $67 Million.  The Compass bid was apparently broken down by an initial bid of $48 million for the FTDF assets and $8 million for the loan servicing rights under the Loan Servicing Agreements and other fees ("Purchased Assets").  The remaining amounts were to be allocated by an over-bid agreement between FTDF

1    and USACM, which was filed under seal, and a break-up fee of $1.5 million to the stalking horse

2    bidder.    The sale was expressly conditioned upon confirmation of the USACM's Chapter 11

3    Plan of Reorganization (the "Plan"), which was confirmed by an order of the Bankruptcy Court

4    entered on January 8, 2007 (the "Confirmation Order").

5        27.    The USACM Plan effectively compromised[1] and released all claims of USACM

6    and its affiliated debtors against the direct lenders, which would include all fees (*e.g.*, loan

7    servicing fees, success fees) and/or claims for default interest under the various Loan Servicing

8    Agreements accrued but unpaid as of the Effective Date of the Plan.    Consequently, such

9    released or waived rights to claim and collect pre-Effective Date fees and interest were not

10   conveyed to Compass when it purchased USACM's surviving compensation rights under the

11   Loan Servicing Agreements, and the only such fees and default interest claims purchased by

12   Compass were those accruing **after** the Effective Date of the Plan.

13       28.    **On information and belief, Compass subsequently sold, transferred and**

14   **conveyed all right, title, and interest in the Purchased Assets to Silar.   Such transfer of**

15   **interest had the effect of passing to Silar all benefits and burdens, and all rights and**

16   **obligations, of the "Servicer" under the Loan Servicing Agreements.    Compass has**

17   **subsequently acted as subservicer for Silar pursuant to such engagement, although**

18   **Compass has always identified itself as "the servicer."  Accordingly, any and all allegations**

19   **of breaches of duty and other claims and causes of action contained in this Second**

20   **Amended Complaint against Compass apply to Silar with equal force and effect, and Silar**

21   **is liable to Plaintiffs to the same extent and upon the same grounds as Compass is liable,**

22   **either directly, under the doctrine of *respondeat superior,* or pursuant to principles of**

23   **agency.**

24

25

---

26   [1] The compromise required the class of direct lenders to surrender their rights to "prepaid interest" back to the
     USACM bankruptcy estate in exchange for the debtor's releases of all other claims against the direct lenders
27   pursuant to the Loan Servicing Agreements. *See* Debtor's Third Amended Joint Chapter 11 Plan of Reorganization,
     Case No. BK-S-06-10725 LBR, Doc. No. 1799, II(C)(1)(e)(ii); *see also* Debtor's First Amended Disclosure
28   Statement for Debtor's Third Amended Joint Plan of Reorganization (Affects All Debtors), Case No. BK-S-06-
     10725 LBR, Doc. No. 1798, IX(B)(2)(a)(v).

29.     Other than certain conditions not germane to this action, the Loan Servicing Agreements were transferred to Compass and Silar without any modification whatsoever, a fact frequently affirmed by the presiding bankruptcy judge.

30.     Compass was not able to obtain a mortgage broker/agent license from the State of Nevada, Mortgage Lending Division, as required by the Asset Purchase Agreement.  As a result, in February 2007, Compass entered into a sub-servicing agreement with USACM.   The sub-servicing agreement, among other things, allowed for USACM to provide administrative functions, while negotiations with borrowers, foreclosures, or other legal proceeding were left to Compass.   As acting servicer, Compass was responsible for the actions of its sub-servicer USACM.

31.     In May 2007, the NMLD entered a formal *Order Revoking Mortgage Broker License And Notice of Right To Request Hearing*, pursuant to which USACM's license to act as a mortgage broker/agent in Nevada was revoked and in which the State described USACM as having instituted "a calculated, self-serving deceptive scheme that was enacted to allow the Principals to potentially profit with no risk, while astronomical risk inured to the unsuspecting lenders."  On May 9, 2007, a formal *Order Imposing Fine And Order To Cease And Desist And Notice of Right To Request Hearing* was entered.  Pursuant to this Order, Compass was ordered to cease and desist all mortgage lending/agent activities in Nevada.

32.     Also in May 2007, and pursuant to NEV. ADMIN. CODE § 645B.073, direct lenders owning more than 51% of the beneficial interests in certain loans exercised their right to replace Compass and/or Silar as loan servicer to their respective loans.

**D.      Facts Relating to Compass's Conduct as Servicer and Involvement of Other Defendants.**

**1.      *Compass, its Managers, and Silar Owe Fiduciary Duties to Plaintiffs.***

33.     Compass has represented in a declaration submitted by Blatt that it is a national firm with over 200 employees which acquires over $100 million in loan interests every year. Blatt and Piskun, as managers of Compass, control and direct Compass's actions, policies, and strategies.

34.    Silar, together with its principals, has a substantial background in the lending industry in numerous asset classes, including consumer, residential and commercial assets. Silar provided financing to Compass for the Purchased Assets, and, upon information and belief, provided guidance, oversight, and conducted due diligence in connection with the financing. Additionally, as stated above upon information and belief, Silar bought all rights, titles and interests in the Purchased Assets from Compass, thereby becoming the true "Servicer" of the USACM loans. Silar subsequently engaged Compass as its subservicer for the loans, although Compass has always identified itself as "the servicer."

35.    Compass completed extensive due diligence on the loans in order to formulate its bid for the FTDF assets. Upon information and belief, Silar was aware of the results of such due diligence and loaned substantial funds to Compass for the purpose of entering into the Asset Purchase Agreement.

36.    On February 16, 2007, Compass issued a press release in which it stated that the actual value of the assets purchased from USACM and FTDF was more than $150 million. Based on the full note value of $62,652,742 for the FTDF assets, not allowing for any borrower defaults, it can be deduced that Compass expected at that time well in excess of $87 million in profit to be realized from the loan servicing rights <u>alone</u> (for which Compass had paid a mere $8 million). However, documents produced by Compass indicate that Compass hopes to extract for itself (and Silar) more than <u>$130 million</u> in profit from those same loan servicing rights.

37.    As a purported loan servicer, Compass's capabilities and experience directly affect the underlying performance of the loans. Further, as a purported loan servicer, Compass acts as an agent to Plaintiffs and other direct lenders and, therefore, assumes fiduciary responsibilities owed to Plaintiffs and other direct lenders. These fiduciary duties are also assumed by Blatt and Piskun as managers of Compass, as well as by Silar, the true loan servicer.

38.    Compass's strategy and approach for servicing the loans (and extracting its projected "profit" noted above) has created a distinct and substantial conflict of interest between and among Compass, Blatt, Piskun, on the one hand, and Plaintiffs, on the other hand, as well as between and among Silar, on the one hand, and Plaintiffs, on the other hand.

40.     Blatt and Piskun have controlled and authorized the objectives of Compass, directed its conduct, and participated in its actions (including Compass's inappropriate acts and conspiracy participation) in their official capacity as managers and directors of the company.  In this way, Blatt and Piskun have understood, developed, and agreed to the objectives of the conspiracy, as well as Compass's role and their own personal roles in it.  Blatt and Piskun have worked through Compass with the purpose and goal of harming Plaintiffs and depriving them of loan proceeds, in violation of their fiduciary duties to Plaintiffs.

39.     Blatt and Piskun have also acted outside of the scope and authority of their employment for their own advantage by spreading false, fraudulent, and misleading information amongst direct lenders through internet sites, chat rooms, telephone conference calls, and email and by generally "spying" on direct lenders.  To facilitate their spying and distribution of false, fraudulent, and misleading information Blatt and Piskun have used false IDs and email addresses.  Such actions are clearly outside of the course and scope of Blatt's and Piskun's employment and are in violation of their fiduciary duties to Plaintiffs.

**2.     *Compass and Silar's Business Strategy to Collect Fees.***

40.     Compass, its individual managers (Blatt and Piskun), and Silar have formed an association-in-fact through which they have agreed and conspired to participate in a series of concerted activities with the intent to defraud and harm Plaintiffs, thereby gaining a substantial monetary windfall for themselves.  In order to effectuate this plan and conspiracy, Compass and its individual managers (Blatt and Piskun), with full knowledge, support, and agreement of the true loan servicer, Silar, has put into action a business strategy to extract value from the collateral pledged by third-party borrowers to Plaintiffs and other direct lenders by attempting to deduct default interest, late fees, loan origination fees, and other fees (including pre-petition interest and fees which it did **not** acquire in its purchase from USACM and FTDF) from loan payoffs and/or collateral proceeds **before** remitting amounts due to all Plaintiffs and other direct lenders.  This practice is in direct conflict with: (a) the loan documents (Promissory Notes, Deeds of Trust, and Loan Agreements); (b) the Loan Servicing Agreements; (c) the intent of the parties to the loans, (d) various other agreements; (e) the historical practices of USACM both prior to and during its

1   bankruptcy; (f) the current practices of the USACM post-bankruptcy trust; (g) long established

2   lending industry standards and practices; and (h) Compass's, its managers', and Silar's fiduciary

3   duties and obligations to Plaintiffs.

4          41.      Pursuant to Section 5 of some, but not all, of the Loan Servicing Agreements, the

5   loan servicer may retain, as compensation for servicing loans (depending on which form of the

6   Loan Servicing Agreement was executed by those direct lenders): (a) a servicing fee varying

7   between 0-4% per annum; and (b) any late charges and default interest collected from the

8   borrower.  However, late charges and default interest may be collected **only** if the direct lenders

9   exercise their option to charge default interest and/or late fees, and then only if default interest

10  and/or late fees are actually collected from the borrower over and above principal and accrued

11  interest.  No Loan Servicing Agreement provides for the recovery of certain of the fees now

12  claimed by Compass (*e.g.,* "success" or "exit" fees).  Further, pursuant to Section 4 of most of

13  the Promissory Notes, all payments on the Promissory Notes are to be applied **first** toward the

14  payment of regular accrued interest and then to principal.

15         42.      The cumulative unpaid principal balance on the loans in which Plaintiffs are

16  direct lenders is currently in excess of $485 million.  The servicing fees and default interest fees,

17  to which Compass claims it is entitled, accrues at approximately 10% or more per annum.  With

18  this financial windfall in mind and upon information and belief, Compass and its managers (and

19  Silar, as the true loan servicer) choose, to the substantial detriment of Plaintiffs and other direct

20  lenders, to either do nothing to collect loan payments or to delay resolution of loans in order to

21  allow greater default interest and late fees to accrue.  A number of the loans in which Plaintiffs

22  are direct lenders are currently, or have been in the past, in this untenable position.  There appear

23  to have been several times in which borrowers have attempted, or have offered, to pay in full or

24  otherwise resolve loans, but Compass and its managers (and Silar, as the true loan servicer) have

25  failed and refused to negotiate resolutions of such loans with the borrowers.  Compass's and its

26  managers' (and Silar's, as the true loan servicer) apparent failure and refusal to work with

27  borrowers to resolve defaulted loans further injures Plaintiffs because such behavior exposes

28  Plaintiffs and other direct lenders to lender liability claims and litigation.  Some borrowers have

1  already filed such suits against Plaintiffs and other direct lenders on certain loans and additional

2  suits have been threatened against Plaintiffs.

3       43.    Additionally, in order to continue accruing default interest and other fees for their

4  own benefit, Compass and its managers (and Silar, as the true loan servicer) have failed to timely

5  communicate to Plaintiffs and other direct lenders certain offers made by borrowers to repay

6  their debts to the direct lenders.  Additionally, Compass and its managers (and Silar, as the true

7  loan servicer) have misrepresented the status of loans to Plaintiffs and other direct lenders for the

8  purpose of coercing the Plaintiffs and other direct lenders to agree to modifications to loan

9  documents, resulting in additional, undisclosed fees to Compass, its managers, and Silar.

10  Further, Compass and its managers (and Silar, as the true loan servicer) have refused to process

11  previously achieved direct lender/borrower settlement agreements.

12       44.    Upon information and belief, Compass, its managers, and/or Silar have knowingly

13  made advances to borrowers and other third parties on certain loans on behalf of Plaintiffs and

14  other direct lenders, which it was not authorized to make.

15       45.    Compass and its managers (and Silar, as the true loan servicer) have also

16  demanded immediate payment of servicer advances from Plaintiffs and other direct lenders

17  without providing a full explanation or an accounting for the service advances.

18       46.    Further, Compass and its managers (and Silar, as the true loan servicer) have

19  subjected some Plaintiffs and other direct lenders to foreclosures upon their collateral,

20  unapproved default interest, and other fees and expenses without the express authorization of

21  Plaintiffs and other direct lenders.   These, and other, self-interested actions have placed

22  Plaintiffs' and other direct lenders' principal investments/loans at substantial risk.

23       47.    Additionally, Compass, its managers, and Silar are aware of NEV. ADMIN. CODE §

24  645B.073 (2007) and have attempted to take advantage of its provisions by acquiring or seeking

25  to acquire 51% of the beneficial interests in certain loans to prevent Plaintiffs and other direct

26  lenders from removing Compass as loan servicer.  These actions violate Compass's fiduciary

27  duties to Plaintiffs and other direct lenders.

28

48.     Since taking over as loan servicer, Compass and its managers (and Silar, as the true loan servicer) appear to have knowingly used to their benefit, and to the detriment of Plaintiffs and other direct lenders, a three-day deadline and other very short deadlines for direct lender responses to loan resolution offers, even when substantially more time was feasible, in breach of the Loan Servicing Agreements.  This action violates Compass's, its managers', and Silar's fiduciary duties to Plaintiffs and other direct lenders.

**3.     *Borrower Payments and Interest Earning Accounts.***

49.     Upon information and belief, Compass, its managers, and/or Silar have negotiated with borrowers for their own benefit, pursuant to which Compass, its managers, and Silar knowingly, and in collaboration with one another, would receive loan payoff proceeds from borrowers when Plaintiffs and other direct lenders were not receiving full principal and interest payments from the borrowers.  These proceeds are rightfully due and owing to Plaintiffs and other direct lenders.

50.     Upon information and belief, Compass, its managers, and Silar have collaborated on the formation of Compass's business plan, as well as the development of a strategy whereby Compass and Silar would work together to receive loan payoff proceeds from borrowers (which are due and owing to Plaintiffs and other direct lenders) and direct them instead to Silar in payment of Silar's financing of Compass's acquisition of the Purchased Assets.  Despite knowledge that their actions harm Plaintiffs and other direct lenders, Compass, its managers, and Silar have put this business plan/strategy into action by working together to direct borrowers to transmit any and all loan payments (including payments of principal, regular accrued interest, default interest, late fees, and other fees) directly to an account held and controlled by Silar (the "Silar Account").  These loan payments are specifically identifiable funds paid by borrowers in satisfaction of the requirements in the Promissory Notes underlying specific loans.  The Silar Account is an interest bearing account in which Silar earns money on funds due and owing to Plaintiffs and other direct lenders.  Silar retains the interest earned on these funds.

51.     Additionally, the loan proceeds improperly held by Silar have been knowingly and improperly commingled with Silar's and Compass's own monies.  Upon information and

1   belief, Silar transfers money from the Silar Account directly to Silar's own investors.  Further,

2   certain monies commingled in this account do not come from borrower payments but instead

3   from deposits made by third-parties unaffiliated with Plaintiffs and other direct lenders.

4   Although the account is controlled by Silar, Compass and its managers have knowingly allowed

5   commingling to occur and, in fact, supported and enabled the commingling.  These actions have

6   been done with the specific intent to deprive Plaintiffs of their right to and security in their funds.

7       52.   Upon information and belief, at the request of Compass and its managers and at

8   various intervals, Silar transfers money from the Silar Account into an interest bearing account

9   (the "Maximizer Account") controlled by Compass and Compass holds these funds due and

10  owing to Plaintiffs and other direct lenders for an unspecified period of time solely to earn

11  interest.  For example, on or about July 18, 2007, Silar made a wire transfer of $3,216,204.61 to

12  Compass's Maximizer Account.  Upon information and belief, Silar knows that this Maximizer

13  Account is solely used to earn interest on funds not belonging to Silar or Compass.  Compass

14  later transfers monies due and owing to Plaintiffs and other direct lenders to its self-described

15  "Disbursement Account," but retains all interest earned on Plaintiffs' and other direct lenders'

16  funds while in the Maximizer Account.   Compass eventually remits the funds in the

17  Disbursement Account to Plaintiffs and other direct lenders, sometimes after the time required by

18  Nevada law.  This practice is in violation of Nevada law and Compass's, its managers', and

19  Silar's fiduciary duties, and has injured Plaintiffs and will continue to injure Plaintiffs until

20  judicial relief is obtained.

21      53.   In addition, upon information and belief, many of the fund transfers requested by

22  Compass from the Silar Account (in which the loan proceeds belonging to the Plaintiffs are held

23  and controlled by Silar) do not correlate by time or amount with loan payments made by the

24  borrower.  These specific loan payments are due and owing to the direct lenders.  Through

25  Compass's, its managers', and Silar's actions, Plaintiffs are deprived of the actual borrower

26  payments to which they are entitled and/or do not receive such payments in a timely manner.

27      **4.    *Compass's Failure to Provide Legally Required Information and Compass's Dissemination of Materially False and Misleading Information.***

28

54.    Pursuant to NEV. REV. STAT. § 645B.185, each investor in USACM was required to receive and sign a Mortgage Investment Disclosure Form, approved by the NMLD.   As detailed in the Mortgage Investment Disclosure Form, a mortgage broker/agent operating in Nevada is required to inform investors, among other things, that:

    a.    "You are entitled to receive information regarding the mortgage broker you are dealing with," including the most recent financial statements.

    b.    "A Mortgage Broker performing loan servicing has an obligation to account to the borrower and every investor for money collected and disbursed in the exercise of that function."

    c.    "When the borrower on a mortgage loan fails to make required payments, the actions an investor can take, or that a servicing agent can take on behalf of an investor, are determined by provisions of Nevada Law and the documents and instruments evidencing the mortgage loan."

55.    Plaintiffs and other direct lenders did not receive the benefit of the Mortgage Investment Disclosure Form as it relates to Compass (or to Silar, as the true loan servicer), nor have they received the required disclosures from Compass (or Silar).  Non-exclusive examples of this include:

    a.    Upon request, Compass and its managers have refused to disclose to Plaintiffs and other direct lenders, or to provide an accounting of, any compensation they (or Silar) are receiving, including the amount of default interest, late fees and other fees they have received in connection with loan payoffs;

    b.    Plaintiffs and other direct lenders have been provided with limited information regarding Compass (and none at all regarding Silar) since Compass began servicing the loans, and Compass and its managers have refused requests for information about Compass or its practices;

c.      Plaintiffs and other direct lenders have not been able to obtain any financial information concerning Compass, yet Compass was entrusted with nearly $750 million dollars of direct lenders' money;

56.     Despite the fact that many of the loans in the USACM loan portfolio were in term default, and others have gone into term default since Compass has taken over as loan servicer, Compass (and Silar, as the true loan servicer) has failed to make monthly reports to the NMLD and to Plaintiffs regarding loan delinquencies as required under NEV. REV. STAT. § 645B.260.  In addition, Compass (and Silar, as the true loan servicer) appears to have failed to produce, keep and maintain records and reports required by NEVADA REVISED STATUTES Chapter 645B and the Loan Servicing Agreements.

57.     Upon information and belief, Compass and its managers have circulated self-interested offers to purchase Plaintiffs' and other direct lenders' interests, at substantial discounts, but have not provided Plaintiffs and other direct lenders with all of the material terms of the offers nor all of the loan information necessary to make an informed decision, including sufficient loan status reports.

58.     Upon information and belief, Compass and its managers have knowingly circulated to Plaintiffs and other direct lenders, both directly through the United States mail and through Compass's website, misleading and materially incomplete information outside of the ordinary course and scope of business, purportedly for the purpose of reporting on legal proceedings in this matter, but in reality and in effect for the purpose of and with the intent to cause confusion, fear, distrust, dissention, and conflict among the direct lenders and to cause disruption of their organization, communications, and legal actions in this case.

**5.      *Power of Attorney.***

59.     Each direct lender (or predecessor in interest of each direct lender) executed a power of attorney in favor of USACM when making their investments/loans.  Those powers of attorney expressly expire on the **maturity date of each related loan.**  Furthermore, at the time the Loan Servicing Agreements were transferred to Compass, many of the loans in the USACM loan portfolio were in term default, and others have since gone into term default.  As a result of

1   the term default of various loans in the USACM portfolio, Compass no longer has a valid power

2   of attorney to act on behalf of direct lenders as required under NEV. REV. STAT. § 645B.330.

3   Compass has not executed any written extension of any of the Powers of Attorney.

4           60.     Despite the fact no valid power of attorney exists authorizing Compass to act on

5   behalf of Plaintiffs and other direct lenders, Compass continues to hold itself out as a

6   representative/agent of Plaintiffs (and other direct lenders) to borrowers, title companies and

7   others.  Upon information and belief, Compass and its managers, without the power to do so,

8   have negotiated payoffs, filed lawsuits and executed satisfactions and releases on behalf of

9   Plaintiffs and other direct lenders.  Moreover, Compass has allegedly acted or purported to act on

10  multiple loans pursuant to a single power of attorney per direct lender in direct violation of §

11  645B.330.

12          61.     The practices of Compass and its managers (and Silar, as the true loan servicer),

13  as exemplified above, are in direct conflict with Nevada state laws, loan documentation

14  (Promissory Notes, Deeds of Trust, and Loan Agreements), Loan Servicing Agreements, intent

15  of the parties to the loans, various other agreements, long established industry standards and

16  practices, and their fiduciary duties and obligations.

17  **E.      Representative Examples of Breaches on Selected Loans.**

18          62.     The following are ***non-exclusive examples*** of breaches committed in connection

19  with specific loans.  These breaches (set forth in alphabetical order) typify those committed by

20  the Defendants on other, similarly situated loans.

21          **(a)    *The Bay Pompano Loan.***

22          63.     On or about April 4, 2007, a Bay Pompano Loan direct lender received a copy of

23  an offer from the Bay Pompano Borrower which offered to pay the full principal and the full

24  interest amount due and owing on the Bay Pompano Loan, as well as an "exit fee" of $325,000,

25  to Compass.  On or about April 13, 2007, the Bay Pompano direct lender sent a certified letter to

26  Compass requesting that Compass, as loan servicer, accept the offer on behalf of the Bay

27  Pompano direct lenders.  Compass never replied and never communicated this offer to other Bay

28  Pompano Loan direct lenders.

64.    In a progress report from Compass, Compass stated that it would send an offer to the Bay Pompano Loan direct lenders in response to an offer made by the Bay Pompano Borrower on May 17, 2007. Compass's letter requested that the Bay Pompano direct lenders accept payment of 90% of the principal amount due and owing on the loan and no accrued interest. However, a comparison of the Bay Pompano Borrower's May 17, 2007 offer to Compass's proposed settlement payout showed that Compass, in furtherance of the conspiracy to defraud Plaintiffs, was attempting to take over $2,000,000.00 in fees for itself (and/or for Silar), while the direct lenders would not be paid in full.

65.    Later, the Bay Pompano Borrower made a revised offer of $16,743.553.46. Again, Compass never communicated this offer to the Bay Pompano Loan direct lenders. Instead of countering or communicating this offer, Compass informed Bay Pompano Loan direct lenders that it would foreclose on the loan collateral. When one Bay Pompano Loan direct lender emailed Compass inquiring about these developments, Compass responded that the Bay Pompano Borrower was not willing to make a full repayment of the loan – *i.e.*, could not pay Compass all of the extra fees it sought for itself – therefore, Compass would foreclose on the loan. Compass refused requests to contact this direct lender by phone to discuss these issues.

66.    Compass (and Silar, as the true loan servicer) has failed to meet its fiduciary duties and obligations under the Loan Servicing Agreements by not readily communicating with Plaintiff Bay Pompano, LLC and other direct lenders. While Compass has scheduled status conference calls, often it does not allow the direct lenders to talk to Compass on these calls. Sometimes Compass does not even participate in lender conference calls it has scheduled, which are purportedly for the benefit of the direct lenders and for the purpose of advising and communicating with direct lenders regarding loan status. For example, on or about August 16, 2007, a conference call was scheduled on the Bay Pompano Loan. One Bay Pompano direct lender waited on the call line for 15 minutes without a representative from Compass appearing. In addition, Bay Pompano direct lenders have left numerous messages and sent emails to Compass without receiving responses. These actions clearly violate Compass fiduciary duties and obligations under the Loan Servicing Agreements.

**(b)**   *The Binford Medical Loan.*

67.   On information and belief, Compass and its managers (and Silar, as the true loan servicer), in violation of their fiduciary duties, wrongfully pursued foreclosure adverse to Plaintiff Binford Lenders, LLC's ("Binford, LLC") and other direct lenders' best interests on the Binford Medical Loan.

68.   Notwithstanding the near completeness of the project and the potential for the Binford Medical Borrower to fully satisfy its loan obligations, Compass and its managers (and Silar, as the true loan servicer) recklessly and irresponsibly chose to pursue foreclosure proceedings and risk financial devastation for Plaintiff Binford, LLC and other direct lenders.

69.   Additionally, since Compass took over the USACM loan portfolio, it has consistently ignored communications from Plaintiff Binford, LLC and other direct lenders and failed to provide timely information about the status of the Binford Medical Loan, including accounting information.  Because the Binford Medical Loan has been in default for more than two consecutive payments, Compass was required to provide monthly accounting, under Nev. Rev. Stat. § 645B.260(1)(b), but has failed to do so.  This also violates Section 2(d) of the Loan Servicing Agreements.  These actions (or lack thereof) are in violation of Compass's and Silar's fiduciary duties.

70.   As an example, at least one direct lender in the Binford Medical loan sent several emails and letters (including a certified letter) to Compass and its managers requesting loan and accounting information.  Compass did not respond.  Instead, several members of Plaintiff Binford, LLC and other direct lenders received cease and desist letters from Compass's legal counsel threatening litigation.  On information and belief, members of Plaintiff Binford, LLC and other direct lenders received their first communication containing information about the Binford Medical Loan from Compass in a non-loan specific report dated May 18, 2007, 91 days after Compass took over as purported loan servicer.  This report stated for the first time that Compass was pursuing foreclosure on the Binford Medical Loan.  Members of Plaintiff Binford, LLC and other direct lenders received their first Binford Medical Loan specific correspondence *over five months* after Compass purportedly acquired the servicing rights.  This Binford Medical

1    Loan specific correspondence stated that Compass had commenced litigation over an internal

2    dispute with the borrower and developer.

3         71.    Compass, as sub-servicer for Silar and in violation of its fiduciary duties and the

4    Loan Servicing Agreements, has also refused to share critical loan and accounting information

5    with Plaintiff Binford, LLC and other direct lenders so that they can make an informed decision

6    on a proposed discounted payoff negotiated during mediation.  Because Plaintiff Binford, LLC

7    and other direct lenders were refused material information, certain Binford Medical Loan direct

8    lenders were forced to reject the proposal.

9         **(c)    *The Cabernet Highlands LLC Loan.***

10        72.    On information and belief, Compass and Silar agreed and conspired to have the

11   borrower of the Cabernet Highlands LLC Loan wire loan payoff proceeds, portions of which

12   were due and owing to Plaintiff Cabernet Highlands Lenders, LLC ("Cabernet, LLC") and other

13   direct lenders, directly to the Silar Account.  For instance, on or about July 9, 2007, Compass and

14   Silar fraudulently induced the Cabernet Highlands Borrower to make a wire transfer of

15   $150,246.49 to Silar.  Also, on or about August 9, 2007, Compass and Silar fraudulently induced

16   the Cabernet Highlands Borrower to make a wire transfer of $37,589.35 to Silar.  Additionally,

17   on or about September 21, 2007, Compass and Silar fraudulently induced the Cabernet

18   Highlands Borrower to make a wire transfer of $129,482.73 to Silar.  Furthermore, on or about

19   October 12, 2007, Compass and Silar fraudulently induced the Cabernet Highlands Borrower to

20   make a wire transfer of $36,337.50 to Silar.  This Silar controlled account is an interest bearing

21   account.

22        73.    Certain portions of the transferred funds were due and owing to direct lenders in

23   the Cabernet Highlands Loan, including Plaintiff Cabernet, LLC.  Subsequently, Silar kept the

24   funds due and owing Plaintiff Cabernet, LLC direct lenders for a period of time, earning interest

25   on monies it did not own.  Compass, its managers (Blatt and Piskun), and Silar agreed that Silar

26   would keep the interest earned with the intent to deprive Plaintiff Cabernet, LLC and other direct

27   lenders of the earned interest due and owing to them.  Silar then transferred these funds to certain

28   Compass-controlled bank accounts, including the Compass-controlled Maximizer Account,

1   which Silar knew also earned interest.  Compass retained these funds in the Maximizer Account

2   for a period of time earning interest on monies due and owing Plaintiffs and other direct lenders.

3   Both Compass and Silar kept the interest earned for their own benefit, with the intent to deprive

4   Plaintiff Cabernet, LLC, and other direct lenders, of these funds.

5          **(d)**    *The Charlevoix Loan.*

6          74.    The Charlevoix Homes loan went into interest default and maturity default on

7   April 4, 2007.  On information and belief, Compass and its managers (and Silar, as the true loan

8   servicer) have made no effort either to negotiate an extension, an act required by the original

9   loan documents, or to send a Notice of Default to Charlevoix Homes.

10         75.    Additionally, Compass and its managers (and Silar, as the true loan servicer) have

11   failed to provide timely information to Plaintiffs and other direct lenders.  For example, on or

12   about August 5, 2007, one direct lender sent Compass an e-mail requesting why no status report

13   had been given to the lenders in this loan since the maturity date.  On information and belief,

14   Compass did not respond and to this date has taken no action to resolve the defaulted Charlevoix

15   loan.

16          **(e)**    *The Clear Creek Plantation Loan.*

17         76.    On March 23, 2007, Compass and its managers, in furtherance of the conspiracy

18   to defraud direct lenders, knowingly and intentionally sent a false, fraudulent, and misleading

19   letter through the United States mail to the direct lenders of the Clear Creek Plantation Loan,

20   which requested their approval of a settlement proposal.  Through the proposed settlement, the

21   direct lenders would receive 100% of principal, but *no accrued, unpaid interest.*  The letter

22   falsely led the direct lenders to believe that the Clear Creek Borrower could not pay accrued

23   interest.  This letter was false, fraudulent, and misleading because the members of Plaintiff Clear

24   Creek, LLC and other direct lenders subsequently learned that the Clear Creek Borrower had, in

25   fact, expressly told Compass that it would pay not only the full amount of principal owing on the

26   loan, but also a substantial portion of the accrued, but unpaid interest.  Compass gave the Clear

27   Creek Plantation Loan direct lenders only one week in which to respond, to the settlement

28   proposal Compass offered.

77.     Certain direct lenders contacted Compass and its managers for information concerning the loan, including the status of the loan, status of the negotiations, and reasons why the Clear Creek Plantation Borrower was unable to pay off the accrued interest due and owing to the direct lenders.  Compass and its managers, in clear violation of their fiduciary duties and in furtherance of the conspiracy to defraud direct lenders, never responded.   Desperate for information, one day before the deadline imposed by Compass to lodge any objections against the settlement deal, certain direct lenders held a conference call with Clear Creek Plantation Borrower.

78.     During this conference call, the direct lenders learned that Compass and its managers had misrepresented the terms of the settlement proposal to the direct lenders and that the Clear Creek Plantation Borrower had expressly offered and was willing to pay off the full unpaid principal balance, *as well as a substantial portion of the accrued interest*.  In fact, the Clear Creek Plantation Borrower had already secured financing specifically intended to pay off all principal and a significant portion of the accrued interest due and owing to the direct lenders of the Clear Creek Plantation Loan.

79.     Furthermore, on or about July 2, 2007, Compass, through Mark Olson, spoke by telephone to one or more direct lenders in the Clear Creek Plantation Loan and stated that a recent appraisal of the property showed that there was not enough value in the property to cover the full amount due and owing on the loan and that the value of the property would only cover the principal amount of the Clear Creek Plantation Loan and Compass's default interest and other fees, but not the direct lenders' accrued, but unpaid interest.  This statement was apparently false, fraudulent, and misleading because the "recent appraisal," dated December 29, 2006, showed the "as is" value of the property as $6,415,000.00 – *i.e.,* more than the total payoff of the Clear Creek Plantation Loan (including Compass's alleged fees).  Also, the appraisal showed the projected market value of the property as of July 1, 2007 as $9,625,000.00, far more than the value of the Clear Creek Plantation Loan.

80.     On or about July 11, 2007, the Clear Creek Plantation Borrower paid off the Clear Creek Plantation Loan in its entirety.  At that time and in furtherance of the conspiracy to

1    defraud direct lenders, Compass and Silar agreed and conspired to have the Clear Creek

2    Plantation Borrower wire the payoff proceeds in the amount of $3,923,771.68, portions of which

3    were due and owing to Plaintiff Clear Creek, LLC and other direct lenders, directly to the Silar

4    Account thereby converting Plaintiff Clear Creek, LLC's funds. Silar earned interest on the

5    converted funds in the Silar controlled account which were due and owing to Plaintiff Clear

6    Creek, LLC. Silar has improperly kept this earned interest for itself, instead of distributing it to

7    Plaintiff Clear Creek, LLC and other direct lenders, to whom it is owed and belongs.

8         81.    On or about July 18, 2007, Silar, in furtherance of the conspiracy to defraud direct

9    lenders, wired $3,216,204.61 of the Clear Creek Plantation payoff funds (minus the earned

10   interest and certain other monies, which Silar converted and kept for itself) to the Compass-

11   controlled Maximizer Account which Silar knew also earned interest. Compass retained these

12   funds in the Maximizer Account until on or about August 31, 2007, in violation of NEV. ADMIN.

13   CODE § 645A.050(2), and then transferred monies due and owing to Plaintiff Clear Creek, LLC,

14   and other direct lenders (minus the earned interest, which Compass converted and kept for itself)

15   to the Disbursement Account. Compass remitted payment, but no earned interest to Plaintiff

16   Clear Creek, LLC, and other direct lenders, on or about August 31, 2007.

17        82.    Both Compass and Silar knowingly converted and kept the interest earned on the

18   monies due and owing the Direct Lenders for their own benefit with the intent to deprive

19   Plaintiff Clear Creek, LLC, and other direct lenders, of the funds which belong to them.

20        **(f)    *The Fox Hills 216 and Eagle Meadows Loan.***

21        83.    In November 2006, the Fox Hills 216/Eagle Meadows Borrower met with

22   representatives of Compass, including Piskun, to discuss payoff of the current balance due and

23   owing to the direct lenders on the Fox Hills 216 Loan which was approximately $58 million.

24   The Fox Hills 216 Loan and the Eagle Meadows Loan stem from the same real estate

25   development project in Los Banos, California.

26        84.    Compass, through Piskun, misrepresented to the Fox Hills 216/Eagle Meadows

27   Borrower that it controlled the Fox Hills 216 Loan, even though at that time the Asset Purchase

28   Agreement had not yet been signed, and stated that decisions regarding the payoff of the loan

1  would be made by Compass.  Compass, through Piskun, requested the Fox Hills 216/Eagle

2  Meadows Borrower present a proposal for resolving the Fox Hills 216 Loan.

3      85.    The Fox Hills 216/Eagle Meadows Borrower presented two alternative payoff

4  proposals to Compass in early December 2006.  Compass did not respond to the two payoff

5  proposals sent by the Fox Hills 216/Eagle Meadows Borrower.

6      86.    The Fox Hills 216/Eagle Meadows Borrower again contacted Compass and its

7  managers at the end of February 2007 and offered a third settlement proposal, which Compass

8  did not respond to until over two weeks later when it demanded a payoff amount of $70 million,

9  approximately $12 million more than the original principal amount of the Fox Hills 216 Loan.

10 The Fox Hills 216/Eagle Meadows Borrower requested a breakdown of Compass's $70 million

11 payoff figure, which Compass refused to provide.

12     87.    Later, the Fox Hills 216/Eagle Meadows Borrower made a final payoff proposal

13 of $65 million.  In breach of its fiduciary duties and in furtherance of the conspiracy to defraud

14 direct lenders, Compass never communicated the Fox Hills 216/Eagle Meadows Borrower's final

15 payoff offer to the direct lenders, including members of Plaintiff Fox Hills, LLC.

16     88.    Compass's and its managers' (and Silar's, as the true loan servicer) wholly

17 unjustified failures to provide the Fox Hills Loan direct lenders, including members of Plaintiff

18 Fox Hills, LLC, with any of the three settlement proposals, damaged the value of the Fox Hills

19 216 Loan and the value of the Eagle Meadows Loan, which Plaintiffs Eagle Meadows Lenders,

20 LLC ("Eagle Meadows, LLC") is invested.

21     89.    As a result of Compass's actions in the Fox Hills 216 Loan, at the beginning of

22 November 2007, the Fox Hills 216/Eagle Meadows Borrower filed a lender liability action

23 against members of Fox Hills, LLC and other direct lenders in California state court.

24     90.    Additionally and in furtherance of the conspiracy to defraud investors, Compass,

25 through Blatt and Piskun, collaborated with Silar on a loan to secure certain water rights related

26 to the Fox Hills 216 and Eagle Meadows Loans, which also had the added side benefit of

27 providing a lucrative and secure financial opportunity to Silar.  Compass (through Blatt and

28 Piskun) and Silar conspired and agreed that Silar would loan the money necessary to secure the

1   water rights and, in return, Silar would receive a very preferential return on the fully secured loan

2   – to the detriment of Plaintiff Fox Hills, LLC, Plaintiff Eagle Meadows, LLC, and other direct

3   lenders.  Because this loan would be labeled as a servicing advance, Silar was guaranteed to

4   make a profitable return on the loan before any direct lender received any payoff on the loan.

5   Blatt and Piskun signed and approved a "Servicing Advance Request" to Silar on or about April

6   16, 2007 and Silar subsequently loaned this money to Compass in return for a very high interest

7   rate (an 18% interest rate), as well as seniority and cross-collateralization on the loan.  This loan

8   was a financial boon to Silar, though it was made at substantial cost and harm to Plaintiff Fox

9   Hills, LLC, Plaintiff Eagle Meadows, LLC, and other direct lenders.

10          **(g)    *The Gardens Timeshare Loan.***

11          91.    The Gardens Timeshare loan originated on March 2, 2004 with an original

12   principal balance of $5,800,000.00.    The principal balance, as of June 4, 2007 was

13   $3,577,719.33.

14          92.    On or about June 4, 2007, Compass sent a communication through the United

15   States mail to the direct lenders of the Gardens Timeshare Loan.   In this communication,

16   Compass outlined a "global restructuring" proposal (the "Restructuring Proposal").    After

17   making this Restructuring Proposal, Compass expressed to the direct lenders that the

18   Restructuring Proposal was the best deal the direct lenders could get.

19          93.    The Restructuring Proposal amounted to a modification of the underlying

20   collateral of the loan, along with two other loans on the same project.  Compass, its managers,

21   and Silar proposed changing and reducing Plaintiff The Gardens TSHR Lenders, LLC's ("The

22   Gardens, LLC") and other direct lenders' deeded positions in the loans, and elevating their own

23   deeded position (one of the three "Gardens" loans is funded 100% by Compass through their

24   purchase of the FTDF).  Compass asked Plaintiff The Gardens, LLC and other direct lenders to

25   consider the proposal with a letter outlining the details of the restructuring which contained

26   incomplete and misleading information.

27          94.    On or about July 20, 2007, Compass sent the direct lenders another

28   communication elaborating on the terms of the Restructuring Proposal.  In a conference call with