1

1        UNITED STATES DISTRICT COURT

2            DISTRICT OF NEVADA

3                LAS VEGAS, NEVADA
   In re:  USA COMMERCIAL MORTGAGE  )
4  COMPANY.                         )
                                    )  Case No.
5                                   )  2:07-CV-892-RCJ-GWF
   _____)
6

7        PARTIAL TRANSCRIPT OF PROCEEDINGS
                    OF
8    MOTION TO VACATE PRELIMINARY INJUNCTION, NO. 779
                    AND
9     SEALED EMERGENCY MOTION TO APPROVE
         GRAMERCY COURT SALE, NO. 902
10                  AND
     MOTION TO SUBSTITUTE ASSET RESOLUTION
11   AS ASSIGNEE BY VIRTUE OF FORECLOSURE
        OF COMPASS USA'S SERVICING RIGHTS
12   UNDER THE LOAN SERVICING AGREEMENTS,
         AND SUBSTITUTE ASSET RESOLUTION
13   AS ASSIGNEE BY VIRTUE OF FORECLOSURE OF COMPASS USA
   WITH RESPECT TO THE PRELIMINARY INJUNCTION, NO. 908
14                VOLUME 1
     BEFORE THE HONORABLE ROBERT C. JONES
15          UNITED STATES DISTRICT JUDGE

16          Monday, March 16, 2009

17

18

19

20

21

22

23  Court Recorder:     Araceli Bareng

24

   Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

```
1    APPEARANCES:

2    For the Jones Vargas    JANET L. CHUBB, ESQ.
     Direct Lenders:         LOUIS M. BUBALA, III, ESQ.
3                            Jones Vargas
                             100 West Liberty Street
4                            Twelfth Floor
                             Reno, Nevada 89501
5                            (Telephonic)

6    For Direct Lenders:     MICHAEL J. COLLINS, ESQ.
                             Bickel & Brewer
7                            4800 Bank One Center
                             1717 Main Street
8                            Dallas, Texas 75201

9    For Thomas Grimmitt,    TERRY A. COFFING, ESQ.
     Receiver:               Marquis & Aurbach
10                           10001 Park Run Drive
                             Las Vegas, Nevada 89145
11
     For Donna M. Cangelosi,LISA L. RASMUSSEN, ESQ.
12   Tito Castillo,          616 South Eighth Street
     Tony Chaudhry,          Las Vegas, Nevada 89101
13   Jonathan Eller,
     Robin Graham,
14   Don Hess,
     Christina Knoles,
15   Arthur Kriss,
     Joe Lafayette,
16   Janice Lucas,
     Charles Maraden,
17   Carol Mortensen, as Trustee,
     Daniel Newman,
18   Edward Schoonover,
     Carol Simon,
19   Lawrence Tengan,
     Connie Westbrook,
20   and Ken Zawacki:

21   For CCM Pathfinder      BETTY M. SHUMENER, ESQ.
     Pompano Bay, LLC,       DLA Piper US, LLP
22   and CCM Pathfinder      550 South Hope Street
     Gramercy, LLC:          Suite 2300
23                           Los Angeles, California 90071

24

25
```

```
 1    APPEARANCES (Cont.):

 2                              JOANNA S. KISHNER, ESQ.
                                DLA Piper US, LLP
 3                              3960 Howard Hughes Parkway
                                Suite 400
 4                              Las Vegas, Nevada 89169

 5    For Platinum              MITCHELL J. LANGBERG, ESQ.
      Properties 1, LLC:        Brownstein, Hyatt, Farber, Schreck, LLP
 6                              100 City Parkway
                                Suite 1600
 7                              Las Vegas, Nevada 89106

 8    For Asset Resolution      REID L. ASHINOFF, ESQ.
      and Silar Entities:       JONATHAN D. FORSTOT, ESQ.
 9                              LOUIS A. CURCIO, ESQ.
                                Sonnenschein, Nath & Rosenthal, LLP
10                              1221 Avenue of the Americas
                                New York, New York 10020
11
                                RANDOLPH L. HOWARD, ESQ.
12                              Kolesar & Leatham, Chtd.
                                3320 West Sahara Avenue
13                              Suite 380
                                Las Vegas, Nevada 89102
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Court convened at 11:26:03 a.m.)
 2           (Partial transcript.)
 3              THE COURT:  We'll get one party on the phone.
 4        (Colloquy not on the record.)
 5              THE CLERK:  Ms. Chubb?  Ms. Chubb?
 6        (Colloquy not on the record.)
 7              THE CLERK:  Ms. Chubb?
 8              MS. CHUBB:  Yes.
 9              THE COURT:  Thank you.
10        Let's start with appearances on USA Commercial.
11        On the telephone, please, Ms. Chubb.
12              MS. CHUBB:  Yes, your Honor.  This is Janet Chubb
13   appearing for the Jones Vargas direct lenders, and I'd like to
14   introduce Michael Collins of Bickel & Brewer who will be
15   representing some direct lenders.  We filed his pro hac vice
16   papers this morning.
17              THE COURT:  We're not picking you up very clearly.
18   Are you directly on the line or on a speaker phone?
19              MS. CHUBB:  I am not on -- let me -- is this better?
20              THE COURT:  That's much better.
21              MS. CHUBB:  Okay.  Now I'm on the speaker phone --
22              THE COURT:  Oh, there you go.
23              MS. CHUBB:  -- which I know I'm not supposed to be,
24   but for now, so I'll start over.
25           This is Janet Chubb for the Jones Vargas direct lenders,
```

1    and in the courtroom is Michael Collins from Bickel & Brewer

2    who will be representing some direct lenders.  I don't know

3    which ones, yet, and we filed his pro hac vice papers this

4    morning.

5        And because I have to leave, your Honor, I would like to

6    say that the Bickel & Brewer arrangement is such that I hope

7    the Court will find it acceptable.  It's substantially

8    different than the one that you disallowed, previously, and

9    Mr. Collins can go into that.

10       And I also want to disclose that McGowan Duncan (phonetic)

11   associated with Cross will be advancing expenses, but there is

12   no encumbrance of the interest.  It's a pure contingency

13   matter.

14              THE COURT:  Thank you.

15              MS. CHUBB:  Thank you.

16              THE COURT:  Appearances in the courtroom, please.

17              MR. COFFING:  Terry Coffing on behalf of the

18   receiver, Tom Grimmett.

19              MS. RASMUSSEN:  Lisa Rasmussen on behalf of

20   Cangelosi, Castillo, Chaudhry, Eller, Graham, Hess, Knoles,

21   Kriss, Lafayette, Lucas, Maraden, Mortensen, Newman,

22   Schoonover, Simon, Tengan, Westbrook, and Zawacki.

23              THE COURT:  Thank you.

24              MS. SHUMENER:  Good morning, your Honor.

25   Betty Shumener --

1              THE COURT:  Thank you.

2              MS. SHUMENER:  -- on behalf of CCM Pathfinder

3      Pompano Bay, LLC, and CCM Pathfinder Gramercy.

4              THE COURT:  Thank you.

5              MS. KISHNER:  Joanna Kishner of DLA Piper also on

6      behalf of those same parties.

7              THE COURT:  Thank you.

8              MR. LANGBERG:  Mitchell Langberg on behalf of

9      Platinum Properties 1 which is not a party to any motion today,

10     your Honor.

11             THE COURT:  Okay.

12             MR. ASHINOFF:  Good morning, your Honor.

13             THE COURT:  Good morning.

14             MR. ASHINOFF:  Reid Ashinoff of Sonnenschein, Nash

15     & Rosenthal for Asset Resolution and Silar.

16             THE COURT:  Thank you.

17             MR. FORSTOT:  Good morning.

18             THE COURT RECORDER:  I'm sorry.  Can you --

19             MR. FORSTOT:  Jonathan Forstot.

20             THE COURT RECORDER:  -- please repeat your last name

21     (indiscernible)?

22             MR. ASHINOFF:  Ashinoff, A-s-h-i-n-o-f-f.

23        Thank you.

24             THE COURT RECORDER:  Thank you.

25             MR. FORSTOT:  Good morning.  Jonathan Forstot also of

1    Sonnenschein on behalf of the same parties.

2            MR. HOWARD:  Good morning, your Honor.

3    Randolph Howard, Kolesar & Leatham, local counsel for

4    Silar Advisors, et al.

5            THE COURT:  Thank you.

6        I believe we have three matters on calendar, the motion to

7    vacate preliminary injunction, the sealed motion to approve the

8    Gramercy sale, and a motion to substitute various parties.

9        I'd like to suggest since we maybe have a basis for

10   resolving it that we present first or discuss first the

11   emergency motion on the Gramercy sale.

12       And then, potentially -- Ms. Chubb, are you already gone

13   or --

14           MS. CHUBB:  Your Honor, I am here.  I really do have

15   (indiscernible) my (indiscernible).

16       (Colloquy not on the record.)

17           MS. CHUBB:  But Lou Bubala will be sitting in.

18           THE COURT:  Okay.  So we'll let you go at any time,

19   but maybe we can resolve this one.  As I understood it, as long

20   as it's consistent with the objections -- that is accounting

21   and segregation of funds, and that there is no waiver here of

22   any of your claims to these funds -- that you did not object to

23   the sale.

24           MS. CHUBB:  As long as -- this is Janet Chubb.  As

25   long as (indiscernible) is no waiver to any of the funds,

1    including the funds that are paid out, that's correct.

2             MR. HOWARD:  Your Honor, if I might remind the Court,

3    this motion was filed under seal, and we'd like to make sure

4    that the privacy of the transaction involved retain the

5    confidential interest or --

6             THE COURT:  Okay.

7             MR. HOWARD:  -- the handling of the confidential

8    interest.

9             THE COURT:  There is no confidentiality vis-a-vis the

10   direct lenders in that note, right?

11            MR. HOWARD:  Absolutely not.

12            THE COURT:  It's full disclosure to them.  It's just

13   otherwise to the public.

14            MR. HOWARD:  Correct.  And to any other counsel who

15   don't represent any --

16            THE COURT:  Okay.

17            MR. HOWARD:  -- direct lenders on the Gramercy

18   matter.

19            THE COURT:  Any objection, then, to my approving this

20   sale, just simply approving this sale, without further argument

21   from those who are involved in the secrecy obligation of the

22   sale?

23            MS. RASMUSSEN:  I --

24        (Colloquy not on the record.)

25            MS. RASMUSSEN:  I would have objections to place on

1    the record, but not necessarily to the sale if that's the

2    limited ruling at the moment, but I --

3              THE COURT:  That's all we're intending to do.

4              MS. RASMUSSEN:  Okay.  Okay.

5              MS. SHUMENER:  Your Honor, the only thing I would

6    request is that the funds that are in dispute be placed with

7    the receiver in an interest-bearing account, so that there is

8    no question or a concern about where the funds are.

9              MS. RASMUSSEN:  And I would join that request.

10             MR. HOWARD:  Your Honor, I object to any last-minute

11   requests.  I don't believe that was in the opposition.  There's

12   a separate motion --

13             THE COURT:  Uh-huh.

14             MR. HOWARD:  -- for a receiver.

15             THE COURT:  I do think I have to deny that request,

16   but there's a clear understanding here that the funds are

17   segregated, separately accounted for, and under all of the

18   constraints that Ms. Chubb asked for.

19        And you will be presenting an order approving this sale

20   with those conditions, the lack of waiver, of course, and

21   you'll be circulating it to counsel who are involved in that

22   representing direct lenders in that note.

23             MR. ASHINOFF:  Your Honor, if I may?  I think that

24   I'd like to add a little precision to this discussion.  There

25   is a list on page 6 of our reply memorandum of the various fees

1    that are in dispute.

2        There's also a list of the postclosing base-servicing fees

3    and the advances that have been made which your Honor's

4    preliminary-injunction order at paragraph 6 allows for the

5    distribution of what I -- what I think I understand the Court's

6    saying is that we can follow the procedure under paragraph 6,

7    and the lenders won't waive any rights to make some complaint

8    about that, but that we can follow --

9            THE COURT:  I'm not sure how to answer that question.

10   That would be my assumption, too, but I just don't know without

11   looking at it item by item.

12       Is that your understanding, Ms. Chubb?

13           MS. CHUBB:  Well, as long as we have recourse against

14   those fees which we may challenge in the future, I did not

15   object to their being paid out.

16           THE COURT:  Okay.

17           MS. CHUBB:  And they are the advances which are as I

18   recall about 700,000 in attorneys fees and the postconfirmation

19   servicing fees, but they would be still subject to a callback

20   if we should prevail down the road.

21           MR. ASHINOFF:  Your Honor, if --

22           THE COURT:  The advances, I'm not sure why you would

23   object to the advances.  Default interest or late fees,

24   et cetera, that I can certainly understand the objection.  Are

25   you objecting also to the attorneys fees or --

```
 1            MS. CHUBB:  Well, we have not --
 2            THE COURT:  I'm sorry.
 3            MS. CHUBB:  700,000 just seems like a lot of money to
 4     resolve one loan.  I'm sure they got billed for it, so
 5     (indiscernible) reasonable.
 6            THE COURT:  Uh-huh.  This is a $30,000,000 loan.
 7            MS. CHUBB:  It is, your Honor.
 8            THE COURT:  Well, as long as you're conceding there
 9     is recourse, they're not waiving their right, why don't you put
10     that in there.
11         You do have the right to pay it out in accordance with
12     your assumption, but as long as it's understood there is no
13     waiver of right here.
14            MR. ASHINOFF:  Your Honor, my understanding of the
15     injunction is that it was the result --
16            THE COURT:  Okay.
17            MR. ASHINOFF:  -- of --
18            THE COURT:  Then I guess I'm going to have to
19     clear --
20            MR. ASHINOFF:  Yeah.
21            THE COURT:  -- the courtroom, so that we can get into
22     it because, apparently, you do disagree.
23         (Colloquy not on the record.)
24            THE COURT:  You do want a waiver of right.
25            MR. ASHINOFF:  Sorry?
```

```
1              THE COURT:  You do want a waiver of right.

2              MR. ASHINOFF:  Your Honor, the paragraph in the

3    preliminary injunction speaks to --

4              THE COURT:  I'll clear the courtroom --

5              MR. ASHINOFF:  -- preserving --

6              THE COURT:  -- then, please.  We'll just have the

7    parties who are representing direct lenders in this loan

8    and/or -- you apparently have a contest over whether we should

9    approve this sale or not.

10        (Courtroom cleared at 11:34:46 a.m.)

11        (Colloquy not on the record.)

12              MS. RASMUSSEN:  Your --

13        (Colloquy not on the record.)

14              MS. RASMUSSEN:  Your Honor --

15        (Colloquy not on the record.)

16              MS. RASMUSSEN:  -- I'm sorry.  Just for a

17    clarification --

18        (Colloquy not on the record.)

19              MS. RASMUSSEN:  -- do the direct lenders who have an

20    interest in Gramercy need to leave?  Are we talking --

21              THE COURT:  No.

22              MS. RASMUSSEN:  Okay.  They can stay --

23        (Colloquy not on the record.)

24              MS. RASMUSSEN:  -- if they have --

25              THE COURT:  If they are represented --
```

1           MS. RASMUSSEN:  -- an interest.

2           THE COURT:  -- and a party here.  Are they a party

3  here?

4           MS. RASMUSSEN:  I --

5      (Colloquy not on the record.)

6           MS. RASMUSSEN:  I don't know the answer to that.  I

7  know I represent four people with an interest in Gramercy.

8      (Colloquy not on the record.)

9           MS. RASMUSSEN:  But I don't believe --

10          THE COURT:  Those four people --

11          MS. RASMUSSEN:  -- any of mine --

12          THE COURT:  -- may remain and, of course --

13          MS. RASMUSSEN:  Right.

14          THE COURT:  -- counsel representing them.

15      (Colloquy not on the record.)

16          MS. RASMUSSEN:  And I don't know if any of my four

17  are here, but there are some people --

18          THE COURT:  People who --

19          MS. RASMUSSEN:  -- who are here.

20          THE COURT:  -- don't have a direct-lender interest in

21  Gramercy, I'll ask just for a few minutes, ten minutes,

22  five minutes only, if you'll vacate the courtroom.

23          MS. RASMUSSEN:  Okay.  Now, is --

24      (Colloquy not on the record.)

25          MS. RASMUSSEN:  Because they're not represented by

1    counsel?

2         (Colloquy not on the record.)

3              THE COURT:  No.  Because they're not --

4              MS. RASMUSSEN:  I mean, if they --

5              THE COURT:  -- not a party.

6              MS. RASMUSSEN:  If they do have an interest, but they

7    don't have counsel, may they stay?  I'm sorry.

8              THE COURT:  Yes, they may.

9              MS. RASMUSSEN:  Okay.

10         (Thereupon, Lisa L. Cline concluded as transcriber,

11         and Michele Phelps commenced as transcriber

12         at 11:35:46 a.m.)

13         (Colloquy not on the record.)

14              MR. COLLINS:  Your Honor?

15         (Colloquy not on the record.)

16              MR. COLLINS:  Your Honor, this is Michael Collins on

17    behalf of Bickel & Brewer.  As Ms. Chubb says, I'm proposed to

18    appear today subject to my pro hac being granted on behalf of

19    the Jones Vargas direct lenders.

20         A number of other lenders want to retain us.  We have not

21    appeared for them, yet.  One of them is people with interest in

22    the Gramercy loan.

23              THE COURT:  On that --

24              MR. COLLINS:  I have not been --

25              THE COURT:  -- proposed basis, you may remain, but

```
1    you're subject to the confidentiality sealing with respect to
2    your various clients who have no interest in Gramercy.
3              MR. COLLINS:  Absolutely, your Honor.
4         (Thereupon, the proceedings were sealed
5         at 11:36:27 a.m.)
6         (Thereupon, the proceedings were unsealed
7         at 11:48:51 a.m.)
8         (Colloquy not on the record.)
9              THE COURT:  Thank you so much for your patience and
10   indulgence.
11        (Colloquy not on the record.)
12             THE COURT:  Let's go now to the motion to substitute
13   and then, finally, the motion to vacate.
14        (Colloquy not on the record.)
15             THE COURT:  In that order, please.  I've read the
16   pleadings, of course, the objections.  I'll entertain your oral
17   arguments on that motion, to substitute Asset Resolution --
18             MR. ASHINOFF:  Thank you, your Honor.
19             THE COURT:  -- and the servicing rights and with
20   respect to the preliminary injunction.
21        (Colloquy not on the record.)
22             THE COURT:  Basically, I'll tell you where my mind is
23   on this, so that you can address it.  There's a difference
24   between -- is it 26, Rule 26 -- what -- substitution of
25   parties.
```

```
 1              MR. ASHINOFF:  20 --

 2              THE COURT:  There's a difference between allowing a

 3      party to substitute in and approval of substitution of those

 4      parties into the servicing rights and into the protection

 5      because they've been allowed to intervene the protections of

 6      the preliminary injunction.  There's a difference.

 7              Under Rule 26, I have to let them intervene, of course.

 8      Basically, the way I come out on it is I haven't reached final

 9      conclusion on all of --

10              (Colloquy not on the record.)

11              THE COURT:  -- DLA Piper's complaints on some of the

12      items.  It seems to me that there's a very good argument on

13      Piper's complaint about how the right to late fees and default

14      interest is limited by the term "collected".

15              I do not agree with their point on personal-service

16      contracts.  I don't think that this is a personal-service

17      contract, and I'm inclined to agree with you that you have the

18      right to substitute.

19              But they're absolutely right on one point.  You take by

20      way of assignments and substitution only what Compass had.  And

21      if Compass has forfeited the servicing rights, you can't assign

22      them.

23              If they did not and if you took validly the assignment,

24      purchased, either subject to a lender's agreement or subject to

25      a sale agreement and a repurchase, either one, and you took
```

1    them validly, and Compass had them, you have full right I think

2    to substitute in for their servicers.

3         So my attitude is that I should grant you, of course, the

4    right to intervene, acknowledge the fact that you have assigned

5    servicing rights pursuant to either your foreclosure sale or

6    purchase, either way you may characterize it, and acknowledge

7    that you further assigned those to Asset Resolution, but

8    without approving the assignment because Piper is right in one

9    respect.

10        If Compass didn't have it to assign and/or you didn't have

11   it to assign at the time you did, you assigned nothing.  What

12   that means in my mind, a little bit further delineation, is

13   your involvement at least as a lender was clearly acknowledged

14   by the bankruptcy court.

15        This Court has acknowledged Silar's -- when I say you, I

16   mean Silar's -- Silar's involvement throughout the case.

17   You've appeared here because you were named as a party.  You

18   made appearance without representing a position on a number of

19   the motions through the course of the case.

20        So I think the assignment at least by way of collateral

21   interest if not in addition by way of purchase -- that remains

22   to be seen -- was acknowledged by the bankruptcy court, and it

23   was acknowledged by this Court.  I don't think I would have any

24   basis to deny your right to substitute Silar in.

25        (Colloquy not on the record.)

1            THE COURT:  That was acknowledged from the outset.

2    And, obviously, reading between the lines or even expressly,

3    the concern is that you're substituting in Asset Resolution as

4    a buffer.

5        If there are counterclaims for misservicing, malpractice,

6    breach of fiduciary duty during the term that Asset Resolution

7    is attempting to service these notes, that you're simply

8    introducing Asset Resolution as a buffer.

9        I don't think it's appropriate for me to approve that

10   scenario at this juncture until I hear the merits of the case,

11   when I hear the merits, so I think it's enough for me, my

12   present thinking, to acknowledge your assignment.

13       If there was no problem with what you got, Compass had it,

14   and there was no proper termination by other direct lenders,

15   Compass had it, then, certainly, Silar's foreclosure took the

16   servicing right.

17       But without going beyond simply acknowledging your

18   assignment to Asset Resolution, I don't think the Court can

19   approve that assignment or substitution.  I can approve you as

20   -- Asset Resolution when I say you -- as a party under Rule

21   26 --

22            MS. SHUMENER:  Um-h'm.

23            MR. ASHINOFF:  25(c), your Honor --

24       (Colloquy not on the record.)

25            MR. ASHINOFF:  -- I think.

```
 1              THE COURT:  -- 25(c).  You will be substituted in as
 2      a party or as an additional party, certainly, in lieu of
 3      Compass.  The opposing parties want that at a minimum.  They
 4      need you as a defendant or a plaintiff --
 5              MR. ASHINOFF:  Right.
 6              THE COURT:  -- on the --
 7              MR. ASHINOFF:  Right.
 8              THE COURT:  -- ultimate judgment that they hope to
 9      obtain --
10              MR. ASHINOFF:  Right.
11              THE COURT:  -- but without approving the substitution
12      into servicing rights.
13          Where does that leave you if I do it that way?  They've
14      been allowed to be a party.  They're here.  They're heard.
15          You're acting.  You've told everybody you're acting by
16      allowing them to handle note negotiations by way of your
17      assignment on the assumption that it was properly done.
18          (Colloquy not on the record.)
19              THE COURT:  You're doing it also with the
20      understanding that you've named Windemere in accord with the
21      Court's mandate that you name a Nevada-licensed servicer.
22              MR. ASHINOFF:  Um-h'm.
23          (Colloquy not on the record.)
24              THE COURT:  That part of it is clearly acknowledged
25      and approved, but I cannot approve at this juncture the
```

1    substitution as service of Asset Resolution.  All I can do is

2    acknowledge your appointment of them under the rights that you

3    suggest that you have and I pretty much agree with under the

4    documentation.

5         With respect to the preliminary injunction, that's a

6    different issue because I do need to consider whether the

7    preliminary injunction should extend to Asset Resolution as

8    well as Windemere and Silar.

9              MR. ASHINOFF:  Your Honor --

10        (Colloquy not on the record.)

11             MR. ASHINOFF:  Your Honor, you've said a lot, and

12   I've been listening as carefully as I can.

13             THE COURT:  I'll let you respond.

14             MR. ASHINOFF:  I'd like to pick pieces of this to

15   respond to.  And if I'm not covering something on your mind,

16   I'd like --

17             THE COURT:  Okay.

18             MR. ASHINOFF:  -- the opportunity to have a little

19   bit of a dialogue.

20             THE COURT:  Okay.

21             MR. ASHINOFF:  Asset Resolution during the course of

22   this litigation is a special-purpose entity that was created to

23   foreclose on the rights that Silar had.  In 35 years of

24   practice and Mr. Forstot's decades of practice, that's how

25   foreclosures are done, and the Court can take notes of that, so

1    Asset Resolution now owns as assignee through a foreclosure the

2    interest in the LSA contractual --

3              THE COURT:  The assignment --

4              MR. ASHINOFF:  -- servicing rights.

5              THE COURT:  -- prior to foreclosure, of course,

6    however, did not occur nor was Asset Resolution created until

7    some short time ago --

8              MR. ASHINOFF:  Yeah.  But --

9              THE COURT:  This last fall.

10             MR. ASHINOFF:  But Asset Resolution is now for the

11   last six months doing all the work.  It's servicing these

12   loans.  It's servicing them extremely well.

13        And there's an uncontested record with declarations and

14   exhibits of the Internet site that's been set up, of the huge

15   efforts to communicate with lenders, of the huge efforts to

16   replace counsel or get better fees and counsel around the

17   country to get offers on the property.  They're doing it --

18             THE COURT:  And I think --

19             MR. ASHINOFF:  They're --

20             THE COURT:  -- I agree that if Compass passed you

21   something, you probably under the various agreements have the

22   right to assign someone like Asset Resolution to take the

23   foreclosure right.

24             MR. ASHINOFF:  But here's the problem I have, and

25   here's the first point of concern that I have with where the

1    Court has this.

2         The Court on the basis of unproven, unsworn allegations is

3    not recognizing an actual commercial transfer of these rights

4    that has taken place in accordance with documents and

5    accordance with law.  You're giving --

6              THE COURT:  I'm acknowledging it.

7              MR. ASHINOFF:  You're giving --

8              THE COURT:  But I'm not approving it.

9              MR. ASHINOFF:  But the problem is you have created --

10   and then I can go to the injunction, too, because the

11   injunction protects the person doing the servicing as well as

12   protecting the lenders, and the person doing --

13             THE COURT:  Well --

14             MR. ASHINOFF:  -- the servicing --

15             THE COURT:  -- that's a good argument why the

16   preliminary injunction ought to be extended to Asset

17   Resolution.

18             MR. ASHINOFF:  As the transferee of the interest from

19   Compass --

20             THE COURT:  That's a separate problem.

21             MR. ASHINOFF:  -- the Ninth Circuit and the

22   Eleventh Circuit have found that we stand in the shoes as the

23   Court said.  Whatever contractual rights Compass had, we have.

24   What rights they didn't have, we don't have.

25             THE COURT:  Well, what if the right was terminated?

1          MR. ASHINOFF:  Well, the truth is, your Honor, that

2     the only purported termination of the right was ruled null and

3     void.  And as we stand here on March 16th --

4          THE COURT:  So why do we need a trial, then?

5          MR. ASHINOFF:  Because there is a -- well, there are

6     a lot of issues to be tried.

7          THE COURT:  You're saying --

8          MR. ASHINOFF:  But that --

9          THE COURT:  -- res judicata?  We've already decided

10    that?

11         MR. ASHINOFF:  No.  I'm saying that the only attempt

12    at termination was null and void.  Up to this date as we stand

13    here today, these rights have not been terminated.  This Court

14    may make a ruling at trial that they should be, but they have

15    not been terminated, and we have unsworn allegations as to why

16    they should.

17        But you are taking away a property right that's protected

18    by an injunction on the basis of unsworn allegations.  There

19    has never been a notice from 51 percent of the holders --

20         THE COURT:  I don't see --

21         MR. ASHINOFF:  -- on cause.

22         THE COURT:  -- that I'm taking away a property right.

23         MR. ASHINOFF:  The --

24         THE COURT:  If I acknowledge --

25         MR. ASHINOFF:  The --

```
 1                THE COURT:  -- and acknowledge --
 2                MR. ASHINOFF:  It's the right --
 3                THE COURT:  -- the fact that Asset -- allow them to
 4      be a party, acknowledge the fact that they have received an
 5      assignment from you, acknowledge the fact that they are
 6      servicing, and even if I go a step further and extend the
 7      protection of the preliminary injunction to them, then I don't
 8      see how --
 9                MR. ASHINOFF:  Okay.
10                THE COURT:  -- I've taken away --
11                MR. ASHINOFF:  It --
12                THE COURT:  -- a --
13                MR. ASHINOFF:  That --
14                THE COURT:  -- property right.
15                MR. ASHINOFF:  It's the last part that I'm
16      addressing.  They have a right under controlling federal
17      authority to get the protection of the injunction.  That's the
18      property right I was talking about.
19          If your Honor extends the injunction and says I recognize
20      that Asset Resolution is now doing the job and carrying the
21      water every day, and I'm putting them in for Compass --
22                THE COURT:  They have the right along with Windemere
23      to be the sole negotiator --
24                MR. ASHINOFF:  Absolutely.
25                THE COURT:  -- with a borrower.
```

1          MR. ASHINOFF:  Absolutely.

2          THE COURT:  That's the basic sum and substance of the

3     injunction.

4          MR. ASHINOFF:  But that injunction -- and we've all

5     read it carefully, and we're trying to really live by it.  That

6     injunction has to take in Asset Resolution in Compass' place,

7     instead, to fully protect the property rights pendente lite.

8     There's been nothing proven.  There's no termination, yet.

9          THE COURT:  Okay.

10         MR. ASHINOFF:  We're entitled to that protection

11    pendente lite -- excuse me -- just as they are entitled to the

12    protection of the injunction that says that the disputed fees

13    don't go into your pocket.  They go into a lockbox account.

14    They have a right to that even though we're the servicer.

15         But as servicer, we also have a right to the commensurate

16    protections that you afforded a servicer to get their advances

17    back, to get the servicing fees postconfirmation when a

18    property is sold.

19         Those are rights that they have that go with the property

20    under controlling Ninth Circuit and Eleventh Circuit authority,

21    so that's --

22         THE COURT:  Okay.

23         MR. ASHINOFF:  That's what I meant by the property

24    right.  If your Honor grants the motion to put Asset Resolution

25    in the injunction in Compass' place, instead, because there's

1    been a transfer of interest, I'm fine with everything else the

2    Court is saying today, and that's really the nub of it --

3               THE COURT:  Okay.

4               MR. ASHINOFF:  -- because the truth is -- and I have

5    to underscore this -- as we stand here on March 16th, 2009,

6    there is no question that the servicing rights that Compass got

7    out of the bankruptcy and that have been assigned to Asset

8    Resolution as we stand here today have not been terminated.

9    That's why we're doing the job.

10        We're spending hundreds of thousands of dollars, putting

11   up money, sending people all over, putting employees to work.

12        Asset Resolution, by the way, is not a gossamer thread.

13   Asset Resolution is the single-largest direct lender in this

14   case.  They have 5.8 percent of the direct loans.  They have

15   substantial assets, I would suggest, more substantial assets

16   than most of the direct lenders.

17        They have been spending the money.  They have been putting

18   their resources to work.  They used an affiliate to help them

19   work and go out and service.  With Windemere, they've put in

20   additional people to help deal with the brokers around the

21   country.

22               THE COURT:  Okay.

23               MR. ASHINOFF:  There's a lot of work going on here,

24   your Honor.

25               THE COURT:  Very good.

```
 1          Let me hear the motion to vacate preliminary injunction as
 2    well as --
 3              MR. ASHINOFF:  And the --
 4              THE COURT:  -- the counter --
 5              MR. ASHINOFF:  All right.  Do you --
 6              THE COURT:  -- or a response --
 7              MR. ASHINOFF:  Do you want to hear me --
 8              THE COURT:  -- to this motion.
 9              MR. ASHINOFF:  -- on the motion to vacate or just --
10              THE COURT:  No.  It's their motion.  Let them present
11    it, and then I'll give you a chance to respond, please.
12              MR. ASHINOFF:  Thank you.
13          (Colloquy not on the record.)
14          MS. SHUMENER:  Your Honor, may I?  Thank you.
15          (Colloquy not on the record.)
16          MS. SHUMENER:  I will start with a confession and
17    then make a statement and welcome any corrections if I'm
18    mistaken.
19          I have scoured what I have of the bankruptcy court record,
20    and I have read the findings of fact and conclusions of law,
21    over 20 pages, the plan and the disclosure statement, and I
22    have not found one reference in there to the master repurchase
23    agreement between Silar and Compass.
24              THE COURT:  You sure saw --
25              MS. SHUMENER:  I'm --
```

```
1              THE COURT:  -- a reference to a lender status for

2      Silar, right?

3              MS. SHUMENER:  I --

4              THE COURT:  Silar is financing this transaction.

5              MS. SHUMENER:  I don't remember.  See, I didn't see

6      it in the findings of fact and conclusions of law.  I did not

7      see it in the 20-page findings of fact and conclusions of law.

8              THE COURT:  With honest --

9              MS. SHUMENER:  And --

10             THE COURT:  -- due respect --

11             MS. SHUMENER:  And --

12             THE COURT:  -- and humble respect, that's selective

13     memory --

14             MS. SHUMENER:  Okay.

15             THE COURT:  -- because all the other pleadings here

16     represent -- and it's my recollection from pleadings long

17     since -- that the bankruptcy judge clearly understood that

18     Compass was being financed, and they were being financed by

19     Silar.

20             MS. SHUMENER:  Maybe.  And I'm not -- your Honor, I

21     started off saying I'm not saying I have a full-fledged

22     recollection.  I just know that when it came to the master

23     repurchase agreement I don't think anybody saw it or had an

24     opportunity to object to it.  That's number one.

25         Number two that I think is very, very important that I did
```

 1    see from the bankruptcy court's records is that the bankruptcy

 2    court wasn't just concerned with who was the highest bidder.

 3        The bankruptcy court was absolutely concerned with

 4    Compass' qualifications to act as a loan servicer and Compass'

 5    representations to the Court that it had the wherewithal and

 6    the ability and would make the advances necessary.  Okay?

 7        We have absolutely no evidence of any kind that Silar or

 8    Asset Resolution have any qualifications to act as loan

 9    servicer.

10            THE COURT:  Why is that required?

11            MS. SHUMENER:  Because a loan servicer has to have a

12    certain skill set and a certain reputation.  They're handling a

13    half-a-billion dollars --

14            THE COURT:  That's if --

15            MS. SHUMENER:  -- in assets.

16            THE COURT:  -- this is a personal-services contract,

17    of course.

18            MS. SHUMENER:  This is a personal-services contract.

19            THE COURT:  And you're going to argue that.  But if

20    it's not --

21            MS. SHUMENER:  Yeah.

22            THE COURT:  And we're using a technical term, of

23    course.  Personal-services contract means -- in the legal,

24    technical art, it means a contract whose obligations and

25    benefits cannot be assigned.

1          MS. SHUMENER:  Correct.

2      (Colloquy not on the record.)

3          MS. SHUMENER:  Well --

4          THE COURT:  And we, in fact, have in the law and over

5   the course of many decades this very kind of contract being

6   assigned in normal commerce and in normal litigation.

7          MS. SHUMENER:  Well, I don't know because I have not

8   seen such assignments, and I certainly haven't seen them when

9   the agreement doesn't call for such assignments, and I

10  certainly wouldn't say that it is common practice in the

11  industry or elsewhere that you have a power of attorney just

12  assigned as a matter of right.  That you have a power of

13  attorney that --

14         THE COURT:  The power of attorney --

15         MS. SHUMENER:  -- which is inherent --

16         THE COURT:  -- is a separate question in my mind.

17  But the assignment of servicing rights, you sat here very

18  patiently and listened to a number of cases.

19     We have a "plethora" -- excuse the term -- of such cases

20  filed in the federal courts now for the last several months and

21  into the indefinite future where parties, mortgagors on

22  homes --

23         MS. SHUMENER:  Um-h'm.

24         THE COURT:  -- are objecting to the assignment of the

25  servicing rights for their loans on their homes, and Courts

1    across the nation are saying that's not an issue.

2         There never has been an issue except in some of the

3    variations that are being raised now.  It's not been an issue,

4    but what that servicing rights on my mortgage, on your mortgage

5    can be assigned.

6              MS. SHUMENER:  Here's the material distinction

7    between those cases, your Honor.  Those are objections being

8    made by the borrower where it's the party that owes money to

9    the servicer who's saying I don't like the invoice you're

10   sending me.  I never approved you coming in; therefore, I don't

11   want to pay you.

12        We are the lenders in this case.  It's our assets.  It's

13   not a borrower who doesn't like getting an invoice from

14   company A versus company B.  The difference here is it's our

15   half-a-billion dollars.

16             THE COURT:  And what --

17             MS. SHUMENER:  It's --

18             THE COURT:  -- exactly --

19             MS. SHUMENER:  You know --

20             THE COURT:  -- is the Nevada case law that you're

21   relying on again?

22             MS. SHUMENER:  Well, I'm relying on the -- well,

23   truly, I don't believe that we could find anything directly on

24   point other than out of the Tax Court which wasn't even Nevada,

25   so I would never represent to the Court --

```
 1              THE COURT:  Right.

 2              MS. SHUMENER:  -- that we have that.

 3              THE COURT:  So it's a Tax Court case.

 4              MS. SHUMENER:  It's a Tax Court case and other cases

 5    that you could read together with the Tax Court case as to this

 6    being a personal-services contract.  But in addition to that,

 7    the loan-servicing agreement itself has a power-of-attorney

 8    provision within it.

 9              THE COURT:  Do you have any bankruptcy cases because

10    they deal with this issue all the time, and I'm sure --

11              MS. SHUMENER:  I --

12              THE COURT:  -- on appeal and, in fact, in this very

13    case the issue was never raised, but that this was not a

14    personal-services contract because it was assigned.

15         There was a ruling, of course, and the issue was raised

16    whether it not had to be cured and assumed and assigned.  That

17    was a definite issue --

18              MS. SHUMENER:  But I've got protection --

19              THE COURT:  -- under bankruptcy law.

20              MS. SHUMENER:  Oh.

21              THE COURT:  But there was no issue raised -- and why

22    do we not have res judicata -- that these were

23    personal-services contracts, Judge, and, therefore, there can

24    be no assumption.  There can be no assignment.  You can't

25    assign, period, because they're personal-service contracts.
```

```
1              MS. SHUMENER:  And I wasn't in the bankruptcy case,
2    your Honor.  I apologize.  I came onto the scene late, and I
3    admit it.
4              THE COURT:  You don't need to apologize, but you do
5    need to answer.
6              MS. SHUMENER:  The answer is that an assignment
7    blessed by a bankruptcy court especially when you have certain
8    nonassignability, certain prohibitions within bankruptcy law,
9    against --
10             THE COURT:  Express.
11             MS. SHUMENER:  -- nonassignability restrictions --
12             THE COURT:  Right in the statute, Judge, you cannot
13   allow assignment of a personal-services contract.
14             MS. SHUMENER:  But an assignment blessed in a
15   bankruptcy proceeding is different than saying and we bless all
16   subsequent assignments for time in memorial --
17             THE COURT:  That's certainly true.
18             MS. SHUMENER:  -- that go afterwards.
19             THE COURT:  We --
20             MS. SHUMENER:  And so --
21             THE COURT:  That's certainly true.
22             MS. SHUMENER:  Okay.
23             THE COURT:  We know that if a contract says no
24   assignments except upon consent of one party or not one
25   assignment does equal a waiver as to all of them, but here --
```

```
 1                MS. SHUMENER:  Um-h'm.

 2          (Colloquy not on the record.)

 3                THE COURT:  -- number one, I don't think we have that

 4      language, and, number two and more importantly --

 5                MS. SHUMENER:  Um-h'm.  We don't.

 6          (Colloquy not on the record.)

 7                THE COURT:  -- that issue wasn't even raised

 8      sufficient for there to be a waiver.

 9                MS. SHUMENER:  Ah, but the --

10                THE COURT:  The question simply --

11                MS. SHUMENER:  But whose burden?

12                THE COURT:  -- was never raised, and isn't that

13      res judicata?

14                MS. SHUMENER:  No.  And I'll tell you why it's not

15      res judicata.  Had Silar stepped up to the bankruptcy court and

16      said, here, Court, here is the master repurchase agreement, and

17      let's disclose its terms to all the direct lenders, and let's

18      have the bankruptcy court actually even be made aware of the

19      terms of the master repurchase agreement and the conditions

20      under which such an assignment could or could not take place,

21      that would be a different issue.

22          You could argue waiver.  You could argue res judicata.

23      You could argue collateral estoppel.

24                THE COURT:  You might --

25                MS. SHUMENER:  But here --
```

1          THE COURT:  -- have a point there, but let me give

2     you the devil's argument.

3          MS. SHUMENER:  Yes, sir.

4          THE COURT:  Assuming for the sake of argument that

5     you had a disclosure that Silar was financing it, and,

6     therefore, they were taking a collateralized interest.

7          MS. SHUMENER:  Um-h'm.

8          THE COURT:  Even though the purchase agreement,

9     repurchase agreement, was not disclosed --

10         MS. SHUMENER:  Right.

11         THE COURT:  -- you had disclosure of their taking of

12    a, quote, "property interest," a collateralized interest.

13         MS. SHUMENER:  In what?

14         THE COURT:  And nobody --

15       (Colloquy not on the record.)

16         THE COURT:  In the servicing right.

17         MS. SHUMENER:  Um-h'm.

18         THE COURT:  Not only the direct-lender interests,

19    but, also, the servicing rights, everything that Compass was

20    receiving, and that would have been the time to raise a

21    question not only of assignment to Compass, but, also, of

22    reassignment to Silar.

23         MS. SHUMENER:  Your Honor, I don't believe that there

24    was ever disclosure that there would be an assignment to

25    Silar --

```
1              THE COURT:  Even --

2              MS. SHUMENER:  -- of the servicing rights.

3              THE COURT:  -- for collateralized purposes?

4              MS. SHUMENER:  Even for collateralized purposes.

5    It's one thing to say --

6              THE COURT:  Okay.

7              MS. SHUMENER:  I think that the burden if -- if a

8    party is going to be burdened with the terms of an agreement,

9    it has to have those terms disclosed to it.  And some hint or

10   generalized statement that this is being financed, financed to

11   what extent, under what conditions, by what?

12        Before I'm saddled with the terms of their private

13   agreement, I should be made aware of that agreement.  I should

14   have a right to stand up and say, you know what, your Honor,

15   Compass came to this Court, to bankruptcy court, and proved

16   that it was a qualified loan servicer, and Compass came here

17   and gave you assurances, Judge, okay, that Compass would make

18   the advances, and Compass gave you the assurances that it would

19   abide by the terms of the agreement.

20        Of course, all of those things turned out to be false.

21   That we'll litigate later.  Silar never did that.  Asset

22   Resolution didn't even exist.

23        So to saddle us, you know, with the private agreement

24   because we knew that there was some financing that took place

25   in the background I don't is either res judicata or collateral
```

1   estoppel or a waiver of any sort.

2          THE COURT:  I think that it turns on the disclosure

3   to the bankruptcy court.  If the bankruptcy court was aware

4   that Silar was financing it --

5          MS. SHUMENER:  Um-h'm.

6          THE COURT:  -- and was aware that Silar was taking a

7   property interest, i.e., a collateral interest by a UCC and by

8   a collateralization agreement whether or not that agreement was

9   disclosed, then I think it's enough.

10          MS. SHUMENER:  I'll go back and check, your Honor.

11          THE COURT:  And it --

12          MS. SHUMENER:  I'll --

13          THE COURT:  -- bars your side.  If your side did not

14   raise the personal-services-contract issue to the bankruptcy

15   court vis-a-vis Compass --

16          MS. SHUMENER:  Um-h'm.

17          THE COURT:  -- I think you're barred on that one.

18          MS. SHUMENER:  Um-h'm.

19          THE COURT:  And if you did not raise with that

20   sufficient a disclosure, if you did not raise the

21   personal-services contract with respect to Silar, I think

22   you're barred, also --

23          MS. SHUMENER:  I --

24          THE COURT:  -- not with respect --

25          MS. SHUMENER:  I --

```
 1              THE COURT:  -- to --
 2              MS. SHUMENER:  I --
 3              THE COURT:  -- Asset Resolution.  I agree on that.
 4              MS. SHUMENER:  I will personally go back and look at
 5      the record.  My associates have looked, and I --
 6              THE COURT:  Okay.
 7              MS. SHUMENER:  And I'm trying to -- I don't want to
 8      burden the Court.  I'm just trying to see if I hit --
 9              THE COURT:  That all --
10              MS. SHUMENER:  -- some of the points.
11              THE COURT:  That depends, of course, on whether this
12      is a personal-services contract.
13              MS. SHUMENER:  Um-h'm.
14              THE COURT:  And I do need to resolve that question.
15          (Colloquy not on the record.)
16              THE COURT:  And do you have anything further on that?
17              MS. SHUMENER:  On the personal-services contract,
18      other than what's been raised in the papers, honestly, I don't
19      really have that much to add --
20              THE COURT:  Okay.
21              MS. SHUMENER:  -- not anything.
22              THE COURT:  Okay.
23              MS. SHUMENER:  I would welcome any questions --
24              THE COURT:  Okay.
25              MS. SHUMENER:  -- or exchange.
```

```
 1              THE COURT:  My main questions to both sides are
 2    what's the case law, what's the authority, what is it --
 3              MS. SHUMENER:  I'll look at our brief.
 4              THE COURT:  -- we are told about Nevada law.
 5              MS. SHUMENER:  I would like to be able to reply if
 6    there is room.
 7              THE COURT:  Please.
 8              MS. SHUMENER:  Thank you, your Honor.
 9              THE COURT:  Other response, please, on the motion to
10    vacate preliminary injunction as well as response to
11    substitution.
12         (Colloquy not on the record.)
13              MS. RASMUSSEN:  Thank you, your Honor.
14              THE COURT:  Thank you.
15              MS. RASMUSSEN:  Just to follow up where we left off
16    while it's fresh in my mind, I have gone through the bankruptcy
17    record as well, and there were no representations made to the
18    bankruptcy court with regard to the competency of Silar, that
19    they were taking an interest, that they were actually funding
20    it, that they were financing it.  It was all Compass, Compass,
21    Compass.
22              THE COURT:  What?  Is Silar never even mentioned in
23    the record?
24              MS. RASMUSSEN:  I can't tell you that Silar was never
25    mentioned because I have not gone through transcripts, but I've
```

1    gone through minutes.  I've gone through pleadings.  I can't

2    find anything that ever makes any representation to

3    Judge Riegle --

4              THE COURT:  Exclusive of the transcripts.

5              MS. RASMUSSEN:  -- but exclusive of the transcripts

6    because I've not gone through them.

7              THE COURT:  Okay.

8         (Colloquy not on the record.)

9              MS. RASMUSSEN:  And I don't have all of them.  I'm

10   not even sure I would have the wherewithal, frankly, to read

11   them because it's been going on for so long.

12        But I can tell you this.  There are no -- and I just

13   recently did this and submitted papers, and I can't even

14   remember which motion or document I attached it to, but I did

15   file it in this case.  There are no UCC filings --

16        (Colloquy not on the record.)

17             MS. RASMUSSEN:  -- with regard to Compass or Silar.

18        (Colloquy not on the record.)

19             MS. RASMUSSEN:  So that would obviously be one of the

20   things that you would look at to see whether or not there's a

21   perfected interest of any kind.

22        Now, with regard to the motion for a preliminary

23   injunction, I get the impression from the comments of the Court

24   and the comments of Silar that the Court is inclined to simply

25   extend it to Asset Resolution.

```
1              THE COURT:  I am inclined.  I'll tell you why, and so

2      that you can respond and tell me why I shouldn't.  I think I

3      ought to acknowledge Asset Resolution --

4              (Colloquy not on the record.)

5              THE COURT:  -- without approving it because I think

6      that turns on the merits of the lawsuit, and I need to hear the

7      merits, but I think Rule 25 is a separate question from the

8      preliminary injunction.

9          A preliminary injunction is designed to hold the status

10     quo.  It doesn't make sense to me before I hear the merits to

11     either shift the status quo in their favor or in your favor.

12         It doesn't make sense to me to say I'm going to substitute

13     in now over their objection unless they agree with it,

14     substitute now in their stead, a receiver before I have

15     determined whether or not they have a present interest in the

16     servicing rights.

17         It doesn't make any sense to me to approve Asset

18     Resolution as a substitute nor even Silar, of course, unless it

19     was acknowledged and represented to the bankruptcy court from

20     the very outset that Silar was a financier and taking a

21     property interest.  Unless it was so represented, it doesn't

22     make any sense to me to approve them, either.

23         But the purpose of the preliminary injunction in this case

24     is to hold the status quo and to make sure that the interests

25     in the notes themselves don't evaporate because of this dispute
```

1    that's going on here.

2        That's the purpose of the preliminary injunction, to hold

3    the status quo to keep all the parties in the same posture

4    until the Court can decide in normal, slow, ordinary judicial

5    process the merits of the litigation.

6        My purpose is to hold the status quo and to make sure that

7    the positions of the parties don't shift forevermore and in

8    spite of the fact that I haven't yet decided the case.

9            MS. RASMUSSEN:  Well, your Honor, okay.  A couple of

10   things, and I'm just thinking of all the things that were said,

11   previously.

12       There was a valid termination of Compass' servicing

13   rights, so that leaves the Court, first of all, with the

14   preliminary threshold question of whether or not Asset

15   Resolution can take over servicing rights that have now been

16   terminated.

17           THE COURT:  Right.

18           MS. RASMUSSEN:  Obviously, that's a substantial

19   issue.

20           THE COURT:  Are you asking me to answer that

21   question --

22           MS. RASMUSSEN:  Well, I'm --

23           THE COURT:  -- today?

24           MS. RASMUSSEN:  I think that you have, but they state

25   that they weren't terminated.

```
1              THE COURT:  Right.

2              MS. RASMUSSEN:  And I understand that --

3              THE COURT:  How have I answered --

4              MS. RASMUSSEN:  -- that --

5              THE COURT:  -- that question?

6              MS. RASMUSSEN:  No.  I'm sorry.  I misspoke.  They

7    assert, Silar asserts -- when I say they, I should say who they

8    are.

9         (Colloquy not on the record.)

10             MS. RASMUSSEN:  Silar asserts that they have not been

11   terminated.  And, of course, I believe that the record in this

12   court indicates that they have.  But if the Court isn't willing

13   to go so far in the record as to say that, that's fine.

14             THE COURT:  It seems to me to be very dangerous to

15   decide that question today before I've even heard the evidence

16   on the merits --

17             MS. RASMUSSEN:  Okay.

18             THE COURT:  -- or at least a summary judgment which I

19   have invited many, many times.

20             MS. RASMUSSEN:  I won't disagree with your

21   hesitation.  Okay.

22        Now, then the next issue is whether or not there was any

23   determination by the bankruptcy court that Silar had some

24   involvement or what about even the competency to service these

25   loans because all the representations which as Ms. Shumener
```

1    pointed out that were made in the bankruptcy court not only did

2    they turn out to be false, but they all had to do with Silar.

3         Silar went to Judge Riegle and said we have all of these

4    abilities and capabilities, and this is what we do or

5    Compass --

6              THE COURT:  Okay.

7              MS. RASMUSSEN:  -- went to --

8              THE COURT:  You raise --

9              MS. RASMUSSEN:  -- the bankruptcy court.

10             THE COURT:  -- a good point.  There is a provision in

11   the bankruptcy code that says, for example, on the right --

12   this is in a different provision than assignment.

13        It's adequate protection.  You have a right to prime a

14   loan.  You have a right to bump a person's constitutional

15   property interests as long as you give adequate protection.

16        There are other similar provisions in other places where,

17   basically, congress is making the decision, Judge, if you can

18   say that their property right is protected, you can change or

19   bump them.

20             (Colloquy not on the record.)

21             THE COURT:  And one of the provisions has to do with

22   substitution of obligors.  So, for example, if you want to say,

23   Judge, this encumbrance covers both houses, you as a debtor,

24   but we want you to divide it in two, so that there's only an

25   encumbrance -- there's separate encumbrances -- and, by the

1    way, we have a sale of one, so we want you to approve that sale

2    even though we're not paying off the whole encumbrance, the

3    judge can do that if there's adequate protection of the

4    property interest.

5         Also, you can substitute a borrower if you can show,

6    appropriately, for example, the right to use cash collateral.

7    If you can say to the Court they're going to be adequately

8    protected because this substituted party has the same

9    creditworthiness, the same ability to answer the contract,

10   those provisions are present, too.

11        And they are provisions that have constitutional

12   parameters.  That's why they're put there because, otherwise,

13   you'd be taking away a property interest.

14             MS. RASMUSSEN:  Right.

15             THE COURT:  So what I'm saying is you do, however,

16   have to ask for that showing.  If you don't object -- now, all

17   of this assumes, number one, that this is a personal-services

18   contract, not a legal term of art, and, number two, that there

19   was a disclosure that Silar is going to finance, and Silar will

20   be taking a property interest.

21        It seems to me that bar applies if nobody on the other

22   side raised the question show us that they're equally credit

23   worthy, equally capable of servicing.

24             MS. RASMUSSEN:  Well, okay.  I think the answer to

25   your question is in the bankruptcy proceedings there was no

```
 1    basis to raise the question because it was never presumed or
 2    even assumed that Silar would end up here where we are today
 3    servicing loans, so I don't think that they could be barred --
 4              THE COURT:  That seems to me --
 5              MS. RASMUSSEN:  -- from --
 6              THE COURT:  -- like a factual question.
 7              MS. RASMUSSEN:  Okay.
 8              THE COURT:  And both sides need to demonstrate to
 9    me --
10              MS. RASMUSSEN:  But --
11              THE COURT:  -- the absence or a presence --
12              MS. RASMUSSEN:  And with regard --
13              THE COURT:  -- of it.
14              MS. RASMUSSEN:  -- to the personal-service contract,
15    I substantially briefed that in the motion to vacate
16    preliminary injunction, and I will let --
17              THE COURT:  What Nevada law are you relying on to
18    tell me that these contracts are personal-service contracts?
19              MS. RASMUSSEN:  Your Honor, I cited several NRS
20    cases, and I apologize.  I don't have the motion in front of
21    me, but it is in my -- I did address the issue in the motion to
22    vacate.
23              THE COURT:  Okay.
24              MS. RASMUSSEN:  I cited statutory law --
25              THE COURT:  I'll simply address those --
```

1          MS. RASMUSSEN:  -- and cases.

2          THE COURT:  -- then in my written response.

3          MS. RASMUSSEN:  Okay.  And, now, let me talk about

4     what the Court was alluding to which was protection.  I

5     disagree with the Court that the purpose of the preliminary

6     injunction is to maintain a status quo, and I disagree more

7     that that has been the operative effect in this case.

8          It appears -- and I think it's fairly well-substantiated

9     by the way things have played out -- that the operative effect

10    of the preliminary injunction which is issued quite some time

11    ago now is that it has been, in effect, a prejudgment writ of

12    attachment and rather than a preliminary injunction to protect

13    the rights of the parties.

14         THE COURT:  How did it attach anything?  What

15    actually transferred these servicing rights was a sale order, a

16    sale order now by the way I remind you that's final.  It was

17    initially appealed.  It was appealed to this court.  It was

18    appealed to the circuit.  The appeal was withdrawn.

19         (Colloquy not on the record.)

20         THE COURT:  That sale is final.  In other words, the

21    transfer of rights here at least to Compass occurred by virtue

22    of a sale, not by virtue of a prejudgment writ of attachment or

23    anything like it.

24         MS. RASMUSSEN:  Right.  But what is at -- the

25    servicing rights are at issue, not the loans themselves, and so

```
 1    the preliminary injunction, the impact that it has, is it has

 2    prevented, for example, all of the direct lenders from

 3    organizing, so that they can litigate against Silar.  It has

 4    basically seized their entire property right.

 5         Now, even more problematic than that --

 6              THE COURT:  I'm just --

 7              MS. RASMUSSEN:  -- is that --

 8              THE COURT:  I'm just having real trouble with that

 9    argument.  Preliminary injunction didn't do that at all.  In

10    fact, I have frequently invited the parties back.

11         I gave them the leave to ask on an emergency-motion basis

12    the right to ask for a hearing to terminate servicing rights

13    with respect to any particular loan.

14         What does that that you've just cited that hinders their

15    organization was my separate order that Ms. Cangelosi and

16    Loan Protection, LP, had to retransfer solicited rights which

17    they were representing were properly solicited.

18         They were the assignments of rights, something that looked

19    to me totally like a security interest.  They were given back

20    in exchange for assignment of a property interest a profit

21    percentage or representation.

22         And in addition, what concerned me was that they seemed to

23    take the position -- Ms. Cangelosi took the position -- that

24    her representation bound all direct lenders in each respective

25    note.
```

1              MS. RASMUSSEN:  Well, your --

2              THE COURT:  That is she had the right because of that

3    assignment to further assign or to handle or take down by way

4    of servicing fees as though she stood in the place of the

5    servicer.  She was the servicer.

6         And I found that to be totally defective, and I ordered

7    her to return it.  That's what caused the impairment that

8    you're citing now, not the preliminary injunction.

9              MS. RASMUSSEN:  Okay, your Honor.  I disagree with

10   the Court's characterization with all due respect as to the

11   characterization that there was a security or a securities

12   violation.

13             THE COURT:  Sure.

14             MS. RASMUSSEN:  Clearly, people would have a right,

15   and that's why, you know, I disagree with that order, but I'm

16   here to talk about the preliminary injunction.  Clearly, people

17   have a right to pledge a portion of their property interests

18   for the purpose of litigating and organizing, and so I disagree

19   with that order.

20        But on a more fundamental level, the two orders work in

21   conjunction with one another, so what these people had done as

22   direct lenders was organize, and they had, for example, loan

23   captains for each loan.  They had an LLC for each loan, so that

24   they could exercise their right to termination.  That's why

25   we're here.

1    Now here we are a year and a half later, and the Court is

2    telling them they haven't validly terminated or Silar is

3    saying, well, you haven't validly terminated, so we're going to

4    keep assigning.

5    It is the ongoing harm is just magnified every month that

6    we go, and then, of course, it's further exacerbated by the

7    market which isn't anyone's fault.  It is what it is.

8    (Colloquy not on the record.)

9    MS. RASMUSSEN:  But the effect of the preliminary

10   injunction and the other order together have been catastrophic

11   to the direct lenders.  I don't think there's any dispute about

12   that.

13   So all that the preliminary injunction did was protect

14   Compass who has failed.  They have miserably failed all of the

15   direct lenders.

16   The representations as it turns out were inaccurate, and

17   now Silar is saying, oh, well, we financed them.  We want the

18   preliminary injunction to extend to us.  The preliminary

19   injunction -- and I'll address one of the issues that the

20   Court --

21   THE COURT:  What is the effect of terminating the

22   preliminary injunction?  It just allows you now?

23   MS. RASMUSSEN:  It would allow people to service

24   their own loans.  This is a contract dispute.

25   THE COURT:  Wow.

```
 1            MS. RASMUSSEN:  They can sue the direct -- well --
 2       (Colloquy not on the record.)
 3            MS. RASMUSSEN:  Well, your Honor, they are perfectly
 4       capable of servicing their own loans.  Silar can certainly sue
 5       over the disputed fees, and Silar could ask for a specific form
 6       of relief --
 7            THE COURT:  So --
 8            MS. RASMUSSEN:  -- that it feels --
 9            THE COURT:  -- basically --
10            MS. RASMUSSEN:  -- will protect its interest.
11            THE COURT:  -- I'm just saying chaos.  Take it to
12       another Court.
13            MS. RASMUSSEN:  I don't think you're saying take it
14       to another Court at all.  Silar ultimately believes it has a
15       right to earn money and to service.  That's what's at issue, so
16       the --
17            THE COURT:  It is.  It's been addressed to my
18       jurisdiction, something I'm obligated to answer.
19            MS. RASMUSSEN:  But anything that the bankruptcy
20       court ruled on was Compass, and now Silar is saying now that's
21       our right, so why are the people, why are the direct lenders,
22       frozen in time while Silar gets to continue with, really, for
23       lack of a better word "raping" these people.
24         I mean, there are disputes over every single thing that
25       happens which brings me to the protection issue.  You know, the
```

1      Court touched on it.

2           You know, most (indiscernible) transfer or do almost

3      anything if there are adequate protections.  There's no bond on

4      this preliminary injunction, so I disagree that it should be

5      extended to Silar.  I certainly disagree that it should be

6      extended to Asset Resolution.

7           But having said all of that, if the Court is going to

8      disagree with me, I need to address the bond issue.  The bond,

9      there is none, and the whole purpose of having a bond is to

10     protect those who are restrained by the preliminary injunction.

11               THE COURT:  And what would be --

12               MS. RASMUSSEN:  The federal rules require it.

13               THE COURT:  -- their potential damage?

14          (Thereupon, Michele Phelps concluded as transcriber,

15          and Lisa L. Cline commenced as transcriber

16          at 12:30:18 p.m.)

17               MS. RASMUSSEN:  Your Honor, I would submit that this

18     Court would need to require a bond of at least $50,000,000, and

19     let me --

20               THE COURT:  Um-h'm.

21               MS. RASMUSSEN:  -- give you some examples of why.

22          Gardens Timeshare, there is a 3.6-million-dollar dispute.

23          Mountain House, there is a $12,000,000 dispute.

24          Bar --

25               THE COURT:  Now, let me slow you down a little bit.

1    There's a 3.6-million-dollar dispute.  Is the dispute over

2    default-interest rate and fees?

3              MS. RASMUSSEN:  Compass alleged that they had equal

4    shares to the direct lenders in that particular loan.

5              THE COURT:  And --

6              MS. RASMUSSEN:  That's --

7              THE COURT:  And, therefore, the dispute is over the

8    fees that Compass and/or Silar has the right --

9              MS. RASMUSSEN:  And if Silar --

10             THE COURT:  -- to collect.

11             MS. RASMUSSEN:  -- is saying they take what Compass

12   had, that obviously is now a Silar dispute.

13             THE COURT:  So where are those fees right now?

14             MS. RASMUSSEN:  I don't know, and that's the other

15   thing I need to tell you when last time I've --

16             THE COURT:  Well, then you do need to tell me where

17   they are because that's part of your obligation to tell me --

18             MS. RASMUSSEN:  Well --

19             THE COURT:  -- the harm.

20        If you're telling me that 3.6 is the potential loss, my

21   question was where are the fees, and I'm assuming unless you

22   tell me otherwise that they're with Silar.

23             MS. RASMUSSEN:  I'm assuming that they're with Silar,

24   too, and I'm also assuming --

25             THE COURT:  And if you prevail in the litigation, and

```
 1   we never should have entered an injunction to aid in their

 2   continued, quote, unquote, "ownership of the servicing rights,"

 3   how have you been harmed?  They get a judgment against them,

 4   pay the three-six million to the direct lenders.

 5           MS. RASMUSSEN:  Well, your Honor, the Federal Rules

 6   of Civil Procedures, quite simply, require a bond.  How it got

 7   issued before -- I wasn't here -- without a bond I don't know,

 8   but the Court is required to set a bond, so now the issue is

 9   what amount.

10           THE COURT:  Okay.

11           MS. RASMUSSEN:  Okay.  So --

12           THE COURT:  1,000 bucks.

13           MS. RASMUSSEN:  No, your Honor.  I'm submitting --

14           THE COURT:  What's --

15           MS. RASMUSSEN:  -- to you that it should be

16   50,000,000 --

17           THE COURT:  And why?

18           MS. RASMUSSEN:  -- because the whole purpose of the

19   -- because the preliminary injunction, first of all, is not

20   warranted.  This is --

21           THE COURT:  You --

22           MS. RASMUSSEN:  -- a contract dispute.

23           THE COURT:  You cited 3.6 million first.

24           MS. RASMUSSEN:  Okay.

25           THE COURT:  And I told you that --
```

```
1                MS. RASMUSSEN:  Than I've got --
2                THE COURT:  That I don't see that as a potential
3    harm.
4                MS. RASMUSSEN:  Then I --
5                THE COURT:  They've got --
6                MS. RASMUSSEN:  -- have 12.
7                THE COURT:  -- the money if they have it at all.  If
8    it exits anywhere, they've got it.  The preliminary injunction
9    orders them to segregate it.  And if we ultimately rule in your
10   favor, you get it.  Where have you been harmed?
11               MS. RASMUSSEN:  Could I continue with the amounts,
12   your Honor?
13               THE COURT:  Sure.
14               MS. RASMUSSEN:  Okay.
15         (Colloquy not on the record.)
16               MS. RASMUSSEN:  Mountain House, 12,000,000, Silar or
17   Compass failed to bring forward an offer for a partial
18   paydown.
19         Bar-USA, 5,000,000, failure to bring an offer to the
20   direct lenders which resulted in $5,000,000 less to the direct
21   lenders.
22         60th Street Venture, 3.7 million, failure to take
23   appropriate servicing actions to protect collateral.
24         Bay Pompano and Palm Harbor, 6,000,000, released
25   collateral in exchange for no payments.
```

1        Brookmere, 6,000,000, Compass abandoned the loan and have

2   refused to turn over the file.

3        Foxhills/Eagle, 65,000,000 -- this is a $65,000,000

4   loan -- full principal and interest payoff offer made in

5   April 2007.  Now it's in foreclosure and all sorts of problems.

6   Nothing's happened with that $65,000,000 loan.

7        Gramercy/Gess, 20,000,000, total and complete

8   mismanagement of income-producing properties.

9        Lerin Hills, 9.6 million, Compass crashed for -- they

10   basically disobeyed the court order and sabotaged a payoff of

11   9.6 million by refusing to accept anything less than

12   17,000,000.

13        That was because they wanted to keep 8,000,000 for

14   themselves, so there was a 9.6-million-dollar offer.  They

15   refused to accept less than 17,000,000, 8 of which would have

16   gone to them.

17        And this doesn't include all of the loans where nothing's

18   been done to service them.  This is why I say a bond is

19   required.

20        Now, you presume that somehow Silar or Asset Resolution

21   who by the way is a shell company that they just recently set

22   up would have assets to pay these damages, but that's an

23   erroneous presumption on the Court's part I believe.

24        And no one's made any promise to you that there would be

25   any assets available to pay anything near these types of

1   damages.  No.  These are the things that are at issue.  That's

2   why a bond is required.

3           THE COURT:  I'll state for the record I have made no

4   such presumption, but --

5           MS. RASMUSSEN:  Okay.  But you are saying you -- so

6   what you just said to me is if you get a judgment, then don't

7   you just go collect from Silar.

8       Well, I mean, I just objected a few minutes ago to the

9   Gramercy proceeds being distributed without at least an

10  accounting, and Silar's not willing to agree that we would

11  escrow, you know, 1.2 million or something.

12      So I don't know why there would be any presumption on the

13  part of Silar that they would be judgment-worthy, and that a

14  bond should not be required.  A bond most certainly should be

15  required.

16      And even if this were a prejudgment writ of attachment as

17  I have also characterized, a bond would be required there, in

18  fact, a bond in twice the amount of potential damages.

19      So when you prevent people from doing what they ought to

20  be able to do which was that they believe they have terminated

21  Compass and service their own loans, their hands are tied

22  behind their back.

23      They can't even coordinate amongst themselves and find an

24  organized fashion to litigate because of the other order

25  involving Ms. Cangelosi.  Here they are completely at the mercy

```
 1    of Silar, and there's no bond.  It just would be completely

 2    improper.

 3         And I don't believe that there is a basis for the Court to

 4    issue a preliminary injunction in this case, anyway, because

 5    it's a contract dispute.

 6         Now, certainly, they could make whatever requests they

 7    wanted for some kind of security if they think that their

 8    interests are at risk, but a preliminary injunction isn't the

 9    necessary remedy for that, and I --

10         (Colloquy not on the record.)

11              MS. RASMUSSEN:  And I would leave the Court with the

12    case.  It's Desarrollo, D-e-s-a-r-r-o, double l, -o, versus

13    Alliance.  It's a U.S. Supreme Court case, 527 U.S. 308, 1999.

14         (Colloquy not on the record.)

15              MS. RASMUSSEN:  And I think that that Court best

16    addresses the circumstance here.  This is a contract-dispute

17    case.  It's not the type of case where equitable relief in the

18    form of a preliminary injunction is warranted.  Okay?

19              THE COURT:  Thank you.

20              MS. RASMUSSEN:  Thank you.

21         Counsel, I'm allowing you to appear here.  Of course, we

22    do need to resolve a question about your pro hac vice

23    application.  We'll do it at today's hearing.  But for purposes

24    of this motion, I'm allowing you to state the position.

25              MR. COLLINS:  All right.
```

1          (Colloquy not on the record.)

2          MR. COLLINS:  Your Honor, Michael Collins on behalf

3     of the Jones Vargas direct lenders.  We agree with the Court

4     that the motion to substitute could be granted under 25(c)

5     where they can prosecute and defend claims and defenses in this

6     action without prejudice to the positions of all the parties on

7     the merits, so we agree that is the proper approach.

8          With respect to the --

9          THE COURT:  Without simply approving it.

10          MR. COLLINS:  Right.  Absolutely, your Honor.

11          THE COURT:  Um-h'm.

12          MR. COLLINS:  Absolutely.  We think that is the

13     proper way to do that, so everything can be in your court.

14          (Colloquy not on the record.)

15          MR. COLLINS:  And we can get this resolved one way

16     or the other either consensually or litigated at a final

17     trial.

18          Two, your Honor, with respect to the motion to dissolve

19     injunction, my firm did not file that motion.  We agree on the

20     bond, your Honor, although we may want to create a separate

21     record based on evidence to present to you on why a bond is

22     appropriate.

23          So we're not joining in this particular motion, although

24     we want to, you know, not lay behind the law, and we may tell

25     you --

```
 1              THE COURT:  I think --
 2              MR. COLLINS:  -- your Honor --
 3              THE COURT:  -- a request for a record is very
 4    appropriate and is, in fact, a necessity to request a bond of a
 5    substantial size.
 6         (Colloquy not on the record.)
 7              MR. COLLINS:  Right, your Honor.  So our firm on
 8    behalf of our clients may do that.
 9              THE COURT:  Okay.
10              MR. COLLINS:  Thank you.
11              THE COURT:  Please.
12              MR. ASHINOFF:  Thank you.
13         (Colloquy not on the record.)
14              MR. ASHINOFF:  May it please the Court, I have a fair
15    bit to say.  Your Honor asked for citations and authorities and
16    law and record cites, and I intend to provide it on every
17    point.
18         Ms. Rasmussen represented to the Court that there was no
19    UCC filed with respect to these rights that were secured for
20    Silar.
21         Exhibit D to the Curcio affidavit on the motion to
22    substitute, Exhibit D, Document 9095, is, in fact, the UCC
23    file.  Ms. Rasmussen misrepresented the record to the Court.
24         There's been a representation that there's no record here
25    for the injunction.  Your Honor found in sanctioning the
```

1   Cangelosi lenders who Ms. Rasmussen represents, "That even

2   prior to the closing of the sale and before Compass assumed the

3   role of loan servicer Cangelosi and the LPG began looking for

4   ways to terminate Compass and to retain a loan servicer willing

5   to waive the fees conveyed to Compass pursuant to the APA,"

6   paragraph 11 of your contempt order, your Honor.

7        This is going on today.  It goes on every hearing.  Every

8   order you issue states that there are protectable property

9   rights here, and you're going to have a full and fair

10  litigation with discovery, a hearing, and a trial.  We welcome

11  that.

12       But every time a motion comes up, they want to relitigate

13  and try to strip away my clients' contractual protected rights

14  with no hearing, with no presentation of evidence, with no

15  record, and with no finding of wrongdoing.

16       And they're asking to do that again today by stripping

17  away an injunction which the Court found necessary to enter

18  after three or four days full of hearings where any of these

19  allegations could have been raised, where any of these

20  horrendous things could have been raised, or a request for a

21  $50,000,000 bond could have been raised, but they weren't.

22  They weren't.

23       You can't keep relitigating on every motion everything

24  that came before because you don't like what came before.  You

25  can't do that.

1          There is a finality to the confirmation and sale order.

2     There is a finality to their right to appeal and keep arguing

3     against a preliminary-injunction order.  There is a finality to

4     this Court's July 11th order, and I want to go to each of them.

5          And that, respectfully, the lenders don't respect the

6     finality of this Court's orders.  They don't respect the rules

7     that the Court has set out which parties are supposed to follow

8     until this case is over.

9          And we would request that those rules be enforced, that

10    they be respected, and that they be set in place, so that the

11    parties can go about the business of litigating over whether

12    there is any grounds to terminate the servicing and what the

13    waterfall rights are.

14         That's the only complaint that's been filed in this case,

15    and the complaint is the second amended complaint filed by some

16    of the lenders, and that complaint says Silar is the owner of

17    the rights.

18         So if their complaint and pleading is saying Silar is the

19    owner of the rights, how can they all get up today and tell you

20    Silar doesn't really have a right to the rights?  They are

21    estopped by their own pleadings.

22         Paragraph 14 of the confirmation order, the bankruptcy

23    sale, the 363 sale -- and we quote it in our reply brief,

24    your Honor -- paragraph 14 said, "The acquired assets" -- and

25    that's the contractual servicing rights.

```
1          "The acquired assets shall be transferred to the asset
2    purchaser on the terms and conditions set forth in the asset
3    purchase agreement and upon closing shall be free and clear of
4    all liens, claims, interests, obligation, and encumbrances
5    whatsoever, including but not limited to, C, all encumbrances
6    of any kind or nature, including but not limited to any
7    restriction on the transfer or other exercise of the attributes
8    of ownership."
9          (Colloquy not on the record.)
10          MR. ASHINOFF:  The bankruptcy court order was a final
11   sale of these rights.  It sold --
12          THE COURT:  I agree with you.
13          MR. ASHINOFF:  -- these rights.
14          THE COURT:  But counsel said that transfer approved
15   without including any limitation on the right to transfer was
16   as to Compass.
17          MS. SHUMENER:  Um-h'm.
18          MR. ASHINOFF:  Your --
19          (Colloquy not on the record.)
20          MR. ASHINOFF:  Your Honor, it says Compass' -- it
21   says "of any right to transfer or exercise any attributes of
22   ownership".  The contractual rights to transfer them were
23   protected by paragraph 14 --
24          THE COURT:  That didn't say --
25          MR. ASHINOFF:  -- free and clear --
```

```
1              THE COURT:  -- into the forever future.
2         (Colloquy not on the record.)
3              MR. ASHINOFF:  -- free and clear of any encumbrances.
4     Certainly, your ability to transfer it to your secured party is
5     one heck of an encumbrance, your Honor.  The fact is my clients
6     and Compass --
7              THE COURT:  Your argument, it just doesn't make sense
8     to me, and I'll tell you why.  The judge in other places said
9     I'm not changing these contract rights at all.
10             MS. SHUMENER:  Um-h'm.  Um-h'm.
11             THE COURT:  I'm not altering them.
12             MR. ASHINOFF:  But let's look at the --
13             THE COURT:  So she clearly had the right, and what
14    she did there in that language is in spite of any limitation on
15    a right to transfer, for example, like that these are
16    personal-service contracts or specific express language in the
17    LSAs, in spite of any such language, I'm transferring these
18    rights to Compass.
19        Now, there was also I would agree with you a transfer to
20    Silar.  If you represented to the Court somewhere in those
21    proceedings that Silar was financing and taking a property
22    interest, then I think that language covers Silar, too, not
23    necessarily Asset Resolution, but that language is only a
24    one-time.
25             MR. ASHINOFF:  Your Honor --
```

1          THE COURT:  It doesn't say that the contract rights

2     are altered forever into the future to waive any limitation on

3     assignment.

4          MR. ASHINOFF:  Your Honor, with due respect -- and

5     it's hard to do this verbally when you're looking at a

6     clause.

7          THE COURT:  You read to me the language.  Read it

8     again, then.

9          MR. ASHINOFF:  It says, "Free and clear of" -- it's

10    going to be transferred to Compass "free and clear of any

11    obligations and encumbrances whatsoever, including but not

12    limited to the encumbrance and any restriction on the right to

13    transfer those rights."  There's no restriction allowed on the

14    right --

15         THE COURT:  Where is --

16         MR. ASHINOFF:  -- to transfer it.

17         THE COURT:  -- that language inconsistent with the

18    interpretation I just gave?

19         MR. ASHINOFF:  But the right to transfer the rights

20    is what enabled Silar to foreclose on that property.  That's

21    why I'm here because the secured lender --

22         THE COURT:  You give me --

23         MR. ASHINOFF:  -- paid --

24         THE COURT:  -- absolutely no reason to translate the

25    language any way other than that I just gave it.

1          MR. ASHINOFF:  Is your Honor saying that if I said

2     Silar has the rights, so we'll take them back, that's fine?

3     But if we use Asset Resolution to foreclose which is the way

4     it's done in this country --

5          THE COURT:  I didn't say that at all.  What I said

6     was in that order the binding res judicata effect of that order

7     is an approval of a one-time assignment, including an

8     assignment to Silar if that was disclosed to the bankruptcy

9     court by way of encumbrance.  That was a one-time approval of

10     waiver of any encumbrance or other restriction on assignment.

11          If you have the right under the normal terms of these LSAs

12     to assignment, not only to Silar, but to Asset Resolution, to

13     anybody else, you've got that right.

14          Judge Riegle didn't change that right, but she told us

15     expressly she was not altering these contracts at all.  She did

16     tell us, however, in that order regardless of any encumbrance,

17     for example, if not Compass, but USA Commercial has already

18     encumbered the servicing rights, and there is an encumbrancy

19     out there, ABC American Bank, that has the first right and the

20     right to prevent them from further assigning or even assigning

21     a secondary interest she is nevertheless approving the

22     assignment in spite of that encumbrance.

23          She is also telling us that in spite of any restriction on

24     the language of assignment expressly in the LSAs or in the

25     deeds of trust and in spite of any restriction under the common

```
1    law, including the personal-services contract --

2              MR. ASHINOFF:  Or a fiduciary-duty objection.

3              THE COURT:  -- objection which was never made --

4              MR. ASHINOFF:  Right.

5              THE COURT:  -- nevertheless, the assignment is

6    improved, and it's free and clear.

7         She is not telling us -- and you have given me no reason

8    to construe that language -- as a revision to the contract --

9         (Colloquy not on the record.)

10             THE COURT:  -- deleting any other limitations

11   otherwise existing on further assignments.

12             MR. ASHINOFF:  Your Honor, I want to move on.  But

13   with due respect --

14             THE COURT:  Okay.

15             MR. ASHINOFF:  -- I think when you read

16   subparagraph C the only way that you can read subparagraph C

17   and its reference to any further encumbrances on restriction on

18   the use or a transfer is to look prospectively to a future

19   transfer.

20             THE COURT:  Okay.  You made your point.

21             MR. ASHINOFF:  I --

22             THE COURT:  You've read it twice.  I'm willing to

23   listen to you read it --

24             MR. ASHINOFF:  No.  I --

25             THE COURT:  -- several more times.
```

```
1          MR. ASHINOFF:  I want to move on.  I want --
2          THE COURT:  That's --
3          MR. ASHINOFF:  -- to move on.
4          THE COURT:  -- my ruling.
5          MR. ASHINOFF:  The sale was over dozens of objections
6    from various lenders.  There was not a single objection that
7    the LSAs were fiduciary obligations that couldn't be assigned
8    without the consent of every lender.
9         (Colloquy not on the record.)
10         MR. ASHINOFF:  There was not a single objection that
11   they were personal-service contracts even though all the
12   lenders were parties.  They had their own committee.  They
13   appeared --
14         THE COURT:  I think I agree with you --
15         MR. ASHINOFF:  -- individually.
16         THE COURT:  -- on that.
17         MR. ASHINOFF:  The --
18         THE COURT:  If, in fact, the assignment to Compass
19   was disclosed -- it was.  If, in fact, the assignment even
20   though not in a detailed-agreement form was disclosed to Silar,
21   then I think I agree with you.
22         MR. ASHINOFF:  What was disclosed --
23         THE COURT:  There's probably a bar, res judicata
24   effect.
25         MR. ASHINOFF:  Yeah.  And there was nothing in there.
```

```
1     There was no objection that the extra powers of attorney beyond

2     the LSAs had expired because the loans had matured at the

3     time --

4              THE COURT:  Now --

5              MR. ASHINOFF:  -- of the bankruptcy --

6              THE COURT:  -- that I have a little bit more of a

7     difficulty.

8              MR. ASHINOFF:  Well --

9         (Colloquy not on the record.)

10             THE COURT:  On the last points, I agree with you, and

11    I'm ready to so rule subject to either side's ability to move

12    for reconsideration and show me the actual record where there

13    was no disclosure.

14        (Colloquy not on the record.)

15             MR. ASHINOFF:  There --

16             THE COURT:  Subject to that, I'm willing to so rule.

17             MR. ASHINOFF:  The --

18             THE COURT:  The question, however, on --

19             MR. ASHINOFF:  Can I make --

20             THE COURT:  -- powers of attorney is a different

21    question.

22             MR. ASHINOFF:  Yeah.  Can I address it?

23             THE COURT:  The powers of attorney -- servicing

24    rights and power of attorney really are two different things.

25    Some of the servicing rights may be supported by the power of
```

1    attorney, and you can withdraw a power of attorney.

2         I'm not sure whether you have the right once it's been

3    granted in a servicing context, for example, a power of

4    attorney to negotiate, to settle, to provide a substitute

5    agreement for, to extend the note, to take a partial payment of

6    the notes.

7         There is all kinds of things that a servicer needs power

8    to do, and the power of attorney, of course, is to support

9    those powers.

10        A servicer also just needs the ability to collect.  It

11   doesn't need a power of attorney for that purpose.  It can

12   receive the funds pursuant to its right originally granted by

13   way of designation as a servicer.  It doesn't have to have a

14   power of attorney.

15        But there are other rights that it needs a power of

16   attorney for, and there that seems to me to be a different

17   question.

18            MR. ASHINOFF:  And --

19            THE COURT:  In other words, does a single direct

20   lender apart from the whole note have the right to terminate a

21   power of attorney to a servicer that had been previously given,

22   in fact, a note which the servicer itself had sold to the

23   direct lenders by way of brokerage?

24        Does a single lender have the right to withdraw power of

25   attorney in that circumstance, for example, a power of attorney

1    to negotiate and settle, or is that really an irrevocable

2    power?

3              MR. ASHINOFF:  Can I address that, your Honor,

4    because I have a number of responses, but the sum and substance

5    of them is that the separate powers of attorney are a total red

6    herring here, and I'll explain why.

7         First of all -- and I'll go sequentially -- at the time

8    that the confirmation order was entered and the sale was done,

9    43 of the 60 loans were already in default, so they had

10   matured.  They had already matured.

11        Not one lender at any point got up and said, wait a

12   minute, you can't assign these servicing rights because the

13   loan is in maturity and the power expired.  They waived that.

14        43 of the loans had matured, and they sat there silent.

15   Why?  Because they were getting $67,000,000, but that doesn't

16   help them now.

17        They had no problem taking $67,000,000 knowing that

18   Compass was going to pay it, and that it had a financier who

19   was lending.  They knew --

20              THE COURT:  I agree --

21              MR. ASHINOFF:  -- that there was --

22              THE COURT:  -- with part of that.

23              MR. ASHINOFF:  I --

24              THE COURT:  And I'll tell you the part I don't agree

25   with.  Number one, it's 8,000,000 for the servicing rights.

```
 1              MR. ASHINOFF:  Your Honor, that's more complicated,
 2     and I --
 3              THE COURT:  There's no --
 4              MR. ASHINOFF:  I don't want to go --
 5              THE COURT:  -- power-of-attorney issue involved at
 6     all in your purchase of the direct-lender rights, so it's just
 7     the money that you paid for the servicing rights.
 8              MR. ASHINOFF:  There --
 9              THE COURT:  And I partially agree with you that
10     there's even a bar effect on the failure to raise the
11     power-of-attorney issue at that point, but only to this extent.
12          Nobody objected.  Although it wasn't express, what was
13     express was a transfer of the servicing rights.  Nobody really
14     raised the issue of by the way, Judge, we're also transferring
15     the powers of attorney.
16              MR. ASHINOFF:  We didn't need the --
17              THE COURT:  So I don't think that question was even
18     raised or discussed.
19              MR. ASHINOFF:  We didn't need the powers of attorney,
20     your Honor.
21          (Colloquy not on the record.)
22              MR. ASHINOFF:  We've never needed the powers of
23     attorney, and I have four or five different independent
24     grounds, and they're in the reply.
25          But it's worth talking about because your Honor has given
```

73

1   this a lot of thought, so I'd like the opportunity to lay some

2   of this out.

3        Number one, the Nevada Revised Statute Section 645B

4   applies only to mortgage brokers.  Compass is not a mortgage

5   broker.

6        Silar's not a mortgage broker, and Asset Resolution is not

7   a mortgage broker nor did Compass, Silar, or Asset Resolution

8   take one scintilla of mortgage-brokerage rights when they

9   bought out a 363.

10            THE COURT:  Why do you think --

11            MR. ASHINOFF:  They bought --

12            THE COURT:  -- I mandated that Windemere, a

13   Nevada-state licensee, had to be involved?  Why do you think I

14   did that?

15            MR. ASHINOFF:  So that there would be a

16   jurisdictional nexus in Nevada, but we're subject --

17            THE COURT:  And so that --

18            MR. ASHINOFF:  -- in personam jurisdictions.

19            THE COURT:  -- a licensed brokerage would be

20   involved.

21            MR. ASHINOFF:  Okay.  And I understand that, but the

22   issue, this whole issue, about whether that statute applies to

23   these people or whether there's a fiduciary duty has not yet

24   been litigated out at all, and we have differences with the

25   lenders on that.

1          But my point here is that the only rights that they bought

2     out of bankruptcy was loan-servicing rights, and at least two

3     other federal courts have recently decided that those rights

4     are not fiduciary -- those contracts do not -- they create

5     fiduciary relationships.

6          There's a Southern District of Florida decision, very

7     recent.  There's a Southern District of New York decision --

8               THE COURT:  Respectfully --

9               MR. ASHINOFF:  -- as distinct from brokerage.

10              THE COURT:  -- I will totally disagree with those

11    decisions.  To the extent that those decisions are saying there

12    is no fiduciary relationship simply based upon the contractual

13    obligation of servicing your loan, I agree.

14         To the extent those decisions are saying that when you

15    collect and hold funds there is no fiduciary obligation with

16    respect to those funds, I totally disagree, and you can appeal

17    that one to the circuit.

18              MR. ASHINOFF:  Right.  You know, the holding of the

19    funds, your Honor, I don't have to argue over because the

20    simple fact is the contractual servicing rights themselves

21    don't create a completely-broad fiduciary relationship.

22    Obviously, when you're holding the funds --

23              THE COURT:  That's an issue --

24              MR. ASHINOFF:  -- they're in a lockbox.

25              THE COURT:  -- that remains for --

```
 1              MR. ASHINOFF:  Right.

 2              THE COURT:  -- the merit discussion.

 3              MR. ASHINOFF:  Right.

 4              THE COURT:  But I do, respectfully, at this juncture

 5    disagree.  I think your obligation, your assumed obligation,

 6    Silar's assumed obligation to service because it assumed then

 7    assigned to Asset Resolution, creates a fiduciary obligation as

 8    well.

 9              MR. ASHINOFF:  With respect to holding of the funds,

10    perhaps, but not with --

11              THE COURT:  More than that.

12         (Colloquy not on the record.)

13              MR. ASHINOFF:  Your --

14              THE COURT:  There is --

15              MR. ASHINOFF:  Your --

16              THE COURT:  -- a fiduciary obligation, certainly, in

17    Asset Resolution and, potentially, in Silar by virtue of

18    selecting and creating Asset Resolution.  They're wholly-owned

19    I'm assuming.

20         There is a fiduciary obligation.  I've said it here a

21    number of times, and I'll repeat it today.  You have a

22    fiduciary obligation.

23         You own direct-lender interests.  It's true.  You can

24    operate on your own account and for your own benefit, your own

25    interest, but you are also a fiduciary.
```

1    And when you make decisions as a servicer that impair the

2    beneficiaries of your trust, you violate your fiduciary duty.

3    That's my opinion of the law.  And, of course, it remains a

4    question for the merits decision.

5              MR. ASHINOFF:  Okay.

6              THE COURT:  But I've said it before, and I've

7    repeated it here today, so that Silar can't disclaim notice of

8    it here (indiscernible).

9              MR. ASHINOFF:  Yes.  But where it comes pertinent for

10   today is their claim that because this was a fiduciary

11   relationship it can't be assigned, and the fact is if they

12   thought that they had to raise that during the bankruptcy.

13        But, number two --

14             THE COURT:  Certainly --

15             MR. ASHINOFF:  And --

16             THE COURT:  -- vis-a-vis Silar.

17             MR. ASHINOFF:  And, number two, your Honor,

18   Section 10 of the LSAs provides that the LSAs "shall remain" --

19   and I'm quoting -- "shall remain in effect until lenders'

20   interest in all notes and deeds of trust with respect to loans

21   arranged and/or serviced by USA is completely liquidated,"

22   and --

23             THE COURT:  That's Judge Riegle's order.

24             MR. ASHINOFF:  No.  What I'm reading from, actually,

25   your Honor, is Section 10 of the LSAs, the actual contracts

1    that were signed, so the actual provision in the LSAs does not

2    say your right to service ends --

3            THE COURT:  Read it again.

4            MR. ASHINOFF:  -- when the loan's in maturity.

5            THE COURT:  Read it again.

6            MR. ASHINOFF:  Section 10 says the LSAs, quote,

7    "shall remain in effect until lenders' interest in all notes

8    and deeds of trust with respect to loans arranged and/or

9    serviced by USA is completely liquidated."

10       So whether a separate power under Nevada law to do

11   brokerage expire or not, the actual power that the LSA gave

12   explicitly on its terms was to carry the ability to service

13   until the entire investment was liquidated, and that clearly is

14   the contractual right that was sold out of bankruptcy.

15       And the other interesting aspect of that --

16           THE COURT:  You know, there's a limit to that one,

17   too, and I think I need to make a record.  I've learned through

18   hard experience -- I apologize -- that if I don't correct

19   counsels' statements on either side of fact, then they start

20   arguing to the appellate court this X, Y, Z is a fact when, in

21   essence, all I was doing was sitting quietly, so I've learned

22   through hard experience that I have to correct statements of

23   fact.

24       Your last point was on what?  It was on --

25           MR. ASHINOFF:  Section 10 of the LSAs that says --

```
 1              THE COURT:  You certainly don't contend, do you, that
 2     if all of the direct-lender interests and all of Compass'
 3     interest let alone USA Commercial --
 4         (Colloquy not on the record.)
 5              THE COURT:  -- was transferred to other direct
 6     lenders such that Compass -- the only involvement Compass had
 7     at all was as a servicer, do you contend here that based upon
 8     this sale that the direct lenders didn't have a right to
 9     terminate Compass --
10              MR. ASHINOFF:  No.  I had never --
11              THE COURT:  -- as a servicer because of that
12     language?
13              MR. ASHINOFF:  No, your Honor.  In fact, if it's
14     terminated --
15         (Colloquy not on the record.)
16              MR. ASHINOFF:  -- in accordance with the terms, of
17     course, that's doable.
18              THE COURT:  Okay.  All right.
19              MR. ASHINOFF:  I --
20              THE COURT:  I'm with you.
21              MR. ASHINOFF:  I have no quibble with that, but there
22     hasn't been a termination, and --
23              THE COURT:  Okay.
24              MR. ASHINOFF:  And we don't believe that there should
25     be.
```

1        But, also, your Honor, Section 11 of the LSAs goes

2   further.  It says, "With resect to each loan, lender hereby

3   agrees that USA shall have full power and authority, and lender

4   hereby appoints USA as its true and lawful attorney in fact

5   to," and then it has a recitation of all the things that you

6   can do.

7        And then it says, "Upon USA's request, lender agrees to

8   execute and deliver in the presence of a notary public a

9   declaration of (indiscernible) power pursuant in a form

10   consistent to Chapter 645(b) which, quote, 'pursuant to which

11   lender shall further evidence the appointment of USA.'"

12       In other words, the separate power was just a further

13   evidence of the contract, what the contract had already

14   appointed under Section 10 and 11, and that's why I say that

15   whole issue is a red herring.  You didn't need the separate

16   power to service the loans.

17       USA was going to be mortgage brokering.  That was the

18   first thing they were going to do.  And, of course, it needed

19   to be a Nevada mortgage broker and licensed and have power to

20   mortgage broker.

21       Respectfully, the LSAs gave the contractual right to the

22   servicer to service as a separate matter as read, and so that's

23   why I say that these separate power-of-attorney arguments --

24            THE COURT:  In fact, to go a little further --

25            MR. ASHINOFF:  -- are a red herring.

1          THE COURT:  -- it gave USA Commercial the right to

2    demand a power of attorney --

3          MS. SHUMENER:  Um-h'm.

4          THE COURT:  -- if anybody said they didn't have

5    sufficient authority.

6          MR. ASHINOFF:  If they wanted or needed it, but they

7    didn't have to have it because the agreement gave it, so that's

8    why I say to your Honor it's a red herring.

9       The last point I'd make as to why the argument about the

10   power of attorney is a total red herring is the fact that even

11   under the LSA there's a provision that on certain circumstances

12   51 percent or more of the lenders could get together and

13   appoint a servicer.

14      Well, if 51 percent of them can, then the other 49 percent

15   obviously don't have the right to say you can't because you

16   don't have my power or you can't because I had a veto or you

17   can't for any other reason.

18      So, obviously, the agreement itself undermines the entire

19   premise that each lender had this kind of huge control --

20          THE COURT:  I'm inclined --

21          MR. ASHINOFF:  -- unprecedented.

22          THE COURT:  -- to agree.  I think, really, to the

23   extent it's a power of attorney at all it's an irrevocable

24   power.  It's coincident with its terms, limits.  Parameters are

25   coincident with the LSAs.

```
 1                  MR. ASHINOFF:  Okay.

 2                  THE COURT:  That is in order to terminate such a

 3      power if you need a power --

 4                  MR. ASHINOFF:  Okay.

 5                  THE COURT:  -- it's coincident with your right to

 6      terminate --

 7                  MS. SHUMENER:  Um-h'm.

 8                  THE COURT:  -- the LSAs.

 9                  MR. ASHINOFF:  Okay.  Your Honor, I'd like to go to

10      the preliminary-injunction order because I do want to make the

11      record that the Court will consider when it's ruling on the

12      extension of it.

13           The preliminary-injunction order at paragraph 11 says

14      prohibition on Compass transfers.  Now, Compass has already had

15      the servicing agreement.

16           It says, "With the exception of sales, assignments

17      transfers, hypothecations, or encumbrances of Compass fees made

18      by Compass to Silar or to a licensed subservicer, Compass shall

19      not sell, assign, transfer, hypothecate the Compass fees and

20      Compass' interests."

21           So your preliminary-injunction order which was also

22      heavily litigated recognized Silar's right to step in.

23                  THE COURT:  Right.

24                  MR. ASHINOFF:  And it can close --

25                  THE COURT:  So --
```

1      MR. ASHINOFF:  -- and take the rights.

2      THE COURT:  -- in extending the preliminary

3 injunction, I should simply substitute the word "Silar" for

4 "Compass".

5      MR. ASHINOFF:  If your Honor says to me that you

6 don't think Asset Resolution had the right -- that Silar had no

7 right to foreclose in the standard, traditional way in this

8 country --

9      THE COURT:  No.

10      MR. ASHINOFF:  -- then I would ask --

11      THE COURT:  I'm not saying that.

12    (Colloquy not on the record.)

13      MR. ASHINOFF:  -- that it be Silar, and I'll talk to

14 my client about moving it back, but the truth is

15 Asset Resolution has significant assets, and they're doing the

16 job.

17    Their papers are derelict.  There's not a single response

18 to the affidavit --

19      THE COURT:  I don't want --

20      MR. ASHINOFF:  -- of Reiner --

21      THE COURT:  -- to approve the assignment to

22 Asset Resolution.  I want to recognize it, acknowledge it, and

23 acknowledge their current status --

24      MR. ASHINOFF:  As --

25      THE COURT:  -- by way of fact they are servicing.

```
 1              MR. ASHINOFF:  Okay.  Okay.

 2              THE COURT:  So as long as you can craft language,

 3      maybe there is no problem with including Silar and

 4      Asset Resolution here, and I'll seek a deferral --

 5              MR. ASHINOFF:  Well --

 6              THE COURT:  -- to further reply --

 7              MR. ASHINOFF:  -- Asset Resolution --

 8              THE COURT:  -- as long as what I'm saying is Silar

 9      and Asset Resolution without approval of Asset Resolution are

10      hereby enjoined from further transfer --

11              MR. ASHINOFF:  Well, we've already represented --

12              THE COURT:  -- without Court approval.

13              MR. ASHINOFF:  -- to the Court --

14              THE COURT:  That may be sufficient.

15              MR. ASHINOFF:  I've already represented to the Court

16      at the last hearing that we would not make a further transfer

17      without the Court's permission, so I've made that

18      representation on the record at the last session --

19              THE COURT:  Then maybe --

20              MR. ASHINOFF:  -- to your Honor.

21              THE COURT:  -- there's not a problem.  I need to

22      hear --

23              MR. ASHINOFF:  But --

24              THE COURT:  -- the reply --

25              MR. ASHINOFF:  But --
```

```
1              THE COURT:  -- including Asset Resolution's name

2        there, but you --

3              MR. ASHINOFF:  But --

4              THE COURT:  -- recognize that under my theory so far

5        with Silar as an acknowledged coincident holder with Compass --

6          (Colloquy not on the record.)

7              THE COURT:  -- it's totally appropriate to substitute

8        Silar's name.

9              MR. ASHINOFF:  But Silar doesn't --

10             THE COURT:  But that very preliminary-injunction

11       language prevented Silar as well other than assignment to its

12       duly-appointed licensed -- what's the language --

13       duly-appointed licensed agent.  It prohibited Silar as well --

14             MR. ASHINOFF:  But --

15             THE COURT:  -- from a further transfer.

16             MR. ASHINOFF:  But, your Honor, I need to go a little

17       bit further to complete this line because Section 7 --

18             THE COURT:  Read the language of the last lines first

19       before you go on.  It says, "Compass" --

20             MR. ASHINOFF:  Where are we?

21             THE COURT:  The last one you quoted, the prohibition

22       upon further assignment.

23             MR. ASHINOFF:  Right.  There's a subsequent order

24       that supercedes it.

25             THE COURT:  Well, read it, first, before you --
```

```
1            MR. ASHINOFF:  Okay.

2            THE COURT:  -- read --

3            MR. ASHINOFF:  Yeah.  No.  I --

4            THE COURT:  -- the superseding --

5            MR. ASHINOFF:  I would --

6            THE COURT:  -- language.

7            MR. ASHINOFF:  "Prohibition on Compass transfers with

8     the" --

9            THE COURT:  You're reading the last language you just

10    quoted to me.

11           MR. ASHINOFF:  Yeah.  I'm reading that paragraph.

12           THE COURT:  Please.

13           MR. ASHINOFF:  "With the exceptions of sales,

14    assignments, transfers, hypothecations, or encumbrances of

15    Compass fees made by Compass to Silar Advisors, LP, or

16    Silar Special Opportunities Fund, Ltd., or to a licensed

17    subservicer, Compass shall not sell, assign, transfer, or

18    hypothecate, or encumber the Compass fees and/or Compass'

19    interests as a direct lender in any loan in which it is

20    currently the servicer without further order of this Court

21    obtained upon a motion by Compass."

22           THE COURT:  Okay.  I'm willing to substitute in

23    Silar.  I already did, but I want it understood that I am not

24    -- and I'm recognizing Asset Resolutions.

25        But I want it understood that Silar and Asset Resolution
```

1   are now under that language.  They are prohibited from further

2   assignment.

3           MR. ASHINOFF:  But, your Honor, I have a problem with

4   what you're suggesting, but not with the piece that you're most

5   concerned about.  I don't have a problem saying that

6   Asset Resolution will not further assign it.

7       But, in fact, Silar doesn't own these rights.

8   Asset Resolution is the sole owner now, so the name that has to

9   go in the injunction is Asset Resolution.  It doesn't mean that

10   at the end of this case --

11           THE COURT:  I understand --

12           MR. ASHINOFF:  -- you won't issue --

13           THE COURT:  -- your request.  Denied.  Silar's name

14   will also go in the injunction.

15           MS. SHUMENER:  Um-h'm.

16           MR. ASHINOFF:  Well, on that you mean for the --

17           THE COURT:  Right.

18           MR. ASHINOFF:  Yeah.  That's fine.  But the other

19   provisions which talk about the ability to sell properties and

20   get consents, that needs to be Asset Resolution.  They're the

21   only ones that own the rights now.

22           THE COURT:  I want the language to be Silar and

23   Asset Resolution.  In other words, I'm acknowledging your

24   designation, your assignment.  I'm acknowledging it.  I'm just

25   not approving it.

1          MS. SHUMENER:  Um-h'm.

2      (Colloquy not on the record.)

3          THE COURT:  So I'm --

4          MR. ASHINOFF:  I'm --

5          THE COURT:  -- protecting --

6          MR. ASHINOFF:  I'm not --

7          THE COURT:  I'm willing to protect Asset Resolution.

8  I want Silar's name there, too.

9          MR. ASHINOFF:  All right.  I hear the Court, and,

10  obviously, we'll do as the Court instructs.  I'm not smart

11  enough on my feet to figure out all the implications of that as

12  I stand here, so I'd reserve my rights to argue that it doesn't

13  change anything, but make --

14          THE COURT:  You --

15          MR. ASHINOFF:  -- the injunction applicable.

16          THE COURT:  You may reserve your rights.

17          MR. ASHINOFF:  The next order is the July 11th, 2008,

18  order.  It says at paragraph 8, "Silar may exercise its

19  contractual rights."

20      And it says, "Nothing in this order shall prevent Silar

21  from exercising any contractual rights and remedies under and

22  consistent with the contracts and agreements controlling its

23  relationship with Compass, including consistent with the

24  preliminary-injunction order its right to foreclose on its

25  collateral and its right to appoint an alternative loan

1    servicer."

2        Now, what --

3            THE COURT:  Just leave that language the way it is.

4            MR. ASHINOFF:  The order also says, "This order

5    supercedes all previous orders and directives of the Court to

6    the extent that such are in conflict with the contents

7    contained herein."

8            THE COURT:  And read --

9            MR. ASHINOFF:  And I read --

10           THE COURT:  -- the last language before that one

11   again one more time.

12           MR. ASHINOFF:  Paragraph 8, "Silar may exercise its

13   contractual rights.  Nothing in this order shall prevent

14   Silar" --

15           THE COURT:  But what we were really referring

16   thereto, of course, is its rights to foreclose.

17           MR. ASHINOFF:  To foreclose.  And what happened --

18           THE COURT:  Go ahead.  Read the language.

19           MR. ASHINOFF:  "Nothing in this order shall prevent

20   Silar from exercising any contractual rights and remedies under

21   and consistent with the contracts and agreements controlling

22   its relationship with Compass, including consistent with the

23   preliminary-injunction order its right to foreclose on its

24   collateral and its right to appoint an alternative loan

25   servicer," and --

1          THE COURT:  That language will just remain the same,

2     but you understand an alternate loan servicer -- I mandated

3     previously and the mandate is still in effect it must be a

4     licensed Nevada servicer.

5          MR. ASHINOFF:  Your Honor had said it has to be

6     licensed Nevada subservicer, and we have retained Windemere as

7     the subservicer, but Asset Resolution is the servicer.

8          And in the preliminary-injunction order, your Honor,

9     paragraph 7 where you talked about Compass' ability to

10     foreclose on property, you explicitly recognized Compass'

11     ability to pursue a foreclosure with respect to a loan in

12     accordance with the applicable LSAs.  And in Sub A of 7, you

13     said, "Compass or a single-purpose entity designated by Compass

14     is authorized to foreclose."

15          All that Silar did is use a single-purpose entity

16     designated and controlled by Silar to foreclose.  It didn't

17     evade anything.  It was trying to do what is commercially done

18     universally --

19          THE COURT:  Um-h'm.

20          MR. ASHINOFF:  -- when you foreclose.

21          It was not to create a shell.  It was the way foreclosures

22     are done in the United States, and the Court with its vast

23     experience can take judicial notice of that.

24          So this whole notion of trying to evade by putting

25     Asset Resolution in and how nefarious, we did what the

1   injunction contemplated in the way the injunction is

2   contemplated.

3         And for the lenders to come in today and say, oh,

4   your Honor, you shouldn't extend this injunction, you shouldn't

5   have this, we never approved Silar, we're too many orders down

6   the road for those arguments.

7         (Colloquy not on the record.)

8             MR. ASHINOFF:  With respect, your Honor, there is a

9   law of this case starting with the confirmation order and then

10  the preliminary-injunction order and now the July 11th order.

11        It's too late for them to try to upend my clients'

12  servicing rights which they've been trying to do even before

13  Compass ever bought them because they don't like the deal.

14        At some point, that becomes final.  At some point, these

15  orders have the force of law in this case, and we will be

16  governed by them, and we will attorn to them, but so must the

17  direct lenders.  It's too late to start arguing the injunction

18  should have had a bond.  That's what appellate courts are for.

19        The truth is all the money they care about is in a lockbox

20  account, and my client has been denied the right to take what

21  it believes is a significant component of those fees and has

22  lost all the interest, but there's no bond that was put up by

23  the direct lenders that would stop my client from accessing

24  millions of dollars.

25        There's no better claim for a bond here from my client

1   than there is from the lenders.  In fact, my clients are

2   probably out more money as the largest direct lender and as a

3   servicer who can't get at these fees.  The bond probably should

4   be higher, but we're too late on that.

5       There was a three- or four-day hearing.  They were all

6   heard.  The Court decided it didn't need a bond.  Under 105

7   because you still are policing the legitimacy and the sanctity

8   of the confirmation sale, you don't need a bond, anyway.

9       And under 65, you decided not to impose one for good

10  reason because the money was going to be locked up.  You don't

11  need the bond.

12      And the evidence in this record is undisputed that my

13  client has been working extremely hard to try to service these

14  properties as servicer in the six months its been in the job.

15      And there's nothing in the record that's been made on this

16  motion to contradict the Reiner declaration or the Dickinson

17  declarations of all the different efforts, and I encourage the

18  Court to look at that when you're crafting any further relief

19  here.

20      The fact is they're doing the job, and they're doing it

21  right.  We've been thwarted here in the inability to sell a

22  property because we can't even get the lenders to agree to the

23  distribution that the injunction provided for.  They're

24  relitigating that.  No.  You can't even take that out says

25  Ms. Rasmussen.

1    We're trying our best here, your Honor, but it's not the

2    problem on our side of the caption.  We're not the gang that

3    can't shoot straight.

4    My client is professional.  It has years of experience.

5    It's been documented in the record, and they're doing the job

6    now.  You don't have a problem at this end.  We can go forth

7    and litigate.

8    On the issue of a personal-service contract, we cited a

9    lot of law to make it clear that this is a commercial contract.

10    That these are bought and sold in the hundreds.  That

11    corporations generally are not found to be parties to

12    personal-service contracts because it uses some unique and

13    individual and extraordinary talent.

14    THE COURT:  I really think I have listened patiently

15    now -- 1:00 o'clock -- to these arguments on both sides.

16    MR. ASHINOFF:  Okay.

17    MS. RASMUSSEN:  Your Honor, may I just give a brief

18    rebuttal on my motion to vacate?

19    THE COURT:  Very quickly --

20    MS. RASMUSSEN:  I --

21    THE COURT:  -- please.

22    MS. RASMUSSEN:  I just have a couple of pages.

23    THE COURT:  Um-h'm.

24    MS. RASMUSSEN:  And I promise --

25    MR. ASHINOFF:  Thank you, your Honor --

1          MS. RASMUSSEN:  -- it will (indiscernible).

2          MR. ASHINOFF:  -- for your time and attention.

3          THE COURT:  It should be very brief.

4          MS. RASMUSSEN:  Okay.  Would you like me to do it

5    from here?

6          THE COURT:  That's fine.

7          MS. RASMUSSEN:  Okay.  With regard to the fiduciary

8    issue because that's one of the issues I raised in the motion

9    to vacate the preliminary injunction, it is a conflict of

10   interest for Silar to service the loans and to -- I mean, first

11   of all, they're suing the direct lenders, and then they want to

12   service their loans, so how it is that we could be in this

13   tortured circumstance I don't know.

14        But the Court is right with regard to the issue of

15   fiduciary, whether or not they're a fiduciary.  They clearly

16   are under Nevada law.

17        All they have cited to you is New York and Florida law

18   which isn't what's controlling here in this courtroom, and the

19   Court is right with regard to that issue.

20        Secondly, I have requested the bank records from

21   Mr. Howard.  I don't have them.  When this goes directly to the

22   issue of the bond should presume because we don't have any

23   representation to the contrary -- and I can't tell you that

24   there has not been commingling -- the Court should presume that

25   there has been commingling, and this is exactly one of the --

1    it's one of the reasons why a bond is required.

2        Third, there was no evidentiary hearing that lasted three

3    or four days on the preliminary injunction, and that's just a

4    misstatement of the record.

5        And with regard to their allegation that I misstate the

6    record on the UCC filing, I apologize.  I was not aware of the

7    UCC filing, and that's because it was done in Delaware, but

8    there is, and I have looked at it here today.  There was a UCC

9    filing.

10       But when I did a search in New York and Nevada, there were

11   none, and there are no UCC filings in New York where Compass

12   was or in Nevada.

13       Finally, the bank -- and I know Mr. Howard wants to

14   respond on the bank records.  I'm just telling you we don't

15   have them.

16       And the Court needs to put -- if the Court is going to

17   continue this preliminary injunction in the manner that it has

18   indicated it is going to substituting Silar and

19   Asset Resolution for Compass, a bond is required, and a

20   substantial bond is required, and that's because it's required

21   to protect the rights of the direct lenders.

22       Finally, with regard to the last thing that Silar just

23   represented that somehow we can't have a sale of Gramercy

24   because we won't agree to it, that is a misrepresentation of

25   the status of affairs.  Nobody is disagreeing to the sale.

1    We're simply asking that until the Court can -- until we

2    can have an accounting of the amounts, and the Court can look

3    at it and determine what should happen with the funds that

4    those funds be escrowed.

5    And it's very simply the servicing funds and the advance

6    interest-payment funds, and it is not that substantial of a

7    money that it should thwart the entire sale.

8    With regard to the powers of attorney, Nevada law requires

9    it under Chapter 645.  So this notion that somehow Silar can go

10   through this whole thing without any power of attorney, and

11   they can simply transfer because there is an intent, the powers

12   of attorney -- and this is why they're personal-service

13   contracts.

14   Powers of attorney were initially issued to USA Commercial

15   Mortgage, and, you know, somehow Silar thinks that they can get

16   by without it or that these powers of attorney can simply be

17   transferred.  They can't, and they haven't, and they're

18   required under Nevada law.

19   Thank you.

20       THE COURT:  Thank you.

21   I'm denying the motion to vacate the preliminary

22   injunction.  The preliminary injunction will continue in effect

23   for the reason that I have already stated.  It's too late to

24   request bonds.  That issue was already considered before.

25   The only new issue before us at all is the substitution of

1    Silar and Asset Resolution.  I will acknowledge the

2    substitution made by Silar.  I will not approve it at this

3    time.  That depends upon the determination of the merits.

4         And you will substitute both Silar and Asset Resolution in

5    in the language of the preliminary injunction.  That's the only

6    issue that's up for reconsideration.

7         There is no other reason to reconsider vacating or

8    changing the status quo and, therefore, the preliminary

9    injunction, so that will remain in effect on its current status

10   and according to its present terms.

11        I'll issue a brief, little memorandum, but, otherwise, I

12   do need the revised preliminary injunction with the

13   substitution of the names and with the understanding, of

14   course, that I'm not approving.  I'm just acknowledging the

15   substitution of Asset Resolution.

16             MS. RASMUSSEN:  Thank you, your Honor.  Just with

17   regard --

18             MS. SHUMENER:  Thank you.

19             MS. RASMUSSEN:  -- to the motion to vacate, I think a

20   separate order should be presented just denying that, a

21   simple --

22             THE COURT:  That's fine.

23             MS. RASMUSSEN:  And I'll submit it if the Court

24   wishes.

25             MR. ASHINOFF:  Your Honor, two --

```
 1              MS. RASMUSSEN:  But, obviously, the revision of the
 2     language --
 3          (Colloquy not on the record.)
 4              MR. ASHINOFF:  Two --
 5              MS. RASMUSSEN:  Okay.
 6              MR. ASHINOFF:  Two matters.  If we can talk in the
 7     hall and figure out how to get --
 8              THE COURT:  Yeah.
 9              MR. ASHINOFF:  -- this property sold.
10              THE COURT:  I'll give you a time.  Should I let you
11     return?  You have already imposed not only upon us, but upon
12     all the cases that follow.  Shall I ask you to return at 2:30
13     on that motion to approve the sale?  I'll order you to return
14     at 2:30.
15              MR. ASHINOFF:  If we can work something out, we will.
16     And if not, can we let the clerk know that it would be not
17     necessary to take any more time --
18              THE COURT:  Yeah.
19              MR. ASHINOFF:  -- because we couldn't --
20              THE COURT:  I have given you --
21              MR. ASHINOFF:  Yeah.
22              THE COURT:  -- a court-hearing date.  You need a
23     lunch hour, too, just like I do, so I'll --
24              MR. ASHINOFF:  2:30 is fine.
25              THE COURT:  -- order you to come back no later than
```

```
 1     3:30.

 2         (Colloquy not on the record.)

 3             THE COURT:  No later than 3:30 or to advise, of

 4     course, that you don't need a further hearing.

 5             MR. ASHINOFF:  All right.  One --

 6             THE COURT:  And I'm just telling you that I'm here.

 7     I'm willing to approve the sale.  You folks need to work out --

 8             MS. SHUMENER:  Um-h'm.

 9             THE COURT:  -- the interim resolution, a status quo,

10     so that you both don't cut off your own right foot.  Approve

11     the sale and get on with a segregation or a nonwaiver of

12     rights, whatever else is necessary or sufficient to hold the

13     status quo.

14             MR. ASHINOFF:  One other issue, your Honor.

15     Your Honor mentioned the June 8th date.  I've had a chance to

16     check calendar briefly.

17         If it could either be June 1 or June 22, I'd greatly

18     appreciate one of the other dates as opposed to June 8th based

19     on personal family commitments.

20             THE COURT:  3:30, please.  Be here no matter what.

21         And you'll need to be here, too, Counsel.  We'll take up a

22     continuance of any objections to your pro hac vice.

23             MR. COLLINS:  Thank you, your Honor.

24             MR. BUBALA:  Your Honor?

25             THE COURT:  Sure.  Yeah.
```

```
 1              MR. BUBALA:  This is Lou Bubala of Jones Vargas
 2     appearing for Ms. Chubb.  In order for this call-in
 3     (indiscernible), is it possible (indiscernible) a hearing at
 4     3:30 or at a time certain?
 5              THE COURT:  You're breaking up, sir.  We didn't even
 6     hear you.
 7              MR. BUBALA:  Is it possible to confirm a hearing at a
 8     time certain?
 9              THE COURT:  That's what I just did.
10         (Colloquy not on the record.)
11              THE COURT:  The time is 3:30.
12              MR. BUBALA:  Okay.  Thank you, your Honor.
13              THE COURT:  Thank you.
14         (Thereupon, the case was trailed at 01:22:13 p.m.)
15         (Court reconvened at 04:22:52 p.m.)
16         (Thereupon, the proceedings were sealed
17         at 04:22:52 p.m.)
18         (Thereupon, the proceedings were unsealed
19         at 04:32:35 p.m.)
20              THE COURT:  You're back --
21              MR. ASHINOFF:  Your Honor --
22              THE COURT:  -- on the record.
23              MR. ASHINOFF:  -- unfortunately, we have some what
24     may be very potentially-significant problems with the
25     Bickel & Brewer role in this case and the manner in which it
```

```
 1    was procured.

 2         We have information, and, you know, we will make an

 3    appropriate motion, but it is relevant to the pro hac and the

 4    signing up with the lenders.

 5         We have information that, unfortunately, the

 6    Lender Protection Group and Ms. Cangelosi and her cohorts have

 7    engaged in another fear-mongering campaign in writing with the

 8    direct lenders --

 9         (Colloquy not on the record.)

10         MR. ASHINOFF:  -- essentially to scare them into

11    retaining counsel telling them things like Silar is going to

12    sue all of them, and that the Judge has told Silar in open

13    court to sue --

14         THE COURT:  But what's wrong with that?  What I found

15    wrong contrary -- I apologize -- Ms. Rasmussen, to your

16    representation earlier, what I found wrong with Ms. Cangelosi's

17    conduct is that she engaged in a securities fraud.

18         That is she procured assignment of property interests in

19    exchange for a profit participation, the classic definition of

20    a security.

21         If all she is doing whether she's engaging in fraud or

22    not, whether she has under Section 15 a proper proxy statement

23    on file, whether it's a proper 34 Act filing or not, if she's

24    not procuring assignments of property interest in exchange for

25    a profit percentage, there's no security issue involved.
```

1            MR. ASHINOFF:  I'll come to the profit percentage in

2      a moment, your Honor.  If I --

3            THE COURT:  And --

4            MR. ASHINOFF:  If I could just have a --

5            THE COURT:  And, otherwise, you have no standing.

6      You have standing on the securities issue and who has proper

7      standing here in this court.

8          But if all that's involved is an effort to have direct

9      lenders directly involved whether they are defrauded or not is

10     not for you to raise.

11           MR. ASHINOFF:  Your Honor, here's the problem, and

12     I'd like to put it on the record.

13         (Colloquy not on the record.)

14           MR. ASHINOFF:  Your Honor said to me at the last

15     hearing we need to know who you're going to sue and for what

16     you're going to sue them.  People are entitled --

17           THE COURT:  That's right.

18           MR. ASHINOFF:  -- to know if they're going to be in

19     or out.

20           THE COURT:  Right.

21           MR. ASHINOFF:  In response to that, we filed our

22     amended answer and counterclaims --

23           THE COURT:  And --

24           MR. ASHINOFF:  -- and third-party --

25           THE COURT:  And you --

```
 1              MR. ASHINOFF:  -- complaints.

 2              THE COURT:  Basically, you have disowned Compass'

 3    tort claims.

 4              MR. ASHINOFF:  We have disowned tort claims that --

 5              THE COURT:  You --

 6              MR. ASHINOFF:  -- Compass had.

 7              THE COURT:  You just want your rights --

 8              MR. ASHINOFF:  We have not brought --

 9              THE COURT:  -- protected.

10              MR. ASHINOFF:  We have not brought our own tort

11    claims.  More to the point, we've only named out of the

12    3500 lenders 62 out of 3,500 lenders.  We don't plan to sue the

13    rest.  We took your comments to heart.  We tried to be

14    effective.

15         These letters are telling them that we're coming after

16    them and are going to sue them for their life savings, and they

17    had better sign up counsel right away.

18         Your Honor, the fact is they're being stampeded into

19    signing up counsel for a litigation that we have no intention

20    of bringing them into.

21         And, frankly, if they tried to come in now en masse, we'd

22    have real problems given the schedule --

23              THE COURT:  Did you not --

24              MR. ASHINOFF:  -- if another 1,000 --

25              THE COURT:  -- countersue them?
```

```
 1              MR. ASHINOFF:  No.  We counter --

 2              THE COURT:  You believe --

 3              MR. ASHINOFF:  Our total --

 4              THE COURT:  -- you have them covered by the

 5    injunction, anyway.  You don't need to countersue them.  You're

 6    not going to countersue them for the tort claims.

 7              MR. ASHINOFF:  We are not going to countersue anyone

 8    for a tort, your Honor, but the point is we only have 62 people

 9    we counterclaimed against.  Most of them are already in the

10    case.

11         And, yet, these thousands of people are getting a

12    communication that says Silar's coming after you.  You better

13    protect your life savings.  You better sign up.

14         It's untrue, and we want these people to know the truth

15    that they're not in any imminent threat of getting sued by

16    us.

17              THE COURT:  Send them a letter.

18              MS. SHUMENER:  Yeah.

19         (Colloquy not on the record.)

20              THE COURT:  We're --

21              MR. ASHINOFF:  We may do that.

22              THE COURT:  We have no present intent to sue you.  If

23    you join the lawsuit, it will be with the understanding that we

24    will then have the right to counterclaim against you.  We have

25    no present intent to sue you.
```

```
 1              MR. ASHINOFF:  Yeah.  And I want to affirm
 2    100 percent of the way your Honor just described it.  That is
 3    our position.
 4         In addition, we didn't sue anybody for a tort.  We're
 5    trying to narrow this case and deal with the contract
 6    issues.
 7              THE COURT:  You can further add in your letter that
 8    the Judge gave you a deadline.  If you're going to countersue,
 9    do it, and the deadline has passed.
10              MR. ASHINOFF:  Right.
11              THE COURT:  So the only way they can be brought into
12    the lawsuit is if they bring themselves in.
13              MR. ASHINOFF:  Right.  And I --
14              THE COURT:  And then --
15              MR. ASHINOFF:  And --
16              THE COURT:  -- you can countersue them.
17              MR. ASHINOFF:  And they will read this transcript,
18    and I'm happy that they will read both of our comments in this
19    transcript to this effect.
20         There's one other problem, your Honor, that we need to
21    raise, potentially, with respect to the application of
22    Bickel & Brewer.
23         And if I can just approach the Court and hand up to it the
24    Court's May 15th, 2008, order, and I have a couple of copies
25    for --
```

```
 1              THE COURT:  Please.  Uh-huh.

 2              MR. ASHINOFF:  -- counsel.

 3              THE COURT:  Counsel.

 4              MR. ASHINOFF:  May I approach?

 5              THE COURT:  Please.

 6         (Colloquy not on the record.)

 7              THE COURT:  And give them copies as well.

 8              MR. ASHINOFF:  I will.

 9         (Colloquy not on the record.)

10         MR. ASHINOFF:  If I can direct the Court's attention

11    here, your Honor, will recall dealing with the unfortunate

12    matters of the way Ms. Cangelosi and Cross' principals

13    proceeded to try to act in the past and the need for this Court

14    to enter an order.

15         And I would like to simply address this briefly and

16    quickly to paragraph 6 of this order, page 4 of 9, and

17    paragraph 7, and then I'll make my point.

18         Paragraph 6 of this order said, "FDH and Cangelosi are

19    prohibited from taking any action on behalf of any direct

20    lender in any manner related to the instant litigation" --

21              THE COURT:  Wait a minute.  I didn't follow you.

22    "FDH and Cangelosi" --

23              MR. ASHINOFF:  Yes.

24              THE COURT:  -- "with respect to any beneficial

25    interest not held by her are prohibited from taking any action
```

1    on behalf of any direct lender in any matter related to the

2    instant litigation, including but not limited to."

3         MR. ASHINOFF:  Right.  "Participating in mediation,

4    responding to proposed loan resolutions; E, negotiating with

5    new counsel or retaining such counsel on behalf of any" --

6         THE COURT:  In other words --

7         MR. ASHINOFF:  -- "other direct" --

8         THE COURT:  -- she can't be an intermediary between

9    other beneficial owners other than herself and counsel.

10        MR. ASHINOFF:  Correct.

11        THE COURT:  She --

12        MR. ASHINOFF:  Correct.

13        THE COURT:  They can retain counsel directly

14   themselves, of course.

15        MR. ASHINOFF:  Yes.  Paragraph 7, your Honor, and

16   then I'll come to the point with respect to the Bickel & Brewer

17   proposed retention.

18        Paragraph 7 said, "Cross is prohibited from acting on

19   behalf of the direct lenders."  It says Cross, and Cross'

20   principal is McGowen Duncan as your Honor will recall, its

21   general counsel and founder and director.

22        "Cross is prohibited from" --

23        THE COURT:  Who is McGowen Duncan?

24        MR. ASHINOFF:  He was the principal at Cross.  He

25   is the cofounder, partner, and general counsel of

1    Cross Equities.

2        It says, "Cross is prohibited from appearing in this

3    litigation.  Cross may not take any action on behalf of any

4    direct lenders in any manner related to this litigation."

5            THE COURT:  And how is McGowen Duncan involved in

6    counsel's present representation?

7            MR. ASHINOFF:  The last subparagraph is

8    paragraph G-2, little 3 of the proposed Bickel & Brewer letter.

9    It states to the lenders that their firm intends to hire

10   McGowen Duncan as co-counsel --

11           THE COURT:  Who's firm?

12           MR. ASHINOFF:  Bickel & Brewer.

13           THE COURT:  And where are you reading to me from?

14           MR. ASHINOFF:  I'm reading from a copy of the

15   Bickel & Brewer proposed engagement letter which was

16   provided --

17           THE COURT:  Present --

18           MR. ASHINOFF:  -- to us.

19           THE COURT:  -- engagement letter.

20           MR. ASHINOFF:  The one that they're trying to ask the

21   lenders to sign up.

22           THE COURT:  They want to represent Jones & Vargas'

23   direct-lender group.

24           MR. ASHINOFF:  And about 1,000 or 2,000 other people,

25   and the letter says, "The firm, Bickel & Brewer, will hire

1  McGowen Duncan, Esq., as co-counsel to assist the firm in the

2  litigation and will share 50 percent in the contingency fee, if

3  any, with him."

4        Your Honor, we believe that's a --

5              THE COURT:  Who will share?

6              MR. ASHINOFF:  Bickel & Brewer will give him

7  50 percent --

8              THE COURT:  Give them --

9              MR. ASHINOFF:  -- of the fee.

10             THE COURT:  -- being who?

11             MR. ASHINOFF:  McGowen Duncan, the principal of

12 Cross --

13             THE COURT:  Are they --

14             MR. ASHINOFF:  -- which we --

15             THE COURT:  Is McGowen Duncan a lawyer?

16             MR. ASHINOFF:  Yes.  But he also is the principal of

17 Cross and is still its general counsel/partner.

18             THE COURT:  And the letter says we'll give Cross

19 50 percent or McGowen Duncan 50?

20             MR. ASHINOFF:  McGowen Duncan, but he is Cross.  He

21 basically is Cross.

22             THE COURT:  So is this 50-percent champerty?  Is the

23 50 percent with a nonlawyer Cross or is it with a lawyer

24 50 percent and based upon professional-rules-required sharing

25 of legal involvement in the case?

1          MR. ASHINOFF:  If Mr. Duncan does what it takes to

2     earn 50 percent of this fee and serves as Nevada counsel, we

3     believe that violates the spirit if not the letter of

4     paragraph 7 of the Court's prior order.

5          THE COURT:  Cross here is prohibited.

6          MR. ASHINOFF:  Yes.  But Cross doesn't act itself.

7     He is the principal who was acting at the time --

8          THE COURT:  He certainly --

9          MR. ASHINOFF:  -- that led the Court --

10          THE COURT:  -- can't act on behalf of Cross anywhere.

11     He certainly cannot receive 50 percent of the fees on behalf of

12     Cross.  That would be not only champerty.

13       It would be an absolute bar under our professional rules.

14     The only way he can act vis-a-vis McGowen Duncan is on behalf

15     of a licensed attorney, not Cross.

16          MR. ASHINOFF:  Right.  But what he's done,

17     essentially, your Honor, is saying if he turns his hat around

18     and says now I'm me, instead of Cross, I can take 50 percent --

19          THE COURT:  He --

20          MR. ASHINOFF:  -- of this fee.

21          THE COURT:  He has the right to do that as long as

22     its true and, in fact, the case as long as he's going to be a

23     lawyer, a participating lawyer, not Cross.  Cross can't stand

24     up here in court and say this is Cross on behalf of X, Y, and

25     Z.  They can't do that.

1          MR. ASHINOFF:  Right.  Well --

2          THE COURT:  So what --

3          MR. ASHINOFF:  -- he wouldn't say --

4          THE COURT:  What's the matter with him serving with

5     two different hats?  Just as I told one of the earlier

6     litigants here today, a pro se, there's nothing wrong, sir,

7     with a person serving as board of directors for two different

8     entities.

9          MR. ASHINOFF:  Your Honor, I was not here in May of

10    2008, and I don't profess to know what led you to get to the

11    point of issuing this kind of prohibition.

12         THE COURT:  What upset me is that Cross, a potential

13    financier, was walking in here and Ms. Cangelosi further

14    transferring and encumbering what she had illegally received

15    what I had told her she could not receive, what I had told her

16    unless she did a resolicitation I was going to order her to

17    return, and which she had never done a proper resolicitation,

18    and I was on the verge and that very day ordered her to return.

19         What upset me is that Cross, a potential financier, was

20    walking in here and seeking a conveyance, a further conveyance

21    and assignment, of what she had illegally obtained in direct

22    contravention of direct-lenders' rights.

23         But that doesn't prohibit -- none of this prohibits a

24    direct lender if they want to cut off their own nose or if they

25    want to submit themselves to this jurisdiction for

1    counterclaiming or if they at a minimum just want to protect

2    their own rights from assigning their rights directly to a

3    lawyer, not through Ms. Cangelosi -- no interest can go to

4    Ms. Cangelosi.  That's champerty.  That's illegal assignment to

5    a nonlawyer -- nor is there any prohibition against assignment,

6    proper assignment, to a real lawyer who will really defend such

7    people here in court.

8         MR. ASHINOFF:  And I hear your Honor.  I raised it

9    because I wasn't sure if what led the Court to issue this

10   injunction against Cross was conduct the Court found was

11   inappropriate for Cross' principal who would be Mr. Duncan --

12        THE COURT:  No.

13        MR. ASHINOFF:  -- and whether that's of any concern

14   to the Court.

15        THE COURT:  No.

16        MR. ASHINOFF:  Okay.

17        THE COURT:  I prohibited Cross, no doubt about that.

18   They're not a lawyer, and they had no right to further take in

19   terms of representation or even financing of representation an

20   interest that Ms. Cangelosi had illegally obtained.

21        MR. ASHINOFF:  The only other question I have, then,

22   with regard to the Bickel & Brewer application --

23        (Colloquy not on the record.)

24        MR. ASHINOFF:  -- is the fact that paragraph G-2,

25   little 1 refers to the potential intention by Bickel & Brewer

1    to hire and, presumably, compensate a litigation-management

2    consultant in the case.

3         And I would like it to be clear that we would view the

4    fact that if that happened to be Ms. Cangelosi that that would

5    run afoul of your Honor's injunction.

6              THE COURT:  Or Cross.  I think I would be inclined to

7    agree.

8         (Colloquy not on the record.)

9              MR. COLLINS:  Your Honor, before we hired such a

10   firm, we would bring it to your attention and make sure.  It's

11   no intention at this point for me to make Ms. Cangelosi --

12             THE COURT:  Especially, if it's either Ms. Cangelosi

13   or an entity controlled by her or Cross or an entity controlled

14   by Cross, not Mr. Duncan.

15             MR. COLLINS:  Absolutely, your Honor.  Absolutely.

16   Do you want to state, though, your Honor, at some point

17   depending on --

18             THE COURT:  I'll let you respond.

19        Why don't you let him respond.

20             MR. COLLINS:  Sure.  Thank you.

21             THE COURT:  You can have a further reply, of course.

22             MR. COLLINS:  Your Honor, Michael Collins on behalf

23   of Bickel & Brewer.  You're absolutely correct.  The --

24             THE COURT:  Mr. Duncan is a principal in your firm?

25             MR. COLLINS:  No, he is not.

```
 1                THE COURT:  No.  It's with him that you would be
 2      sharing 50 percent.
 3                MR. COLLINS:  With Mr. McGowen Duncan as an attorney
 4      licensed in the state of Texas.
 5                THE COURT:  And --
 6                MR. COLLINS:  He was a former Fulbright lawyer, real
 7      estate lawyer.  He's intimately --
 8                THE COURT:  And by way of disclosure, of course,
 9      he'll need local counsel which would be Jones Vargas.
10                MR. COLLINS:  Right.
11                THE COURT:  And he will be participating in the case.
12      You're not just giving him a grand gift of a 50-percent
13      referral fee.  He will participate in the case and for --
14                MR. COLLINS:  Oh, absolutely, your Honor.  I --
15                THE COURT:  -- and conduct --
16                MR. COLLINS:  I --
17                THE COURT:  -- his fair share of the litigation
18      effort.
19                MR. COLLINS:  Absolutely.  We intend to work him very
20      hard.
21                THE COURT:  Uh-huh.
22                MR. COLLINS:  Also, your Honor, we expect to talk to
23      him about sharing expenses between our two firms.  He may out
24      of pocket come out and share some of the expenses, out of his
25      pocket.
```

1           It's been very made clear -- excuse me, your Honor -- made

2    very clear -- and I don't want to waive any privilege here --

3    but it's he, not Cross.  And if he is helping with the

4    expenses, it's he, not Cross.

5           THE COURT:  I don't think I could find anything wrong

6    with that.  I do add my caution, of course, to the extent he

7    seeks financing from Cross he's got a potential problem.

8           And to the extent that he expects Cross as opposed to the

9    interest which you folks will get by way of lawyers fees he

10   expects Cross to receive any kind of reimbursement or transfer

11   of interest from these folks, direct lenders, he also has a

12   potential problem.

13          MR. COLLINS:  Oh, absolutely, your Honor.  None of

14   that -- I'm not saying any of that's intended.  But if anything

15   like that happened, we'd come to you first to make sure it's

16   properly represented to you by a motion if it was done, but

17   there's no intention --

18          THE COURT:  Okay.

19          MR. COLLINS:  -- at this point.

20          THE COURT:  Any other response?

21          MS. RASMUSSEN:  Your Honor, I have a --

22          MR. COLLINS:  No.

23          MS. RASMUSSEN:  I am sorry.  When it's time, I have

24   just --

25          THE COURT:  Okay.

```
 1            MS. RASMUSSEN:  -- a couple --

 2            MR. COLLINS:  And, your Honor, as --

 3            MS. RASMUSSEN:  -- of things.

 4            MR. COLLINS:  So as I say, as we do intend to hire a

 5   litigation-management consultant, if it has anything to do with

 6   Ms. Cangelosi -- and I'm not saying it's going to -- it would

 7   come to you first.

 8            THE COURT:  It's going to be a litigation consultant,

 9   right --

10            MR. COLLINS:  Yes.  Absolutely.

11            THE COURT:  -- like a paralegal or a financial expert

12   or somebody who has some expertise, not just Ms. Cangelosi or

13   somebody, an entity owned by her --

14            MR. COLLINS:  Oh, absolutely not, your Honor.

15            THE COURT:  -- in order to reward her for her past

16   participation.

17            MR. COLLINS:  Absolutely not, your Honor.  Absolutely

18   not.

19            THE COURT:  Okay.  I take that as an

20   officer-of-the-court representation.

21            MR. COLLINS:  Thank you.

22            THE COURT:  If that's the case, I can't sustain an

23   objection.  It's consistent with my prior understanding, and

24   that I never barred nor did I intend to bar direct lenders from

25   hiring counsel themselves.
```

1           (Colloquy not on the record.)

2                MR. COLLINS:  Thank you, your Honor.  That's all I

3      have here.

4                THE COURT:  Okay.

5                MS. RASMUSSEN:  Your Honor, just for the record

6      because I represent Ms. Cangelosi --

7                THE COURT:  Right.

8                MS. RASMUSSEN:  -- I object to the Court and Silar

9      and anyone else's characterization that Ms. Cangelosi engaged

10     in and illegal, unlawful behavior.

11               THE COURT:  I accept the objection, and I overrule

12     it.

13               MS. RASMUSSEN:  Okay.  And, secondly, I'd like to

14     know how it is that Silar is in possession of a proposed

15     retainer agreement between direct lenders and their counsel.

16     In my practice as a lawyer, I have never handed over --

17               THE COURT:  I'll permit you to ask the question.

18               MS. RASMUSSEN:  -- a retainer --

19               THE COURT:  I'm not going to order them to answer it.

20               MS. RASMUSSEN:  Well, I'd ask -- I request that the

21     Court make the inquiry.

22          (Colloquy not on the record.)

23               MS. RASMUSSEN:  I think it's an appropriate inquiry.

24               MR. COFFING:  It's posted on the receiver's Web site,

25     your Honor, and it was provided --

```
 1                UNIDENTIFIED SPEAKER:  Right.

 2                MS. RASMUSSEN:  Okay.

 3                MR. COFFING:  -- on the LPG Web site as well for

 4     anyone to access.

 5                MS. RASMUSSEN:  And that's why I was asking because I

 6     don't know how it is that they come --

 7                THE COURT:  Okay.

 8                MS. RASMUSSEN:  -- into possession of it.

 9         I also think that it inappropriate on some level for Silar

10     -- on any level, frankly -- for Silar to be objecting to how it

11     is that Bickel & Brewer will do its job of representing the

12     direct lenders --

13                THE COURT:  I already ruled --

14                MS. RASMUSSEN:  -- what consultants --

15                THE COURT:  -- on that.  To the extent --

16                MS. RASMUSSEN:  -- it will retain.

17                THE COURT:  They do not have standing to the extent

18     they're simply objecting to fraud, to inducing a relationship

19     directly between a lawyer and one of the direct lenders.

20                MS. RASMUSSEN:  Okay.  And then I --

21                THE COURT:  As long as it doesn't involve

22     Ms. Cangelosi or Cross or those who were prohibited in the

23     prior order, emergency motion for order authorizing encumbrance

24     of beneficial interests, as long as it doesn't border on any of

25     those items for which, of course, they do have standing, they
```

1    do not have standing to complain about that kind of a problem.

2            MS. RASMUSSEN:  And then, finally, I just think the

3    record should reflect that although this is an arrangement that

4    they've recently been able to achieve -- the direct lenders,

5    they, and my clients, the 18 that I represent, will likely

6    benefit from it -- it comes at a substantial cost far in excess

7    of the previous agreement that they had arranged which this

8    court order dissolved.

9            (Colloquy not on the record.)

10           MS. RASMUSSEN:  So I didn't want to leave the Court

11   with the impression that now they're all protected because, in

12   fact, they were previously protected.  Their new arrangement is

13   substantially more expensive to them.

14        And, in fact, they have to disgorge a substantial

15   percentage of what they would earn, and I just want the record

16   to be clear --

17           THE COURT:  I'll --

18           MS. RASMUSSEN:  -- on that.

19           THE COURT:  I'll let you make your statement for the

20   record, but the record is not clear.  I have no understanding

21   of such, and you have not presented any record to support that.

22   You made your statement on the record, but there's no showing

23   of that.

24           MS. RASMUSSEN:  Well, previously, your Honor, they

25   had engaged counsel at an hourly rate.  Now they're paying a

1    percentage.  So to the extent that the Court --

2          THE COURT:  They hadn't --

3          MS. RASMUSSEN:  -- didn't have any understanding --

4          THE COURT:  -- just engaged counsel.  They had said

5    that we are going to engage Cross who will finance the

6    litigation, retain the counsel.

7        And we are going to give them, what was it, a third or a

8    half of their interests up to 50 percent of their interest.  It

9    was something in that nature.

10       They were transferring from what they had transferred to

11   Cangelosi all of their direct-lender interests.  They were

12   transferring some huge percentage to Cross which was incredible

13   in my mind.

14       So there is just absolutely no record to support your

15   statement.  You've made your statement for the record.  There's

16   just no record to support it.

17         MS. RASMUSSEN:  Okay.

18         THE COURT:  Okay.

19         MR. ASHINOFF:  Your Honor --

20         THE COURT:  And I've overruled the objection, of

21   course, and their pro hac vice may be granted.

22         MR. ASHINOFF:  Your Honor, on the basis of the

23   representations --

24       (Colloquy not on the record.)

25         MR. ASHINOFF:  -- I'm not going to object, and I --

```
1              THE COURT:  Okay.

2              MR. ASHINOFF:  I heard the Court, and I heard

3    Mr. Collins.

4              THE COURT:  Okay.

5              MR. ASHINOFF:  But I --

6         (Colloquy not on the record.)

7              MR. ASHINOFF:  I raise one issue, your Honor.  We

8    have to respond to the motion by the DLA clients to file a

9    putative class-action complaint.  We also --

10             THE COURT:  Say that again.

11             MR. ASHINOFF:  They've asked for permission to file a

12   putative class-action complaint.  Of course, the filing doesn't

13   mean it's going to proceed as a class-action.

14             THE COURT:  There is --

15             MR. ASHINOFF:  And --

16             THE COURT:  -- some motion pending --

17             MR. ASHINOFF:  No.

18             THE COURT:  -- in that regard?

19             MR. ASHINOFF:  No.  This is where I'm going.  To the

20   extent --

21             THE COURT:  You're talking about in the solicitation

22   of these people.

23             MR. ASHINOFF:  No.  That's the other.  That's the

24   rub.

25             THE COURT:  Where have they made a request to file a
```

```
 1    putative class --
 2              MR. ASHINOFF:  DLA Piper Rudnick has moved to file --
 3         (Colloquy not on the record.)
 4              MR. ASHINOFF:  -- a class-action complaint as a
 5    representative with the plaintiffs they have --
 6              THE COURT:  Is it set for some date certain?
 7         (Colloquy not on the record.)
 8              MS. SHUMENER:  We have filed a proposed -- we have
 9    filed the motion for leave to file an amended complaint.  The
10    amended complaint is a proposed class-action complaint for the
11    three loans in which my clients own substantial interests, so
12    they're the class representatives or proposed class
13    representatives.
14              THE COURT:  And is there a hearing set for a hearing
15    on that proposed --
16              MS. SHUMENER:  That motion has been set for a while.
17    That's the April 13th motion, your Honor.
18              THE COURT:  Okay.
19              MS. SHUMENER:  It's set for April 13, and then if
20    that's granted --
21              THE COURT:  I just simply --
22              MS. SHUMENER:  -- we'll file --
23              THE COURT:  -- haven't looked --
24              MS. SHUMENER:  -- a motion --
25              THE COURT:  -- at that.
```

```
 1              MS. SHUMENER:  -- for a certification --
 2              MR. ASHINOFF:  Well, your Honor, here --
 3              MS. SHUMENER:  -- on this.
 4              MR. ASHINOFF:  Here's my concern.  We have that
 5    coming from DLA.  Now we have from Bickel & Brewer what we
 6    understand through the grapevine to be an effort to sign up
 7    hundreds if not thousands of individuals.
 8         And what we may have is something quite unruly which is
 9    one lawyer group putatively representing a class through the
10    representative method and another lawyer group putatively
11    representing the same individuals which can happen.
12              THE COURT:  It sounds a little chaotic --
13              MR. ASHINOFF:  And --
14              THE COURT:  -- and uncoordinated.
15              MR. ASHINOFF:  And my concern is --
16              THE COURT:  But what beyond that do you want --
17              MR. ASHINOFF:  -- we --
18              THE COURT:  -- from me?
19         (Colloquy not on the record.)
20              MR. ASHINOFF:  Well, we may object to one or the
21    other coming in because of the problem and the trial date and
22    the need to have something finite --
23              THE COURT:  Okay.
24              MR. ASHINOFF:  -- to finish with discovery --
25              THE COURT:  You'll --
```

1          MR. ASHINOFF:  -- and on other --

2          THE COURT:  You'll do that I'm sure.

3          MR. ASHINOFF:  Okay.

4          THE COURT:  April 13th is, apparently, the scheduled

5     date for a hearing on the first motion.

6        (Colloquy not on the record.)

7          MR. ASHINOFF:  Well, just whether they can file it

8     which is -- right.  That it's not a class-cert --

9          THE COURT:  They, of course --

10          MR. ASHINOFF:  -- hearing.

11          THE COURT:  -- can file it.  They have filed it.

12    Whether or not it would be approved is a totally-different

13    thing.

14          MR. ASHINOFF:  No.  They filed for permission to file

15    the complaint.  That's with --

16          THE COURT:  That's right.

17          MR. ASHINOFF:  Yeah.  But we need putative class

18    discovery before there could ever be a hearing or a motion on

19    class cert, and I just don't want to have --

20          THE COURT:  They're just advising me --

21          MR. ASHINOFF:  -- too many different trains.

22          THE COURT:  -- that it's coming.  Duck, Judge.

23        (Colloquy not on the record.)

24          MR. ASHINOFF:  Your Honor, it's just coming, and

25    thank you --

124

```
 1              THE COURT:  Okay.

 2              MR. ASHINOFF:  -- for all your time today.

 3              THE COURT:  Okay.

 4         (Colloquy not on the record.)

 5              MS. SHUMENER:  Yeah.

 6              UNIDENTIFIED SPEAKER:  Thank you, your Honor.

 7              MS. SHUMENER:  Thank you, your Honor.

 8              MS. RASMUSSEN:  Thank you, your Honor.

 9              THE COURT:  Thank you, Counsel.

10         (Colloquy not on the record.)

11              MR. ASHINOFF:  Well, two --

12              MS. RASMUSSEN:  Your Honor --

13              MR. ASHINOFF:  Two --

14              MS. RASMUSSEN:  Oh, sorry.

15              MR. ASHINOFF:  Two things on dates.  If it's possible

16    to change the June 8 date to either June --

17              THE COURT:  That's off calendar.

18              MS. SHUMENER:  It's off calendar, yeah.

19              MR. ASHINOFF:  Oh, it is.

20              MS. SHUMENER:  We just got --

21              THE COURT:  That's --

22              MS. SHUMENER:  -- (indiscernible).

23         (Colloquy not on the record.)

24              THE COURT:  We have approved the sale.

25              MR. ASHINOFF:  Oh, we don't need that, anymore.
```

```
 1                MS. SHUMENER:  Yeah, yeah.

 2                MR. ASHINOFF:  Thank you.

 3                MS. SHUMENER:  Yes.

 4                THE COURT:  Yep.

 5                MR. ASHINOFF:  Thank you.  Thank you.

 6           (Colloquy not on the record.)

 7                MR. ASHINOFF:  And the other thing is --

 8                MS. SHUMENER:  You can go to the graduation.

 9                MR. ASHINOFF:  -- can we get two more days to respond

10      to your motion given that we ended up here --

11                MS. SHUMENER:  Absolutely not.

12           (Colloquy not on the record.)

13                MR. ASHINOFF:  Can I take that as a yes?

14                MS. SHUMENER:  It's been pending for weeks and weeks

15      and weeks and weeks.

16                MR. HOWARD:  I'm sorry, your Honor.

17                THE COURT:  Step outside and make the request.

18                MR. HOWARD:  That's Los Angeles counsel --

19                THE COURT:  If they don't grant it --

20                MR. HOWARD:  -- talking.

21                THE COURT:  -- of course, direct it to me.

22                MR. ASHINOFF:  Thank you for your time today,

23      your Honor.

24                MS. SHUMENER:  Thank you, your Honor.

25                THE COURT:  Thank you so much.
```

1          (Colloquy not on the record.)

2              THE COURT:  Okay.

3              THE CLERK:  All rise.

4          (Court concluded at 04:55:29 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      I certify that the foregoing is a correct transcript

2    from the electronic sound recording of the proceedings in

3    the above-entitled matter.

4

5

6    /s/ Lisa L. Cline                          03/20/09

7    _____          _____
     Lisa L. Cline, Transcriptionist              Date

8

9

10   /s/ Michele Phelps                         03/20/09

11   _____          _____
     Michele Phelps, Transcriptionist             Date

12

13

14

15

16

17

18

19

20

21

22

23

24

25