```
                    UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA
                         LAS VEGAS DIVISION


                              ) CASE NO: 2:07-CV-892-RCJ-GWF
                              )
                              )          CIVIL
IN RE:  USA COMMERCIAL MORTGAGE )
COMPANY.                       )     Las Vegas, Nevada
                              )
                              )  Tuesday, January 19, 2010
                              )  (3:32 p.m. to 5:11 p.m.)
```

MEMBER CASES:  3:07-cv-0241-RCJ-GWF; 2:07-cv-1133-RCJ-GWF;
                2:07-cv-0894-RCJ-GWF; 2:08-cv-1389-RCJ-GWF

```
                              )
                              ) CASE NO: 2:09-BK-32824-RCJ
IN RE:  ASSET RESOLUTION, LLC., )  (Adv. Proc. 09-1410)
                              )
                              )
```

MEMBER CASES:  2:09-BK-32831-RCJ; 2:09-BK-32839-RCJ;
2:09-BK-32843-RCJ; 2:09-BK-32844-RCJ; 2:09-BK-32846-RCJ;
2:09-BK-32849-RCJ; 2:09-BK-32851-RCJ; 2:09-BK-32853-RCJ;
2:09-BK-32868-RCJ; 2:09-BK-32873-RCJ; 2:09-BK-32875-RCJ;
2:09-BK-32878-RCJ; 2:09-BK-32880-RCJ; 2:09-BK-32882-RCJ;

1)    MOTION FOR ORDER CONVERTING BANKRUPTCY CASES TO CHAPTER 7,
      OR ALTERNATIVELY, TO APPOINT A TRUSTEE (136, 09-BK-32824);
2)    APPLICATION OF THE OFFICIAL COMMITTEE OF
      UNSECURED CREDITORS FOR ORDER AUTHORIZING RETENTION
      OF NACHMAN HAYS BROWNSTEIN, INC, NUNC PRO TUNC;
3)    CALENDAR CALL - TRIAL SETTING RE 2:07-CV-892

              BEFORE THE HONORABLE ROBERT C. JONES,
                 UNITED STATES DISTRICT JUDGE

Appearances:            See Next Page

Court Recorder:         Araceli Bareng

Transcribed by:         Exceptional Reporting Services, Inc.
                        14493 S. Padre Island Drive, #A-400
                        Corpus Christi, TX 78418-5940

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```

**APPEARANCES FOR:**


Debtors:                      TRACY L. KLESTADT, ESQ.
                              Klestadt & Winters
                              292 Madison Avenue
                              17th Floor
                              New York, NY 10017


Debtors/Local Counsel:        RANDOLPH L. HOWARD, ESQ.
                              Kolesar & Leatham
                              3320 W. Sahara Avenue
                              Suite 380
                              Las Vegas, NV 89102


JV Direct Lenders:            JANET L. CHUBB, ESQ.
                              Jones Vargas
                              100 West Liberty Street
                              Twelfth Floor
                              Reno, NV 89501


Certain Direct Lenders:       ROBERT M. MILLIMET, ESQ.
                              MICHAEL COLLINS, ESQ.
                              Bickel & Brewer
                              1717 Main Street
                              Dallas, TX 75201

                              LISA A. RASMUSSEN, ESQ.
                              616 S. Eighth Street
                              Las Vegas, NV 89101

                              McALAN DUNCAN, ESQ. (Telephonic)
                              16475 N. Dallas Parkway
                              Addison, TX 75001

Silar Advisors, et al.:       PHILIP M.  HYMANSON, ESQ.
                              Greenberg Traurig, LLP
                              3773 Howard Hughes Parkway
                              Suite 500-N
                              Las Vegas, NV 89169

                              MELANIE ELLS, ESQ.
                              Law Office of Melanie Ells
                              8509 Normandy Shores
                              Las Vegas, NV 89131

**APPEARANCES FOR:**              (CONTINUED)


Silar Advisors, et al.:    FRANCIS B. MAJORIE, ESQ.
                           The Majorie Firm
                           3514 Cedar Springs Road
                           Dallas, TX 75219

                           KATHERINE M. WINDLER (Telephonic)
                           Bryan Cave, LLP
                           120 Broadway Street
                           Santa Monica, CA 90401

G.T. Leach Builders:       LISA M. NORMAN, ESQ.
                           Cokinos Bosien & Young
                           Four Houston Center
                           1221 Lamar Street, 16th Floor
                           Houston, TX 77010

Creditors Committee:       NORMAN N. KINEL, ESQ.
                           Duval & Stachenfeld
                           101 Park Avenue
                           11th Floor
                           New York, NY 110178

Debt. Acquisition:         DEAN T. KIRBY, ESQ.
                           Kirby & McGuinn
                           600 B Street
                           San Diego, CA 92101

U.S. Trustee:              MICHAL BLOOM, ESQ.

Also present:              CRIS RODRIGUEZ (Telephonic)

Courtroom Administrator: K. Goetsch

1      **Las Vegas, Nevada; Tuesday, January 19, 2010; 3:32 p.m.**

2          **(Courtroom and Telephonic Appearances)**

3                      **(Call to Order)**

4          **THE CLERK:**  All rise.

5          **THE COURT:**  Good afternoon, and thank you.  Please be

6   seated.

7          We're here in a withdrawn bankruptcy case.  I'm

8   sorry.  The formal name of the case is *Asset Resolution, LLC*.

9   Judge Jones here sitting in bankruptcy as a district court

10  judge, of course, Article III, but in a bankruptcy case

11  withdrawn under the provisions of Title 28.

12         Let's start with appearances, please.

13         **MR. KLESTADT:**  Good afternoon, your Honor.  Tracy

14  Klestadt of Klestadt and Winters, counsel to the debtors.

15         **MR. HOWARD:**  Good afternoon, your Honor.  Randolph

16  Howard, Kolesar and Leatham, on behalf of the debtor as local

17  counsel.

18         **MS. ELLS:**  Good morning, your Honor.  Melanie Ells

19  appearing as local counsel on behalf of Silar and Silar

20  Advisors.

21         **COURT RECORDER:**  Please move closer to the

22  microphone.  This microphone --

23         **THE COURT:**  Just a little bit louder into the

24  microphone.

25         **COURT RECORDER:**  Thank you.

1          **THE COURT:**  I'm sorry.

2          **MS. ELLS:**  Good afternoon, your Honor.  Melanie Ells

3   appearing on behalf of Silar and Silar Advisors as local

4   counsel.  I'm here with Frank Majorie, who has filed a pro hac

5   application for this case; has not yet been granted.  He's

6   asking for special permission to appear.

7          **THE COURT:**  Appear for?

8          **MS. ELLS:**  Just for purposes of this hearing until --

9          **THE COURT:**  For?

10          **MS. ELLS: -**- his pro hac application.

11          **MR. MAJORIE:**  Oh.  I'm sorry.

12          **MS. ELLS:**  On behalf of Silar.

13          **THE COURT:**  Very good.

14          **MR. MAJORIE:**  Thank you, Judge.  Francis B. Majorie

15   on behalf of Silar Advisors and Silar Special Opportunities

16   Fund.

17          I filed a pro hac in the ARC bankruptcy, and I've

18   also filed a pro hac in the 892.  Mr. Hymanson is here for the

19   892 as local counsel for 892.

20          **THE COURT:**  Thank you.  That's not a matter of

21   permission by the Court appointing; that's simply pro hac vice

22   appearance, and that may be approved.

23          **MR. KINEL:**  Good afternoon, your Honor.  Norman Kinel

24   of Duval and Stachenfeld on behalf of the creditors committee.

25          **THE COURT:**  Mr. Hymanson.

1          **MR. HYMANSON:**  Good afternoon, your Honor.  Phil

2    Hymanson on behalf of Silar.

3          **THE COURT:**  Thank you.

4          On the telephone?

5          **MR. DUNCAN:**  McAlan Duncan --

6          **MR. KIRBY:**  Dean Kirby --

7          **MR. DUNCAN:**  **--** on behalf of the special direct

8    lenders.

9          **MR. KIRBY:**  I'm sorry.  Dean Kirby, Kirby and

10   McGuinn, on behalf of Debt Acquisition Company of America V,

11   LLC.

12         **MS. BLOOM:**  Good afternoon, your Honor.  Michal Bloom

13   on behalf of the United States Trustee.

14         **COURT RECORDER:**  I'm sorry; there's a microphone next

15   to you.  Thank you.

16         **MS. BLOOM:**  Does it work?

17         **THE COURT:**  Yes.  Ms. Bloom, please.

18         **MS. BLOOM:**  Michal Bloom on behalf of the United

19   States Trustee.

20         **THE COURT:**  Thank you.

21         **MR. GREEN:**  Good afternoon, your Honor.  James Green,

22   local counsel for the unsecured creditors committee.

23         **THE COURT:**  Thank you.

24         **MS. CHUBB:**  Good afternoon, your Honor.  Jan Chubb,

25   Michael Collins, and Rob Millimet for the certain direct

```
 1   lenders.

 2              THE COURT:  Thank you.

 3              MS. RASMUSSEN:  Good afternoon, your Honor.  Lisa

 4   Rasmussen on behalf of the entity counter defendants and

 5   certain direct lenders.

 6              THE COURT:  Thank you.

 7              MS. NORMAN:  Do I need a microphone?

 8              THE COURT:  Yes, you do.

 9              MS. NORMAN:  Lisa Norman, your Honor, on behalf of

10   G.T. Leach Builders, a creditor in the bankruptcy case.

11              THE COURT:  Thank you.

12              I think the most significant thing we have on

13   calendar, Ms. Chubb, is the motion for order converting the

14   case, which I'm going to let you proceed with.  We also have

15   the application of the official committee of unsecured

16   creditors for order authorizing retention of financial

17   advisors, and, of course, trial setting for the adversary

18   proceedings.

19              I've read all of the pleadings, and I fairly much

20   know what I want to do.  Of course, there are things up in the

21   air, and I'm sure I need input of counsel, your arguments; but

22   what I want to emphasize is that I have read the pleadings.

23   You don't need to be redundant on the details, but I would like

24   you to focus on a persuasive argument on both sides emphasizing

25   the most important points.  That will be the most helpful to
```

1    me.

2              **MS. CHUBB:**  Okay.

3              **THE COURT:**  So, with that reminder and caution.

4              **MS. CHUBB:**  I just wanted to summarize for you

5    what --

6              **THE COURT:**  Please.

7              **MS. CHUBB:**  -- we will be presenting today.

8              You've previously indicated a readiness to terminate

9    Asset Resolution as the servicer, and you did terminate the

10   stay so you could do that.

11             **THE COURT:**  I have already terminated the stay.

12             **MS. CHUBB:**  Yes, you have.

13             **THE COURT:**  Uh-huh.

14             **MS. CHUBB:**  Right.

15             **THE COURT:**  Yeah.

16             **MS. CHUBB:**  And the termination of ARC is under

17   submission presently.

18             **THE COURT:**  Right.

19             **MS. CHUBB:**  Today we're requesting that if you're

20   going to terminate ARC as the servicer that you do it before

21   any conversion.  One, it will help us organize our arguments to

22   you; and, two, it will be a lot clearer to a trustee if a

23   Chapter 7 trustee gets the estate without those servicing

24   rights in it.  We could end up being where we were three and a

25   half years ago with a debtor, who now has servicing rights that

9

```
 1   might be sold again; that would just be quite awful.  So, if

 2   you're going to do those things, we would ask that they be done

 3   in that order.  We are seeking conversion today of Asset

 4   Resolution from the Chapter 7 -- Chapter 11 to the Chapter 7

 5   case, and Mr. Collins and Mr. Millimet will present that

 6   argument to you.

 7           With respect to the conversion of the SPE's, if you

 8   terminate ARC as the servicer today, and that's effective

 9   immediately, and then you can --

10           THE COURT:  What do the SPE's consist of?

11           MS. CHUBB:  They are the -- they are the --

12           THE COURT:  Entities that hold title after

13   foreclosure.

14           MS. CHUBB:  Yes.  Exactly.

15           THE COURT:  Formed by Asset Resolution; they are

16   subsidiaries of Asset Resolution?

17           MS. CHUBB:  Um --

18           THE COURT:  What are they?

19           MS. CHUBB:  I don't know.

20           THE COURT:  Who owns them?

21           MR. MILLIMET:  Your Honor, they were actually formed

22   by Compass back in the time when Compass foreclosed.  And the

23   sole managing member at that time was Compass, which was

24   eventually assigned, I believe, to Asset Resolution, LLC, and

25   Asset Resolution, LLC, now constitutes the sole member, which
```

1   means that they're manager but I don't believe that they are

2   subsidiaries, per se, of Asset Resolution, LLC.

3        THE COURT:  So, they're not assets, and I don't need

4   to characterize in my mind whether a stay is applicable or

5   anything else; they are separate entities.  Are they trusts --

6        MS. CHUBB:  But they're debtors.  They're debtors.

7        THE COURT:  -- or owned entities by Asset Resolution?

8   What are they?

9        MR. KLESTADT:  Your Honor, they're separate LLC

10  entities, each of which owns one of the foreclosed properties.

11       THE COURT:  Right.  And the members and managing

12  entities of which are what?

13       MR. KLESTADT:  Asset Resolution is the managing

14  member of each of the LLC's.

15       MS. CHUBB:  It's the owner.

16       MR. KLESTADT:  But, your Honor, the --

17       THE COURT:  And the members are --

18       MR. KLESTADT:  Your Honor, it is --

19       THE COURT:  You'll get a chance.  I just want to get

20  the background --

21       MR. KLESTADT:  Asset --

22       THE COURT:  -- of whether the stay is applicable,

23  whether the conversion has anything to do with them, or what.

24       MR. KLESTADT:  Your Honor, Asset Resolution is the

25  managing member, is the sole member of each LLC, but we

1    recognize, your Honor, that the direct lenders maintain

2    ownership interests in the properties.  So --

3          THE COURT:  So, in essence, are the direct lenders,

4    all of the direct lenders -- including Asset Resolution -- but

5    all the direct lenders members?  Does the document say -- is

6    there a document?

7          MR. KLESTADT:  There is no document, your Honor, that

8    says that each particular direct lender is a member or has a

9    membership interest, but it's --

10          THE COURT:  How are they formed, then --

11          MR. KLESTADT:  It's --

12          THE COURT:  -- under any state law unless there is a

13    document?

14          MR. KLESTADT:  Your Honor, as I understand it, they

15    were formed pursuant to the servicing agreements.

16          THE COURT:  Is there a document?

17          MR. KLESTADT:  There is a manage -- there is a

18    membership agreement, which was --

19          THE COURT:  Under New York law?

20          MR. KLESTADT:  I believe under New York law.

21          THE COURT:  And under New York law an LLC document

22    must be filed, certainly.

23          MR. KLESTADT:  Correct.

24          THE COURT:  And they were filed.

25          MR. KLESTADT:  Yes.  That's my understanding.

1          THE COURT:  And they're signed only by --

2          MR. KLESTADT:  Asset Resolution.

3          THE COURT:  -- Asset Resolution as managing member.

4          MR. KLESTADT:  May I have a moment, your Honor?

5       (Pause)

6          THE COURT:  I guess the bottom line question is:  Do

7  we all agree that, in essence, title formerly held by these

8  SPE's is held, basically, in trust by an LLC?

9          MR. KLESTADT:  The title -- the nominal title is held

10  by each of the SPE's, yes, by an LLC --

11          THE COURT:  Uh-huh.  Right.

12          MR. KLESTADT:  -- for the benefit of the direct

13  lenders.

14          THE COURT:  So, nobody is claiming that it holds both

15  nominal title and all beneficial interest.

16          MR. KLESTADT:  No.

17          THE COURT:  Everybody agrees it's, basically, title

18  is held in trust --

19          MR. KLESTADT:  Correct.

20          THE COURT:  -- for all direct lenders who --

21          MR. KLESTADT:  Yes.

22          THE COURT:  -- at the time of the foreclosure.

23          MR. KLESTADT:  Yes, your Honor.

24          THE COURT:  Okay.

25          MR. MAJORIE:  Your Honor, if I might; with one

1    clarification.

2         Under paragraph seven of the preliminary injunction

3    it specifically provided that Compass or a single-purpose

4    entity designated by Compass is authorized to make a credit bid

5    at the foreclosure sale on behalf of Compass and the direct

6    lenders, including but not limited to Compass to the extent it

7    is a direct lender under such loan, with respect to Compass's

8    and the direct lenders' respective rights as beneficiaries.

9         **THE COURT:**  Does that change my summary?  We all

10   agree that basically title is held nominally by these SPE's but

11   for the benefit of all direct lenders at the time of

12   foreclosure.

13        **MR. MAJORIE:**  With the exception that at least one of

14   the debtors is also a direct lender, and I just wanted -- that

15   does clarify, Judge.

16        **THE COURT:**  I don't understand the clarification.

17   Obviously, if Compass was a direct lender at the time of

18   foreclosure, it's also standing as a beneficiary of the title.

19        Were you attempting to clarify to an extent I don't

20   understand?

21        **MR. MAJORIE:**  I thought I was clarifying that one of

22   the -- that ARC has an interest in some of these properties as

23   a direct lender and, therefore --

24        **THE COURT:**  The order doesn't provide that, doesn't

25   conclude or say that you do; it just simply acknowledges for

1     the benefit of all direct lenders including Compass to the

2     extent it's a direct lender.

3          So, what are you seeking by way of clarification?  I

4     just simply don't understand.

5          **MR. MAJORIE:**  Well, to the extent there was a direct

6     lender interest in Compass, one of the beneficiaries of the

7     direct lender interests that are now in the SPE's would be one

8     of the debtors.

9          **THE COURT:**  Okay.  I can't confirm that or deny that,

10    but I'll let your statements stand at this juncture.

11         All right.  Sorry for the interruption.  Go ahead.

12         **MS. CHUBB:**  That's okay.  I'm sorry for interrupting.

13         But I think still the only person who could act on

14    behalf of the SPE's presently is Asset Resolution because it's

15    the only member.  So, our concern --

16         **THE COURT:**  And, clearly, Asset Resolution is under

17    this Court's 1334 -- Section 1334 -- in rem jurisdiction.

18         **MS. CHUBB:**  Yes.

19         Now, as to the motion to convert the SPE's, if you

20    terminate Asset Resolution as the servicer today, and effective

21    right away, and then you were to convert the case to Chapter 7,

22    we would ask for a continued hearing date on the conversion of

23    the SPE's so we can go back to the direct lenders and get

24    51 percent of them to decide what needs to be done.  As in

25    DACA, they, of course, don't want a conversion.

1          **THE COURT:**  Okay.  I'm not sure I see the need for

2   that.  I mean, you'll hear how I'm going to rule.

3          **MS. CHUBB:**  Okay.

4          **THE COURT:**  But I see no reason to rule on the one

5   question before the other.  Clearly, as a separate court, as an

6   Article III court, not sitting in bankruptcy, I have

7   jurisdiction of the separate cases, bankruptcy cases, but also

8   the adversary proceedings --

9          **MS. CHUBB:**  Right.

10         **THE COURT:**  -- and I have pending the motion, various

11  motions, to declare a termination.  Sitting as a bankruptcy --

12  in bankruptcy, if you will, under 1334, I have the right to

13  declare a conversion or not declare a conversion, and if I

14  declare -- and I also have the right to lift the automatic stay

15  so that in the separate case, if I declare that they are to be

16  terminated or already terminated, that's effective, and there

17  is nothing carried over into a separate Chapter 7 that wasn't

18  terminated or not terminated per my order in the 11.

19         **MS. CHUBB:**  That was -- that is true, your Honor.  I

20  was just concerned that a bankruptcy trustee appointed under a

21  chapter --

22         **THE COURT:**  You just have a longer holdup, is all.

23         **MS. CHUBB:**  Yes.

24         **THE COURT:**  Yeah.

25         **MS. CHUBB:**  Just a delay.

16

1          **THE COURT:**  I'll certainly take that into --

2          **MS. CHUBB:**  Yes.  And even if you terminate and then

3    convert, think then the Asset Resolution Chapter 7 trustee

4    would be the manager of the SPE's, at least for a time being,

5    but as we've just discussed, that's not really property of the

6    estate because it's held nominally for the benefit of these.

7    But at least during that hiatus time, if you gave us a

8    continuance, there would be someone to turn to; it wouldn't be

9    a vacuum.  So, that's why we're asking for that.

10         **THE COURT:**  I do want to hear the motion for

11   conversion today.

12         **MS. CHUBB:**  Yes.

13         **THE COURT:**  Scheduled a notice today.

14         **MS. CHUBB:**  Yeah.  Right.

15         **THE COURT:**  I want to hear that.

16         **MS. CHUBB:**  No --

17         **THE COURT:**  And I am undoubtedly going to rule today.

18         **MS. CHUBB:**  Okay.  If you grant our motions today,

19   then, to the extent that today's rulings are inconsistent with

20   the previously entered preliminary injunction, there should be

21   an order that that preliminary injunction is modified.

22         So, in summary, what we're asking today is for you to

23   terminate Asset Resolution as the servicer immediately; to

24   convert the Asset Resolution case from a Chapter 11 to a

25   Chapter 7; and, depending on what you do, perhaps, or not,

1    continue the SPE conversion motions; set a date for the bench

2    trial; and if all of that should happen, you'll deny the motion

3    for a financial advisor for the committee.

4           Thank you.

5           **THE COURT:**  Okay.  Thank you.

6           May we hear those motions.

7           **MR. COLLINS:**  Good afternoon, your Honor.  Michael

8    Collins on behalf of certain direct lenders.

9           We're here and I'll be arguing our motion to convert

10   and/or appointment of a Chapter 11 trustee.  Our first request

11   is to convert the case to a Chapter 7.  If the Court is not

12   inclined to do so, we request the Court to appoint a Chapter 11

13   trustee.  I noticed this afternoon we got a pleading where, I

14   think, Asset Resolution now says it doesn't oppose a Chapter 11

15   trustee if the Court doesn't terminate the servicing.  And I'll

16   let them speak to that, but I did see that.  But, your Honor,

17   our first request and our primary request is conversion,

18   although the arguments are similar.  And I will not repeat the

19   brief, but I will highlight for your Honor.  As we know, under

20   1112 of the bankruptcy code, it says "includes."  Well, you can

21   -- "you shall" or "you should" convert for cause if it exists,

22   and it says "includes" and it enumerates a number of causes.

23          The way we look at this case, your Honor, is Asset

24   Resolution has two assets.  It has the servicing rights, which

25   we believe should be converted -- excuse me -- should be

```
 1    terminated.  If that's terminated, there is no ongoing

 2    business.  And there is no dispute that they don't service

 3    loans other than the direct lenders loans that have been before

 4    this Court for a number of years.  So, there is no other

 5    ongoing business; we've seen no evidence that they intend to

 6    continue servicing loans of other people or other entities.

 7    So, if they are terminated as a servicer of these direct

 8    lenders, there is no ongoing business to rehabilitate or

 9    reorganize.  So, therefore, your Honor, we believe, if the

10    Court grants our request to terminate them, the case should

11    definitely be converted.

12            They do have a number, at the ARC level, direct

13    lender interests.  We don't dispute that.  But as to that,

14    that's not an ongoing business as far as our argument, your

15    Honor.  That is passive equity interest in various real estate

16    projects just like the other direct lenders.  There --

17            THE COURT:  And, of course, just as a side point,

18    under 1334 this Court has in rem and "exclusive" -- the word of

19    the statute -- exclusive jurisdiction over such --

20            MR. COLLINS:  Absolutely, your Honor.

21            THE COURT:  Uh-huh.

22            MR. COLLINS:  That's our position with that.

23    Absolutely, your Honor; both as to the direct lenders and to

24    Asset Resolution.  Absolutely, your Honor.  You do.

25            So, with respect to those passive real estate
```

1    interests, direct lender interests, there is nothing to

2    rehabilitate.  There is nothing to reorganize.  They have made

3    admissions that we cited in our briefs that they intend to

4    liquidate; they intend to ask the bankruptcy court, now this

5    court, to allow them to liquidate sooner than later.  And we

6    don't think as to certain properties that's a proper way of

7    going forward, but there's no argument that they intend to

8    reorganize or rehabilitate.  They intend to liquidate.

9         So, therefore, your Honor, if we take away the

10   servicing rights because they're terminated and we just have

11   left the direct lender interests, there is no reason for this

12   case to stay in Chapter 11.  It can go into a seven or a

13   Chapter 7 trustee to liquidate their interests.  And there may

14   be certain properties in which they have a majority vote over

15   51 percent, and they, obviously, can control the vote there.

16   As to other properties, the Chapter 7 trustee will vote his

17   interest, just like other direct lenders, and whatever happens

18   is whether the 51 percent will control unless someone comes to

19   you with a motion saying, "Your Honor, I need other type of

20   relief; please ignore that 51 percent for these extraordinary

21   reasons," but otherwise it doesn't need to be in a 11.

22        Our concern, your Honor, between Chapter 7 and

23   Chapter 11 trustee is very, very simple.  It's administrative

24   cost.  Right now we have a committee, we have a committee

25   counsel, we have a committee local counsel, and then we have a

1    request for a financial advisor.  That's not extraordinary in

2    Chapter 11 cases, but we think in this case it is, given the

3    nature of the asset base, of what the property we're talking

4    about.  That is a significant administrative cost.

5          Then you will have a Chapter 11 trustee and his or

6    her counsel -- which makes sense; they'll be needing counsel --

7    and they may need a financial advisor.  There will be an issue

8    about whether the debtor will still try to -- now, the debtor

9    has been displaced, but it may try to seek the higher counsel,

10   but right now we have three debtors' counsels.  Nothing wrong

11   with that.  You know, the debtor is allowed to try to choose

12   its counsel subject to court approval.  But that's a lot of

13   administrative cost that we believe is unnecessary when you

14   step back and look at this asset base.  So, that's one of our

15   big concerns with respect to leaving this in Chapter 11 versus

16   Chapter 7.

17         Two, there may be issues about once a Chapter 11

18   trustee is appointed, exclusivity goes away, and you may have

19   Silar trying to confirm a plan; you may have Asset Resolution

20   trying to confirm a plan; you may have DACA trying to confirm a

21   plan; you may have the Chapter 11 trustee trying to confirm a

22   plan.  You may have certain of our clients -- we haven't talked

23   about it, but maybe we'll try to confirm a plan.  Again, we

24   don't think we need that delay and administrative expense.

25   Chapter 7 trustee can take control of all of that.

1          So, that's basically, in the simplest manner, your

2    Honor, our position.  And why, again, to displace them, your

3    Honor, just very quickly, because we know you've read the

4    briefs; here is one of our major concerns.

5          If I may, your Honor?

6          **THE COURT:**  Please.  Uh-huh.

7      **(Pause)**

8       **MR. COLLINS:**  I apologize, your Honor.  Maybe

9    Mr. Millimet will help me.  I think we've got it there.

10          Your Honor, the type is not very big.  I could hand

11   you one, too, if you'd like.

12          **THE COURT:**  I think I can read it.  And you can zoom

13   it in if you feel it appropriate.

14          **MR. COLLINS:**  Your Honor, being practical, we have

15   benefited by this bankruptcy, because we've gotten a lot of

16   information.  So, as far as the actual bankruptcy filing for

17   itself, it's actually been a good thing in certain ways because

18   we've gotten a lot of financial information.  But what we

19   learned, your Honor, if you look before your summary judgment

20   ruling in July of 2009 -- I think it was early July, 2009 --

21   Asset Resolution contends to be the servicer, having obtained

22   the rights from a Compass entity.  We have now learned, your

23   Honor, that Asset Resolution supposedly had an affiliate called

24   SOS, Servicing Oversight Solutions, perform servicing services;

25   and then they had Windermere because they needed a local Nevada

1    servicer.  And what we found out, your Honor, is prior to the

2    summary judgment ruling we were seeing monthly payments of 70,

3    80, maybe high 80's thousand dollars each month.  After this

4    Court's ruling on certain late fees --

5              THE COURT:  "Payments."  You mean recovery of fees.

6              MR. COLLINS:  Yes.  Exactly.

7              THE COURT:  Uh-huh.

8              MR. COLLINS:  Amounts paid by Asset Resolution to SOS

9    for servicing -- services, whatever they may be; somewhere in

10   the 70 to 90 thousand dollar a month range.  This Court's

11   ruling comes out in early July, and we see the amount spike up.

12   Over $4 million is paid after early July up to the date of

13   bankruptcy.  We need an independent trustee to look at that

14   $4 million.  As the Court is aware, this was a substantial

15   portfolio years ago, and given time, economic reasons -- and we

16   think also bad act, but I'm not here to argue those here today;

17   that's for another trial someday -- the portfolio has gone down

18   in value.  But we see $4 million go out the door 90 days before

19   a bankruptcy.  We need an independent person to look at those

20   transactions and say, "Can we recover those for the benefit of

21   all direct lenders?"  That is, we think, an extraordinary

22   amount of money, especially when compared to somewhere between

23   70 and 90 thousand dollars a month before that, or over

24   $500,000 a month in July, over a million in August; $4 million

25   for that time period, your Honor.  So -- and that's not

1   disputed.

2        My understanding, your Honor, is today is more on

3   legal argument; you said, "If I see a fact issue, we'll come

4   back to have an evidentiary hearing."  I don't think there is

5   any dispute about the existence of these payments.  There may

6   be a dispute about why they were paid, but I'm not asking you

7   to resolve that today; I'm just saying, "Look at that number as

8   compared to what it was months before that."

9        So, that's another reason why, your Honor, we need an

10  independent trustee.  By doing so, your Honor, we can move

11  forward.  By this Court's rulings over the summer, we made

12  substantial progress.  We think we can actually expedite that

13  process going forward by getting a Chapter 7 trustee in to take

14  over ARC, and from there move forward to trial, hopefully,

15  maybe, resolve it without aid of trial, but probably may need a

16  trial, and if we do, the first opportunity the Court gives us

17  we'll get that done, but we think the conversion of this case

18  is an essential part to getting these cases over.

19       Your Honor, with respect to that, I'd like to show

20  you just one more slide.  Your Honor, there is -- again, it's

21  always fun when -- and wonderful when both sides agree on

22  something.  And we did hear this a little bit earlier today

23  that we both agree that the SPE's are holding certain

24  properties in trust for direct lenders:  my clients, other

25  people's clients, and for Silar and Asset Resolution to the

24

1   extent they have direct lender interest.  But, your Honor,

2   they're also holding cash.

3        **(Pause)**

4            And, your Honor, we know you've read the papers and

5   you'll see there is a dispute about some $900,000 and why was

6   it paid, and when was it paid, and was it trust funds, and was

7   it money for Pathfinder.  But the simple issue demonstrated by

8   this chart, your Honor, is at the top we show the amounts that

9   were paid and result as monies due to Pathfinder and certain

10  servicing fees arising out of the transactions with Pathfinder.

11  Those are at the top.  They're $835,000 approximately to

12  Pathfinder; $92,000, Asset Resolution.

13           But, your Honor, then we have another $950,000 of

14  trust funds that we don't know why they went out the door.  And

15  I'm not asking you to resolve that factual question today.  All

16  I'm saying is that's a substantial issue that has to be

17  addressed, and that's best addressed by an independent trustee

18  on behalf of ARC looking at that to see what was done.

19       **(Pause)**

20           Your Honor, really, my argument is that simple.  If

21  you have some questions I could help you with --

22           **THE COURT:**  No, thank you.

23           **MR. COLLINS:**  Okay.  Thank you, your Honor.  I'd like

24  to maybe have a rebuttal, have Mr. Millimet do a short rebuttal

25  subject to you allowing him to do so.

1          **THE COURT:**  Further arguments in favor of the motion

2    to convert?

3       **(No audible response)**

4          You may respond, please.

5          **MR. KLESTADT:**  Good afternoon, your Honor.

6          Your Honor, I gather from your comments you have read

7    the partial withdrawal of our opposition.  Your Honor, I have

8    been practicing bankruptcy law for nearly 25 years, and one

9    thing I've learned -- I still have a lot to learn -- but one of

10   the things I have learned is that I tell my clients to do what

11   the judge wants to do.

12         Now, your Honor, what does that mean in this case?

13   If you want a Chapter 11 trustee, your Honor, we have no

14   objection to a Chapter 11 trustee.  I think, intellectually,

15   your Honor, a conversion in this case doesn't make sense.  It

16   doesn't make sense for a number of reasons.  First and

17   foremost, if you convert the case and there are no operations

18   of Asset Resolution, who's going to service the portfolio?  I

19   think that's the largest question that's before your Honor

20   right now.  If you terminate the servicing rights today by

21   virtue of converting the case, who's going to service the loan

22   portfolio?  You're going to be back to where it was, the

23   situation was at the end of the USACM bankruptcy three and a

24   half years ago.  The attempted remedy there, your Honor, was to

25   sell and transfer the servicing rights to Compass.  I don't

1    want to go into the history of what transpired there; that's

2    before your Honor in the 892 litigation.  But I think, your

3    Honor, you don't need to decide this motion today, necessarily.

4    Because Asset Resolution filed for Chapter 11, it can't do

5    anything.  It can't sell property, it can't dispose of

6    property, it can't encumber property, without coming to your

7    Honor for permission, under Section 363 of the bankruptcy code

8    or under the plan processes of Chapter 11.

9            THE COURT:  Now, you got permission from the

10   bankruptcy judge in this case to do that on an interim basis?

11           MR. KLESTADT:  That's correct, your Honor.

12           THE COURT:  To what extent and how much and against

13   what?

14           MR. KLESTADT:  The answer is, your Honor, a

15   $1 million interim debtor-in-possession financing facility was

16   approved by Judge Markell, and the collateral security for that

17   advance, your Honor, is solely the direct ownership interest of

18   Asset Resolution.  The direct lender interests were

19   specifically not encumbered by that debtor-in-possession

20   financing facility.

21           THE COURT:  And has that money been spent?  And where

22   to?

23           MR. KLESTADT:  The money has not yet been spent.  It

24   is being funded into my escrow account.  I am told by the --

25           THE COURT:  In other words, it hasn't been funded

1    yet.

2           **MR. KLESTADT:**  It is being funded into my escrow

3    account, your Honor.

4           **THE COURT:**  In other words, it hasn't been funded

5    yet.

6           **MR. KLESTADT:**  It has not been funded into a debtor-

7    in-possession account.  Correct.

8           All right.  Now, having said that, your Honor, the

9    DIP lender -- one of the items that was supposed to be on your

10   Honor's calendar today was the final hearing on debtor-in-

11   possession financing.

12          **THE COURT:**  Right.

13          **MR. KLESTADT:**  The lender has said:  If a trustee is

14   going to be appointed, we're not going to fund the case; which

15   is understandable, your Honor.

16          Now, so, getting back to where I was going, your

17   Honor, if you terminate today, who is going to service the

18   portfolio if you convert the case to Chapter 7?  That's why we

19   believe if your Honor is inclined to remove my client as the

20   debtor in possession, a Chapter 11 trustee makes more sense.

21          A Chapter 11 trustee can step into the shoes of the

22   debtor, prosecute the litigation in the 892 litigation if the

23   trustee believes it to be appropriate.  I don't know how the

24   trustee is going to fund that litigation, but that's a separate

25   issue.  But at the same time, your Honor, the tools that are

1   available in Chapter 11 remain available.  And Mr. Millimet --

2   I'm sorry -- Mr. Collins mentioned that exclusivity could

3   terminate -- will terminate upon the appointment of a trustee;

4   Silar could file a plan; the direct lenders could file a plan.

5   But the point is the plan process is available for potential

6   use by the direct lenders, if joint ventures want to be

7   proposed, or what have you.  That remains available to the

8   Chapter 11 trustee.

9            In addition, your Honor -- and this has not been

10  mentioned -- Section 1146 would still be available if you kept

11  all of the cases in Chapter 11.  Eleven forty-six, as your

12  Honor knows, provides an exemption for the incurrence of

13  transfer taxes and other taxes if the properties are sold or

14  transferred pursuant to confirmed plans.  Now, the amounts

15  here, your Honor, I believe are substantial enough that if the

16  plan process were utilized to transfer properties -- and under

17  the Supreme Court case in Piccadilly Cafeterias, the plan has

18  to be confirmed now before the property is sold or

19  transferred -- I think substantial savings could be realized

20  for the estate.

21            And the estate, your Honor, the parties, if you will,

22  include not only the debtor and its creditors, but we recognize

23  that the direct lenders have an ownership interest.  The size

24  of the pie, your Honor, has always -- the idea has always been,

25  your Honor, to maximize the size of the pie.  Litigation, your

1  Honor, minimizes and reduces the size of the pie.  And, quite

2  frankly, our objective in filing Chapter 11 was to try to bring

3  a global resolution of all of these issues once and for all so

4  that all parties could benefit.

5        And that's why, as your Honor recognized at the last

6  hearing, we initiated the declaratory judgment action, so that

7  the plenary jurisdiction of the bankruptcy court, and now this

8  court by virtue of the withdrawal of the reference, could be

9  utilized so that you could bring order to the situation and

10  implement a judgment, depending on what your judgment is, your

11  Honor, that will bind all of the direct lenders.  There are

12  parties that are not represented by Bickel and Brewer; there

13  are only 46 named plaintiffs, as I understand, in the 892

14  litigation.  With the filing of the declaratory judgment

15  action, your Honor, you now have the opportunity and ability

16  to -- and, hopefully, as I think through the Chapter 11

17  process, to confer some order into the situation.

18        Your Honor, Mr. Collins said that there was progress

19  that was made previously.  I understand, your Honor, previously

20  there was substantial litigation with regard to two of the

21  properties, the Gess property and the Anchor B property.  I

22  think, your Honor, by the cases remaining in Chapter 11, as

23  opposed to a conversion to Chapter 7, it's more likely that the

24  different issues surrounding each of the different

25  properties -- and I understand that the direct lenders are not

1   identical in each of the properties; there are different groups

2   of lenders for each of the properties.  Those properties can be

3   addressed on a lender-by-lender basis.

4           Your Honor, if you convert the case to Chapter 7 and

5   there's no funding available for a Chapter 7 trustee, what's

6   the Chapter 7 trustee likely to do?  I think he's likely to

7   abandon the estate's interest, which is direct ownership

8   interest of Asset Resolution at this point, and simply walk

9   away from everything, because there will be nothing to

10  administer.  Well, where does that leave you?  It leaves you

11  back in the situation where there's no servicer.  I don't know

12  who benefits from that, your Honor, but I don't think the

13  direct lenders at large will benefit from that situation.

14          Is it possible for them to organize and to appoint a

15  servicer?  Well, we have been asking for the direct lenders to

16  give us names of a servicer.  My client, your Honor, doesn't

17  want the servicing rights.  We are an involuntary party here by

18  virtue of what happened with Compass and the foreclosure of

19  Asset Resolution of its security interests in Compass's

20  portfolio.  But my client doesn't want to service the loans.

21  We've asked the direct lenders to give us names.  The only name

22  that was provided was Cross.  Your Honor, if that's what the

23  direct lenders want to do and if that's what your Honor thinks

24  is in the best interests of the direct lenders and creditors,

25  we're happy to turn it over.  But I don't think, your Honor,

31

1    that can be accomplished in Chapter 7.

2            Your Honor, the other issue I think you need to focus

3    on is the scheduling of trial in the 892 litigation.  I am new

4    to the scene by virtue of the commencement of the bankruptcy

5    case.  I was not part of the 892 litigation up until this

6    point.  There are other counsel that have been, so if I make

7    any misstatements, I'll ask that your Honor forgive me and that

8    they be corrected.  But I did not understand that your Honor

9    was prepared now to terminate the servicing of Asset

10   Resolution.  I know there are motions before the Court.  I also

11   know that your Honor has been speaking of scheduling both a

12   bench trial and a jury trial to address various issues,

13   including tort issues.  If your Honor rules on this motion now

14   and appoints either a Chapter 11 trustee or a Chapter 7 trustee

15   and removes my client, you're effectively denying, I think, the

16   ability of Asset Resolution to prosecute its affirmative claims

17   and defend itself.

18           Your Honor, Asset Resolution may be entitled to

19   substantial fees, or it may not.  But given that your Honor has

20   been insisting on trying the case as soon as possible, your

21   Honor would be tying either one or both hands of Asset

22   Resolution behind its back by appointing a trustee at this

23   point.  I think, your Honor, my client and Silar -- and I'll

24   ask Mr. Majorie to correct me if I'm wrong -- would be prepared

25   to have your Honor try the case in late March or early April --

1    we're now in mid-January -- to have discovery finished and to

2    go forward with the trial as soon as possible.  During that

3    time period, your Honor, nothing else needs to be done in the

4    bankruptcy case if you keep the case in Chapter 11.  You could

5    even keep my client, your Honor, in position as debtor in

6    possession.  Why?  Because we can't do anything, your Honor,

7    with regard to the properties because we've started the

8    bankruptcy case for Asset Resolution and for the SPE's, while

9    the case is in Chapter 11, without coming to your Honor for

10   approval.

11           So, you could resolve, your Honor, the issue of what

12   is in the estate.  Does Asset Resolution have a seven figure

13   entitlement to servicing fees?  Does it have a six-figure, or

14   does it have zero?  You can resolve that, your Honor, keep the

15   rest of the bankruptcy case in status quo; and then, once your

16   Honor has decided what Asset Resolution is entitled to, then

17   pick up where we are now and determine whether a plan process

18   makes sense or whether a Chapter 7 makes sense.  But if your

19   Honor were to decide to appoint a trustee now, I think that you

20   would be depriving Asset Resolution of the ability to properly

21   defend itself and it would be detrimental to the estate, your

22   Honor, at the end of the day, because there are creditors at

23   the Asset Resolution level and the SPE level, and I'm sure that

24   Mr. Kinel on behalf of the creditors committee will have

25   something to say about that.

1       Your Honor, as to these points raised by Mr. Collins

2   on the servicing fees paid to Servicing Oversight Solutions,

3   none of the direct -- as I understand it, none of the direct

4   lender monies were used for those payments.  Silar made an

5   equity infusion into Asset Resolution, and those funds were

6   used to pay for the servicing fees.  I don't see that as an

7   issue, your Honor, at this point with regard to whether or not

8   that constitutes a cause for the appointment of a trustee at

9   this stage.  They were pre-petition events, no payments have

10  been made to this point, no payments can be made except upon

11  approval by the bankruptcy court either pursuant to retention

12  applications for the professionals or the DIP budget as

13  approved by Judge Markell at the last hearing.

14       As to the Pathfinder transactions, your Honor, my

15  understanding is there are explanations and justifications for

16  what was done, and that could be addressed at an appropriate

17  time.  I don't believe that that's evidence at this point.  My

18  understanding this was a preliminary hearing, and you're not

19  going to entertain any evidence today.

20       Unless your Honor has any other questions for me --

21       **THE COURT:**  Okay.  Thank you.

22       **MR. KLESTADT:**  -- I think I've said everything I need

23  to say.

24       Thank you, your Honor.

25       **THE COURT:**  Further argument, please.

1         **MR. KLESTADT:**  Your Honor, one more point if I may.

2    I apologize.

3         In the motion papers there are references to the

4    operating reports for the various debtors not being filed.

5    They were filed today, your Honor, to the extent that we were

6    able to complete them, for the SPE's, I think for the Asset

7    Resolution entity; they're being finalized.  The delay in

8    filing these, preparing these, your Honor, was in part due to

9    the transfer of the case from New York to Las Vegas, and then,

10   your Honor, we had to get our accountants engaged, a retention

11   application was approved in late December; we're now mid-

12   January.  They were filed today, and they're on the docket.

13        **THE COURT:**  Thank you.

14        **MR. KLESTADT:**  Thank you, your Honor.

15     **(Pause)**

16        **MR. MAJORIE:**  Thank you, your Honor.  Mr. Majorie.  I

17   appreciate the opportunity to join the fray, I guess is maybe

18   the right word.  I do represent Silar.

19        I think counsel for the certain direct lenders only

20   identified two assets.  I think there are more than two assets

21   here.  There's the claims for interference.  There's also the

22   claims for servicing fees.  There are two, really, two subsets

23   of those claims.  One are the accruing fees issue, which I

24   understand your Honor spent a lot of time on in the Gess

25   hearings.  The second is the accrued fees which were purchased

1    at the time of the bankruptcy, or of the sale pursuant to the

2    confirmation order.  Those were accrued fees.  There were

3    really only several -- there are only a few objections to the

4    identification of those accrued fees, no one else objected, and

5    it would be our position that those accrued fees are a

6    substantial asset of this estate, notwithstanding whether there

7    are accruing fees subsequent to that.  So, even if your Honor

8    were to apply the Gess formula, there is a substantial question

9    going to be in either the 892 or the DACA action, the adversary

10   proceeding, as to the purchase of those accrued fees and the

11   impact of the interference on the value of those assets.

12           With respect to the unnecessary administrative costs,

13   counsel for ARC indicated, you know -- I think it is accurate

14   to say that there could be essentially the status quo

15   maintained while there is a litigation of the ultimate issues

16   with respect to what it is that ARC owns or doesn't own and who

17   owes what to whom with respect to the direct lender claims.

18           I would point out to your Honor that with respect to

19   the payments to SOS and the cash dispute that Mr. Collins

20   referred to, a Chapter 11 trustee could certainly examine

21   those.  Those by themselves, Mr. Collins I think has indicated,

22   there are fact questions going to what types of payments, why

23   were they made, et cetera.  The existence of those payments

24   certainly could be examined either by an examiner, by the

25   creditors committee without a Chapter 11 trustee, or a Chapter

1    11 trustee.  So, I don't think that the existence of those two

2    facts that Mr. Collins says are undisputed by themselves

3    warrant a conversion in this case.

4          What I really would like to focus on, Judge, and

5    emphasize and highlight a little more is the question:  If

6    there is a conversion, what really happens?  I'm very -- I

7    understand I'm late to many of the proceedings, but I have read

8    as many transcripts as is humanly possible and orders as is

9    humanly possible.  I recognize your Honor's dilemma in the Gess

10    case where your Honor at one point figuratively threw up your

11    hands, at least in the transcript, and said, "I don't know who

12    I can trust.  I can't trust Silar or ARC, I can't trust the

13    direct lenders, and I don't know who I can trust."  Certainly a

14    Chapter 11 trustee would give your Honor the ability to trust;

15    to trust the information that you are getting so that you can

16    hear on the merits and not be concerned, as a fact finder, is

17    there an ulterior motive about this, is there an ulterior

18    motive about that.  The trustee can bring a level playing field

19    to what was a two-party dispute but is now really a matter

20    involving several thousands of other people, and probably had

21    involved several thousands of other people even way back in the

22    Gess days when your Honor was making rulings which impacted the

23    loan servicing rights and relationships of people who weren't

24    before the Court and who were clearly being impacted by those

25    resolutions.

1          When I take a step back and started to study about

2    direct lender interests on hard money loans, the 51 percent

3    rule really creates a difficulty, I think, for your Honor and

4    for the various participants in these transactions.  The

5    51 percent rule in both the Gess scenario and in the Anchor B

6    scenario kind of highlights the problem.  In Gess, and as

7    Ms. Chubb indicated, there is a need to go and solicit, if

8    that's the right word, 51 percent, and once you reach the

9    threshold, you don't need to talk to anybody else.  That's a

10   model that is usually followed in a close corporation context

11   where the parties know each other and where they can vote with

12   each other even though they don't include the other

13   constituencies because there is a proximity of relationship

14   there.

15          In a public corporation context, which this is much

16   more akin to, you have disparate people all over the country

17   who made investments based upon whatever their own decision-

18   making was, who are now finding themselves tied to people they

19   don't know over properties they probably have never seen and

20   are subject to this creeping consent process, which essentially

21   means that as long as somebody, like the Cangelosi group did

22   early in the case, tries to get 51 percent, the other 49

23   percent never have their day, because they don't even -- it's

24   not even as if they get to vote no.  They get no vote at all;

25   because under the conversion scenario where they're basically

1    left to the vagaries of where they were post-confirmation in

2    USA, what you wind up with is people who have direct lender

3    interests who will be told that 51 percent voted this way, and

4    this is what's happening to your interest in this particular

5    property, and they can't do anything about it.

6         The neat thing and the really valuable thing about a

7    Chapter 11 proceeding is that it can stop now.  The valuable

8    part of a Chapter 11 proceeding is that through the plan

9    process the LSA's can all be altered in a way that the direct

10   lenders want and apply to the other direct lenders that don't

11   even have LSA's that no one can find so that there is a level

12   playing field for a new servicer to come in and actually know

13   what he's bidding on and actually know what the rules of the

14   road are.  The bankruptcy process would allow -- and I have a

15   lot of respect for Mr. Collins; I used to -- a long time ago,

16   was at Bickel and Brewer -- but I beg to differ.  There's a lot

17   of reasons why there should be competing plans.  There are a

18   lot of reasons why a Chapter 11 is a good idea, because all of

19   the relevant constituencies can then use the mechanisms

20   available in a Chapter 11 to create what should have been

21   created -- and I think in Gess your Honor said it at one point;

22   the inherent problem was that under the USA operating business

23   plan this was a problem, and under the confirmation plan this

24   problem of what do you do about the servicer, what do you do

25   about the loan -- advanced servicing advances or capital calls;

1 those problems were never resolved in the USA bankruptcy.  They

2 can be resolved here.

3           And, therefore, Silar's position is we understand

4 your Honor's view expressed in Gess that in that bi-party

5 dispute you really weren't sure who to trust, and you said at

6 line 21, page 23, "I can't trust Silar or Asset Resolution, and

7 I can't trust the direct lenders."  That's because we are

8 heavily litigating positions in a case.  But we are now in a

9 Chapter 11, and we ask your Honor to keep it in a Chapter 11 so

10 that an independent person can come in, can examine where the

11 matters lie, and if they determine that it's not proper to be

12 in an 11, then they can make a motion to convert, which,

13 obviously, your Honor can hear.

14           If you convert the case today, you are leaving the

15 other direct lenders with no voice.  You're making it -- most

16 likely what will happen is what we've already seen in Gess.

17 There will be a joint venture; the properties will go to tax

18 foreclosure.  There's over, I think, $20 million or so of

19 property taxes on these properties.  Nobody can pay them,

20 apparently.  There's going to be a property tax foreclosure.

21 At the property tax foreclosure some joint venture, probably,

22 comprised of some direct lender group, probably, will go and

23 bid and buy the property cheap at the tax foreclosure.  Unlike

24 in Gess, that joint venture won't have to include all the other

25 direct lender interests who would get the put option to

40

1    actually sell out or ride, which your Honor crafted in the Gess

2    hearings.  That protection can be given in a plan.  It can't be

3    given in a seven.  And we, therefore, ask that your Honor not

4    convert the case at this time and that you appoint a Chapter 11

5    trustee so that you can have the confidence that there are

6    independent eyes, giving you independent information, and then

7    let the relative -- the respective parties argue their

8    positions, but you will have the benefit of that level playing

9    field trust factor for a Chapter 11 trustee.

10            In brief, Judge, if you convert it today, you are

11   giving -- you are creating more problems for the people that

12   were victimized a long time ago when they bought these

13   interests, and we would ask that you give them an opportunity;

14   you give Silar an opportunity; you give the certain direct

15   lenders, which there are only four here today, an opportunity

16   to submit plans that could be the basis of ultimately a

17   consensual arrangement which will give what everybody wants in

18   this world, to the extent you can get it:  one resolution, one

19   time, applicable to all the constituent interests.

20            And I would just, in closing, say one other -- point

21   out one other thing, your Honor.  The certain direct lenders

22   represent more than the four people who are the movants.  And I

23   was here last hearing, and I heard your Honor indicate that

24   whether they're good people or bad people or what their motives

25   are is irrelevant to your consideration of the present motion.

1    And I hear that, and I'm not here to discuss the relative

2    merits or character or intent or anything else of those people.

3    But what is important to note is this, I believe.  There is --

4    the movants would like to suggest that 51 percent of the direct

5    lenders are asking you for this relief.  Ms. Chubb honestly

6    acknowledged that she doesn't have that 51 percent

7    authorization today.  So, your Honor is really moving to

8    convert or would be converting on the basis of four direct

9    lenders who don't hold anywhere near 51 percent.  And I'm

10   simply asking your Honor to protect the people who would

11   comprise the other percentage, the 95 percent or so, that are

12   not here today, and allow the Chapter 11 process to go forward

13   with a trustee.

14           Thank you for the opportunity.

15           **THE COURT:**  Thank you.

16           Other argument opposing conversion?

17           **MR. KINEL:**  Good afternoon, your Honor.  Norman Kinel

18   on behalf of the creditors committee.

19           I guess I have to confess that I have been practicing

20   bankruptcy law for a year longer than Mr. Klestadt, 26 years,

21   and this is indeed one of the stranger cases that I've come

22   across and been involved in.  I think it would be fair to say

23   that these bankruptcy cases are stillborn.  They started about

24   three months ago and have been bouncing around between

25   different courts, different jurisdictions, the reference was

42

1    recently withdrawn; we're here now on a motion to convert or

2    appoint a trustee.  And it's somewhat perplexing to the

3    committee as to why it seems that this debtor, unlike the, I

4    don't know, hundreds of other cases that I have been involved

5    in, if not thousands, doesn't seem to be entitled to have its

6    day in court, and that being bankruptcy court, which this court

7    is now sitting as, at least in part, and have an opportunity to

8    either reorganize or liquidate as the case may be.

9              There is nothing extraordinary about a business that

10   may or may not have significant ongoing operations but clearly

11   does have assets, clearly does have litigation claims, being in

12   a Chapter 11 proceeding.  It's almost as if the movants have

13   turned the bankruptcy code on its head.  It's not the debtor

14   who has to establish cause for being in Chapter 11 or for not

15   having a trustee appointed; it's the opposite.  And the only --

16   there really is no evidence in a formal sense before the Court,

17   but even the scant documents that were put before your Honor

18   today, they may raise some questions, but there certainly have

19   been no answers.  And that's one of the jobs of a creditors

20   committee, and that's the job that we intend to fulfill and

21   pursue, as we said in our papers.  If there's anything that was

22   done improperly before the case or during the case, obviously,

23   we're here to police that.  Our impression is that money was

24   paid pre-petition to a subservicer, but it was money that was

25   an equity infusion; it wasn't money taken from any direct

43

1   lender.  So, we're not really sure what that is intended to

2   show.

3           Your Honor, something else that struck me as I sat

4   there earlier; the creditors committee, and I don't think any

5   party in interest was on any kind of notice that there's even

6   the remote possibility that the Court, sitting as the district

7   court, could make a decision today terminating the servicing

8   rights of Asset Resolution.  We understand that's the subject

9   of a litigation that's pending before the Court, but there has

10  been no notice of any hearing where that could be the outcome.

11  If there was, the creditors committee certainly would have

12  spent time looking into that and responding.

13          So, we're a little confused.  It seems that the cart

14  is before the horse here.  It seems that the burdens of proof

15  and the burdens of persuasion have been turned on their head

16  and that this debtor, who really hasn't done a thing since it

17  filed for Chapter 11 except engage in some turf wars -- and

18  we're not necessarily -- I mean, we have -- the committee has

19  taken sides to the extent that -- not because it necessarily

20  believes the debtors have done the right thing in the past or

21  even will do the right things in the future.  We don't know;

22  it's premature.  But we do firmly believe that the debtors

23  haven't been given any opportunity to do anything.  They've

24  been just attacked repeatedly since the Chapter 11 was filed,

25  and, of course, much litigation incurred before the Chapter 11

1    were filed.

2            Even the fact that the debtors now seem to consent to

3    the appointment of a trustee is somewhat perplexing, although I

4    think we understand -- the committee does -- that there is a

5    sense of battle fatigue at this point, in that if the Court,

6    given the Court's history, doesn't have confidence in the

7    debtors, and the Court's in a better position than the

8    committee is at this point to make those kinds of judgments

9    without any evidence being before the Court, then perhaps that

10   is the -- a middle ground that could serve everyone's

11   interests.

12           But to convert the cases, your Honor, I mean, I

13   haven't heard or seen or read a shred of evidence or a shred of

14   rationale other than as a litigation tactic, which would really

15   just wipe the debtors essentially out and their interests and

16   leave the certain direct lenders with no real adversary, no one

17   to contest the claims that they're going to make, no one with

18   any funding to be able to stand up in court and protect the

19   interests of the other direct lenders and the other creditors

20   who exist in large number.

21           And in terms of administrative costs, your Honor,

22   especially if a trustee is appointed, the committee intends to

23   be active and can look into whatever transactions need to be

24   looked into; can be the proponent, potentially, of a plan; can

25   be, hopefully, some -- an entity that can help resolve disputes

1    and not create more disputes.  But it's very dispiriting to

2    those who I represent, and that includes in part the certain

3    direct lenders here today, that all we've done for three months

4    is engage in this kind of, you know, who can knock the other

5    off their balance rather than trying to create solutions to a

6    problem.

7              And if a Chapter 11 trustee is appointed, the

8    committee would eagerly work with that individual if that's

9    what the Court sees as necessary.  Our papers were to the

10   effect that we didn't think that either was necessary at this

11   point.  I don't think the debtors necessarily are asking that a

12   trustee be appointed.  I think they feel that if that's what

13   the Court wants to do, they're not going to oppose it and

14   they're not going to spend the time and the effort and the

15   money in trying to put out an evidentiary hearing to dissuade

16   your Honor of that -- from making such a ruling.

17             But, your Honor, I think the committee is very

18   concerned that the interests of creditors generally are being

19   lost or could be lost or subsumed in this litigation that's

20   gone on for years; and Asset Resolution does have significant

21   assets, and I don't think anybody could dispute that.  And

22   whether or not they have an active, ongoing servicing business

23   or not is irrelevant.  There are individuals who are in

24   Chapter 11 who have no active ongoing business.  There are

25   other businesses that were no longer active.  There are

1    numerous Chapter 11 plans that have been confirmed for entities

2    that no longer were operating businesses.  So, if that's all

3    the certain direct lenders can tell your Honor today, that --

4    and this is all based on the premise that your Honor is going

5    to make a ruling today that's not even teed up before your

6    Honor with respect to make today.  And if it is, then something

7    really got lost in the presentation of this motion or what was

8    on the Court's calendar today.

9            So, on behalf of the committee, your Honor, we would

10   respectfully request that the Court deny the motion and give

11   the debtors at least some opportunity to try to do something,

12   and if they don't do it appropriately or they don't do it

13   promptly or timely or with good faith, there will be ample

14   recourse to -- by virtue of your Honor, the creditors

15   committee, the other parties who are participating in this

16   case -- if the trustee -- if your Honor feels that that's the

17   way to go, certainly that will increase administrative costs,

18   but we would certainly respect that decision.

19           Conversion, your Honor, we think should be out of the

20   question.  There is no basis for converting these cases, we

21   respectfully submit.  There is no evidence; there is no

22   support; no one has been given a chance to try to make some --

23   enable maximization of assets and to try to obtain a recovery

24   for unsecured creditors in these cases, and to convert really

25   will have prevented anyone from even attempting to do so.

1          Thank you.

2          **THE COURT:**  Thank you very much.

3          **MR. KINEL:**  Thank you, your Honor.

4          **THE COURT:**  Other arguments opposing conversion?

5       **(No audible response)**

6          All right.

7          **MR. KIRBY:**  Your Honor, Dean Kirby on the telephone.

8    I can't see if there are other people in the courtroom ready to

9    speak.  So --

10         **THE COURT:**  There are not.  Opposing conversion,

11   please.

12         **MR. KIRBY:**  Yes, your Honor.  The opposition that I

13   filed on behalf of DECA only pertains to Fiesta Stone Ridge.

14   Our clients do hold 57 percent of the direct lender interest in

15   Fiesta Stone Ridge which is one of the SPEs, as they're called.

16   My clients have been proactive and successful in finding a

17   solution for that property and in connection with our

18   opposition, we filed with the Court a signed term sheet with a

19   joint-venture partner Capstone prepared to invest 4 and a half

20   million dollars.

21         The financing exists to pay -- repay the advances, to

22   pay servicing fees under the Gess formula, to pay dissenting

23   direct lenders based on a 5 and a half million-dollar valuation

24   of that property which rather greatly exceeds the 3 and a half

25   million-dollar sale proposed out of Court by Asset Resolution.

1   All we want is to implement that solution as quickly and

2   cheaply as possible and to us, appointing a trustee or

3   converting this particular SPE, Fiesta Stone Ridge does not

4   further that goal.  That's all on the one hand.

5          I will say that in attempting to negotiate a plan

6   with Counsel for this Debtor in Possession, the SPE, we find

7   ourselves negotiating over just one thing and that is how Asset

8   Resolution's claim is to be treated.  This is wrong and

9   inappropriate.  Asset Resolution is a fiduciary to the direct

10  lenders not because of any bankruptcy that's been filed but

11  because there's a loan servicing agreement and Asset Resolution

12  under the loan servicing agreement is bound to follow the

13  instructions of 57 percent of the direct lenders but Asset

14  Resolution looks teed up to be not part of the solution but

15  part of the problem here.

16         And so, no, don't convert this SPE case to Chapter 7.

17  Don't appoint a trustee for this SPE.  That's simply going to

18  raise expenses and complicate matters.  Let us go forward to

19  propose a plan based on the joint venture.  I find it

20  interesting, for example, that the arguments that have been

21  made say, well, the other direct lenders not constituting a

22  majority will be left out not under any plan that would pass

23  muster in bankruptcy that I know of and the dissenting rights

24  that, you know, we're proposing certainly pattern those allowed

25  in Gess and are entirely appropriate and protective.

1          Also we've heard the idea of competing plans being

2   touted as being some mechanism for protecting the direct

3   lenders but I think there's a motion to extend exclusivity

4   pending all because Asset Resolution really does not want to

5   relinquish control of these bankruptcy cases mainly because

6   what Asset Resolution really wants to do is to sell these

7   properties for whatever they can get for cash and then litigate

8   about the cash until -- well, until a very long time.

9          Those problems, we believe, can only be solved by

10   either terminating Asset Resolution as the loan servicing agent

11   or converting or appointing a trustee as to the Asset

12   Resolution bankruptcy case itself.  Thank you.

13          **THE COURT:**  Thank you.  Other arguments opposing

14   conversion?  Thank you.  I pretty well know what I want to do.

15   I am going to immediately convert.  This is a speaking order.

16   I'll ask for an order in written form embodying the Court's

17   order but this is a speaking order and effective immediately.

18   I will convert forthwith and ask the U.S. Trustee to appoint a

19   trustee.

20          I'm a little incredulous.  While both sides have

21   argued relevant factors, you have totally ignored the forest

22   for some of those relevant trees.  So the Court will answer

23   your question and delineate fully what there is and what there

24   is not to organize or reorganize in a Chapter 11.

25          First, a little bit about the history.  There, of

1    course, was in USA Commercial a reorganization confirmed.

2    Judge Regal, pursuant to the reorganization, sold the servicing

3    rights.  Compass purchased those rights.  Silar financed, if

4    you will, that purchase.  Judge Regal specifically made

5    findings that these servicing rights were not executory

6    contracts in the sense required by Section 365 to be cured,

7    that is, there was nothing that the Debtor had to do to cure

8    these servicing rights, that such as they were, they passed

9    through the bankruptcy.  The direct lenders had their same

10   rights.  They had their same rights to terminate whatever those

11   rights were and their same rights to look to the servicer,

12   whoever that may be as a fiduciary under Nevada law or the law

13   of any appropriate jurisdiction relative to those notes and

14   deeds of trust.

15          Compass took the first initial step both in

16   Bankruptcy Court and then in filing cases in the Federal

17   District Court to enforce its rights of purchase and quiet

18   title, if you will, vis-à-vis the threatened actions of

19   Cangelosi and others to terminate those rights.  Judge Regal

20   entered an order containing preliminary conjunctive relief and

21   this Court later upon request entered a preliminary conjunction

22   attempting to preserve the status quo.

23          Now, this is the important part.  This Court has a

24   history -- this case has a history of depriving and defrauding

25   over 6,000 investors of millions of dollars worth of interest.

51

 1  There's a gentleman who's just attempted to plead guilty, of

 2  course, to participating in fraud and the Debtors -- aside from

 3  the fraud that he's consented to plead guilty to, the Debtors

 4  were also accused both in the plan and in Judge Regal's

 5  confirmation and findings of basically misappropriating funds.

 6          They did it in several ways.  They did it in

 7  primarily causing the Debtor USA Commercial to go into an out-

 8  of-trust position.  They continued to make payments to

 9  investors, direct lenders when payments were not forthcoming

10  from a borrower.  The way they did it is, of course, by out-of-

11  trust situations in the escrow that they should otherwise have

12  been required to maintain.  One way, for example, that they

13  accomplished that is by taking payments and payoffs on notes

14  and deeds of trust of other investors and without the knowledge

15  of such direct lenders, applying it not to those proper

16  recipients but instead to the ongoing payments.  There are

17  other ways, of course, that they caused the trust to be out of

18  trust including some fraudulent activities that are the subject

19  of the criminal proceeding.

20          There were over 6,000 direct lenders, millions of

21  dollars, as we learned in the Gess loan.  What was that,

22  originally -- how many millions of dollars?

23          **MR. UNIDENTIFIED:**  Twenty-six and a half.

24          **THE COURT:**  Twenty-six million-dollar loan, just that

25  one property alone.  With that background in mind, this Court

1    made it very clear to both sides how I intended to maintain the

2    status quo.  On the one hand, I cautioned Cangelosi as she

3    stood here personally represented by Counsel.  I will not

4    tolerate your unilateral subversion or taking of the servicing

5    rights which were validly sold in the Bankruptcy Court.  I will

6    not tolerate that.  She, by her conduct, indicated pretty clear

7    intent in course of conduct to subvert and walk around the

8    Court's order and so I took appropriate remedy to stop that.

9            In the same breath and at the same time, I cautioned

10   Compass.  Silar was standing here with their ear cocked

11   listening.  They were parties.  You will not be permitted to

12   further rape -- and I apologize for using the term.  It's the

13   only term I can use to describe this situation in light of

14   Compass' prior conduct and USA Commercial's prior conduct

15   primarily.  You will not be permitted to further rape or

16   pillage the direct lenders and investors.  There was at the

17   time, of course, reputed evidence that the insiders of Compass

18   had specifically said, "We're entering into this transaction

19   for the purpose of garnering these assets that belong to the

20   direct lenders and we're going to do it to our benefit."

21           I reminded Compass -- Silar standing with their ear

22   cocked listening -- in open court, you are a fiduciary.  You

23   have servicing rights.  I'm going to protect you in those

24   rights.  At the same time, you must act as a fiduciary on

25   behalf of all direct lenders, not on your own behalf.  I

1    clearly cautioned them.  I think that was obvious anyway but I

2    clearly cautioned them in that hearing and in a number of

3    hearings.

4            It now is apparent that just like Cangelosi, they

5    intended to walk around the Court's jurisdiction.  As long as

6    this Court was protecting their interest, they sought to their

7    benefit to permit this Court's orders.  For example, I said on

8    a number of occasions, I believe I have in rem jurisdiction

9    over the servicing rights.  I certainly said I have in rem

10   jurisdiction over the assets that Cangelosi was trying to

11   acquire from direct lenders and I believe I also said I think I

12   have in rem jurisdiction over these servicing rights since they

13   are the subject of the lawsuit.  That doesn't mean I took title

14   to them but I believed I have -- I believed that I had in rem

15   jurisdiction over those servicing rights.  I stated that on a

16   number of occasions.  Again, Silar stood here with ear cocked

17   listening and without objection.

18           Then in relation to the Gess loan, as I made -- began

19   to make rulings that were contrary to Silar's position, Silar

20   constructed or imagined a way to waltz around the Court's

21   jurisdiction, my asserted in rem jurisdiction.  First, they

22   transferred these assets to Asset Resolution, the assets they

23   held basically as collateral while Compass was still in

24   possession.  I realize now although I suspected at the time

25   that the true motivation -- and I doubt there will be much

1  disagreement -- was to protect Silar from taking direct

2  possession of potentially toxic assets while at the same time

3  preserving the value to Silar as collateral.  They conveyed

4  these assets to Asset Resolution.  That is the servicing rights

5  that it -- collateral interest in the servicing rights in the

6  direct lender interests.

7           And then somewhere down the road when, again, the

8  Court's rulings began to be onerous to Silar, somebody

9  counseled Asset Resolution to enter into a Chapter 11 filing.

10 There was nothing to reorganize.  There were no separate

11 creditors, separate and apart from creditors Asset Resolution

12 had accrued at the request of Silar, of course, other than,

13 perhaps, the servicing -- the rights to servicing

14 reimbursements for expenses out of pocket in protecting the

15 assets which they were servicing.

16          Otherwise, the creditors they accrued were Counsel

17 fees, professional fees and fees basically in litigating with

18 the direct lenders.  This Court made clear at a number of

19 junctures including in respect to the Gess loan that that was

20 out of their own pocket.  It certainly couldn't be charged at

21 the feet of all the direct lenders including themselves as

22 direct lender.

23          Nevertheless, somebody counseled that the way to

24 avoid this is to get the assets out of the hands of the Federal

25 District Court.  Let's put it into a Chapter 11.  That gets it

1    in front of another judge and of course as it works out now,

2    that did not work.  The venue was transferred back here to

3    Las Vegas, Nevada District Court and this Court withdrew the

4    reference and this Court clearly now has, if it didn't already

5    have before by virtue of its declaration of in rem jurisdiction

6    -- it now has clearly 1334 exclusive jurisdiction over these

7    assets, the servicing rights and the direct lender interests

8    owned now by Asset Resolution and, of course, not the exclusive

9    jurisdiction over the assets owned by SPEs but exclusive

10   jurisdiction over the managing member of each and every one of

11   those SPEs, that is Asset Resolution.

12          Basically what Silar and Asset Resolution were doing

13   was waltzing again around -- just like Cangelosi, waltzing

14   around this Court's jurisdiction over those assets.  You are

15   doing exactly what I told you not to do.  Do not further rape

16   or pillage.  Do not violate your fiduciary duties to the direct

17   lenders.  I expect to hold the principals of Asset Resolution

18   and Silar, the entities themselves and any attorneys or

19   professionals who counseled this frivolous -- under Rule 11 of

20   the Federal Rules of Civil Procedure, this frivolous endeavor

21   -- I expect to hold you personally liable for the Rule 11

22   appropriate sanctions and I will expect to see those motions.

23          That's the forest.  That's the forest.  There is

24   nothing for Asset Resolution to properly reorganize.  Asset

25   Resolution was devised from the outset as a shell entity to

1   protect Silar from liability for holding and preserving the

2   value of these servicing rights.  That's what it was devised

3   for.  It wasn't -- it didn't predate this series of cases.  It

4   didn't have an existing business.  It was devised solely for

5   the purpose of holding these assets, prosecuting them,

6   increasing their value including the servicing rights and

7   protecting upstream Silar as the holder of the parent of Asset

8   Resolution.  That was its purpose.

9           There is nothing to reorganize and we all know that

10  there are extensive case and case authorities for similar

11  attempts when the Court properly identifies them as forum

12  selection or forum avoidance procedures.  For that reason, the

13  Court will convert.  I will also convert the case for all of

14  the reasons listed in the moving papers with which I totally

15  agree.  Those are also bases and grounds for conversion of

16  case.  There is nothing to reorganize here.  There are assets

17  to protect in a Chapter 7 and for the reasons Counsel -- and

18  suggested by Counsel, an independent trustee, especially one in

19  a Chapter 7, can look into the prior administration of these

20  assets.

21          Remember and recall, please, as an aside that the

22  Court acknowledged the transfer to Asset Resolution but never

23  approved it.  I issued injunctions to preserve the rights of

24  Compass and, of course, Silar as well but in my mind I did not

25  resolve the question whether it was appropriate or rightful as

1  opposed to wrongful to further transfer these servicing rights

2  without permission of the Court to another entity such as Asset

3  Resolution.  It's now obvious to me that that transfer as well

4  as the subsequent counseled Chapter 11 was wrongful and

5  wrongful in motivation and intent warranting further the remedy

6  here.

7           Expressly, I am converting these cases ordering the

8  U.S. Trustee to name a trustee forthwith.  This is a speaking

9  order.  Expressly, the trustee does not have authority to

10  continue to operate any business of Asset Resolution including

11  servicing of loans under servicing agreements or LSAs, as we've

12  referred to them previously.  I don't know that that order

13  automatically terminates the servicing rights but I intend in

14  the separate adversary proceedings and in the separate cases

15  filed originally in this case to issue orders now that clearly

16  instruct that those servicing rights were either terminated

17  previously by the wrongful conduct of Compass and/or Silar

18  and/or that there was full right to terminate them at the time

19  any one of those deeds of trust or representatives of the same

20  acquired a 51-percent vote or more to terminate Compass and/or

21  Silar and/or Asset Resolution.

22           I'll issue those rulings but regardless of that, I'm

23  expressly not authorizing, as the Bankruptcy Code otherwise

24  gives me the authority to do, the trustee to operate that

25  business.  So where does that leave us?  We will have a

1    trustee, of course.  That trustee will function as the trustee

2    for the operating managing member of any SPE that already has

3    title and with respect to those that do already have a

4    foreclosure or those that do not, Ms. Chubb, you may see to a

5    solicitation or a request of 51 percent or more of each and

6    every note and deed of trust and the 51 percent or more

7    interest in any SPA-held title.

8           You may seek direction from those 51 percent or more

9    members of what they want to do, whether they want to appoint a

10   new servicing agent, whether they want to undertake the

11   servicing of the note without a servicing agent, whether they

12   just simply want to leave the title presently within SPE with a

13   newly appointed trustee understanding that that trustee, of

14   course, would be the one who would be managing the SPE.  Fifty-

15   one percent of the members of the direct lenders have the right

16   to so dictate.  So for example, in response to Mr. Kirby's

17   comments and concerns, I certainly echo those and agree,

18   Mr. Kirby.  If there is an SPE that has entered into

19   arrangements, the trustee will now be the voting party in that

20   managing member but subject to the fiduciary duties, of course,

21   he only -- he or she only holds legal title, nominal legal

22   title and he or she must take the direction of 51 percent or

23   more.

24          So specifically I will order that the trustee turn

25   over forthwith any servicing right as demanded or requested by

1    51 percent or more and really the only person that I'm really

2    trusting to make sure that we have a proper vote is Ms. Chubb.

3    There will be a trustee but you will make sure, Ms. Chubb, that

4    51 percent of each and every note and deed of trust and each

5    and every SPE has either a proper vote or no vote.  If there's

6    no vote, for example, on an SPE, no direction from 51 percent

7    or more, then we must all acknowledge that the newly appointed

8    trustee is, in essence, not a servicer of course but holds

9    title and has the fiduciary obligation to represent and to

10   pursue and enforce the views of 51 percent or more as he or she

11   may receive them.

12           There is no need to reorganize, no opportunity to

13   reorganize and I think I've answered the question as to why

14   this is the different kind of case and in such cases -- and we

15   have a number of them on the books -- the Courts do convert and

16   declare an effort to reorganize at an end.  I have denied and

17   will deny the Motion to Extend the Time for Exclusive Plan as

18   moot.

19           I'm also terminating at this time any and all

20   injunctions.  The injunction issued by Judge Regal, the

21   injunctions heretofore issued by myself, they're at an end.

22   Those injunctions were to protect Silar -- Compass first, Silar

23   secondarily in their servicing rights acquisition.  There's no

24   longer any need to do that and so I am terminating those

25   injunctions forthwith.  It is now up to the direct lenders what

1    they want to do.  I certainly acknowledge some of the

2    arguments.  The problem in this case, especially when

3    Ms. Cangelosi held sway to some extent, was that we could not

4    get consensus and Silar complained, rightly so, at various

5    stages of these cases that they could not get consensus.  They

6    couldn't even get response and therefore they felt they had a

7    fiduciary obligation to simply protect the properties.

8            But there is now no longer a need for those

9    injunctions either to protect Silar or Compass in their

10   servicing rights or to protect the properties.  The direct

11   lenders will protect themselves and they can protect themselves

12   by a 51-percent vote saying you'll put this SPE into a Chapter

13   11 or you'll put this SPE into a direct default situation by

14   our not covering the tax default payments, for example, or

15   you'll put this SPE under the jurisdiction and authority of a

16   new servicing agent that we will designate.

17           So the direct lenders will protect themselves, it

18   becoming very obvious to the Court that neither nor

19   Ms. Cangelosi nor Compass nor Silar nor Asset Resolution were

20   either effective or in good faith in their attempts to preserve

21   or protect these assets for the benefit of all direct lenders.

22           I am specifically revoking the DIP authorization in

23   the Chapter 11.  I'm glad to hear that it has not been funded.

24   There is no longer a purpose for it or intent.  I'm

25   specifically revoking that order.  There is no authorization to

1   complete or fund or sign documents or do anything further in

2   support of that DIP financing.

3         Any other clarifications to this speaking order?

4   I'll expect, of course, order to embody the Court's rulings

5   with the reasons here stated on the record.  Please?

6         **MS. RASMUSSEN:**  Your Honor, just a jurisdictional

7   issue.  I had filed an appeal to the Ninth Circuit of the order

8   denying my motion to vacate the preliminary injunction and so I

9   don't want you and I to get in trouble with the circuit and so

10  to the extent that you intend -- I'm not free of jurisdiction

11  to vacate it right now and I just don't want us to get in

12  trouble.  So I -- one thing I can do is withdraw the appeal.

13        **THE COURT:**  I'm not afraid of getting in trouble.

14        **MS. RASMUSSEN:**  Maybe it's just me and I don't want

15  to drag you down with me.

16        **THE COURT:**  I'm doing it.  If I don't have

17  jurisdiction, of course, somebody will tell me that.

18        **MS. RASMUSSEN:**  I think I can withdraw the appeal and

19  then the order -- I mean, that you've indicated your intent

20  today, I think it can be handled that way but since that's the

21  entire subject matter of the appeal, I think it would be

22  problematic.  So I think perhaps that's what I should ask them

23  for a stipulation to withdraw the appeal upon the consent of my

24  clients, which I'm sure they will, and then your order can be

25  entered therewith.  Okay?

1          **MR. HOWARD:**  Your Honor, I fully understand the

2   Court's order but there is one perhaps unintended

3   consequence --

4          **THE COURT:**  All right, please.

5          **MR. HOWARD:**  -- and that is I believe there are four

6   pending tax sales from local authorities.  I can think of one

7   off the top of my head.  It's scheduled for February 11$^{th}$ --

8          **THE COURT:**  Of what?  Not specific properties but of

9   what?  Of specific properties for tax sales?

10         **MR. HOWARD:**  For separate specific properties.

11         **THE COURT:**  Uh-huh.

12         **MR. HOWARD:**  The one I'm thinking of is the Comdex

13  (phonetic) property --

14         **THE COURT:**  They're held by title to which is held by

15  an SPE?

16         **MR. HOWARD:**  No, the title of which is held by a

17  borrower who has not yet been foreclosed upon who is --

18         **THE COURT:**  So in other words, the automatic stay

19  doesn't apply to stop those asset -- those tax --

20         **MR. HOWARD:**  I would have thought the automatic stay

21  up until today stayed the foreclosure because the servicer

22  was --

23         **THE COURT:**  Well, a conversion doesn't lift any stay.

24  So --

25         **MR. HOWARD:**  But the servicing rights --

```
1              THE COURT:  -- my question though is why are you

2    under the impression that there was an automatic stay against

3    tax sales.

4              MR. HOWARD:  I was --

5              THE COURT:  The title wasn't held by the Debtor,

6    right?

7              MR. HOWARD:  I understood -- my understanding, your

8    Honor --

9              THE COURT:  Uh-huh.

10             MR. HOWARD:  -- was that the tax foreclosure sale was

11   stayed by virtue of the servicer not being in a Chapter 11

12   case.

13             THE COURT:  Why would you think that?

14             MR. HOWARD:  Perhaps because I'm --

15             THE COURT:  Because the Debtor has the servicing

16   right?

17             MR. HOWARD:  I'm not as sophisticated, perhaps, as

18   some of the bankruptcy lawyers here and thought the automatic

19   stay was very broad and kept the rights of the servicers, too

20   but the point is it's not my issue -- not our issue but --

21             THE COURT:  Right.

22             MR. HOWARD:  -- if those tax foreclosure sales are

23   eminent, Debtor's Counsel has been charged with the task of

24   protecting those --

25             THE COURT:  If there is a stay, the stay is already
```

1    still in place.  I'm not lifting any stays.  I'm simply

2    converting the case.  If there is not a stay in place or any

3    fear of that whether in a Chapter 11 or in a Chapter 7, there

4    should be action taken to make sure there is a stay.  For

5    example, in respect to the Gess loan, I ordered the stay.  I

6    said a sale or a deed on tax sale cannot occur for certain

7    periods of time.  I ordered that.  I think somebody asked it or

8    I suggested it and I specifically ordered that.

9         So if there is not an automatic stay in effect --

10   which I'm not lifting in any regard -- or any doubt about that,

11   the appropriate parties including the direct lenders if they

12   need to protect themselves should make an appropriate request

13   for an injunction.

14        **MS. CHUBB:**  Well, if Asset Resolution has an interest

15   in that property as an owner or as a junior secured creditor --

16        **THE COURT:**  Well, here's the problem.  You know, if

17   it's been foreclosed upon, then clearly Asset Resolution as one

18   of many direct lenders may have a title interest even if it's a

19   beneficial title interest in the property and I would assume

20   there's a stay --

21        **MS. CHUBB:**  We'll look at that.

22        **THE COURT:**  -- but simply as the holder of a

23   servicing right on behalf of all other direct lenders, I don't

24   think there's any automatic stay.

25        **MS. CHUBB:**  I agree.  We'll look into that and maybe

1   we could discuss with Counsel.

2         THE COURT:  Yeah.  I just caution you -- I thank you

3   for raising the issue and I caution you, direct lenders need to

4   be advised if there's not an automatic stay, they certainly

5   ought to seek one and they are -- from this moment on that

6   their own prejudice for protecting these properties.

7         MS. CHUBB:  So I do have some questions.

8         THE COURT:  Please.

9         MS. CHUBB:  There are trust funds being held for the

10  benefit of someone.

11        THE COURT:  Those go immediately into the hands of a

12  new trustee.  The Debtor, under the Federal statute Title 11

13  and the Rules, is mandated and directed without an additional

14  order from me to immediately cooperate with that trustee in

15  turning over assets, preserving the assets.  All parties are on

16  notice that this Court has exclusive jurisdiction, that any

17  attempts to avoid this Court's exclusive jurisdiction will be

18  met with proper sanctions, et cetera but that trustee, of

19  course, I assume would take possession of those assets not as

20  assets of an estate but as assets of the fiduciary of those

21  funds.

22        MS. CHUBB:  Okay, thank you.  Then did you have in

23  mind some specific procedure for implementing the 51 percent?

24  Do you have desires or --

25        THE COURT:  No.  I'm going to leave that to you

66

 1    because --

 2              MS. CHUBB:  I was afraid of that.

 3              THE COURT:  -- and that's the reason for doing that

 4    is --

 5              MS. CHUBB:  Okay, we'll do that.

 6              THE COURT:  -- because the direct lenders now are on

 7    notice they have --

 8              MS. CHUBB:  Yes.

 9              THE COURT:  -- to protect themselves.

10              MS. CHUBB:  Okay.

11              THE COURT:  This Court will not protect them any

12    longer.  If, of course, there is no 51-percent vote to take it

13    to somebody else, then an SPE at least as well as a trustee who

14    has the servicing rights but without authority to exercise them

15    or operate them as a business presumably has the servicing

16    right and the right to say what happens to a property but in

17    the case of an SPE or a note that's held and where 51 percent

18    do vote to take it to somebody else, the trustee will

19    immediately comply with that.

20              MS. CHUBB:  Okay.  There may be some instances where

21    we have to come back here before the District Court action or

22    the bankruptcy --

23              THE COURT:  Absolutely and as sitting in bankruptcy,

24    I'll give you an immediate hearing --

25              MS. CHUBB:  Okay, thank you.

67

1          THE COURT:  -- if you need that help.

2          MS. CHUBB:  Thank you.

3          THE COURT:  Any other clarifications?

4          MR. HOWARD:  The only other clarification, your Honor

5     -- Randolph Howard as attorney for Asset Resolution.  I heard

6     the Court very loudly and clearly state its basis for

7     converting including what the Court perceives as bad faith on

8     the part of the people who filed the Chapter 11 case.  This is

9     not, as the Court well knows, a simple matter.  I would ask the

10    Court to indulge the parties who have a very real interest in

11    preserving their good names justification and rationale for

12    what they did -- ask the Court to give us the luxury of a

13    factual hearing on that issue.

14         THE COURT:  It goes without saying.  That's why I

15    invited the motions.  I did not rule.

16         MR. HOWARD:  I was just asking for a factual hearing

17    in addition to just the normal law and motion proceeding if the

18    Court will please.

19         THE COURT:  Very good.  Let's see.  The application

20    to authorize retention of financial advisors is moot and the

21    trial setting -- of course, the Court has -- didn't I already

22    lift the stay on the separate adversary proceedings withdrawn

23    and/or those filed here?

24         MS. CHUBB:  We thought so.

25         THE COURT:  I thought so, too.  I've lifted that

1    stay.  So we do have a trial setting.  I'm sure we need to

2    further -- I promised you that we would further set dates as

3    appropriate to the extent we still need them and I think we

4    probably still do.  You may be -- may need consultation about

5    what issues remain to be tried but we certainly need a trial

6    date.

7            **MR. KLESTADT:**  Your Honor, on that point with regard

8    to the declaratory judgment action which your Honor at the last

9    hearing acknowledged and thanked us for the favor of commencing

10   the action against the various direct lenders --

11           **THE COURT:**  That was the State Court removed here to

12   this --

13           **MR. KLESTADT:**  No.  No, your Honor.

14           **THE COURT:**  No.

15           **MR. KLESTADT:**  We started a separate action in the

16   Bankruptcy Court --

17           **THE COURT:**  Uh-huh.  Oh, yes and I withdrew that one.

18           **MR. KLESTADT:**  That's correct, your Honor.  My

19   question is that now, I believe, the exclusive plaintiff is the

20   Chapter 7 trustee.

21           **THE COURT:**  That's correct.

22           **MR. KLESTADT:**  So I think before setting a trial

23   schedule, you need to have the Chapter 7 trustee appointed

24   before you.

25           **THE COURT:**  That's true and that Chapter 7 trustee

69

1    may decide to retain the same Counsel to prosecute that or may

2    decide to retain separate Counsel.

3           **MR. KLESTADT:**  Your Honor, part -- if I may, part and

4    parcel of the entire strategy of putting this in the Chapter 11

5    was to bring that action before a Bankruptcy Court whether in

6    New York, here or before your Honor withdrawing the matter.  I

7    gave that advice, your Honor.  There was no bad faith intended.

8           **THE COURT:**  Okay.

9           **MR. KINEL:**  Your Honor, I -- Norman Kinel on behalf

10   of the soon to nonexist committee, I guess.  Clarification,

11   your Honor, the committee was appointed and Counsel was

12   retained pursuant to an order of the Court.  There was a

13   financial advisor application before your Honor and the funding

14   for professional fees in this case were to -- was to come from

15   the DIP lender who is an affiliate of the Debtors and a

16   reliance upon that funding, the professionals were retained and

17   engaged.

18          **THE COURT:**  Of course, the orders of retention are in

19   place.  I can appreciate that the expectation for payment may

20   be frustrated and, of course, Counsel have every right to do

21   whatever they need to do but the orders of retention are in

22   place and there was a request to nunc pro tunc retained which I

23   just approved and signed today as well.

24          **MR. KINEL:**  Well, with respect to the financial

25   advisors, your Honor ruled that it was moot and I would just

1   make a point that in order for them to have the right to come

2   to this Court and seek compensation for what they did, I think

3   they would need an order of the Court even though they

4   certainly would not be performing any services --

5           **THE COURT:**  I'm sorry.  I don't think we're picking

6   up a good record.

7           **(Loud speaker heard in the courtroom)**

8           **THE COURT:**  Just a classroom tip.  I'm sorry.

9           **MR. KINEL:**  I have two points, your Honor.  One is

10  sort of as a ministerial matter.  I would respectfully request

11  that the Court approve the retention of the financial advisors

12  and their services will be immediately terminated but at least

13  they'd be in a position to come back and ask the Court for

14  approval of the fees that they incurred to date.

15          **THE COURT:**  I will deny that.  It is moot.

16          **MR. KINEL:**  The second request is, I guess, a

17  clarification on the DIP financing.  I'd like to understand --

18  if the Court's denying the funding of DIP financing -- which I

19  don't understand whose prejudice that would be since without

20  that financing, there is -- there will be -- I guess ultimately

21  the application could be made but the insider of this Debtor

22  was willing to spend money to administratively maintain this

23  case.

24          **THE COURT:**  Sure.  If that's a question, it is

25  clearly to the prejudice of direct lenders and direct lender

```
 1   interests.  I am revoking it.  I was glad to hear that it had

 2   not been funded.  If it had been funded, of course, rights

 3   would have accrued but it has not been funded.  I am

 4   specifically revoking the order.

 5           MR. KLESTADT:  Your Honor, may I address that point?

 6           THE COURT:  Sure.

 7           MR. KLESTADT:  That is not, your Honor.  There is a

 8   specific --

 9           THE COURT:  What's not accurate?

10           MR. KLESTADT:  With regard to the debtor-in-

11   possession financing, there's a specific -- I don't have it in

12   front of me but there's a specific paragraph in the order that

13   says that the incurrence of the loan and the collateral

14   securing the loan is not as against any ownership interest of

15   the direct lenders but solely as against Asset Resolution.  It

16   was designed specifically so that there would be no detriment

17   to the direct lenders.  So I do not understand how your Honor

18   comes to that conclusion.

19           THE COURT:  Okay.

20           MR. KLESTADT:  It does not act to their detriment.

21           THE COURT:  Are you asking me to argue with you or --

22           MR. KLESTADT:  No, your Honor, I'm not asking you to

23   argue.  It's an incorrect conclusion and the detriment --

24   Mr. Kinel  I  think  correctly  points  out.   The  detriment,

25   frankly, is to the professionals.
```

72

1          **THE COURT:**  I appreciate your pointing that out.

2          **MR. KLESTADT:**  Thank you, your Honor.

3          **THE COURT:**  Anything else?  That's the order.

4     Ms. Chubb, could I give you the initial legwork of preparing

5     orders?  I've given my reasons here on the record.  You may

6     allocate that burden as you see fit.

7          **MS. CHUBB:**  I'm really good at delegating.

8          **THE COURT:**  Good.

9          **MS. CHUBB:**  Yes, we will.

10          **THE COURT:**  Okay.

11          **MS. CHUBB:**  Yes, we will prepare all the orders you

12     think arise out of today.

13          **THE COURT:**  And does the U.S. Trustee have a trustee

14     that you already have in mind to name?

15          **MS. BLOOM:**  Your Honor, when a case converts from an

16     11 to a Chapter 7, it goes by rotation.  We do not specifically

17     appoint anyone.

18          **THE COURT:**  Okay.  Could you provide that name to

19     these parties no later than tomorrow morning --

20          **MS. BLOOM:**  Yes, absolutely.

21          **THE COURT:**  -- to see if there's any objection and

22     forthwith get the order in place?  This, again, was a speaking

23     order relative to conversion.

24          **MS. BLOOM:**  Thank you.

25          **THE COURT:**  Okay.  Thank you.

73

1          **MS. UNIDENTIFIED:**  Thank you very much, your Honor.

2          **MR. UNIDENTIFIED:**  Thank you, your Honor.

3          **THE CLERK:**  All rise.

4     **(This proceeding was adjourned at 5:11 p.m.)**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____          _January 21, 2010   _

TONI HUDSON, TRANSCRIBER