1
                      UNITED STATES DISTRICT COURT
                         DISTRICT OF NEVADA

2
       BEFORE THE HONORABLE ROBERT C. JONES, DISTRICT JUDGE
                       ---o0o---

3

4
  IN RE:  ASSET RESOLUTION.    :  No. BK-S-09-32824
                      :

5
  IN RE:  USA COMMERCIAL     :  No. 2:07-CV-892-RCJ-GWF
  MORTGAGE.                :

6
                      :  May 17, 2010
                      :

7
                      :  Reno, Nevada
                      :

8
                      :

9
  _____:

10
                  TRANSCRIPT OF MOTION HEARING

11
APPEARANCES IN RENO:
FRANCIS B. MAJORIE   MELANIE ELLS      JANET CHUBB

12
Attorney at Law      Attorney at Law     Attorney at Law

13
MICHAEL COLLINS     ROBERT MILLIMET   McALAN DUNCAN
Attorney at Law      Attorney at Law     Attorney at Law

14

15
DANIEL HAYWARD      JONATHAN DABBIERI
Attorney at Law      Attorney at Law

16
APPEARANCES IN LAS VEGAS:
VICTOR VILAPLANA        ELIZABETH STEPHENS

17
Attorney at Law         Attorney at Law

18
LISA RASMUSSEN         JAMES MacROBBIE
Attorney at Law         Attorney at Law

19

20
WILLIAM BIFF LEONARD     TELEPHONIC APPEARANCE:
Trustee               PAMELA HALLAMAN
                     Attorney at Law

21

22
Reported by:         Margaret E. Griener, CCR #3, RDR
                Official Reporter

23
                400 South Virginia Street
                Reno, Nevada 89501

24
                (775)329-9980

25
            COMPUTER-ASSISTED TRANSCRIPTION

1          RENO, NEVADA, MONDAY, MAY 17, 2010, 9:00 A.M.

2                          ---o0o---

3

4          THE COURT:  We're here in a district court

5   proceeding, not bankruptcy proceeding, of Asset Resolution/

6   USA Commercial, and this is, of course, the previously

7   adversary proceeding in bankruptcy court but now withdrawn and

8   also originally filed here district court cases.

9          I acknowledge in the courtroom Judge Hagen in whose

10  seat I sit and position I sit.  We're so grateful for you,

11  Judge Hagen, for being here as a potential mediator and

12  arbitrator in this very complex case.

13         Let's start, please, with appearances, if we could,

14  please, in Reno first.

15         MR. MAJORIE:  In Reno.  I'm sorry.

16         THE COURT:  Right.

17         Good morning, your Honor.  Francis B. Majorie, and

18  with me is Ms. Ells on behalf of Silar.

19         MR. HAYWARD:  Good morning, your Honor.  Daniel

20  Hayward on behalf of the Compass entities, Mr. Piskun and

21  Mr. Blatt.

22         THE COURT:  Thank you so much.

23         MR. HAYWARD:  Thank you.

24         MS. CHUBB:  Good morning, your Honor.  Janet

25  Chubb, Michael Collins, Rob Millimet and McAlan Duncan for the

3

1  plaintiffs.

2          MR. MILLIMET:  Good morning.

3          THE COURT:  Thank you.

4          MR. DABBIERI:  Good morning, your Honor.

5  Jonathan Dabbieri on behalf of William Leonard, the Chapter 7

6  trustee for Asset Resolution.

7          THE COURT:  Thank you.

8      And in Las Vegas, please.

9          MR. VILAPLANA:  Good morning, your Honor.

10  Victor Vilaplana of Foley & Lardner on behalf of Pathfinder

11  Pompano.

12      I'm appearing on the matter that is continued over

13  from last Thursday, your Honor.

14          THE COURT:  We'll probably take that up first.

15  Thank you so much.

16          MS. STEPHENS:  Good morning, your Honor.

17  Elizabeth Stephens appearing for the trustee, William Leonard

18  of the Asset Resolution estate.

19          THE COURT:  Thank you, Ms. Stephens.

20          MR. LEONARD:  Good morning, your Honor, Biff

21  Leonard, Trustee.

22          THE COURT:  Thank you, Mr. Leonard.

23          MR. MacROBBIE:  Good morning, your Honor.  James

24  MacRobbie of Silvester & Polednak on behalf of Sullivan &

25  Worcester, also on the matter that was continued from last

4

```
 1    week's hearing.
 2                 THE COURT:  Thank you.
 3            Any other appearances.
 4            Let's take up the bankruptcy matter in the
 5    bankruptcy case withdrawn which was the matter that was
 6    continued over to today.
 7            This was, just for the record -- let's see.  Do I
 8    have a motion number?  Here it is, BK-S-09-32824.  This was
 9    docket number 732, motion for an order approving asset
10    management and majority, Pompano Bay as asset manager.
11            Again, please, that was continued over so that --
12    let's see.  Ms. Rasmussen is not here?
13                 MR. VILAPLANA:  She's not here in Las Vegas,
14    your Honor, that's correct.
15                 THE COURT:  It was continued over so that she
16    could raise any concerns.  Has she raised any concerns and did
17    we have any further objections?
18                 MR. VILAPLANA:  I have received no further word
19    from Ms. Rasmussen, and we've had no further objections, your
20    Honor.
21                 THE COURT:  Okay.  So you represented last time
22    you had more than 51 percent vote, correct?
23                 MR. VILAPLANA:  I did, your Honor.
24                 THE COURT:  And you still do.
25                 MR. VILAPLANA:  Yes, your Honor.
```

1          THE COURT:  Okay.  Then it's appropriate to

2    approve that order.

3          And just for the record, too, so -- I'll have to

4    repeat this each time.  This was to authorize the assumption

5    of servicing rights by the designated servicer of the

6    51 percent in that particular note.

7          This isn't a termination of Asset Resolution's

8    servicing rights, nor Mr. Leonard's authority thereto.  We

9    already terminated those servicing rights and gave Mr. Leonard

10   the ability for a temporary period to continue to service

11   while those rights were under consideration by the note

12   holders.

13         So what you're doing is simply assuming, with the

14   Court's approval and consent, the servicing rights on behalf

15   of the 51 percent.

16          MR. VILAPLANA:  That is correct, your Honor.

17         Just for the record and to make sure that your Honor

18   is aware of all the important facts in this matter, as a

19   result of our efforts to reaffirm -- to seek reaffirmation of

20   the votes as you suggested last Thursday, we did contact a

21   number of the -- but not all of the direct lenders that had

22   voted for Pathfinder.

23         In that process, several -- two of the direct

24   lenders asked that we make changes to the proposed agreement.

25   One of those people that made this request was Ms. Chubb's

6

1    client.

2            We agreed to those changes.  They are for the

3    benefit of all the direct lenders so we're glad to make them,

4    and we will make them, your Honor.

5                    MS. CHUBB:  Thank you.  I just wanted to clarify

6    the record that we had made some changes.  Thank you.

7                    THE COURT:  Okay.  Very good.  If you'll submit

8    those orders, please, after passing them by counsel.

9                    MR. VILAPLANA:  By counsel you mean Ms. Chubb

10   and trustee's counsel?

11                   THE COURT:  Yes.  Anybody else want a copy of

12   that order?

13           Yes, please.

14                   MR. MacROBBIE:  Your Honor, James MacRobbie on

15   behalf of Sullivan & Worcester.

16           We had previously filed a reservation of rights in

17   response to this motion and have agreed with counsel for the

18   moving party on additional language to be inserted.

19           I would just like a chance to review the final

20   order.

21                   THE COURT:  Yes, please.

22                   MR. VILAPLANA:  And that is correct, your Honor,

23   we will be glad to do that.

24                   THE COURT:  Thank you so much.

25                   MR. VILAPLANA:  Thank you, your Honor.

1           THE COURT:  Anything else, then, before we

2    proceed to case 892 and the summary judgment motions?

3           All right --

4           MS. CHUBB:  Your Honor?

5           THE COURT:  Please, Ms. Chubb, preliminary?

6           THE CLERK:  Excuse me, Pamela Hallaman has

7    joined the conference.

8           THE COURT:  Thank you much.  This is Judge

9    Jones.  We're in process.

10          MR. HALLAMAN:  Thank you, your Honor, and I hope

11   not to disturb the Court.

12          THE COURT:  Thank you.

13          MS. CHUBB:  Good morning, your Honor.

14          With respect to the Huntsville sale, it turned out

15   after we started to close that three of the parcels had never

16   been foreclosed on by any of the servicers --

17          THE COURT:  There you go.

18          MS. CHUBB:  -- even though they're part of the

19   sale order.

20          So Mr. Dabbieri and I submitted an amended order

21   which expands the sale order to allow the new buyers to have

22   the right to foreclose on those properties.  So I just wanted

23   to bring that to your attention.

24          THE COURT:  So, in essence, are we selling the

25   note then?  In other words, do we still have responsibility

1   and liability for completing the foreclosure, for getting

2   trustee's guarantee?

3                MS. CHUBB:  No.  My clients did not ask for

4   recision.  They will undertake the job of foreclosing on the

5   three parcels.

6                THE COURT:  Okay.  So 892 and any of the

7   entities thereto, Asset Resolution in particular, have no

8   further obligation.

9                MS. CHUBB:  Correct.

10               THE COURT:  You're taking the note and all

11   responsibility for the note.

12               MS. CHUBB:  Yes.  We would like to get the

13   note --

14               THE COURT:  You bet.

15               MS. CHUBB:  -- since we're going to need it.

16               THE COURT:  Absolutely.

17               MS. CHUBB:  So maybe somebody could see about

18   that.

19               THE COURT:  Yes, please, if you'll see about it.

20               MS. CHUBB:  I will.

21               THE COURT:  And I'll give you any order that you

22   need.

23               MS. CHUBB:  Okay.  Fine.  Thank you.

24               THE COURT:  Thank you so much.

25           Now, a little bit of background, then, to 892.

1          Are we ready to proceed with the summary judgment

2   arguments?  Is everybody in accord with doing that?

3          We do have, of course, Judge Hagen who I understand

4   is standing by potentially for mediation arbitration, and

5   there's no reservations about the Court hearing these motions

6   and ruling on them.  I assume that will advance any final

7   resolution, especially if you have a mediation in mind.

8          MR. COLLINS:  We agree, your Honor.  We think

9   it's -- if the Court has the time today, that we should argue

10  them.

11          THE COURT:  Okay.  So there's no reason to delay

12  that.

13          MR. MAJORIE:  No, your Honor, but -- and we are

14  scheduled for mediation tomorrow in front of Judge Hagen.

15          THE COURT:  Okay.  A little background then,

16  please.

17          MR. MAJORIE:  I'm sorry, your Honor, with -- I

18  may want to argue that the May 24th trial should not go

19  forward, but that wasn't specifically what your Honor asked

20  about so --

21          THE COURT:  And I'll discuss that at the end of

22  the summary judgment which I think would be the best time.

23          This case originates back in an old bankruptcy case,

24  USA Commercial Mortgage, 2:07 -- I'm sorry, no, bankruptcy --

25  I don't even have the bankruptcy number.

1          Judge Riegle presided over that case.  It was a

2    complex case.  Commercial Mortgage got itself into difficulty.

3    It had over 5, 6,000 direct lender investors in the various

4    notes that it was in the business of placing and selling

5    interests in.

6          It had how many properties, finally and/or notes?

7                MS. CHUBB:  Over 50 loans.

8                THE COURT:  Right, 50 loans, and some of them

9    were in the millions and tens of millions of dollars each for

10   those loans.

11         Thank goodness, USA Commercial didn't get into a

12   pyramiding scheme like we've seen before, that is, double

13   selling interests in notes, but what it did do was something

14   akin to it.

15         It had an escrow account, of course, and it would

16   receive payments and then pass them on, but it got into the

17   habit, in order to promote its business, of making

18   distributions of payments it hadn't even received.

19         So it made regular distributions to direct lenders

20   on their investment, their 10 percent, two percent,

21   three percent in a loan, but oftentimes it made the

22   distribution without any receipt of a payment on the other

23   side.

24         It, of course, quickly developed a negative position

25   in its escrow account, and to accommodate that, on the other

1   side of the balance sheet, there were a number of times when

2   they received payments and payoffs, or partial payoffs, of

3   notes which they did not distribute to direct lenders,

4   instead, they used it to cover the shortfall in their escrow

5   account.

6           So, in the bankruptcy estate, there were many, if

7   you will, called prepaid -- what did we call it, prepaid

8   interest?

9           MS. CHUBB:  Prepaid interest, yes.

10          THE COURT:  -- prepaid interest where payment

11  had not been received but, in fact, interest payments had been

12  paid out on the other side, many in the form, then, if you

13  will, of fraudulent conveyance or preference, also subject to

14  attack under Nevada law, of course, it was just contractually

15  and fiduciarily impossible and should not have been

16  accomplished to pay out those payments without receipt of a

17  payment from a borrower.

18          The arrangement between USA Commercial and various

19  direct lenders was one of contract.  There were LSAs, lender

20  what?

21          MS. CHUBB:  Loan servicing agreements.

22          THE COURT:  Loan servicing agreements, and they

23  varied in form, but they had a very common theme and common

24  language in many of the paragraphs, and, basically, like most

25  loan servicing agreements, they provided that USA Commercial

1   was basically the lead lender, it was the lender, it was the

2   servicing agent, it had the right to handle all of these loans

3   and, of course, make distributions on behalf of direct lenders

4   who were the actual owners of the notes.

5            It also gave it right to, in some of the cases, some

6   of the loans, to default interest, accelerated default

7   charges.

8            The concept under the LSAs was that, in essence, in

9   many cases, it was USA Commercial that would keep default

10  interest rates much higher than the regular rate, late charges

11  and default amounts.

12           The attorneys in USA Commercial could see that there

13  was a very big train wreck coming down the road.  They not

14  only had lots of litigation over the fraudulent preferences

15  and such, they had a real problem in distributing and who

16  owned what.

17           And they had the potential issue that they were

18  facing of what we call a roll-up, that is, if the bankruptcy

19  court could see that these interests were oversold, it does

20  have case law precedent for rolling up those direct lender

21  interests, actual ownership interests,

22  constitutionally-protected property interests, it does have

23  case law authority for rolling those up so that they become

24  assets of the estate, not of individual direct lenders and

25  then to make thereafter an equal distribution to everybody.

1    That, of course, would have been a horrific result and would

2    have hurt a lot of people.  A lot of people have been hurt

3    already.

4            So they came up with a brilliant scheme, and that is

5    to adopt a plan of arrangement, plan of reorganization, that

6    they would push through the court in very fast order, six to

7    nine months max, usually these cases take two to five years.

8            They would thereby diminish the fees, they would get

9    a confirmed plan, and basically the plan would be to sell the

10   servicing rights.  They would sell the servicing rights.  They

11   would sell the direct lender interests that were owned

12   directly by USA Commercial still, and they would end up with a

13   pot of gold, and from that they would make distributions, and

14   they would also pay for attorneys fees and such to litigate

15   all these items that had to be litigated in the bankruptcy.

16           So they did it.  Judge Riegle confirmed a plan and

17   approved a high bidder which was Compass.  Compass was the

18   purchaser, and, of course, there's a little bit of an issue,

19   but known or unknown to the direct lenders at the time,

20   Silar -- you are a mutual fund company, correct?  You're a

21   mutual fund or are you wholly owned by one or two

22   institutional investors?

23           MR. MAJORIE:  There are institutional investors.

24   It's not a mutual fund, your Honor, it is a limited

25   partnership of investors.

1          THE COURT:  Okay.  So those -- Silar loaned the

2    money for Compass to purchase.

3          Now, there is a significant issue that we'll hear

4    today, and that is whether Silar actually involved itself in

5    an asset repurchase agreement, a repo agreement, that are

6    specifically identified in commercial law, they're identified

7    in tax law, and, of course, they're identified in bankruptcy

8    law.

9          There are special provisions in bankruptcy law for

10   these repos.  Banks on Wall Street were engaging in these

11   transactions all the time.  They would lend money to an

12   ultimate lender like a warehousing loan, and they were in the

13   practice previously or anciently of taking big warehouse

14   groups of mortgage loans and such.

15         But a couple of decades ago they developed the

16   process of repurchase agreements, that is, in order to protect

17   themselves, that is ultimate lender, from a bankruptcy by

18   their sublender, they would actually purchase the underlying

19   notes and deeds of trust and security instruments with an

20   obligation to put them, place them back with the sublender at

21   the appropriate day and time.

22         So these repo agreements have been around a long

23   time, probably more than a couple of decades, right?  But, of

24   course, as part of the last Wall Street meltdown, they played

25   not an insignificant role amongst banks.

1           But one of the major issues here today is whether

2    those repo agreements actually transferred title to Silar and

3    making Silar thereby law ramifications, but at least in these

4    motions, thereby potentially liable for the conduct of its

5    agent, the actual servicer, Compass, or whether or not it was,

6    in fact, simply a loan from Silar to Compass to allow them to

7    purchase all these assets and with a secured interest back.

8    That's part of the issue we'll talk about today.

9           Ultimately, I think Compass paid some 58 million,

10   only four million or so, four to $6 million for the servicing

11   rights, but the rest for remaining direct lender interests

12   that had not been sold or distributed out by USA Commercial.

13   So it's a substantial chunk of money.

14          And the plan called for all the servicing rights to

15   be sold.  There were major objections.  Many of the direct

16   lenders did not like Compass, did not like who Compass was and

17   the fact that they were going to be their new agent and new

18   servicer, and so there were objections.

19          There were also many who wanted to take over the

20   servicing themselves, many, I'm sure, a majority of direct

21   lenders in a few notes that wanted to take over the servicing

22   themselves.

23          And so they made a claim, a major claim in the

24   bankruptcy case.  These are executory contracts, and you can't

25   assign these out, Judge Riegle, unless and until they're

1   cured, unless and until all of Compass's defaults and

2   irregularities have been cured, or Compass's rights

3   terminated, you can't assign these contracts out.

4          Judge Riegle ruled to the exact opposite.  She said

5   no, I'm not going to treat these as executory contracts, we're

6   not going to sell them and change any of the rights of the

7   direct lenders or any of their obligations, we're just going

8   to sell these free and clear of any claims of the bankruptcy

9   estate, but, basically, these LSAs, loan servicing agreements,

10  between USA Commercial and the lenders will flow through the

11  bankruptcy totally intact, no alteration of their rights on

12  either side.

13         So if they have a right to terminate their contract

14  with the servicer, they have that right, it continues under

15  Nevada law or under the LSA contract language.

16         So that's the way she concluded it.  It was

17  appealed, of course.  I sat on the appeal with Judge Pro.  And

18  ultimately the plan was confirmed and the order confirmed.

19         Then, of course, Compass raised a very significant

20  issue, first in the bankruptcy court.  They said that we have

21  some significant parties, direct lenders, primarily

22  represented and led by a Ms. Donna Cangelosi, who is

23  interfering with our purchase of these servicing rights.

24  She's sent out e-mails and solicitations, she wants the

25  servicing rights herself, and she's soliciting direct lenders

1   not to cooperate with and us, secondarily, to in fact adopt

2   her and her new-formed companies as the new loan servicers.

3              Judge Riegle got a little upset at that.  She issued

4   an injunction, at least a temporary injunction.

5              Several of the parties filed complaints in this

6   court.  One of the cases filed down south in my court was a

7   case file, I believe -- is that 892?  That was filed by

8   various of the direct lenders against Compass and Silar and

9   others.

10             Another case was filed up here, I think by the

11  Compass side, or Silar side, I'm not sure which, in front of

12  Judge Reed, and Judge Reed ultimately transferred that case to

13  me.  All of those cases, about three or four of them, have

14  been consolidated into the 892 case in front of me.

15             And, basically, it's for -- on Compass and Silar's

16  side, a declaration that there is contempt of the various

17  injunctions, that they are entitled to the servicing rights,

18  that there's no right to terminate those servicing rights

19  except upon a showing of cause, and there has been no cause

20  for Compass's and ultimately Silar's termination, and

21  therefore a declaration that they cannot terminate those

22  servicing rights, also, a declaration that they have a right

23  first in order to default interest which amounts to very large

24  numbers, and in excess of and prior to the rights of direct

25  lender owners of the note to their principal and interest.

1          So, for example, in one loan we had -- I think the

2     Gess loan was ultimately a $24 million loan, or was it 50

3     million?  It was --

4               MS. CHUBB:  Twenty-five.

5               THE COURT:  $45 million?

6               MS. CHUBB:  Twenty-six, sorry.

7               THE COURT:  Twenty-six, and Compass could not

8     get -- this is just an example, Compass could not get the

9     cooperation of the direct lenders, they would not make

10    advances for preserving the property or note.  There was

11    litigation on the other side with the borrower.

12         And so, finally, Compass made several attempts to

13    sell the property even after foreclosure and could not get

14    anybody's consent.

15         They proposed sales at 16 million and 12 million,

16    the property value was going down, and ultimately they came in

17    said, Judge, we've had enough, we want to sell this note

18    and/or property, foreclosed property, for $8 million, and we

19    want to keep out our servicing moneys other than arrearages

20    and advances on taxes which amounted to over a million

21    dollars.  The rest, up to the $8 million, we believe, comes

22    first to us, the servicer, for default interest and late

23    charges, and therefore really nothing, if anything, goes to

24    the direct lenders who actually owe the note.

25         So we litigated that one on an emergency basis, and

1    the Court made preliminary rulings.  We looked at the language

2    of the LSAs and said no, in a case where you are collecting

3    far less than the principal amount of the note and far less,

4    certainly, than any accrued regular interest, you do not have

5    the right to retain default interest and default interest

6    rates or excess late charges.  You must first answer the

7    principal and interest, and, of course, you are entitled,

8    right off the top, to any of your advances, you're also

9    entitled right off the top to your regular servicing fee for

10   collections and distributions on the note, but otherwise the

11   next layer goes to the direct lenders.

12            Now, that would be very different, of course, in a

13   case where Compass and/or Silar is collecting all of the

14   principal and interest and moneys in excess.  Then, of course,

15   clearly, Compass, and now Silar/Asset Resolution, has the

16   right to accelerated or default interest rates.

17            Now, one other wrinkle, and then I'm just about

18   through with the background.

19            Compass, of course, defaulted.  It was not doing

20   well in the litigation, and it wasn't doing well with regard

21   to the servicing rights.

22            In this case, 892, many of the direct lenders

23   claimed that Compass was involved in a scam and a further

24   fraud, just like USA Commercial.

25            There are some quotes, evidential quotes, for

1    example, from Piskun, et al., who owned Compass, to the effect

2    that we can really make a killing here on these advanced or

3    accelerated and default interest rates, and we can also make a

4    killing by withholding various fees before we have to make any

5    distribution to direct lenders.  So there are some quotes to

6    that effect.

7           It's still at an evidential stage on that issue,

8    but, in fact, those allegations are made part of this

9    complaint, 892, and, in fact, Piskun, et al., have defaulted.

10   Compass defaulted.

11          And Silar then, in preparation and prior to the

12   default of Compass, transferred all of Silar's rights, all of

13   these things that they were purchased, they were all

14   transferred to a wholly-owned subsidiary of Silar, Asset

15   Resolution, and it was Asset Resolution now that was in the

16   position to take possession of all these assets upon Compass's

17   default, and they did that.

18          They served a letter.  One of the issues raised in

19   the motions for summary judgment is this smells, looks like,

20   tastes like a purchase because there was no UCC foreclosure by

21   Asset Resolution or Silar upon Compass and all of these

22   servicing rights and direct lender interests, rather, it was

23   just a simple letter saying you have not complied with the

24   asset purchase obligations, and therefore we have no

25   obligation in the future to reconvey these assets to you, we

1   own them, and we are servicing them.  And Asset Resolution

2   took over that task, and it's assigned to a subservicer, I

3   think, SOS.

4            Now, Asset Resolution's interposition here in this

5   court was not approved by the Court.  It was acknowledged by

6   the Court, but it was not approved.

7            So early on in these cases we had a real issue as to

8   whether Compass was licensed in the State of Nevada to be a

9   servicer, whether it had to comply with Nevada law in its

10  fiduciary obligations to the direct lenders, and the Court

11  made it very clear, yes, it does, and it has to be licensed or

12  it has to have a sublicensee who is licensed in the State of

13  Nevada.  Silar was not, of course.

14           And so when Silar proposed the interposition of

15  Asset Resolution on its behalf, Asset Resolution wasn't a

16  licensee in the State of Nevada, the Court said, well, I'm not

17  approving that, but there's nobody else here, Compass is gone,

18  they're being defaulted, not only in this lawsuit, but they're

19  being defaulted on their servicing rights, if you will, so

20  Asset Resolution is the only one sitting here to service these

21  things.  So I will acknowledge the transfer of the servicing

22  rights to Asset Resolution from Silar, but I'm not approving

23  it.  It's not in accord with the procedure that we had laid

24  out for getting authorized, Nevada-licensed servicers.

25           That was the process, and then, of course, this

1    whole action has heated up.  We've had a number of other notes

2    that came to fruition and came to emergency status.

3          And we've been -- I gave very clear indication to

4    the direct lenders that the injunctions that I had entered and

5    Judge Riegle had entered to protect the servicing rights in

6    Compass's and/or Silar's names, those injunctions would

7    protect their rights.

8          But I also gave very clear indication, Judge Riegle

9    said these contract rights, LSAs, flow right through, and

10   therefore you continue to have any right that you had under

11   the agreements or under state law to terminate those servicing

12   rights and take them yourself.

13         I gave them an open invitation on many occasions to

14   file emergency motions, and, of course, they did.  We put

15   those motions off and off and off, and it is folded up now

16   into this trial, 892, that we're looking at here in the next

17   couple of weeks.

18         That's where we stand.

19         Now, we're looking at the summary judgments for

20   consideration here today, and I do have some preliminary

21   feelings on these motions, and I'm willing to give those to

22   you unless you want -- I'm also willing to recognize that in a

23   third of these cases, a quarter of these cases, oral argument

24   persuades me to go a different direction.  That happened on

25   Friday on a major case not related to USA Commercial.  They

23

1   got me going 180 degrees.

2          So if you don't want to hear it, you don't have to

3   hear it, you can go ahead with your argument, or I'll give you

4   a preliminary feeling, and then you can use that to direct

5   your arguments if you wish.

6          MR. COLLINS:  Your Honor, I think it would be

7   helpful, at least our side of the table thinks it would be

8   helpful to hear your tentative rulings.

9          MR. MAJORIE:  We agree, your Honor.

10          THE COURT:  Okay.

11          MR. MAJORIE:  If we can focus --

12          THE COURT:  Okay.

13          MR. MAJORIE:  We're from the same school so --

14          THE COURT:  And I'll try to keep a -- good.

15   Awesome.  Nice to hear that.  I won't ask what school nor what

16   class standing or rank.

17          I'll try to keep an open mind even though I'm

18   stating some preliminary feelings.

19          We have a number of motions for summary judgment.  A

20   couple of the major ones, the first major ones are docket

21   entries 1687 and 1702.

22          1687, in essence, is almost uncontested.  It's a

23   motion, very substantial, that alleges on behalf of plaintiff,

24   the direct lender side, that Silar has no standing.  It

25   assigned -- it is a defendant and a counterplaintiff here, but

1   it has no standing because it assigned all rights to Asset

2   Resolution.

3         And, in fact, the language of the assignment is

4   very, very broad.  It goes on to include any and all choses in

5   action, any and all causes of action, or complaints against

6   any of the direct lenders, for example, or anyone else.  So

7   it's very broad assignment language.

8         And the plaintiffs here have said in a motion we

9   want them dismissed because they have no standing on their

10   countercomplaints to sue us.  Asset Resolution has whatever

11   they had.

12         And Compass, of course, is defaulted.  I've taken

13   their default.  I did tell Compass and Piskun, the owners of

14   Compass, that they could participate in the prove-up, the

15   evidential phase of the trial, but they are a defaulted party,

16   and, otherwise, they await ultimately a judgment against them.

17         But Silar, and I agree, does not have standing

18   because of that assignment.

19         Now, Silar has said in response, we agree with that,

20   but a logical predicate to that is that Silar is not the

21   owner.  We were the lender to Compass.  We did not own these

22   notes and servicing rights in spite of the language of the

23   repurchase agreement.

24         And why do they claim that?  Because, of course,

25   they are seeking buffer against any liability claimed against

1   Compass for Compass's conduct or against Asset Resolution, for

2   that matter, although, of course, there there's a different

3   issue.

4           I think I'm in a position to say that I certainly

5   will approve this motion to say that Silar does not have

6   standing, but I'm a little bit up in the air on this

7   additional question of sale versus loan.

8           Now, that takes me to 1702, docket 1702.  Was this a

9   sale or was it a loan from Silar to Asset Resolution?  And I

10  have previously indicated on a number of occasions that this

11  looks, smells, tastes like a loan to me.

12          Compass was put in a position of servicing these

13  servicing rights, they had major interaction with all of the

14  direct lenders.  Silar sat back in the wings unless and until

15  Compass's default.

16          On the other hand, the parties have presented to me

17  some very good points and authorities that, under New York

18  law, which is the effective law, that these really are

19  repurchase agreements conveying total title to Silar, and

20  there's some good issues there which you'll address, please.

21          There's tax case law that probably isn't quite so

22  applicable.  There's New York law which probably is directly

23  relevant.  There's also bankruptcy law, of course, in deciding

24  what kind of an animal this is.

25          The bankruptcy code expressly recognizes repurchase

1  agreements and gives them special status.  A sublender who

2  walks into bankruptcy with a normal loan obligation to its

3  ultimate warehousing lender holds everybody off for an

4  infinite period of time, and the ultimate lender doesn't have

5  much recourse.

6          But with these repurchase agreements, Congress gave

7  special status.  They said no, the bankruptcy court will

8  recognize these as owned by the ultimate warehousing lender,

9  and the sublender who files a bankruptcy can't hold that

10 warehouser off, they can proceed with all of their rights.

11         So there's bankruptcy law that's applicable, too,

12 and it is making tentatively some sense to me that it's

13 New York law that applies and gives -- which read very like

14 repurchase agreements that transferred totally the ownership

15 rights to Silar with an obligation to retransfer them if

16 Compass complied with all of its obligations.

17         On the other hand, that doesn't end the issue

18 because, even if Silar and/or Asset Resolution are liable for

19 the conduct of Compass, they're not liable for any conduct

20 outside the scope of the employment of Compass.  Compass was

21 employed, if you will, to be the servicer, and the servicing

22 obligation was transferred, if not the purchase.

23         So, clearly, under that theory, if Compass engaged

24 in an act or conduct within the scope of its duties,

25 ultimately the owner of the servicing rights and the direct

1    lender interests would be obligated to cover for that conduct

2    but not fraudulent conduct.

3            If, for example, Compass had an intent to defraud

4    all of these direct lenders, we're going to embezzle, we're

5    going to illegally transport off, we're going to deny these

6    moneys, that certainly would be outside the scope of anything

7    they were retained to do by Silar and/or Asset Resolution, and

8    I don't know how Silar could be held responsible for that.

9            So if, for example, Compass made a decision, you

10   know, that we are going to withhold temporarily a million

11   dollars on payouts, Silar must recognize that and account for

12   that.

13           But, on the other hand, if Compass did something

14   fraudulent, I don't see how Silar and/or Asset Resolution can

15   be liable for that.

16           It goes a little further than that.  Part of the

17   claims in this lawsuit are that Compass, and, ultimately,

18   Asset Resolution and Silar, improperly claimed default

19   interest and late charges in derogation of their fiduciary

20   duties and in priority to the direct lenders who were the

21   owners of the notes.

22           But, as we'll see, what's good for the goose is good

23   for the gander, and the movants here in some of these motions

24   have said, you know, we're not liable, and we want you to

25   grant summary judgment on our behalf on the claims coming from

1    Silar because we had the right, for example, under the LSAs to

2    make claim -- to file a lawsuit here, to make claim that Silar

3    and Asset Resolution had no priority, that we stood first in

4    priority and, therefore, as a matter of summary judgment, you

5    can't hold us liable.

6           Well, the same thing works on the other side.  Silar

7    and Asset Resolution had the right, under ambiguous language

8    and ambiguous law, to claim that we do have the right and even

9    to file a lawsuit to assert that right that they have the

10   priority right to default interest, late charges, normal

11   servicing fees before even the first penny is paid out to

12   direct lenders on the principal of the note.

13          And, of course, they were pointing at the language

14   in the various notes.  The lender, under this note, will apply

15   all receipts first to interest, including default interest and

16   late charges, before we apply to it principal.

17          So I'm sure that that same argument cuts on both

18   sides.  And so even though I am now -- that's a question mark,

19   and I'll expect your final convincing arguments on whether

20   this is a sale or a loan, I'm not sure it does anything but

21   leave us in the same position.  That's 1702.

22          1704, summary judgment -- let's see.  This is

23   summary judgment filed by the plaintiffs, again, direct

24   lenders, on plaintiff's liability.  That follows 1702, doesn't

25   it?  That follows from 1702.  I may be a little confused,

1    but -- so my inclination here is to grant that.

2              In 1706, also a motion for dismissal filed by the

3    plaintiffs, direct lenders, and/or summary judgment, they

4    raise a *Twombly* U.S. Supreme Court issue, that is, the

5    complaint does not assert a proper cause of action against

6    some of the -- well, let's call them the Jones Vargas direct

7    lenders.

8              The Jones Vargas direct lenders are some of the

9    defendants.  Also, of course, the LLCs and the other entities

10   formed by Ms. Cangelosi are defendants in that action, that

11   Cross action, if you will.

12             And the complaint lays out lots of complaints and

13   bad conduct by Ms. Cangelosi and the LLCs that she formed in

14   attempting to terminate unfairly Compass's servicing rights,

15   but it does not lay out any factual basis to pull in these

16   other 54, 50-some-odd Jones Vargas direct lenders.

17             They did not join Ms. Cangelosi's LLCs, they did

18   not -- so the claim goes.  They did not participate in the

19   e-mail program and the slander program against Compass's

20   servicing rights.

21             They were standing up for their rights, and they

22   filed lawsuits and such, but there's nothing in the complaint

23   and under *Twombly* to tie them in, and therefore that should be

24   dismissed.

25             If we were in the early stages of this litigation, I

1    would be very strongly tempted to grant that one.  I agree

2    with the argument.

3          Part of the problem -- there's two problems with

4    this motion, however.  Number one, it may be moot depending on

5    the resolution of Silar's involvement in this case and whether

6    they're out on standing grounds and/or whether they're out on

7    liability grounds, purchase versus loan.

8          But, also, it's too late.  You know, we're here two

9    weeks before trial, and it's a little too late in my mind,

10   even if I hadn't given you deadlines that cut off motions to

11   dismiss under *Twombly*, it's too late to ask for a

12   recharacterization of the complaint to comply with *Twombly*.

13         So that motion has a couple of problems with it.

14         Now comes Silar's motions.

15         Let's see, the first one here was 1710, docket 1710,

16   and that's a standing issue.  Let's see.  That's a -- no,

17   that's not Silar's, that's -- who filed 1710?  That's also a

18   standing motion.

19              MS. CHUBB:  I think it's Ms. Rasmussen's.

20              THE COURT:  Ms. Rasmussen, and I'm inclined to

21   grant that motion, too.  She raises the same standing, she's

22   piggybacking on top of 1687, the standing issue, and, of

23   course, and therefore it makes sense to apply the same

24   analysis.

25         Now comes Silar's motions.  The first one is 1711,

1    and that is that Silar is not -- a motion that Silar's not

2    responsible for Compass's acts based upon the sale versus loan

3    analysis and other grounds.

4             I'm adding to that, of course, the grounds that

5    you'll want to address in your motion for summary judgment,

6    even if you are the purchaser, that, in essence, you're still

7    not liable for any conduct of Compass outside the scope of

8    that engagement of Compass.

9             So my present inclination is to grant in part and

10   deny in part that motion.

11            Silar probably is not responsible for Compass's

12   acts, but it is, of course, potentially responsible for Asset

13   Resolution's conduct, but, again, with the caveat that I'm not

14   sure Asset Resolution's insistence upon priority payment of

15   default interest, even though the Court is disagreeing with

16   that position, I'm not sure that that's bad conduct of any

17   kind.

18            Then comes 1712.  This is the LLCs.  This is Silar

19   against the LLCs, no standing.  This is 1712.

20            My inclination right now is to grant that, but, of

21   course, I'll want to hear your refining comments on the briefs

22   that I've reviewed.

23            1713, finally, is again by Silar, that when it comes

24   to the issue of whether or not all of these payments coming in

25   from borrowers get applied to interest first, including our

1   default interest or principal, there is, we agree and

2   acknowledge and concede, a right and election in the note

3   language by the direct lenders, that is, upon direct lenders

4   election, this money can be applied first to interest and then

5   to principal, or first to principal and then the interest,

6   including default interest.  But, by gum, they've made no

7   election.  There's nothing, no proof in the record, no

8   evidence anywhere that they made any such election that all

9   moneys would come first to principal before Compass and

10  servicer would get any distribution of default interest.

11          I'm a little up in the air on that one, deny or

12  grant.

13          That's my predilection, and you will get, of course,

14  very detailed written decisions, but that's a summary of it.

15          Again, I'm a little bit up in the air on some of

16  those issues, and I think we ought now to proceed with your

17  final arguments.

18          Let's address first 1687, that's the standing issue.

19          MR. COLLINS:  Your Honor, Michael Collins for

20  certain direct lenders.

21          With respect to that motion, obviously, we would

22  agree with the Court's analysis, and, obviously, we step back

23  a second --

24          THE COURT:  Let me stop you.  I need to say one

25  other thing for the benefit of the mediation.

1          You know, Asset Resolution, to protect itself, filed

2    a bankruptcy in New York, and it believed that -- in my

3    opinion, it believed it was circumventing this Court's orders.

4          I had attempted to maintain the status quo and to

5    benefit Compass and Silar's servicing rights and to protect

6    Judge Riegle's order and confirmation order.

7          But then, when I made a ruling, especially in the

8    Gess loan, that Compass/Silar Asset Resolution did not have a

9    right first to default interest, that the money first had to

10   go to the direct lenders on principal, I have ruled previously

11   as a matter of factual finding, that Asset Resolution came up

12   with a way to go around the Court's orders, and, that is, it

13   filed a bankruptcy in New York, Judge Gonzalez, I believe.

14         And it hoped thereby, in essence, to do what the

15   prior bankruptcy of USA Commercial had not done, and that is

16   to roll up all the interests, roll up all the servicing

17   rights, get a declaration that nobody had any right to

18   terminate those servicing rights, to get a resolution in

19   another court, in front of Judge Gonzalez, the waterfall

20   issue, that is, who has priority to payments from borrowers,

21   and that they would accomplish it in that fashion.

22         This Court, of course, took umbrage at that tactic,

23   and I ordered, of course, the parties here in the 892 case to

24   move to lift stay.  They worked in the bankruptcy court in New

25   York, they sought a transfer of venue first to Nevada,

1    bankruptcy, which was approved, Judge Gonzalez agreed, this

2    case belongs in Nevada.

3           It's a bankruptcy case.  I'm not addressing yet

4    dismissal or anything else.  This Chapter 11 will be

5    transferred to Nevada, and Judge -- not Judge Zive, rather,

6    Markell, bankruptcy judge colleague and brother, he had the

7    case, and it was proceeding apace with early motions and such,

8    including huge fees to be paid out, $5 million for transfer of

9    servicing and withholding of moneys, all moneys collected for

10   payment of the attorneys and the servicing rights, all in

11   derogation of the direct lenders.

12          And, of course, the direct lenders took umbrage at

13   that, and the Court took umbrage at that.  So I exercised my

14   authority to withdraw that case, and I withdrew that case, and

15   I received assignment by consent of Chief Judge Hunt of that

16   case, and the case was then in front of me, the Chapter 11.

17          Upon motion of the direct lenders and other

18   claimants in that case, I converted the case to a Chapter 7

19   and appointed Mr. Leonard, the trustee, for Asset Resolution.

20          My finding was to the effect there was no

21   reorganization right.  This was a shell company, Asset

22   Resolution was a shell company, it did not previously exist,

23   it was formed for only one purpose and, that is, to hold the

24   assets and protect Silar who was its wholly-owning parent.

25          It had no reorganization potential.  The only

35

1    liabilities it really owed, other than liabilities under this

2    lawsuit, were to its own attorneys to undertake that effort.

3           So, on that basis, the Court converted that case,

4    transferred all of Asset's properties and rights to

5    Mr. Leonard, the trustee.  That's an additional basis for lack

6    of standing here by Silar/Asset Resolution, et cetera.

7           Now, the reason I say that is because -- and that's

8    predicate to the mediation, is because that issue is on

9    appeal.  The Ninth Circuit has stayed my order, any order

10   terminating the injunctions previously issued, those

11   injunctions which protect the servicing rights.

12          I don't think that order applies at all.  It's my

13   opinion that stay from the Ninth Circuit does not apply to any

14   declaration under Nevada law, under Judge Riegle's prior

15   order, that fifty-one percent or more of the majority of the

16   direct lenders have terminated those rights as is their right

17   to do.

18          Judge Riegle clearly held, and it was part of those

19   injunctions and other orders, that at any appropriate time

20   under the LSAs or under Nevada law, 51 percent had the right

21   to terminate those servicing rights.

22          So it's my opinion that a declaration or prior

23   declaration in January, I think, of this year declaring all of

24   those service rights terminated upon conversion of the case

25   has no impact one way or the other upon that ultimate Ninth

1   Circuit stay which I think was issued after that January order

2   anyway.

3           So what we're doing here in acknowledging new

4   servicers appointed by 51 percent or more is simply

5   acknowledging their rights.  I'm not transferring any rights

6   from Compass or from Silar in derogation of those injunctions.

7           The reason I bring that up, however, is to state

8   that that is on appeal, and, as I understand it, the issues

9   before the appellate court, Ninth Circuit, are the withdrawal,

10  the conversion of the case allowing service rights to be

11  acknowledged in other parties other than Silar and Asset

12  Resolution.  Those are issues on the appeal.

13          A writ of mandamus was denied, and further stays

14  were denied.  So those issues are squarely before the

15  appellate court.

16          So there is a chance, of course, here -- I see it as

17  a one percent chance, but there's a chance that the Ninth

18  Circuit --

19                  MR. MAJORIE:  I have two, Judge, anybody, two

20  percent?

21                  THE COURT:  Right.

22          -- will reverse me, and, of course, undo everything

23  we've done and the miles of river that we've come down.  But

24  that is a factor in the mediation, of course, and should be an

25  element in value -- in settlement value.

1          Also, very substantial issues for mediation purposes

2    are the legal rights claimed by Silar and Asset Resolution to

3    the waterfall issue.  We have the first dollar that comes out

4    of every lender's, every borrower's payment because we have

5    the right to collect, not only our servicing fees, our

6    advances, of course, but also default interest, late charges,

7    and, therefore, ultimately, on a lot of these notes and

8    properties that have been foreclosed upon where the value has

9    gone down so drastically over the last year, 10 percent,

10   20 percent of ultimate loans, really the direct lenders will

11   get very little, if anything.

12          So that's their claim.  And we'll hear, of course,

13   the legal basis, and if I make the rulings along the lines

14   that I've said that I am contemplating making them, there's

15   still a chance that the Ninth Circuit could reverse those.

16          Silar and Asset Resolution does not have a lot to

17   gain if my rulings are upheld.  They do have normal

18   servicing -- for example, out of the Gess loan, instead of 6,

19   $7 million, they were limited down to some $90,000, their

20   regular servicing fee.

21          So that's what's at stake, and there's wide

22   disparity in the dollar amounts, but my impression of the way

23   this case is going to come out as a result of the summary

24   judgment is we're probably not even going to need a trial, and

25   I'm probably going to -- if I find Ms. Cangelosi -- I've

1    already found her in contempt.  If I award any damages, they

2    will not be substantial or significant.

3           There will probably be no damage awarded against

4    Silar and Asset Resolution, and, in essence, the direct

5    lenders will walk out of this court, after a number of years

6    of being held up here, with the notes and control of the notes

7    that remain and their value.  That's probably where this case

8    is coming out.

9           But, of course, Silar and Asset Resolution have a

10   big dollar figure to protect on behalf of their institutional

11   investors.  They're a private entity, private partnership.

12          And, of course, the direct lenders have everything

13   to protect.  They have -- this represents livelihood

14   investment by some of these people and, if not, a very

15   substantial investment in these millions of dollars worth of

16   loan portfolio.

17          I'm sorry for the digression, but I needed to do

18   that to give the background to the mediation as well.

19          Let's do final resolution now, 1687 first, please,

20   standing for Silar.

21            MR. COLLINS:  Your Honor, the motion, as has

22   been recognized, I think, by all the parties including Silar,

23   is a very simple motion.

24          We contend that Silar does not have standing to

25   assert any of the counterclaims that it's asserting.  Why?

1   Because of the terms of the omnibus assignment and assumption

2   agreement -- and, your Honor, we're having a little trouble --

3   I don't know if there's a button back there that had to be

4   pushed or something.

5               THE COURT:  I've got it.  Let's see.  Oops.

6   It's coming I think.  Is it turned on there?

7               THE CLERK:  I do have it here.

8               THE COURT:  Put a piece of paper there.

9               MR. COLLINS:  There is, your Honor.

10              THE COURT:  Okay.

11              MR. COLLINS:  Or I can hand up copies to your

12  Honor.

13              THE COURT:  I just can't see it from this

14  distance.

15              MR. MAJORIE:  Your Honor, I just don't want to

16  press the wrong button.  Can I turn this on or --

17              MS. CHUBB:  They don't seem to be going on.

18              THE COURT:  Hang on.  I've got my screen on,

19  too.  It's just not getting the signal.  It connects to a

20  little computer down there in the cabinet, and so -- could be

21  that the computer in the cabinet is turned off.

22          Okay.  Let's proceed, please.

23              MR. COLLINS:  Your Honor, I have a hard copy if

24  you want one.

25              THE COURT:  Okay.  What are you handing up?

1          MR. COLLINS:  The omnibus assignment and

2     assumption agreement.

3          THE COURT:  I've got it here.

4          MR. COLLINS:  Okay.  Perfect.  In case, they

5     need a copy, your Honor.

6          That is the basis for why we contend they don't have

7     standing.

8          In their response, they say, well, we agree, if we

9     are just a lender, we don't have standing for these claims,

10    but, if we are the owner of the assets like the direct lenders

11    contend, maybe we have standing.

12          But that ignores the real terms of our argument

13    which is it doesn't matter if they're a lender or owner --

14          THE COURT:  You're relying on the post

15    assignment from Silar to Asset Resolution which transferred

16    all of those rights, having nothing to do whether it was a

17    loan or purchase, they transferred all of their rights

18    including choses in action.

19          MR. COLLINS:  Absolutely, your Honor.

20          THE COURT:  Okay.

21          MR. COLLINS:  It's that simple.

22          The Court, in its preliminary ruling, recognized the

23    language that said choses of action, causes of action, it was

24    all the purchased assets which were all the direct lender

25    interests held the loan servicing rights and any cause of

1    action related thereto.

2            And in their response, they don't seem to even

3    address the existence of the omnibus assignment and assumption

4    agreement.  So we think, your Honor, it's very -- it's really

5    that simple, we're entitled to summary judgment.

6            THE COURT:  Thank you.

7            MR. MAJORIE:  I think your Honor's analysis of

8    our position was correct.  I also would like to highlight for

9    the Court, however, a couple of things that --

10           THE COURT:  Is my analysis correct whether or

11   not you're the owner or simply a lender?

12           MR. MAJORIE:  No.  And I would explain to your

13   Honor why.

14           If I'm responsible for the acts of Compass, and

15   leaving aside the outside the scope --

16           THE COURT:  As the owner of the servicing

17   rights, if you're responsible for the acts of Compass --

18           MR. MAJORIE:  Then I would have to defend those

19   acts.

20           THE COURT:  Sure.

21           MR. MAJORIE:  And to defend those acts, I would

22   be entitled to show, for example, third-party causation of

23   damage.

24           I would be entitled to show that the group was

25   really estopped from asserting those claims because of their

1    own conduct.

2              I would be entitled to show that they were in prior

3    breach of --

4                   THE COURT:  No, you wouldn't.  Asset Resolution

5    would.

6                   MR. MAJORIE:  Simply as a matter of defense,

7    your Honor, I've transferred my causes of action, but I didn't

8    transfer my ability to defend myself.

9              Nothing in that omnibus agreement --

10                  THE COURT:  Are you saying by way of offset or

11   are you saying by way of affirmative actual claim against

12   direct lenders, for example, the Asset Resolution rights.

13                  MR. MAJORIE:  I'm saying two things.  I'm

14   saying, number one, by way of estoppel, or simply a factual

15   defense, that the cause -- the damages that were caused were

16   caused by -- the acts that underline the counterclaims are

17   still also a defense factually to the causation argument about

18   damages.

19             In other words, our argument is that to the extent

20   the plaintiffs were damaged, they were damaged by their own --

21   by the wrongful acts of this group rather than the wrongful

22   acts of, say, in this case, Compass.

23                  THE COURT:  Well, that's true.  You can always

24   raise a defense, we're not responsible, you're responsible,

25   plaintiff, yourself.

43

1          But you do not have standing still to bring an

2     affirmative claim against them for damage flowing to Silar

3     because Silar transferred all of its rights to Asset.

4               MR. MAJORIE:  I absolutely agree with your Honor

5     about that.

6               THE COURT:  Okay.

7               MR. MAJORIE:  That was the nature, but I wanted

8     to be clear to the Court that our view is, if we're still in

9     the case on liability grounds, essentially the counterclaim

10    issues, although not a matter of affirmative recovery on

11    behalf of Silar, but all of our assertions relating to those

12    counterclaims --

13              THE COURT:  Okay.  We'll get to those issues.

14         I agree with you.  I don't think you're cut off from

15    any defense, but you do -- standing you do not have.  That

16    will resolve it.

17              MR. COLLINS:  Right, your Honor.  My motion

18    wasn't trying to get to any defenses --

19              THE COURT:  I'll write a detailed decision that

20    embodies that.

21         1702 which gets to the heart of the sale versus

22    loan, please.

23              MR. COLLINS:  Your Honor, Michael Collins again.

24         And I had a short handout that I was going to use on

25    the machine that, again, I can hand up to the Court.  It's not

1   an underlying document, it's a series of quotes from the MRA

2   and certain other documents.  If you would like, I could hand

3   you a copy.

4                    THE COURT:  Please.

5           And I think I have most of main arguments.  You'll

6   want to emphasize some to persuade me.  We've got the various

7   factors that different courts have given us to determine

8   whether an animal is a sale or a loan secured by a UCC

9   financing.

10          And we've got the tax case lines of authority where,

11   in essence, taxing authorities are very interested in who is

12   the actual owner.  When it comes to receiving moneys, are they

13   received as interest, are they received simply as repayments

14   of loans, et cetera.

15          We've got the New York law line of cases which, of

16   course, strongly emphasize the intent of the parties and the

17   language of the contract.

18          We've got section something-or-other in the

19   bankruptcy code that acknowledges the exemption for repurchase

20   agreements from the normal automatic stay and hold-off powers

21   of a debtor filing in bankruptcy.

22          That seems to me to be the core of the argument,

23   and --

24                    MR. COLLINS:  It is, your Honor.

25          And, in essence, there's two different views of the

1   world.  We contend that those tax cases, which pretty much is

2   what they rely on, if you agree with us that those tax cases

3   are not applicable to our situation, we think we prevail.

4           We don't think there's any real argument other than

5   that tax courts, your Honor, are not looking out to what the

6   parties intended, it's looking to the substance of the

7   agreement.  We know from law school that the IRS always looks

8   to the substance of agreement, not the form.

9           So therefore, your Honor, for tax purposes -- and

10  they have a very different understanding of the agreement in

11  question.

12          But our question is, your Honor, between Compass and

13  Silar, under New York law, we know under New York law, it's --

14  the issue is what did the parties intend, the parties to that

15  agreement, Compass and Silar.  It's not what the tax

16  implications may be.

17          And, your Honor, a little analogy there is,

18  corporation -- C Corporation is taxed at the corporate level.

19  You can have a Subchapter S corporation in which its taxed at

20  the owner level.  That doesn't mean, though, it's still not a

21  corporation entitled to limited liability for other purposes.

22          So often there may be a different tax treatment for

23  a document than there is for other purposes, and we know that

24  under New York law, your Honor, because the cases we cite

25  recognize, even the Supreme Court in a tax case says this is a

1    tax case, for other purposes, this may be something different.

2              And so, your Honor, what was the intent here?

3              Compass was a shell that was created to take over

4    the servicing.  We know it had no other business, was created

5    to take over the servicing rights it purchased from USA

6    Capital Mortgage.

7              Well, your Honor, therefore Silar wanted to make

8    sure -- and this is why the document was structured the way it

9    was is it's a shell, it's a new business, we don't know what's

10   going to happen, we did give it a lot of money.

11             There's no doubt, your Honor, that they gave a lot

12   of money to Compass, but what did they take in return, a

13   security interest, or did they take actual ownership of the

14   assets?

15             And, your Honor, the plain language of the document,

16   the MRA, makes absolutely crystal clear they took absolute

17   ownership.  Why?  To protect themselves.  They wouldn't get

18   caught up in a Compass bankruptcy.  They wouldn't get caught

19   up in a complicated foreclosure proceeding under the UCC.

20   They would just send, like they did, that one-page notice

21   saying you defaulted, we have no obligation to give it back to

22   you, to sell it back to you, no obligation whatsoever.

23             So, your Honor, the document that I handed up has

24   quote after quote from the MRA, and one of the most important

25   ones, your Honor, is Section 9(a), seller, which is Compass,

1   and buyer, Silar, intend that the transactions hereunder be

2   sales to buyer, Silar, of purchased assets and not loans from

3   buyer, Silar, to seller, secured by the purchased assets.

4           They couldn't make their intent any clearer.

5           And then, your Honor, we go through and do that over

6   and over again of other provisions that make that intent

7   absolutely crystal clear of what Compass and Silar intended

8   for that document to mean and its legal effect between the two

9   of them.  It may have a different legal effect as to the IRS,

10  but as to them, they wanted to have an absolute sale.

11          Your Honor, that's confirmed in the UCC statement on

12  the second page, section D.  We quote from the UCC statement

13  that was filed.  The buyer-secured party, which is Silar, and

14  the seller-debtor Compass, intend the transactions

15  contemplated by the master repurchase agreement to constitute

16  a sale of the purchased assets, and this filing should not be

17  construed as a condition that a sale has not occurred, or to

18  indicate that it is necessary if not required.

19          So, your Honor, they made it crystal clear.

20          Now, again, they had good lawyers all over the

21  transaction, major New York law firms, maybe even firms from

22  other jurisdictions, too, they all put a belt and suspenders

23  on it.  We intended this, but if, for some reason, somebody

24  disagrees with us someday, we still have a security interest

25  to fall back on.

1          But they made it very clear again, after the

2    transaction -- in connection with the transaction, just not

3    just in the MRA but in the UCC statement, that this is a true

4    sale to Silar to protect Silar.

5          Your Honor, we then quote from the omnibus

6    assignment agreement which is further evidence.  We quote from

7    the subservicing agreement in connection with the assets,

8    again, demonstrating the intent that it was a sale to Silar.

9          Your Honor, you asked about the bankruptcy

10   implications and how they impact here.

11          Section 35 of the MRA provides that the transactions

12   and MRA were a repurchase agreement and a master netting

13   agreement as defined in 11 USC Section 101, and a securities

14   contract as defined in 11 USC Section 741.

15          They wanted, again, to make crystal clear for all

16   purposes.  So they said to themselves how can we make it clear

17   to any court, to any party, this is a true sale.  We'll say it

18   over and over in the MRA.  We'll say it in all the

19   accompanying documents.  We'll say it in the UCC, and we'll

20   refer to those bankruptcy provisions.

21          And those bankruptcy provisions were put in for very

22   important reasons and very particular reasons.

23              THE COURT:  You seem to concede, however, in the

24   reply that this may not qualify as a purchase under the

25   bankruptcy provisions.  Is that the case, or no?

1          Your language just said that it's New York law that

2    really matters, it's certainly not tax law, and it may not

3    even be the purchase-repurchase provisions in the bankruptcy

4    code that apply.

5              MR. COLLINS:  Right.  Exactly.

6              THE COURT:  For example, we have the case cited,

7    recent bankruptcy case from Delaware citing that an animal

8    that transfers servicing rights, as opposed to underlying

9    loans, does not qualify as a characterization of a sale and

10   repurchase agreement under the bankruptcy code.

11             MR. COLLINS:  That piece that was split off,

12   your Honor, not the underlying repurchase agreement

13   necessarily.  But if the servicing rights were retained by the

14   debtor, that would create, in essence, two transactions

15   instead of one.

16             Here, your Honor, we had the assets transferred to

17   Silar, we had the loan servicing agreements transferred to

18   Silar.  In that case, Compass, in essence -- and that was --

19   along with Compass, didn't transfer over the servicing rights.

20             THE COURT:  They recharacterize the agreements,

21   they say, no, it was a retention of servicing rights by

22   Compass.

23             MR. COLLINS:  Right, right.  Versus here, your

24   Honor --

25             THE COURT:  And therefore ought to be split off.

1              MR. COLLINS:  Right.  Exactly.  Absolutely, your

2    Honor.

3              THE COURT:  Yes?  Absolutely, under the Delaware

4    case, that therefore the bankruptcy provisions do not apply,

5    that they can be -- they are severable and the servicing

6    rights, in fact, were retained, and, against those servicing

7    rights, there's simply a UCC security interest.

8              MR. COLLINS:  As to the servicing rights,

9    absolutely, your Honor, because the intent of the parties

10   wasn't to transfer that over.  The court said that's something

11   different from the repurchase agreement.  There was a

12   separate -- the servicing rights didn't go over.

13          We know from --

14             THE COURT:  Well, what is it that they

15   purchased, then, under that analysis?  What is it that Silar

16   purchased from Compass?

17             MR. COLLINS:  It purchased direct lender

18   interest.

19             THE COURT:  Right.

20             MR. COLLINS:  It purchased the servicing rights,

21   the rights under the LSA, and then --

22             THE COURT:  They argue to the contrary.  They

23   say there was no purchase on the servicing rights because,

24   under the Delaware case, they were retained by Compass, and

25   therefore, as to the servicing rights, they're severable and

1    it's not a sale, it's a loan and security interest.

2                    MR. COLLINS:  Your Honor, that goes to the

3    actual terms of the agreements.  I'm not disputing that that's

4    what the Delaware case found the parties intended there.

5                    THE COURT:  You're just saying this MRA does not

6    so provide.  It provides for a sale of -- and a redesignation

7    of agency status as opposed to a retention by Compass.

8                    MR. COLLINS:  Absolutely, your Honor.

9    Absolutely.

10            Silar owned the servicing rights, allowed, as

11   subservicer, Compass to service those rights during the time

12   period, but the LSAs were transferred to Silar, and that is

13   what makes the Delaware case distinguishable factually.  It's

14   a different type case.

15            We talk about the Granite Partners case which we

16   believe is right on point.  There's actually a form agreement,

17   your Honor, that has been developed by a trade association in

18   New York, then it's modified to a particular circumstance.

19            But our agreement looks very much like the MRA that

20   was in the Granite Partners case in which it was found to be a

21   repurchase agreement, a true sale of the rights.

22            So, your Honor, that's what we have here.  And it

23   was very purposeful, your Honor, because, again, what did they

24   want to do, not get caught up in a bankruptcy, not get caught

25   up in a foreclosure proceeding, to be able to send that

1    one-page notice that they did.

2            So we're not arguing those tax cases are wrong, your

3    Honor.  We're just saying that they're distinguishable for a

4    whole different purpose.

5            And the case law recognizes that there can be a

6    hybrid depending on why you're asking the question.

7                    THE COURT:  Okay.

8                    MR. COLLINS:  But for these two parties to now

9    say, well, we didn't mean it.  When we said we intend this to

10   be a purchase transaction, we didn't really mean it.

11                   THE COURT:  I think I got it.

12                   MR. COLLINS:  Thank you, your Honor.

13                   MR. MAJORIE:  Thank you, your Honor.

14           I will focus on what your Honor has focused on.

15           In the agreement, paragraph 31 has a severability

16   clause, and it says, quote,

17               "If any provision of any program document is

18        declared invalid by any court of competent

19        jurisdiction, such invalidity shall not affect any

20        other provision of the program documents."

21           Counsel has already acknowledged, as your Honor has

22   indicated, as counsel calls it, there's a belt and suspenders.

23   These are hybrid transactions.  That's why there are cases

24   that some say for some purposes they're sales, for some

25   purposes they're loans.

53

1          Well, the Delaware court has made it even more --

2  has sliced the onion even thinner, if you will, and it's

3  focused on the difference between, in our case, the applicable

4  analysis would be the difference between direct lender

5  interests and loan servicing agreement interests or rights.

6          It's clear that the parties acknowledged in their

7  own documents that there could be a scenario under which it

8  would be deemed to be a sale for some purposes and deemed to

9  be a loan for other purposes.

10         The Delaware case clearly establishes that loan

11 servicing rights for bankruptcy analysis purposes which, as

12 your Honor indicated in the opening remarks, is one of the

13 genesis reasons for a repurchase agreement, that you cannot

14 have a sale of loan servicing rights for that purpose.  It has

15 to be deemed a loan.

16         So even if they sold the DL interests, it didn't

17 sell the loan servicing agreement interests, they pledged

18 them, and then the pledge was taken down as a result of an

19 agreed foreclosure which, of course, any secured lender is

20 capable of doing.

21         There isn't -- you know, they go through the -- they

22 suggested to your Honor, and your Honor's opening remarks

23 indicated, that there might be this issue because there wasn't

24 a formal auction and there wasn't formal notice.  Well, one of

25 the provisions in the UCC is that you can do -- you can simply

1    take the asset by agreement.  You could take in it

2    satisfaction.  That's what happened here.  There's nothing

3    special or unique about that, it happens every day all over

4    the country with respect to secured lenders.

5           So we would ask your Honor to rule in favor of --

6    I'm not sure procedurally -- our motion that would say that,

7    as a matter of law, this agreement doesn't represent a

8    principal agency relationship, and that you deny their motion.

9           And then I would note that if your Honor were to

10   find otherwise, that we do agree with your Honor's opening

11   remarks, that simply because we might be deemed the principal

12   doesn't mean we're *ipso facto* automatically liable for any

13   acts of Compass.

14          But I would suggest, your Honor, in closing, loan

15   servicing agreements were not the subject of a sale whether

16   the DL interests were or not.

17          What is issue here is the loan servicing agreements.

18   There's no allegation that the principal agency relationship

19   arose out of DL interests or how they were voted or what they

20   were done.  The issue here is whether or not there was a sale

21   of the loan servicing agreements as a result of this

22   agreement.

23          And we would submit that, based on the clearest

24   case, based on the severability clause, based upon the fact

25   that the parties themselves acknowledged in the two documents

1   that counsel has indicated that there would be a possibility

2   of a determination by a court that some or all of this

3   transaction would be characterized as a loan, that your Honor

4   find as a matter of law that it was a loan.

5           Thank you.

6               THE COURT:  Thank you.

7           I don't think I need to give you a chance to respond

8   because I'm intent on proceeding with my preliminary feelings.

9   You haven't persuaded me any differently.

10          I do think under New York law this looks, smells,

11  tastes like a sale, and that's what it ought to be declared to

12  be.  And the parties acted.  I think that notice is more

13  indicative of a sale as opposed to a UCC sale.

14          But, again, that doesn't end the issue because,

15  again, even as principal agent, Silar/Asset Resolution are not

16  responsible for Compass's acts outside the scope of the agency

17  relationship.

18          And even for conduct within the scope, they, of

19  course, will acknowledge payments made, fiduciary moneys held

20  in trust by Compass, they're responsible for all of that, but

21  there is no liability for Compass's right to proceed with a

22  position, or Silar's right to proceed with a position in their

23  favor vis-a-vis withholding or accrual of default interest.

24          So it doesn't end the inquiry, but I think I am

25  going to proceed with my preliminary ruling, that is, this is

1    a sale as opposed to a loan.

2              MR. COLLINS:  Absolutely, your Honor.

3         I'm only approaching the bench -- I'm assuming the

4    podium here now to clarify, I wasn't intending to waive my

5    right to argue for why they're liable --

6              THE COURT:  Sure.

7              MR. COLLINS:  -- for the conduct so --

8              THE COURT:  We'll get to that a little bit

9    later.

10             MR. COLLINS:  Great.  Thank you, your Honor.

11             THE COURT:  Okay.  And I do appreciate the

12   briefs.  The briefs have been very complete, and I do intend

13   to plagiarize extensively in the decision.

14        I will make sure that any cover order contains this

15   great big long monologue that the Court has because I think

16   the appellate court needs that big long history, and it's here

17   on the record.

18        But then, on each of the separate orders, I do

19   intend to plagiarize extensively from the briefs.  They're

20   very good in this regard.

21        That's 1702.  Let's proceed to 1704.  Again,

22   plaintiff direct lenders' motion on regarding plaintiff's

23   liability.  This is against the counterclaims of Silar/Asset

24   Resolution.

25             MR. MILLIMET:  And your Honor has already

1    indicated his initial indication of where he views this

2    matter.  So I don't want to waste too much of the Court's

3    time, but I would -- I just want to reiterate a couple of

4    points where I think the motion should be granted.

5           The motion moved for summary judgment on two

6    grounds:  One, that there was an interference as a matter of

7    law pursuant to the 51 percent rule, the LSA right, the right

8    embodied within the preliminary injunction, et cetera.

9           We also moved for summary judgment that Silar/Asset

10   Resolution could not demonstrate causation for any damages,

11   and both of those grounds I think --

12              THE COURT:  Now, address the first one.

13              MR. MILLIMET:  Yes.

14              THE COURT:  You know, I can conceive of a set of

15   facts which would allow for that cause of action even though

16   there's a 51 percent voting right.

17           In other words, the allegation here is from Silar/

18   Asset Resolution against Cangelosi, et al., and the Jones

19   Vargas direct lenders, you interfered in a conspiratorial

20   fashion and illegally with our servicing rights.

21           Your counter is we have the right to take over the

22   servicing rights, the court has declared it thus, upon a vote

23   of 51 percent.  So how legally can we be liable for

24   interfering with those rights?

25           Well, I can imagine a set of facts where Silar/Asset

1    Resolution first, the clearest case is talking about third

2    parties.  You know, third party out of the blue, for example,

3    Cangelosi, not the owner of a note we're talking about, but a

4    third party to one of the notes we're talking about, attempts

5    to interfere with our contract, the LSAs with the direct

6    lenders, and they're doing it in an illegal fashion.

7             Number one, they're violating the injunction issued

8    by Judge Riegle and/or Judge Jones.

9             Number two, they're doing it in violation of the

10   confirmation order and sale order.

11            Number three, they're third parties.  They have no

12   standing themselves to vote, and what they're doing is putting

13   together a cabal, you know, they're -- would be their

14   characterization, and to usurp, if you will, the service

15   rights.

16            That would be the clearest case.

17            With respect to those, however, who are direct

18   lenders in a particular note, I'm inclined to agree with you,

19   they have the right to vote.  They certainly have the right to

20   send out correspondence, to send out letters and attempts to

21   solicit votes, let's get together, let's resolve this note.

22            They would not have the right to slander or defame.

23   They would not have the right in soliciting -- let's say, for

24   example, that as part of the solicitation to vote, get rid of

25   Compass and obtain a new servicer, that part of the

1    solicitation says, by the way, ABC, our newly-formed entity

2    will be the servicer, and in that regard we make the following

3    misrepresentations, fraudulent statements regarding Compass.

4         Why wouldn't they have, properly stated, a cause of

5    action if that's what they stated?  You're right, you have the

6    right to communicate, to talk, to arrange for new servicers,

7    but what you don't have the right to do is illegally solicit

8    for servicing rights in you, only one of the direct lenders

9    with an interest, and, more importantly, based upon

10   misrepresentation and fraudulent statements.

11        MR. MILLIMET:  Well, I think part of what we

12   have to understand here is that there are a couple of

13   different factors in play.

14        The scenario you just presented seems to me would

15   present maybe a situation where some of the other direct

16   lenders may have an issue with the majority of the direct

17   lenders.

18        I'm not sure that the servicing party would have

19   standing to contest whether or not the majority member

20   misrepresented something -- misrepresented something to

21   another direct lender.  That seems to me --

22        THE COURT:  You know, that's true just generally

23   unless that one party is trying to elicit a benefit or

24   interfere with the contract between the -- between Silar and

25   that other direct lender.

1          For example, you know, we get these cases all the

2     time, interference with contract under Nevada law, and one of

3     the elements is you can't -- you can't state a cause of action

4     if you're alleging interference with a contract to which you

5     are a party.

6          In other words, if I'm accused of interfering with

7     my own contract with another side, that's not a proper cause

8     of action, there's no cause of action that exists for that.

9          It can be alleged against me, violation of the duty

10    of good faith in a contract, or breach of contract, but

11    there's no cause of action under Nevada law for interference

12    with my own contract as opposed to the -- but here we have the

13    latter kind of contract.

14         We have not only a contract with you, you can't be

15    charged with interference with that contract, of course, but

16    you can be charged with interference between -- in the

17    contract between another direct lender and the servicer

18    Compass, Silar.  So why doesn't that cause of action follow?

19               MR. MILLIMET:  Well, I have two responses.

20         One, in the situation here, you've got a contract

21    between another direct lender and the servicer except that

22    that contract is part and parcel with all the other contracts

23    because that one LSA doesn't establish what happens with that

24    loan, you have to deal with the embodiment of all the direct

25    lenders in a loan to get to the 51 percent threshold.

1           THE COURT:  But that really doesn't answer the

2    question.

3           I agree with you that you've got the right to make

4    misrepresentations without being held liable to a fellow

5    lender to get them to vote the same way you are.  Same thing

6    happens in the halls of Congress, you know, I can lie to my

7    fellow senator, and nobody is at fault.

8           But if you are interfering with that contract by

9    using fraud and misrepresentation, then they've stated a cause

10   of action.

11          MR. MILLIMET:  Except that the alleged

12   interference in your hypothetical assumes that that individual

13   contract stands in and by itself.

14          And, to me, it seems to me that when you're dealing

15   with fractionalized loans here, and you have multiple LSAs

16   that compromise one loan, the embodiment of the loan

17   constitutes the contract here.

18          So it goes to your point a moment ago, your Honor, I

19   can't interfere with my own contract.  Well, the contracts

20   here are part and parcel of one loan, and it just so happens

21   in the nonordinary sense here, when you're dealing with

22   fractionalized loans, that you have to be able to interact

23   with your individuals because you're -- all the individuals

24   that are subject to that one loan are part of essentially the

25   same contract.

1          THE COURT:  I'm just not fully persuaded, and

2     I'm not quite getting it.

3          I think you do have to be protected.  In fact,

4     there's probably even privilege, some privilege, limited

5     privilege, applicable to communications between co-direct

6     lenders on a note that's held by multiple parties.

7          There's even probably some privilege that attaches,

8     but I'm not sure it goes so far as to protecting you in an

9     actual attempt to interfere with a side third-party contract.

10          If what we can say is your intent and the causation

11     and all of the effect had to do simply with the vote, you're

12     right, there's no liability.

13          But if, on the other hand, a jury would find that

14     your communication, your intent was instead to terminate their

15     servicing rights and get to you some nonextra contractual

16     benefit like, for example, you will be the servicer, you will

17     get all of the default interest and such instead of Compass,

18     seems to me like there you have no privilege and a jury could

19     so find if it had the proper evidence, and therefore they've

20     stated a cause of action.

21          MR. MILLIMET:  Assuming that to be true, I still

22     think that the motion should be granted for the following

23     reasons:

24          One, the issue that is raised by their response to

25     our motion is that we have a claim for damages here because

1   interference resulted from a wrongful termination, and even

2   assuming that there were misrepresentations, and even assuming

3   that there was a cause of action back in 2007-2008 for the

4   conduct that was initiated by Ms. Cangelosi --

5           THE COURT:  The Court has said there is no such

6   thing, there is no wrongful termination.  51 percent has the

7   right to --

8           MR. MILLIMET:  And that's my point.

9       The Court issued that termination order pursuant to

10  the vote of 51 percent that was recognized by the people who

11  had signed up with Bickel & Brewer and, pursuant to that

12  engagement agreement, had authorized pursuant, pursuant to

13  that retention, to terminate the servicer.

14      And therefore, notwithstanding any potential

15  interference and cause of action that may have existed in

16  2007, as we sit here in 2009 and 2010, there is no claim for

17  cause -- there is no counterclaim any longer because the vote

18  was not wrongful.

19          THE COURT:  Well, that goes to the heart of the

20  elements of an action for interference with contract.

21      For example, what we have here is a contract.  It

22  doesn't say you are the servicer for five years and have the

23  right to the following fees, it doesn't say that.

24      I've declared that what it says is you, Silar/Asset

25  Resolution, you are the servicer.  But, under Nevada law and

1    under the LSAs, but primarily under Nevada law, there is a

2    right to terminate this at will as opposed to for cause.

3                    MR. MILLIMET:  Correct.

4                    THE COURT:  Can you have a cause of action for

5    interference with such a contract?

6                    MR. MILLIMET:  And I don't think --

7                    THE COURT:  In other words, if a third party who

8    wants to now be the at-will servicer, nefariously and in cabal

9    fashion makes an attempt to interfere with an at-will

10   contract, is there any cause of action for -- or liability for

11   such conduct under Nevada law?  I'm not sure there is.

12                   MR. MILLIMET:  I don't think there is either,

13   and that was just in furtherance of my point about the

14   retention of Bickel & Brewer.

15           Those people -- those people signed up with Bickel &

16   Brewer and constituted the 51 percent in the 29 loans pursuant

17   to which the Court granted the termination of the service, and

18   my point there is you found in that order that they could do

19   so without cause, and, as a result of that circumstance, there

20   can't be any kind of -- on the merits, there can't be any kind

21   of claim for interference any longer against the lenders

22   because there is no wrongful termination.

23           And the response by Silar -- and, by the way, we've

24   established has no standing, the response brief assumes that

25   they have damage because they have lost servicing fees and

1    they've lost servicing advances potentially because they're no

2    longer the servicer based on a wrongful foreclosure.

3                THE COURT:  Well, it will only be Asset

4    Resolution that's making that argument today.

5                MR. MILLIMET:  And -- well, Asset Resolution has

6    not made the argument.

7                Pursuant to Local Rule 7.2(d), they did not file a

8    response to our motion which gives this Court consent to grant

9    the motion.

10               And, also, they never -- by not filing any kind of

11   response, they haven't raised any kind of fact issue.  They

12   haven't pursued their claims.

13               THE COURT:  Let me hear a response.

14               MR. MILLIMET:  Thank you, your Honor.

15               MR. MAJORIE:  Mr. Majorie on behalf of Silar.

16               I'm not sure, given what your Honor has said,

17   whether you want to hear from me or not.  I did submit an

18   opposition, and I can answer your Honor's questions.

19               THE COURT:  How about Asset Resolution's

20   response?

21               MR. MAJORIE:  I just wish the trustee had filed

22   an opposition.

23               THE COURT:  You're right, it's the trustee.

24   You're right.

25               MR. DABBIERI:  Good morning, your Honor.

66

1          THE COURT:  Good morning.

2          MR. DABBIERI:  On behalf of the trustee, to

3  first answer your question whether one can interfere with a

4  contract at-will, I would suggest one can.

5          And, for example, your Honor, if, to seek revenge

6  against someone, I told his employer that his employee was

7  stealing goods and embezzling moneys and the employee was

8  fired, certainly, that employee would have a contract -- I'm

9  sorry, a cause of action against me for --

10          THE COURT:  For defamation.

11          MR. DABBIERI:  -- for interfering with his

12  employment agreement.

13          THE COURT:  I don't think so.

14          You would have a cause of action for defamation.

15  You don't have any kind of a Title VII cause of action.

16  It's -- you know, an employer can discriminate on those

17  grounds even if they have wrong facts for the basis of the

18  discrimination, and that person would have a defamation cause

19  of action, but they wouldn't have a right to interference with

20  an at-will employment relationship.  I don't think there's a

21  cause of action under Nevada law for that.

22          MR. DABBIERI:  I would suggest there is, your

23  Honor, but we'll move on from that.

24          With respect to the counterclaims, first, I would

25  submit that Silar actually does have standing to assert these

1    counterclaims with respect to actions which took place post

2    the assignment, and that would be post Compass's foreclosure,

3    and I believe the damages which are being asserted by the

4    plaintiffs are for causes of action and actions which took

5    place, the damages to Compass -- I'm sorry, the damages to

6    Asset Resolution are -- and what they -- what the direct

7    lenders are claiming were improper acts by Asset Resolution --

8              THE COURT:  I'm not quite sure what you're

9    saying, but are you saying, in other words, the trustee --

10   they had standing, and the trustee has the right to step into

11   their shoes, and would step into their shoes, and assert --

12   and assert that they're -- on this summary judgment motion,

13   that it should be denied because there is liability flowing to

14   Asset Resolution?

15             MR. DABBIERI:  I'm saying that in part.  I'm

16   saying two things.

17        The claims by the direct lenders have to be cut in

18   half, so to speak.  There are claims for wrongful acts prior

19   to Asset Resolution becoming the servicer.

20        Now, Asset Resolution took all of those loan

21   servicing agreements and all of those other rights under the

22   assignment which did transfer to it the choses in action,

23   et cetera.

24        But then there's an allegation by the direct lenders

25   that Silar is also liable for the acts of Asset Resolution

1    post assignment, and those post assignment rights are held by

2    Silar, and to the extent it's being asserted, well, Silar

3    you're an owner therefore --

4              THE COURT:  Well, what post assignment rights do

5    they have?  They have the right -- they have the right, for

6    example, of a shareholder against whom there's been a wrongful

7    conduct alleged that reduced the value of the corporation.

8    They don't have standing to come into court to issue that

9    complaint, right?

10             MR. DABBIERI:  But the direct lenders have said,

11   Silar, you are actually the true servicer during Asset

12   Resolution's time on watch so to speak.  Silar, you have a

13   direct liability for what Compass did because you are the true

14   servicer.

15        Well, those claims were never assigned, and Silar,

16   to the extent that there were wrongful acts by the direct

17   lenders during the time Asset Resolution was the servicer --

18             THE COURT:  I just don't get that.  I'm sorry, I

19   don't see that.

20        The direct lenders aren't claiming that they are the

21   servicer, they're claiming they're third-party liable for

22   their agent's conduct, their servicer's conduct, Asset

23   Resolution's conduct.

24             MR. DABBIERI:  But if -- I'm sorry, your Honor.

25             THE COURT:  So I don't see that that claim is

1   being made by the direct lenders.

2          But, more importantly, they transferred any cause of

3   action they have.  Like I've said, they have the right to

4   defend themselves, and they can raise this bad conduct in

5   defense against lawsuits against them.  But with respect to

6   their affirmative claim against these direct lenders, they've

7   assigned all of that right to you.

8          MR. DABBIERI:  If those acts took place prior to

9   or at the time of the assignment.  If an improper act took

10  place by a direct lender after the assignment --

11         THE COURT:  Okay.

12         MR. DABBIERI: -- future choses in action were

13  not assigned, and it was the existing choses in action that

14  were assigned to Asset Resolution.

15         THE COURT:  Okay.  I'll buy that, but there is

16  no choses in action here.  They can't complain that your

17  wrongful conduct, direct lenders, against Asset Resolution's

18  servicing rights harmed us, Silar.  There's no cause of action

19  for that.

20         MR. DABBIERI:  Well, but if they're being sued

21  for post assignment wrongful acts by Compass --

22         THE COURT:  Who they --

23         MR. DABBIERI:  Silar is.

24         THE COURT:  Yes, they have a right to defend

25  themselves, yes.

1              MR. DABBIERI:  Then Silar should be able to

2    defend --

3              THE COURT:  I agree.

4              MR. DABBIERI:  -- through the Asset

5    Resolution --

6              THE COURT:  I agree.

7              MR. DABBIERI:  -- counterclaims as well.

8              THE COURT:  Addressing now the core issue, Asset

9    Resolution's right to pursue liability against the direct

10   lenders.

11           The trustee has not filed an answer or response.

12   Should I take that to mean you don't intend to file a response

13   or have a response, or do I take your statement to mean that

14   you are walking into their brief?

15             MR. DABBIERI:  We are walking into their brief.

16   We have asserted in the pretrial order that we have a right of

17   indemnification from Silar, and we are following in their

18   wake, so to speak, as they defend us pursuant to that

19   indemnification --

20             THE COURT:  A brief here was filed on behalf of

21   Silar, but it was filed post appointment of a trustee because

22   Silar had no right to file on behalf of Asset Resolution.  Is

23   that a fair statement?

24             MR. MAJORIE:  Yes, it is, your Honor, but I will

25   say the motion was uncertain, unclear.  The motion is

1   addressed to Silar and then talks about Asset Resolution in

2   the body of the motion, and I, of course --

3            THE COURT:  Okay.  Let me hear a response on

4   that, please.  Why I don't I need to -- I understand that the

5   trustee has not filed a response to the motion, but, number

6   one, there's a little ambiguity about whether the motion is

7   directed to Silar's causes of action or Asset Resolution's or

8   both.

9            And, more importantly, we have a trustee, the

10  interposition of a trustee who walks into Asset Resolution's

11  rights and ownership, and the only reason there's no

12  responsive brief under the local rule here is because they had

13  no right to file it.

14           MR. MILLIMET:  Who had no right to file it?

15  Asset Resolution --

16           THE COURT:  Silar had no right to file it.

17           MR. MILLIMET:  Absolutely Silar had no right to

18  file it, and the trustee has filed nothing.

19           THE COURT:  And therefore the trustee should be

20  heard orally --

21           MR. MILLIMET:  Orally, maybe.

22           THE COURT:  -- to be able to walk into their

23  brief.

24           MR. MILLIMET:  Well, first of all, that's a new

25  position.

1          Second of all, Asset Resolution didn't exist before

2   September of '08, and so, as we've established here in my

3   earlier argument, the vote -- the only interference that could

4   have occurred with respect to Asset Resolution by the lenders

5   is the vote by 51 percent to terminate.

6          And, as we have already established, that vote was

7   more than proper.  It had no taint to it.  It was people

8   signing up with Bickel & Brewer, and we put that evidence in

9   through summary judgment with this Court, and the Court

10  granted our motion to terminate based on -- that the people --

11  1500 people had signed up with Bickel & Brewer to terminate

12  pursuant to their right under the state law.

13          THE COURT:  I'm going to agree with you.  It's a

14  little bit gray in my mind, to be honest and frank on the

15  record here, because I can see -- I agree totally that Silar

16  has no claim.  Asset Resolution potentially has a claim.

17          But I think, considering the liability and the way I

18  intend to rule on some of the other motions, it is a little

19  gray, but I think I'm going to agree with the movants here and

20  that -- first, Silar certainly has no right to pursue, but

21  Asset Resolution not only waived it because they didn't file a

22  response, that's not really a fair ground for ruling, but,

23  more importantly, that there just is not a liability here.

24          MR. MAJORIE:  Your Honor, if I could, I guess as

25  a friend of the trustee, point out to the Court a few things

73

1    that I think the Court should be aware of before you make your

2    final ruling.

3              To say that there was no taint here is belied by the

4    record.  Your Honor found, and I understand your Honor undid

5    the contempt citation, but you did make findings of fact that

6    would establish --

7              THE COURT:  Did I undo the contempt citation?

8              Mr. Majorie:  Several hearings ago, your Honor.

9    You indicated --

10             THE COURT:  I think it still stands.  That's my

11   vague recollection is there is still a finding of contempt.

12             MR. MILLIMET:  There's still a finding of

13   contempt, but the Court opened it up for a jury to reconsider

14   that issue at the trial.

15             THE COURT:  The very merits issue, not just the

16   damages.

17             MR. MILLIMET:  Correct.

18             THE COURT:  Okay.

19             MR. MAJORIE:  And your Honor found that the

20   Cangelosi plan to undermine the servicing started before

21   Compass even started.

22             Your Honor made fact findings -- these are in our

23   brief.  Your Honor made fact findings that she engaged in

24   fraud and misrepresentation.

25             The trust -- the receiver filed a report with your

1    Honor which reflected that there was a continuation of fraud

2    and misrepresentation in connection with the receiver vote.

3          The evidence is undeniable in this record that every

4    single direct lender was contacted with the original Cross

5    proposal that your Honor indicated was not acceptable and was

6    evidence of bad faith.

7          There is a taint here, and counsel would like to

8    suggest that the votes that resulted from that Cross

9    solicitation are not tainted, but there is no evidence to the

10   contrary.

11         Our evidence shows that out of their own mouths,

12   across his own affidavit, they solicited every single direct

13   lender.  That's what Mr. Duncan's affidavit says.  They then

14   were told by the Court they could not participate.

15         What we now have and the jury could find is that

16   there was a resolicitation, if you will, of -- by Cross for

17   Cross for the Cangelosi group in the guise of soliciting

18   clients for Bickel & Brewer.

19         And, interestingly, your Honor, we've never seen an

20   actual written vote by any of these 51 percent.  Your Honor

21   was faced with an affidavit which your Honor credited as part

22   of the termination that said we have these clients, but the

23   evidence in the record does not reflect any direction by any

24   of those clients, specific authorizations to terminate.

25               THE COURT:  I hear what you're saying.

1          MR. MAJORIE:  Yes, sir.

2          THE COURT:  And it's partly persuasive, but in

3    light -- depending on the ruling down in 1712, the LLC

4    standing, if I agree that they have no standing, you haven't

5    been harmed.

6          MR. MAJORIE:  Oh, no, your Honor, the servicer

7    was definitely harmed.  There were disruption of servicing

8    acts throughout this entire period of time, including refusals

9    to accept.

10          For instance, your Honor even noted, the Gess

11    transaction, part of this process was to induce people to

12    stop -- to stop the servicer from engaging in liquidity events

13    which would have been to the benefit of both -- all of the

14    direct lenders but also the servicer.

15          THE COURT:  Okay.

16          MR. MAJORIE:  And therefore there was real

17    damage.

18          THE COURT:  I think I've got it.

19          I'm going to grant this motion.  And, of course,

20    there will be a lengthy, detailed decision, I'll lay it out

21    for you, but just so it's very clear here, the underlying

22    basis, the real basis, is an overall view of the case and the

23    equities of the case.  I just don't think you were harmed.

24          This Court for two years held the direct lenders off

25    in order to protect the sanctity of the confirmation order and

1   that sale order, Judge Riegle's statement that you were buying

2   the servicing rights, but that holding off wasn't an ultimate

3   ruling because ultimately I've ruled that they had the right

4   to terminate those servicing rights, 51 percent did.

5          So, really, what that two years was for, with all

6   due respect, was to give Compass, primarily, and Silar, its

7   financer, the opportunity to act in good faith and persuade

8   these direct lenders who had already been defrauded by USA

9   Commercial that, hey, we are a legitimate servicer, we are

10   looking out for your rights, we have many, many owners of each

11   of these notes, you should trust us because we're the only

12   game in town, and, quite frankly, Compass, at least, I'm not

13   saying anything about Silar, did not do that.

14          You know, you had -- Silar and Compass had the right

15   to say, hey, we're entitled to the first dollar out.  You had

16   the right under the ambiguity of these various agreements.

17   That didn't mean that you should have done it because,

18   obviously, in making claims that we get every last dollar from

19   these notes, direct lenders be damned, and I use that term

20   advisedly, please excuse me, you showed the direct lenders and

21   you showed the Court that you were not pursuing their best

22   interests.

23          And in spite of the Court's many, many admonitions,

24   I'm protect you, but please acknowledge you are a fiduciary,

25   what you bought was not only servicing rights and fees, you

77

1   bought a fiduciary status and standing, and you owe that

2   standing to them.

3           So while I can't fault you for asserting what you

4   believed were your rights, the real reason, the underlying

5   reason for ruling on this motion is because you didn't take

6   advantage of the two years protection the Court gave you, and

7   you, Compass, you did not persuade them that you were a proper

8   servicer.  I gave you that opportunity, but you didn't take

9   advantage of that.

10          So that's the underlying reason for ruling this way.

11  But I think that the ruling in long, lengthy, detailed fashion

12  will lay out formal reasons for the ruling.  I'm going to

13  grant this motion.

14          1706, *Twombly*.  Again, very good brief.  I

15  appreciate it.  I appreciate the --

16              MS. CHUBB:  Thank you.  I have a wonderful

17  associate.

18          So, your Honor, you said it's too late.

19              THE COURT:  Right.

20              MS. CHUBB:  But how can it be too late when I

21  brought this motion for the first time in February of last

22  year?

23              THE COURT:  We use *Twombly* to get the pleadings

24  in order.  If it doesn't state a cause of action, that's the

25  time to do it, at the early pleading stage --

1          MS. CHUBB:  I did it.

2          THE COURT:  -- not two weeks before trial.

3          MS. CHUBB:  I did it.

4          THE COURT:  Because two weeks before trial,

5     we've finished all the discovery, we're ready to go to trial.

6          Certainly, the movant here can cannot be heard to

7     say we don't understand the complaint because it doesn't

8     allege enough as long as you've heard in discovery that they

9     have enough facts and have alleged enough.

10         MS. CHUBB:  No, I have not heard that in

11    discovery --

12         THE COURT:  Okay.

13         MS. CHUBB:  -- which is why I filed declarations

14    after Mr. Bonnet and Mr. Kehl had been deposed because nothing

15    came out of that discovery --

16         THE COURT:  So, as a summary judgment motion, I

17    think I agree with you.

18         MS. CHUBB:  Well, I --

19         THE COURT:  But, as a motion to dismiss, I think

20    it's too late.

21         MS. CHUBB:  Okay.  I brought a summary judgment

22    motion, too, and filed my declarations, and nobody opposed it.

23         THE COURT:  It's alternative.  You're right.

24         MS. CHUBB:  Yes, it is.  So I think under one of

25    those two, it should be granted.

1          Because I -- I am now, a week before trial, going to

2    trial and still not knowing what is alleged in facts against

3    my clients which you told them to tell me.

4               THE COURT:  I think I agree with you.

5               MS. CHUBB:  Okay.  Thank you.

6               THE COURT:  On summary judgment.

7               MS. CHUBB:  Yes, thank you.

8               THE COURT:  Would you respond to that.  You just

9    simply haven't come forward, as is your obligation in summary

10   judgment, to show enough to tie the Vargas --

11              MS. CHUBB:  Jones Vargas.

12              THE COURT:  -- Jones Vargas direct lenders in.

13              MR. MAJORIE:  I would -- I'll address that

14   argument.  Our position is that we have.

15          What we have is evidence that the Jones Vargas

16   direct lenders in 2006 were table-funders for the USA

17   transaction --

18              THE COURT:  But that was totally later, it was

19   totally later.  It wasn't part of Cangelosi's initial effort,

20   and, in fact, you've more or less conceded that.

21          They made very clearly the point we didn't join the

22   LLCs, we didn't participate in the e-mails, the only thing

23   you're accusing us of is post --

24              MR. MAJORIE:  No --

25              THE COURT:  -- bad conduct joining this

1    conspiracy.

2              MR. MAJORIE:  With all due respect to your

3    Honor, that is not what our evidence shows, and it's not what

4    we've argued.

5              Our evidence shows --

6              THE COURT:  You'll need to clarify that for me,

7    then, because, in my mind, all you're talking about is joining

8    what the Court or a jury might later find to have been a

9    wrongful civil conspiracy.

10             MR. MAJORIE:  Well, your Honor, we have --

11             THE COURT:  But not at inception and not during

12   the critical time periods when the major damage to Silar was

13   incurred.

14             MR. MAJORIE:  Your Honor, we have two exhibits

15   that show that, in fact, the Jones Vargas lenders were members

16   of the LLCs and participated in the vote, and those are cited

17   in our brief.

18             We have evidence that the Jones Vargas lenders

19   started in this process with -- in 2006, and had a reason to

20   participate with the Cangelosi group because they had sold

21   interests to other direct lenders immediately prior to the

22   bankruptcy.

23             We have an interesting collection of Cangelosi group

24   plaintiffs.  One of them includes Ms. Cangelosi, obviously,

25   Mr. Stubbs, who is admitted to have been the broker for the

1   Florida office for the Milanowski group.  We have evidence in

2   the record that Mr. Milanowski actually offered to provide

3   cash to those so-called lenders protection group.

4           And then we have the Jones Vargas e-mail showing

5   that the Jones Vargas clients were, in fact, part of the LLCs

6   and did both vote their interests, and that is part of the

7   evidence that we have which is Exhibit 25, your Honor.

8           These are e-mails with respect to two different

9   loans.  We have one of the Cangelosi group in 2007 showing,

10  quote,

11          "I just yesterday received the update and I

12      will work on a follow-up.  The Kehl family has $1.3

13      million" --

14          THE COURT:  Let me get a final reply on that

15  issue.  That goes to the very core of it.  But the critical

16  overriding problem is you don't have standing, you've assigned

17  that to Asset Resolution.

18          MR. MAJORIE:  I agree -- I'm sorry, your Honor,

19  I thought you wanted me in the same spirit that I was --

20          THE COURT:  No, I did.

21          MR. MAJORIE:  Okay.  I agree that -- I

22  understand your Honor's rulings, but I was trying to give your

23  Honor the benefit of what I think is important in our

24  opposition --

25          THE COURT:  Okay.

1          MR. MAJORIE:  -- as to why there is a triable

2    issue of fact.

3          They were participants in 2007, they clearly picked

4    up the mantle directly hiring Bickel & Brewer at the same time

5    everyone else was hiring Bickel & Brewer.

6          Mr. Collins stood up and represented to the Court

7    that he's here to represent the Jones Vargas direct lenders,

8    but that there were many other direct lenders, I think is the

9    exact quote, will be hiring him.

10          We have an e-mail that shows that it was all part

11    and parcel of the same plan.

12          We have Cross showing up both before and after, and

13    then, at the very end, we have a Kehl family member purchasing

14    one of the properties that were the subject of all the

15    fighting with respect to the litigation.

16          So we have it from 2006 through 2010.  We have it in

17    almost every year, we have evidence for almost every year, and

18    we therefore have shown participation by the Kehls sufficient

19    for a jury to infer or find that they were part of this plan

20    from either the outset or from the very beginning through the

21    very end.

22          Thank you.

23          THE COURT:  Thank you.

24          Just for the record, the trustee makes the same

25    request to orally step into the brief filed by Silar on behalf

 1    of Asset Resolution?

 2                    MR. DABBIERI:  Yes, we do, your Honor.

 3            Again, we have tendered the indemnity to Silar.  We

 4    expect them to defend and prosecute our claims.  Thank you.

 5                    THE COURT:  Thank you.

 6                    MS. CHUBB:  Yes, the Jones Vargas lenders joined

 7    and hired Bickel & Brewer to pursue these claims as

 8    individuals, not -- and that was done very intentionally.

 9    They were never covered by the LLCs because they didn't join

10    the LLCs.

11            And to say that the purchase of --

12                    THE COURT:  In other words, the LLCs hired

13    Bickel & Brewer, right?

14                    MS. CHUBB:  Yes, and then --

15                    THE COURT:  But you hired them separately, you

16    jumped on the ship.

17                    MS. CHUBB:  I did, because I was concerned that

18    if they weren't plaintiffs, any benefits to this litigation

19    would not be extended to them.  So, yes, they became

20    plaintiffs so these same causes of action could be brought.

21                    THE COURT:  And how about his response we do

22    have enough evidence to present that they were actually part

23    of a civil conspiracy?

24                    MS. CHUBB:  There is no evidence of a civil

25    conspiracy.  I've submitted declarations that say we didn't

 1  join any of those.  We didn't talk to other direct lenders, we

 2  weren't conspiring with anybody, and they deposed them and

 3  couldn't find anything to submit here.

 4          THE COURT:  I think I agree with you.  I'm going

 5  to issue that ruling on that summary judgment motion.

 6          MS. CHUBB:  Thank you.

 7          THE COURT:  1710.  This is Cangelosi's standing

 8  argument, summary judgment, that Silar has no standing.

 9          MS. CHUBB:  Your Honor, could we have a

10  five-minute break before you start another motion?

11          THE COURT:  Yes, please.  Let's take five

12  minutes --

13          MS. RASMUSSEN:  Your Honor, Lisa --

14          THE COURT:  I'm sorry, Ms. Rasmussen?

15          MS. RASMUSSEN:  It's okay.  I just wanted you to

16  know that I'm here to argue, but I have no objection to the

17  break.

18          THE COURT:  Let's take five minutes, and let's

19  continue, please.

20              (A recess was taken.)

21          THE COURT:  Thank you.  Let's see,

22  Ms. Rasmussen, this is docket number 1710.

23          MS. RASMUSSEN:  Thank you, your Honor.

24      I won't belabor the point because you've indicated

25  that you're inclined to grant it, and I don't believe there's

1  any opposition.  In fact, the response that was filed stated

2  that that was essentially Silar's position, either that they

3  did not have standing to pursue a contempt claim against

4  Ms. Cangelosi.  So I just wanted to reiterate where I think we

5  are.

6          The Court decided some few weeks ago that this is an

7  issue that would go to the jury, whether or not there was

8  contempt.

9          I don't believe that Silar -- and that's what I

10  filed -- Silar has no standing to pursue that.  The only

11  person who would have standing is Asset Resolution.  And

12  that's my position.

13          Since I'm standing here, I would like to take the

14  opportunity to correct some of the misstatements that

15  Mr. Majorie made with regard to Ms. Cangelosi.

16          There has never been any finding by the receiver

17  that Ms. Cangelosi interfered in any way.  In fact, I think

18  that, if anything, the receiver would say that she was helpful

19  in gathering votes when they were discussing settlement in

20  2008.

21          So, again, we keep repeating this theme that somehow

22  it's a civil conspiracy to seek redress in the courts and to

23  gather and petition as plaintiffs, and, certainly, those --

24  that would be a violation of the First Amendment to listen to

25  Mr. Majorie tell it, and I just wanted to say that for the

1    record because it's kind of hard to sit here and listen to the

2    pounding and the constant battering of Ms. Cangelosi.

3                    THE COURT:  Thank you.

4                    MS. RASMUSSEN:  Thank you, your Honor.  I'll

5    just stay here.

6                    THE COURT:  Okay.

7                    MR. MAJORIE:  Your Honor, with respect to the

8    receiver's report, I will just ask the Court to look at our

9    papers.  The receiver said that the vote was the result of, in

10   his opinion, gross, false and misleading statements.

11               I'll move on.

12               With respect to this motion, we do have -- you know,

13   we do have the same standing position as we had before, and I

14   don't want to belabor the record.

15               Our view is that we were a party.  To the extent

16   we've lost standing, we've lost standing, and there is not a

17   whole lot I can do about it until the Ninth Circuit maybe

18   gives me my two percent.

19                    THE COURT:  Okay.  Very good.  Thank you.

20               I'm going to grant this motion then.

21                    MS. RASMUSSEN:  Thank you.

22                    THE COURT:  And I'll prepare the order.

23               Thank you, Ms. Rasmussen.

24               Finally, we have 713, that, again, is Silar's

25   motion.  If, in fact, there was election available under

1    taking principal or applying payments to principal first

2    rather than interest, no such election was made.  Silar's

3    motion.

4              MR. MAJORIE:  Your Honor, with respect to the

5    election motion, your Honor's preliminary indication is the

6    way we would ask your Honor to rule, that is, there was --

7    there was a requirement in the note type for transactions for

8    an election, otherwise there would be a default, if you will,

9    to principal -- I'm sorry, to interest.

10             Your Honor has indicated that there would be an

11   argument that there was -- since there were no elections,

12   there could be an assertion of good faith, at least in terms

13   of the right to assert on behalf of Compass, and therefore,

14   since there is no proof of any those elections, we would ask

15   that this summary judgment motion be granted.

16             I'm not sure how it impacts ultimately in terms of

17   the issues to be tried, but I do think it would be useful to

18   establish as a matter of law, either through an instruction to

19   the jury, if we get there, or what have you, by virtue of

20   granting this motion that there were no such elections made,

21   none were communicated, none were made, and that would be our

22   request so that you grant this motion.

23             THE COURT:  Thank you.  Please.

24             MR. COLLINS:  Very simply, your Honor, we

25   disagree with their construction of the promissory note.

88

1          But as far as the election, there's no deadline in

2     the promissory note for when we can make the election.

3          As we know, most of these loans didn't pay much of

4     anything.  So you wouldn't make an election if you didn't have

5     a payment to be received.

6          And we believe the evidence will show at trial that

7     people would elect, when necessary, to take it all as

8     principal for tax reasons, for practical reasons, nothing

9     against Silar or the servicer, but they would rather put more

10    money in their pocket than put money in the servicer's pocket.

11    So therefore they would elect to principal at the appropriate

12    time that it's needed to do so.

13         But the motion is really based on a false premise

14    that there was some obligation to make an election at some

15    point in the time in the past.  Well, there's nothing in the

16    promissory note that says that.

17         And, we believe, your Honor --

18              THE COURT:  So, in other words, you kind of

19    concede and agree that when and if a payment is received,

20    that's a deadline for making an election.  It has to be

21    applied somewhere within a reasonable time period after that

22    payment has been received.

23         But to the extent the payment hasn't been received,

24    there's a continuing, ongoing right to make that election

25    whenever a large payment or small payment comes in.

1          MR. COLLINS:  Right, your Honor.

2          My understanding, in the past -- and we would put on

3    evidence at trial to the extent necessary, that, in the past,

4    when money did come in the door, it was elected as principal

5    because that's the rational thing to do.

6          Now, your Honor, I do want to, in full disclosure to

7    everyone is, you had made a prior ruling in the summary

8    judgment order --

9          THE COURT:  Please.

10          MR. COLLINS:  -- on September 18, 2009, and

11   that's why we asked to take a little break because I believe

12   there's a little bit of ambiguity there.

13          If I may, your Honor, the problem is it splits on

14   two different pages.

15          If we go to the last full paragraph on page 7,

16          "The majority of the promissory notes provide

17      that payments the loan servicer collects from the

18      borrowers are to be applied at the option of the

19      direct lenders first to accrued interest."

20          "At the option first to accrued interest."

21          And then, your Honor, the Court stated,

22      "Note Type 1 is distinct in its wording and provision

23      for payment to the principal first unless the lender

24      chooses to apply to it the accrued interest."

25          We believe that is a correct interpretation of the

1    promissory note.  So that if there's no election, it's

2    principal.  And you were talking about promissory note 1,

3    which is like most of the loans, it's 30 some of the 50 some

4    loans.

5           Your Honor, but -- you did go on to state in your

6    conclusion paragraph to that section,

7               "The court holds that as a matter of

8         interpretation of the contract, Note Type 1," that I

9         just mentioned, "provides that payments go to accrued

10        interest then payable unless direct lender chooses to

11        allocate it elsewhere at its discretion."

12          And I think those two paragraphs conflict, your

13   Honor, or I may be misreading it, and that's why we asked to

14   take the break.  I never noticed it before.  We always assumed

15   you had ruled against us on that.

16              THE COURT:  Well, I think I have.  I think that

17   last sentence kind of says it, and, really, it's -- as opposed

18   to your implied election, I have a little difficulty putting

19   an *imprimatur* on that one.

20          But I certainly think I am inclined to agree that

21   you still have a continuing right to make an election until a

22   reasonable time period after payment or principal payment is

23   received.

24              MR. COLLINS:  Thank you, your Honor.

25              THE COURT:  Okay.

1          MR. MAJORIE:  Your Honor, with respect to that,

2     I certainly respect your Honor's practice of indicating where

3     you're going, and I don't want to argue with the Court, but

4     with all due respect to the Court, we have -- that is an issue

5     that's not really necessary -- the second part, which is, in

6     the future, if a payment comes in, and I can think of several

7     arguments against it, against that interpretation, and it's --

8          THE COURT:  You're just not arguing that right

9     now.

10          MR. MAJORIE:  And it's not before your Honor,

11     and I would just ask that you limit your Honor's ruling to my

12     motion as it relates to the fact that as of the trial date

13     this were no elections.

14          I would point out that to the extent that

15     Mr. Collins has said -- and I think I heard him correctly --

16     that he plans on bringing some people in who will testify that

17     they -- I think he said would or did make elections, the time

18     for us to know who those people were was in his opposition to

19     summary judgment through affidavit or otherwise.

20          I mean, there are so many of them, and it is really

21     unfair for us to fly blindly, if we are going to trial, as to

22     who he thinks he's going to show made these kind of super

23     secret elections, because I have not seen any evidence of any.

24          THE COURT:  Okay.  I'll take under consideration

25     your request.

1          I'll issue orders on all of these.

2          I think you've pretty well heard, either

3   preliminarily or during the course of the argument, how I'm

4   going to rule, and I'll get those out as soon as I can.

5          This actually resolves most of the lawsuit.  There

6   is a big, huge gap here about damage flowing one way or the

7   other.

8          Of course, we've eliminated standing for Silar.

9   Asset Resolution has asked to be heard on those damage claims

10  through the trustee adopting Silar's pleading and response.  I

11  have to make a decision on that, but, otherwise, Silar is out

12  of most of those claims.

13         And on some of the liabilities going the other

14  direction, I've ruled as well.  So much of the lawsuit is

15  now -- will now be finished.

16         There are some very narrow issues of damage still

17  that are possible will be presented to the jury.

18         I've also given you a prediction about how I think

19  the case ought to come out, you know, sitting as a juror.

20         So let's talk about the trial.

21         I think my intent right now is to take the trial off

22  calendar and to mandate that you sit down with the mediator

23  and try to resolve this final area within the parameters

24  specified by the Court, and, of course, subject to the

25  potential that the Court -- that I am wrong, that these

1    rulings would be reversed on appeal.  There's always that risk

2    factor as well.

3            But I think what I ought to do now is to force you,

4    mandate that you sit down now for a final mediation and then

5    schedule what could be a much, much more shortened trial.

6            MR. MAJORIE:  We absolutely -- this is

7    Mr. Majorie on behalf of Silar.  We would agree with the Court

8    that's the appropriate thing to do.  As I indicated, we're all

9    scheduled to meet tomorrow.

10           And I would note for the Court that when I first

11   made the comment about needing the Court's assistance because

12   of another trial, I now have been -- I had another matter come

13   up with Wyoming District Court, and I have a setting in late

14   June.  I think I'll tell -- I will inform the Court that this

15   has been put off, and I may get to move that.

16           I don't know if the Court -- the Court indicated

17   that he had called --

18           THE COURT:  I don't know what you meant.

19           MR. MAJORIE:  I'm sorry, the Wyoming District

20   Court had indicated that -- it inquired about the Asset

21   Resolution case, and I had just wanted the Court -- this Court

22   to know that if you had communications, or if personnel did, I

23   will make sure that I communicate to the Wyoming District

24   Court now that you've put us off so that he can set his

25   calendar because he had -- it had been affected by today.

1          MR. COLLINS:  Your Honor, we will certainly

2     proceed with the mediation tomorrow in good faith.  You know,

3     a consensual resolution makes sense in this case if we can get

4     there.

5          We understand the Court's suggestion about possibly

6     moving the May 24th date.  I would have to check with my

7     clients to actually agree to that, but I can't say it doesn't

8     make sense.

9          We would ask the Court, though, that if we can't get

10    there, and we will try our hardest tomorrow, and we've had

11    preliminary discussions.  After the last hearing, there was a

12    half day discussion --

13          THE COURT:  Maybe the way to handle that is

14    later in this week set a pretrial status because, number one,

15    you know, right now the pretrial order is just in no condition

16    to help us for the trial.

17          And so even if your mediation is unsuccessful, I

18    think we can come to some very drastic reduced parameters for

19    that pretrial order, and then, of course, you're going to need

20    some final preparation time if we are going to trial under

21    that reduced pretrial order.

22          MR. COLLINS:  Your Honor --

23          THE COURT:  So why don't I give you a status

24    hearing and entertain any further suggestions you have

25    regarding dates for trial.  Why don't I give you a further

1    trial status hearing later this week.

2                    MR. COLLINS:  Can we do that by telephone, your

3    Honor?  It would be --

4                    THE COURT:  Yes, we can.

5                    MR. COLLINS:  Okay.  And, your Honor, I did want

6    to get a clarification.

7            With respect to -- you found that it was a sale to

8    Silar, and you said we could argue later on about what claims

9    could Silar be liable for.

10           We would --

11                   THE COURT:  Silar still has defenses:  Number

12   one, we are responsible for any decisions or actions that

13   Compass made in the scope of their agency's employment with

14   us, but we're not liable for wrongful conduct outside the

15   scope;

16           And -- and, number two, we probably, on the

17   merits -- we didn't address that here today, but probably on

18   the merits, even -- there is no liability either by Compass or

19   by us for simply asserting what we thought to be our rights.

20                   MR. COLLINS:  Absolutely, your Honor.

21           With respect to what they can be liable for as far

22   as being within the scope of the agency or the relationship,

23   we may want to present a short document to you where we

24   summarize what our claims are and why we believe they fall

25   within something that Silar is liable for.  I don't know if

1    you'd want that for the Thursday hearing.

2                    THE COURT:  I don't particularly want that.

3    You'll want that in discussions with Silar in framing the

4    pretrial order.

5                    MR. COLLINS:  Okay.

6                    THE COURT:  But let's do that.  When shall we

7    hold this, Thursday or Friday?

8                    MR. MAJORIE:  Your Honor, I would ask --

9    Mr. Majorie.

10         I would ask for Friday just because we don't know

11   whether we go beyond tomorrow, and with our travel schedule,

12   I'm praying we'd be back by Friday in order to at least have a

13   phone call.

14                    MR. COLLINS:  Friday would be fine, your Honor,

15   with us.

16                    THE COURT:  Let's see.  What's today, the 19th?

17   I'm traveling --

18                    THE CLERK:  You're traveling on Friday.  I

19   suggest Thursday at 2:30 p.m.

20                    THE COURT:  Let's do that, Thursday the 2:30.

21   I'm sorry, I am traveling on the 23rd.

22                    MR. COLLINS:  And we will try our best.

23                    THE COURT:  You can appear by phone and/or in

24   person, please, with prior approval by Madam Clerk.

25                    MR. HAYWARD:  Your Honor, Dan Hayward for the

1    Compass defendants.  Just a housecleaning question.

2              What would be the status of the further pretrial

3    submissions, if you will, such as proposed jury instructions,

4    statement of the case, voir dire?

5              THE COURT:  You're not obligated to do that by

6    this Thursday.

7              MR. HAYWARD:  I'm sorry?

8              THE COURT:  We'll give you a deadline this

9    Thursday to do that.  You're relieved of that right now.

10             MR. HAYWARD:  Oh, you're going to set it on

11   Thursday, it's not the deadline is Thursday.

12             THE COURT:  Right.

13             MR. HAYWARD:  I understand.  Thank you.

14             MS. CHUBB:  That's fine, and I just wanted to

15   remind you that there are a couple of orders that we've

16   submitted, one on the motion to disburse the moneys, and --

17             THE COURT:  Some of those I've signed, and I'll

18   make sure I clear out the rest of that inbox.

19             MS. CHUBB:  Great.  Thank you.

20             MR. DABBIERI:  While we are -- Jonathan Dabbieri

21   on behalf of the trustee, your Honor.

22             While we are covering orders that are pending, we

23   uploaded this morning an order on the University Estates

24   motion, and we would just ask if your Honor could give that

25   prompt attention.

1          THE COURT:  I will do that today.

2          MR. DABBIERI:  We have a buyer ready to buy.

3          THE COURT:  Okay.

4          MR. DABBIERI:  Thank you, your Honor.

5          MR. HAYWARD:  I'm sorry, your Honor.  Dan

6    Hayward on behalf of Compass again.

7          Just for our information, we did file a motion to

8    set aside the default against the Compass LLC entities, and

9    also what I believe --

10         THE COURT:  When did you file that?

11         MR. HAYWARD:  I believe it was Thursday of last

12   week, if I'm not mistaken, and we just filed it in the

13   ordinary course.

14         THE COURT:  Now, this would really be a

15   reconsideration because I previously denied the motion.

16         MR. HAYWARD:  Well, with respect to the actual

17   Compass entities, Mr. Rawlins, who is counsel in this -- let

18   me -- very quickly.

19         There was the motion to enter the default.

20   Mr. Piskun appeared on January 5th of this year before your

21   Honor --

22         THE COURT:  I'm sorry, what's your question,

23   when to set it or --

24         MR. HAYWARD:  No, no, no.  My question is -- I'd

25   really set that in the ordinary course.  I don't believe an

Case 2:07-cv-00892-RCJ-GWF   Document 1798   Filed 05/19/10   Page 99 of 100

1    opposition is, of course, due yet.

2                    THE COURT:  Okay.

3                    MR. HAYWARD:  It won't be for sometime.  I just

4    wanted to bring it to your Honor's attention.

5            In light of the possible continuance of the trial,

6    should I leave that as is, or would the Court like for me to

7    move for a --

8                    THE COURT:  Your question is whether to expedite

9    it?

10                    MR. HAYWARD:  Yes.

11                    THE COURT:  Why don't you reserve that till

12   Thursday.  If we set the trial in the following week, you'll

13   want to expedite it.

14                    MR. HAYWARD:  Absolutely, thank you, your Honor.

15                    THE COURT:  But otherwise --

16                    MR. HAYWARD:  And I didn't want to inconvenience

17   everybody by filing something like that yesterday or, I'm

18   sorry, Friday with all this going on today.  So that's my

19   explanation for that.

20                    THE COURT:  Thank you, and thank you so much for

21   your patience.  I did feel a strong need to make a very

22   complete record here.  We have lots of parties and a lot of

23   dollar amounts involved, as well as we do want to recognize

24   the good offices of Judge Hagen.  If there's anybody that can

25   resolve this, he can, short of a trial.  So I do hope all

1    sides will appear in good faith.

2         But I did want to make a very lengthy record, not

3    just for his benefit, but for the benefit of the appellate

4    court in obvious forthcoming appeals.

5         Okay.  Thank you very much.  Court will be in

6    recess.

7                          -o0o-

8

9         I certify that the foregoing is a correct
         transcript from the record of proceedings
10        in the above-entitled matter.

11        /s/Margaret E. Griener        05/19/2010
         Margaret E. Griener, CCR #3, RDR
12        Official Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25